STATE OF MICHIGAN

IN THE DISTRICT COURT, 62-A JUDICIAL DISTRICT

---

THE PEOPLE OF THE STATE OF MICHIGAN,     Case No. 11FY-4668

vs.

KELVIN WAYNE HEATH,

    Defendant.

---

PRELIMINARY EXAMINATION

BEFORE THE HONORABLE STEVEN M. TIMMERS, DISTRICT JUDGE

Wyoming, Michigan - Wednesday, December 14, 2011

APPEARANCES:

| | |
|---|---|
| For the People: | MR. TRAVIS J. EARLEY   P-68745<br>Assistant Prosecuting Attorney<br>82 Ionia NW   Suite 450<br>Grand Rapids, Michigan   49503<br>(616) 632-6710 |
| For the Defendant | MS. VALERIE FOSTER   P-44459<br>Office of the Defender<br>920 McKay Tower<br>Grand Rapids, Michigan 49503<br>(616) 774-8181 |
| RECORDED BY: | Lori Hinueber - CER 8269<br>Certified Electronic Recorder<br>(616) 530-7378 |

REC'D & FILED
JAN 25 2012
CIRCUIT COURT ADMINISTRATION

1

ORIGINAL

TABLE OF CONTENTS

| WITNESSES: PEOPLE: | | PAGE |
|---|---|---|
| Barry Isaacson | | |
| Direct Examination by Mr. Earley | | 5 |
| Cross-Examination by Ms. Foster | | 21 |

| EXHIBITS: PEOPLE | IDENTIFIED | RECEIVED |
|---|---|---|
| PX 1 - Ad | 15 | 16 |
| PX 2 - Photograph | 16 | 17 |

2

---

		Wyoming, Michigan
		Wednesday, December 14, 2011 - 1:52 p.m.
		THE COURT: Ms. Foster, what else are you ready on?
		MS. FOSTER: Mr. Heath.
		THE COURT: Okay.
		MR. EARLEY: We're ready.
		MS. FOSTER: And just for the record, Mr. Heath-- yeah, we're going to run his. I talked with Mr. Earley about Mr. Heath's case. He's got two unarmed robbery cases. The prosecutor had extended an offer--come over here and have a seat--the prosecutor had extended an offer of a package with his pending case, and my understanding is that part of the reason why we're taking testimony is to lock in one of the victims, alleged victims, because the guy lives out of state. But in talking with Mr. Heath, I was under the impression that he's not inclined to waive these prelims anyway. So I've advised Mr. Earley that we're probably just going to need to take testimony from both the alleged victims of both cases.
		THE COURT: That's fine. Are you ready to proceed, Mr. Earley?
		MR. EARLEY: I am, Your Honor.
		THE COURT: Ms. Foster, what are you going to do on the Krombeen matter? Ms. Foster?
		MS. FOSTER: Yes, sir.
		THE COURT: What are we going to do on the Krombeen

3

---

matter?
		MS. FOSTER: I'm sorry. I didn't hear.
		THE COURT: Krombeen?
		MS. FOSTER: Krombeen? That's not mine.
		MR. EARLEY: Your Honor, that matter is being--
		MS. FOSTER: Oh, it is mine. That's going to be dismissed--oh sorry. The prosecution--
		MR. EARLEY: That's all right. That matter is being dismissed, Your Honor.
		THE COURT: Oh, it is? By the prosecution?
		MR. EARLEY: Yeah, there'll be a Nolle Pros filed probably tomorrow, only because our support person was out today.
		COURT CLERK: She'll be back Friday.
		MR. EARLEY: I hope somebody is covering for her so that it gets done.
		COURT CLERK: Denise will be back Friday. If you want I'll prepare it if you want to sign it.
		MR. EARLEY: Um, sure.
		COURT CLERK: Or do you need it to go through your office?
		MR. EARLEY: It doesn't matter. Thank you.
		COURT CLERK: I'll get one.
		THE COURT: All right. If you want to call your first witness?

4

---

		MR. EARLEY: And for the record, Your Honor, I'd like to start with the November 29th incident. Due to the witness that I have, I'd like him to get back to Illinois today.
		THE COURT: Sure.
		MR. EARLEY: The people call Barry Isaacson.
		MS. FOSTER: This is the guy from Illinois?
		MR. EARLEY: Yes.
		THE COURT: Mr. Issaacson, could you have a seat right over here. And you said your name is Barry--
		MR. ISAACSON: Isaacson.
		THE COURT: Isaacson. Can you spell that for us please?
		MR. ISAACSON: I-s-a-a-c-s-o-n.
		THE COURT: All right. Can you raise your right hand? Do you swear or affirm the testimony you're about to give will be the truth, so help you God?
		MR. ISAACSON: Yes.
		THE COURT: Thank you. Go ahead.
		MR. EARLEY: Thank you.
			BARRY ISAACSON
		(At 1:54 p.m., witness sworn)
			DIRECT EXAMINATION
BY MR. EARLEY:
Q.	Mr. Isaacson, without giving us a street address, can you tell

5

us where you came into town from today?
A. Illinois.
Q. And back on November 29th of this year, were you in Grand Rapids at that time?
A. Yes.
Q. And what brought you to Grand Rapids on the 29th?
A. I had uh--business.
Q. Okay. You were in town--in town for business?
A. In town for business.
Q. All right. Specifically then after or during the time you were in town for business, did you end up going to the Swiss Valley Apartments here in Wyoming, the city of Wyoming?
A. Yes.
Q. Okay, and what--what drew your attention to the Swiss Valley Apartments on that particular day?
A. I had responded to an ad on backpage for an adult service.
Q. Okay.
A. Actually, the day before I came into town. The person that I responded to gave me a different phone number to text when I was in town. I concluded my business. I texted that person, then they directed me to the apartment complex and then specifically a specific unit in her building and unit number in the complex.
Q. Okay, and do you happen to recall the address at all or the apartment number or anything like that?

6

A. It was the--one of the front buildings, the furthest to the right if you were facing the complex.
Q. Okay, and--
A. The unit was the lower level. I want to say 1-D, toward the backside of the building.
Q. Okay, and how did you get to the apartments that day?
A. I drove.
Q. And were you by yourself or with somebody else?
A. I was by myself.
Q. And did you attempt to look for that specific apartment number?
A. Yes. I walked into the apartment building, went and knocked on the door that I was instructed, you know, to go to.
Q. Do you happen to recall the--either the number that you initially contacted or the phone number that contacted you back?
A. I gave both the phone numbers to the police that day. The one that I had texted and then also one that I had called the previous day that instructed me to then text the following day.
Q. Okay. But you don't have those numbers memorized?
A. No.
Q. Okay, and about what time of day was that that you went to the apartments?
A. Um--around the middle of the day, maybe around 12 or 1

7

o'clock.
Q. And you physically got out of your car to look for that apartment number?
A. Correct.
Q. And what happened when you didn't find it?
A. Well, I did find the apartment.
Q. Okay. I'm sorry.
A. I walked into the building. I knocked on the door and a gentleman came up to me from the backdoor and identified himself as a police officer. He was wearing a Wyoming Police tee shirt. He put me--or shoved me against the wall, said "sting operation", started searching me, asked me if I had any weapons or sharp instruments in my pockets. He grabbed my billfold which holds my credit cards and then also cash that I had attached to it, got on his telephone after he took the cash, and really at that point I said, let me see some identification. Because it kind of felt like something was a little, you know, going--something didn't seem, you know, appropriate as far as, you know, someone being a police officer. And he got on the telephone and said, okay--suspect, you know, he's not 5'8" or Hispanic and, you know, bring the girl down. Like, you know, this was--I was going to be used to identify someone that roughed someone up was part of his B-S I was told at the time. And I said, you know, let me see your ID, and, you know, he had my money in his hands. I had

8

about $500 in cash. I had my bill--my clip with my driver's license and my other information and he made this, you know, phone call supposedly. He said wait right here, and then he walked out, and you know, it seemed like complete bullshit at that point. I got in my car; I followed and found him in the parking lot, you know. I said, just give me my money back, you know. You're full of it, of course. And he drove away. I had called him; I had his number. He called me back. He said, okay, we're coming down. I'll bring the girl down right now to identify, and I said, you know, enough. Give me my money back and I'll be on my way or I'm calling the police. And you know, he's like, oh you're, you know, a tough guy, whatever. I said, you know what? It's easy. Just give me my money back. I'll be on my way and you'll be done or I'm calling the police and that's exactly what I did. When I backed my car up or actually pulled forward as he was trying to pull away, I took a picture of him. I backed up; I tried to reach around and take a picture of his license plate, and I had told the officer I remembered, I think it was GR, you know, 1211. I had the majority of the numbers on his license plate. The police came about 10 or 15 minutes later. During that time I had circled around to see if his car was parked or if he was in the area. I gave all the information to the officer and I was on my way back home.
Q. Mr. Isaacson, you gave us a lot of information right there,

9

**Page 10**

1  which I appreciate, but I'm just going to ask you for a few
2  more details--
3  A.  Okay.
4  Q.  --through the middle of some of that. When you had the
5  initial contact with the number of what you believed to be
6  this service--
7  A.  Yes.
8  Q.  --did you ever speak to anybody on the phone?
9  A.  The first--the night before I came to town, a girl answered
10  the phone.
11  Q.  Okay, and what was her--what was discussed?
12  A.  Just, you know, a rate and, you know, text me this--I'm going
13  to send you a text with the number tomorrow. Just text me
14  when you get in town.
15  Q.  Okay, and what was the amount of money that you were to bring?
16  A.  Um--I think it was $150.
17  Q.  And then you said the following day you received a text from a
18  different number?
19  A.  Well, I texted the number I got from the previous day.
20  Q.  Okay.
21  A.  No, the second number was the number I was instructed to text
22  when I was in town and that was the number that I texted.
23  Q.  And in return for that, did they send the address in a text
24  message?
25  A.  The address--the address, the building number, directions.

**Page 11**

1  Q.  And when you went to make contact with that specific
2  apartment, did you knock on the door or--
3  A.  I knocked on the door. No one answered.
4  Q.  Okay.
5  A.  I believe I sent a text. I'm here, you know, standing outside
6  the door. No one was answering. A minute or so later the
7  gentleman walked up and--
8  Q.  Okay. When the man approached you then, were you standing
9  just outside the apartment door?
10  A.  Yes.
11  Q.  And in the hallway then of the complex?
12  A.  Yes.
13  Q.  And that's where the initial conversation about him being a
14  police officer took place?
15  A.  Yes.
16  Q.  And is that where the--where he removed your wallet?
17  A.  Yes.
18  Q.  And what--where was your wallet located when he took it from
19  you?
20  A.  Front, right pocket.
21  Q.  And he walked up and identified himself as a police officer?
22  A.  Yes, and he said, "sting operation."
23  Q.  Did he have--did he give a name?
24  A.  No.
25  Q.  And you said you were pushed up against the wall?

**Page 12**

1  A.  Yes.
2  Q.  Was that instantaneous to him saying, I'm a police officer
3  or--
4  A.  Yes.
5  Q.  Okay.
6  A.  That sting operation, pushed--you know, started to frisk me,
7  asked me if I had any weapons or sharp objects and, you know,
8  stuck his hand in my pocket and took out--it's not a regular
9  wallet, it's a little clip that, you know, has a magnetic
10  thing to hold money and a little slot for my credit cards.
11  And he separated the two.
12  Q.  And when he pushed you up against the wall, were you face
13  against the wall or back against the wall?
14  A.  Face against the wall.
15  Q.  And then did he--did he pat you down or did he go right for a
16  pocket or--
17  A.  He patted from--you know, it's against the law--he patted me
18  down, he stuck his hands in my pocket and took out my clip,
19  separated the money, you know, gave it back. Let me see your
20  driver's license. I pull it out and then he got on the phone
21  and, you know, he was off.
22  Q.  Okay. So you saw him separate the money from your credit
23  cards and other information?
24  A.  Well, that's what he--yes.
25  Q.  Okay, and did he hand you the clip back or did he put it back

**Page 13**

1  in your pocket?
2  A.  Um--he handed it back to me.
3  Q.  Okay, and when you got it back from him, the money was gone?
4  A.  Yeah. I mean he--absolutely.
5  Q.  Okay. You--and you indicated that you asked him for
6  identification multiple times.
7  A.  Yes. Yes.
8  Q.  Okay. He gets on the phone, acts like he's talking to other
9  officers; is that the impression you were getting?
10  A.  Yes.
11  Q.  And--
12  A.  I mean at that point I realized it was bullshit.
13  Q.  --right. But I mean--that was the action, the drama--
14  A.  Yeah, like bring down the subject, you know, victim for
15  identification.
16  Q.  --and then at some point he walked into the parking lot? Or
17  did you walk out?
18  A.  He walked out the door; this unit was a half a flight down.
19  It was the lower. He walked up and out the back door. I went
20  out the front of the building where my car was, and then I
21  chased him down in the parking lot.
22  Q.  Okay, and then so you were, again, on foot when you confronted
23  him again about getting your money back?
24  A.  No, I was in my car.
25  Q.  Was he in a vehicle at that point?

1  A. Yes.
2  Q. Can you describe the vehicle he was in?
3  A. Um--black four door, you know, mid-sized, no front license
4     plate. The front area by the license plate was scraped up but
5     not dented. And I have a picture of it which I then, you
6     know, forwarded to the police officer that came on the scene.
7  Q. Right. Okay, and that was what I was going to get at, too.
8     You said that you were able to get partial--a partial plate
9     that you memorized.
10 A. Yes.
11 Q. And you gave that information to the police?
12 A. That is correct.
13 Q. And at some point you were able to take a picture of the man.
14 A. Yes. My car was next to him.
15 Q. Okay.
16 A. I took, you know, my window was down. We were exchanging, you
17    know, not such nice words. His window was down and then I
18    went to back up to try and get a picture of his license plate
19    as well, which I was unsuccessful.
20 Q. Okay, and what did you take the photo with?
21 A. My iPhone. I have both the first picture and the unsuccessful
22    picture on my phone right now if you're interested in seeing
23    it.
24 Q. Sure. I have a copy of these.
25 A. Okay.
                              14

1        MR. EARLEY: Thank you. Can I have these marked, please?
2        MS. FOSTER: This is what I have. You don't have
3  anything better than that? Except what's on his phone?
4        DETECTIVE: The original colored ones are in evidence.
5        MR. EARLEY: Okay. We do, but not here.
6        MS. FOSTER: Okay. If I can at some point get a copy of
7  the original?
8        MR. EARLEY: Sure.
9        MS. FOSTER: The colored version of that. That one's
10 kind of grainy.
11 BY MR. EARLEY:
12 Q. Mr. Isaacson, I'm going to show you what's been marked
13    proposed Exhibits 1 and 2. If you wouldn't mind just looking
14    at each of those, please.
15 A. Okay.
16 Q. Exhibit 1 there, do you see which one is Exhibit 1?
17 A. Yes.
18 Q. What does that appear to you? Do you know what that is?
19 A. That is the ad that I responded to.
20 Q. Okay, and is there a phone number on that?
21 A. Yes.
22 Q. Um--and the ad is for some sort of--
23 A. Adult service.
24 Q. --right. And there's a photograph.
25 A. Correct.
                              15

1  Q. Can you describe what the person looks like in the photo
2     there?
3  A. Um, you know, a young girl.
4  Q. Okay, a female.
5  A. Female.
6  Q. Okay, and is that the--is that a copy at least of what the ad
7     looked like?
8  A. Yes.
9  Q. And is that an ad that you found online?
10 A. Yes.
11       MR. EARLEY: Your Honor, I'd ask for the admission of
12 Exhibit 1.
13       THE COURT: Ms. Foster?
14       MS. FOSTER: No objection.
15       THE COURT: It'll be received.
16       MR. EARLEY: Thank you.
17 BY MR. EARLEY:
18 Q. The phone number there, sir, is that the number you initially
19    called and spoke to a female?
20 A. Yes.
21 Q. And could you tell us what number that is?
22 A. 616-477-1333.
23 Q. Okay, and could you take a look at Exhibit 2 now please? Do
24    you recognize that exhibit?
25 A. Yes.
                              16

1  Q. And what is that?
2  A. That's the picture I took of him.
3  Q. Other than being a copy, is that how the photograph looked on
4     your phone the day that you took it?
5  A. Yes.
6        MR. EARLEY: Okay. Your Honor, I'd ask for the
7  admission of Exhibit 2.
8        MS. FOSTER: I won't object at this point of
9  preliminary exam, but I did indicate on the record that--or do
10 indicate to the detective who is in the courtroom, that I
11 would like a better copy of that if possible.
12       THE COURT: It's so noted.
13       MS. FOSTER: That one's pretty grainy.
14       THE COURT: It's noted, and can I have the pictures?
15 They'll be admitted for the record.
16       MR. EARLEY: Thank you.
17 BY MR. EARLEY:
18 Q. And then when you were in Grand Rapids, you got information
19    from another phone number; is that correct? One different
20    from the one on Exhibit 1?
21 A. Yes.
22 Q. Okay, and that's the one you were texting back and forth with?
23 A. That's correct.
24 Q. And that information was all given to the police as well?
25 A. Correct.
                              17

**Page 18**

Q. How long would you say you were pushed up against the wall when you were being frisked and your wallet was being taken out, or your clip?
A. Ten, fifteen seconds. It all happened fairly fast.
Q. Sure, and although it happened fairly quickly, did you feel like you were free to leave at that point, when initial contact was made by this person?
A. Initially, no.
Q. Okay. Did you believe that he was a police officer at first?
A. Initially, yes. Absolutely.
Q. You recall seeing a Wyoming Police tee shirt that he was wearing.
A. Yes. A yellow shirt with--I think it was blue writing on it. Blue or black.
Q. Okay. Was there any insignia or badge?
A. The badge type insignia. I mean, it looked like, you know, a police tee shirt.
Q. Okay, and was that writing on the front or on the back of the shirt.
A. It was on the front. I don't recall if it was on the back but it was on the front, definitely.
Q. Do you remember anything else about the person that they were wearing?
A. Uh, I believe underneath he had a light blue shirt underneath.
Q. Okay.

**Page 19**

A. It was a tee shirt over I think it was a long-sleeved shirt.
Q. Okay, and do you think if you saw that person again that you'd be able to recognize him?
A. Of course.
Q. And do you see that person in the courtroom today?
A. Yes.
Q. Can you identify him by something he's wearing, please?
A. He's wearing a pair of nice bracelets over there.
Q. And what color? What color is the clothing?
A. Dark green.
   MR. EARLEY: Thank you. Your Honor, may the record reflect he's identified the defendant?
   THE COURT: It shall.
   MR. EARLEY: Thank you.
BY MR. EARLEY:
Q. Had you ever seen the defendant before in your life?
A. Never. I've never been to Grand Rapids before in my life.
Q. Okay. When--in the photograph here, you're obviously taking it out of your car window and through his car window.
A. Correct.
Q. Was the conversation still at that point you saying hey, just give me my money back and I'll leave kind of thing?
A. Yes.
Q. All right, and in the photograph you see that he's on the phone as well.

**Page 20**

A. Yeah.
Q. Was he talking out loud so you could hear what he was saying or acting like he was saying?
A. Yeah, like he was talking to, you know, his--someone else to bring down to, you know, to bring this girl who the story-- like someone assaulted her.
Q. Okay. So, you're still going on with the act of being a police offer.
A. Yes.
Q. Okay. At some point--and is this photograph taken in the apartment complex driveway or parking lot?
A. No. It's just in the middle of the parking lot. If you look at the complex it was on the right side so the unit was all the way to the right and this was in the middle right side kind of towards the dumpster.
Q. Okay, and you might have already covered this when you were initially telling us the narrative, but what--did he leave in the vehicle or did you pull away in the vehicle when you finally said this was enough.
A. Well, he left, you know, when I backed up to try and get a picture of his license plate; he pulled away. I called the police. Actually, I called him, you know, I had his number. He answers the phone, I said, you know, bring me my money down, and you know, or I was going to call the police and that's exactly what I did.

**Page 21**

Q. Okay, and the number that you called and said, hey, I'm going to call the police, was that the one that you'd been texting?
A. That was the--yes, the number I texted. Yes.
Q. Okay. So from the same number you were getting directions from the address--I'm sorry--from is the number that you called and spoke with the person who still acted like a police officer.
A. Correct.
   MR. EARLEY: All right. I don't believe I have any additional questions at this time.
   THE COURT: Ms. Foster?
   MS. FOSTER: Yes, Your Honor. Thank you.
          CROSS-EXAMINATION
BY MS. FOSTER:
Q. Good afternoon, Mr. Isaacson. You indicated that you were in this area in--looking for some woman that you had found in an ad, correct?
A. Correct.
Q. And isn't it true that initially you had told a story when you were interviewed by the police that you were in the area because you were lost and you were trying to find your way out through a GPS unit, correct?
A. Yes.
Q. And part of that is because you knew you were doing something illegal initially, correct?

**Page 22**

1  A.  No.
2  Q.  You didn't know that you were doing anything illegally?
3  A.  No.
4  Q.  You didn't think going to an apartment building looking for a booty call is illegal.
6  A.  Well, that would be your opinion of what I was looking for, so no.
8  Q.  What were you looking for then?
9  A.  I answered an ad for a massage. So, I don't think this is about me.
11 Q.  Well, yeah. It kind of is about you, too.
12 A.  Is it? Okay, why don't you explain to me how?
13 Q.  You know, I know you're from out of state, but---
14 A.  Right.
15 Q.  --I ask the questions, you answer. In your prospective, this wasn't--what you were doing--there was nothing wrong with what you were doing?
18 A.  Well--
19 Q.  --initially.
20 A.  --I didn't say--so--state your question again.
21 Q.  Initially, you were there in response to an ad for a massage, correct?
23 A.  Yes.
24 Q.  And I saw the ad; it's been admitted into evidence.
25 A.  Okay.

**Page 23**

1  Q.  Does that look--is that, in your opinion, an ad for a legitimate massage?
3  A.  Yes.
4  Q.  They don't have massage parlors out in Illinois?
5  A.  Um--sure they do.
6  Q.  Okay. But you were looking for a specific type of massage, correct?
8  A.  No.
9  Q.  Oh, so the $150 was for somebody just to bang on your back and do one of these little things with the karate chops on your back; is that what you were looking for?
12 A.  Um--yes.
13 Q.  Okay, and when this guy first approached you and indicated that he was the police, you initially believed him, right?
15 A.  I did.
16 Q.  And you initially believed him because you were actually there looking to score with a prostitute and you knew you were doing something wrong, isn't that true?
19 A.  No. It was embarrassing for me going for a massage. I'm married and that's pretty much the end of the story. So--
21 Q.  Well, there's nothing wrong with a married man going for a massage if they're going for a legitimate massage.
23 A.  Okay.
24 Q.  All right, but let's be real. You weren't going for a legitimate massage here, were you?

**Page 24**

1  A.  Uh, actually, I was but--
2       MR. EARLEY: I'm going to object to the argumentative nature at this point, Your Honor.
4       THE COURT: Well, it's already been asked. So, let's move on.
6       MS. FOSTER: Okay. All right.
7  BY MS. FOSTER:
8  Q.  So, you initially thought this gentleman was a police officer and it only became evident to you that you didn't believe him to be a police officer when he took your money, correct? Is that a fair statement?
12 A.  No.
13 Q.  So when did you start to suspect he wasn't a real police officer?
15 A.  When I asked for his identification and his badge.
16 Q.  And he didn't present something.
17 A.  That's correct.
18 Q.  Okay, and why did you lie to the police about why you were here in Michigan in the first place, if what you did wasn't wrong?
21 A.  I didn't lie to the police about why I was in Michigan.
22 Q.  Okay. You said that you were here on business.
23 A.  Correct.
24 Q.  You said that the reason why you were in that parking lot was because you had lost your way and you were trying to figure

**Page 25**

1  out where you were with your GPS?
2  A.  Okay, you're asking two different questions. As far as I didn't lie to anyone about being there. It was embarrassing for me--
5  Q.  Okay.
6  A.  --going for a massage and I felt uncomfortable and when I talked to the detectives later, I, you know, told them exactly, you know, the truth as far as what my reason for being there.
10 Q.  Well, did you tell him or did he ask you? You know, did he say to you something along the lines of Mr. Isaacson, we don't--don't be embarrassed about why you're here. We're not here to bust you for soliciting. We're here--
14 A.  No, I told them.
15 Q.  --to bust the guy who robbed you.
16 A.  I told them.
17 Q.  Okay.
18 A.  I volunteered the information.
19 Q.  Okay, and how much money did you say was taken from you?
20 A.  I had probably between 475 and 5 and a quarter in my pocket.
21 Q.  Okay, and you had that much money in cash because that's what you normally do? You normally carry that much money in cash?
23 A.  I usually carry much more.
24      MS. FOSTER: Okay. A lot of lucky massage people in Michigan and Illinois. Thank you.

```
 1          THE COURT:  Anything else, Mr. Earley?
 2          MR. EARLEY:  No, not from this witness, Your Honor.
 3          THE COURT:  Thank you, sir.  You're free to go.
 4          THE WITNESS:  Sure.
 5          (At 2:16 p.m., witness excused)
 6          MS. FOSTER:  Your Honor, may we approach?
 7          THE COURT:  Sure.
 8          (At 2:16, conference at bench)
 9          MS. FOSTER:  Your Honor, I think we're going to go
10    ahead and waive the second.  Since the other gentleman, I
11    believe, lives in state and he could be available for
12    testimony at a later date pretty easily anyway, we'll waive
13    the preliminary examination.
14          THE COURT:  All right.
15          MS. FOSTER:  I think the main reason for taking this
16    other gentleman's testimony was to preserve it because he
17    doesn't live in state.
18          THE COURT:  I understand that.  Ms. Foster, if you
19    want to retrieve this form.
20          MS. FOSTER:  Yes, sir.
21          THE COURT:  Sir, you have a right to a preliminary
22    examination where it must be shown that there's probable cause
23    to believe you committed the crimes contained in the warrant.
24    Do you understand that?
25          THE DEFENDANT:  What did he say?
                                   26
```

```
 1          MS. FOSTER:  He's saying that--
 2          THE COURT:  I said you have a right to a preliminary
 3    examination.
 4          THE DEFENDANT:  I can't hear what you're saying.
 5    You're not speaking loud enough, sir.
 6          THE COURT:  Why don't you come up to the podium?
 7          MS. FOSTER:  All right.
 8          THE COURT:  What I'm telling you, sir, is that you
 9    have a right to a preliminary examination.
10          THE DEFENDANT:  Oh, yeah.  I'm aware of that.
11          THE COURT:  Like we just did.
12          THE DEFENDANT:  Yeah.
13          THE COURT:  And your attorney is saying now that you
14    wish to waive the second one to continue negotiations in that
15    case.
16          THE DEFENDANT:  I understand.
17          THE COURT:  Is that your understanding?
18          THE DEFENDANT:  Yeah.
19          THE COURT:  Okay.  I find your waiver to be
20    knowingly and intelligently made.  I'll sign it after you.
21          MS. FOSTER:  We'll have him waive both circuit court
22    arraignments, Your Honor.  He's going to enter a plea of not
23    guilty for both, Your Honor.
24          THE COURT:  We will make that part of the record
25    when I receive it.
                                   27
```

```
 1          MS. FOSTER:  And at the appropriate time--at the
 2    appropriate time I'd like to address bond?
 3          THE COURT:  Sure.  Go ahead.
 4          MS. FOSTER:  The bond, I believe, is currently set
 5    at--
 6          THE COURT:  25,000 cash and $50,000 cash.
 7          MS. FOSTER:  --okay.  Different bonds, different
 8    cases.  We would ask the Court if it would consider a
 9    modification of both of these bonds.  Mr. Heath has ties to
10    the community.  Are any of these people relatives of yours?
11          THE DEFENDANT:  Yeah.
12          MS. FOSTER:  Are these your family members here?
13          THE DEFENDANT:  Yeah.
14          MS. FOSTER:  Okay, there are a lot of family in the
15    courtroom.  He's got a lot of family support.  I don't think
16    he poses any kind of a flight risk.  I'm going to have to
17    finish filling these out but I'll sign this at least.  Um--and
18    based on those factors, Your Honor, we would ask the Court to
19    consider reduction of bond.  Thank you.
20          THE COURT:  All right.  Thank you.  I'm going to
21    respectfully deny that motion because there's a long criminal
22    history, five felony convictions, three bench warrants,
23    probation violations, eleven misdemeanors, and has another
24    case pending for aggravated stalking.  So, I think the bonds
25    are appropriate as set and I'll continue them.  Thank you.
                                   28
```

```
 1          MS. FOSTER:  Okay.
 2          MR. EARLEY:  Your Honor, can I get some
 3    clarification, I guess, on what was waived and what was not?
 4          THE COURT:  Case number 11FY-4743 was waived.
 5          MR. EARLEY:  Okay.
 6          THE COURT:  And we ran the 4668.
 7          MR. EARLEY:  All right.  Do you want argument on
 8    that case--on that file number then or--
 9          THE COURT:  If you'd like.  Do you have a motion?
10          MR. EARLEY:  Well, I do.  It--assuming that that
11    file number was not waived and we took testimony for each
12    party's benefit, I'm going to ask for an added count of
13    impersonating a police officer on that file as well.
14          MS. FOSTER:  I thought there was already an
15    impersonating a police officer on that file.
16          MR. EARLEY:  Not on that file.  Not on that file
17    number.
18          MS. FOSTER:  Well, if I--if he waives that one,
19    because I believe we were just taking testimony to preserve,
20    if he waives that one, will you--are you going to seek a bind
21    over on that or is that just--
22          MR. EARLEY:  No.  If he's waiving, I won't seek to
23    add it.  If he's not waiving it, then I believe the
24    testimony--I believe the information should conform to the
25    proofs taken.
                                   29
```

```
 1              MS. FOSTER:  I'll have you sign a waiver form so
 2   they won't add that count.  We'll waive.
 3              THE COURT:  Okay.  I don't think it makes a whole
 4   lot of difference either way because they could amend it
 5   later.
 6              MS. FOSTER:  They could, but I mean, it could be
 7   potentially--
 8              THE COURT:  And you could continue--
 9              MS. FOSTER:  --a negotiated plea down the road.
10              THE COURT:  --continue to do that.
11              MS. FOSTER:  I don't want--yeah.
12              THE COURT:  I agree.
13              MS. FOSTER:  Here.  Use my pen.  That's not writing.
14   And I'm going to need a couple minutes to finish filling out
15   those waivers to circuit court arraignment, Your Honor.  I'll
16   take care of that.
17              THE COURT:  All right.
18              MS. FOSTER:  Okay.  Thank you.
19              MR. EARLEY:  Thank you, Your Honor.
20              THE COURT:  We're adjourned in this matter.
                 (At 2:19 p.m., proceedings concluded)
```

30

STATE OF MICHIGAN)
                 )
COUNTY OF KENT   )

    I certify that this transcript, consisting of 31 pages,
is a complete, true, and correct transcript of the preliminary
examination and testimony taken in this case on December 14, 2011.

_____
Lori Hinueber - CER 8269
Certified Electronic Recorder
(616) 530-7378

31