1    STATE OF MICHIGAN

2

      SEVENTEENTH JUDICIAL CIRCUIT COURT (KENT COUNTY)

3
                              - - -
4

THE PEOPLE OF THE                    ORIGINAL
5    STATE OF MICHIGAN

6
                              Case No. 11-11910-FH
7    -v-                               11-11911-FH

8    KELVIN WAYNE HEATH,              RCV'D & FILED

9         Defendant.
                                      MAR 28 2012
10    _____/
                                      JUDGE BUTH
11                 JURY TRIAL         17TH CIRCUIT COURT

12    (Excerpt of Proceedings - Witness Brian James Gray)

13    BEFORE THE HONORABLE GEORGE S. BUTH - CIRCUIT JUDGE
        Grand Rapids, Michigan - Tuesday, March 27, 2012
14
                              - - -
15   APPEARANCES

16   For the People:          MR. KEVIN M. BRAMBLE P38380
                              ASSISTANT PROSECUTING ATTORNEY
17                            82 Ionia, N.W.
                              Suite 450
18                            Grand Rapids, Michigan  49503
                              616.632.6710
19

20   For the Defendant:       MS. VALERIE A. FOSTER P44459
                              KENT COUNTY DEFENDER OFFICE
21                            146 Monroe Center Street, N.W.
                              Suite 920
22                            Grand Rapids, Michigan  49503
                              616.632.5021
23
                              - - -
24
     Reported by:             Leslie L. Rydahl, CSR-4078
25                            Official Court Reporter
                              616.632.5021

1

1

TABLE OF CONTENTS

2

3

4   WITNESSES - PEOPLE:

5

6   BRIAN JAMES GRAY

7           Direct Examination by Ms. Bramble          3, 14

8           Voir Dire                                      10

9           Cross-Examination by Ms. Foster                15

10          Redirect Examination by Mr. Bramble            28

11          Recross-Examination by Ms. Foster              29

12

13  EXHIBITS:                    MARKED               ADMITTED

14  PX 3-5                        --                      14

15  DX A                         23                       24

16

17

18

19

20

21

22

23

24

25

```
 1              STATE OF MICHIG,

 2    SEVENTEENTH JUDICIAL CIRCUIT COURT (KENT COUNTY)

 3

 4   THE PEOPLE OF THE
     STATE OF MICHIGAN
 5

 6    -v-                      Case No. 11-11910-FH
 7                                      11-11911-FH

 8   KELVIN WAYNE HEATH,

 9         Defendant.
                            /
10

11              JURY TRIAL

12   (Excerpt of Proceedings - Witness Brian James Gray)

13   BEFORE THE HONORABLE GEORGE S. BUTH - CIRCUIT JUDGE
        Grand Rapids, Michigan - Tuesday, March 27, 2012
14

15   APPEARANCES

16   For the People:       MR. KEVIN M. BRAMBLE P38380
                           ASSISTANT PROSECUTING ATTORNEY
17                         82 Ionia, N.W.
                           Suite 450
18                         Grand Rapids, Michigan  49503
                           616.632.6710
19

20   For the Defendant:    MS. VALERIE A. FOSTER P44459
                           KENT COUNTY DEFENDER OFFICE
21                         146 Monroe Center Street, N.W.
                           Suite 920
22                         Grand Rapids, Michigan  49503
                           616.632.5021
23

24                         - - -

25   Reported by:          Leslie L. Rydahl, CSR-4078
                           Official Court Reporter
                           616.632.5021

                              1
```

## TABLE OF CONTENTS

**WITNESSES - PEOPLE:**

**BRIAN JAMES GRAY**

|  |  |
|---|---|
| Direct Examination by Ms. Bramble | 3, 14 |
| Voir Dire | 10 |
| Cross-Examination by Ms. Foster | 15 |
| Redirect Examination by Mr. Bramble | 28 |
| Recross-Examination by Ms. Foster | 29 |

| EXHIBITS: | MARKED | ADMITTED |
|---|---|---|
| PX 3-5 | -- | 14 |
| DX A | 23 | 24 |

```
                              2
```

1        day, March 27, 2012

2        (Court in session)

3

4

5            - - -

6        THE COURT:  State your full name, please.

7        MR. GRAY:  Brian James Gray.

8        Do you solemnly swear or affirm that the testimony

9    you're about to give in this matter will be the truth, the

10   whole truth, and nothing but the truth, so help you God?

11       MR. GRAY:  Yes.

12       THE COURT:  Please be seated.

13            BRIAN JAMES GRAY,

14   called by the People at 11:50 a.m., sworn by the Court,

15   testified:

16            DIRECT EXAMINATION

17   BY MR. BRAMBLE:

18   Q.  How do you spell your last name, Mr. Gray?

19   A.  Gray.  It's G-R-A-Y.

20   Q.  Are you employed, sir?

21   A.  Yes.

22   Q.  Where are you employed?

23   A.  Hope Network.

24   Q.  What do you do there?

25   A.  I work at a group home with developmentally disabled

```
                              3
```

1    individuals.

2    Q.  How long have you done that?

3    A.  Eight years.

4    Q.  All right.  I want to draw your attention back to November

5    14 of 2011.  Did you respond to an ad on that day?

6    A.  Yes.

7    Q.  And where did you see this ad?

8    A.  On backpage.

9    Q.  What is backpage?

10   A.  It's similar to like a craigslist type of cite.  That has

11   lots of different advertisements and stuff.

12   Q.  What type of advertisement did you respond to?

13   A.  It was for a massage.

14   Q.  And did you -- were you given a phone number to call?

15   A.  Yes.

16   Q.  Did you call that number?

17   A.  I called it, yes.

18   Q.  Did you get ahold of someone right away when you called it?

19   A.  I got a text message back.

20   Q.  You get a text message back.

21   A.  (Nods head affirmatively).

22   Q.  Did you begin to text back and forth with this person who

23   had texted you back?

24   A.  Yes.

25   Q.  Did this text come from the number you had called?

```
                              4
```

**Page 5**

2  Q.  Who did you think you were communicating with when you were

3      texting back and forth?

4  A.  It was supposed to be a female that was supposedly from

5      Northern Michigan, it said.

6  Q.  Through this texting were you -- did you come to an

7      agreement or understanding as to where you would meet?

8  A.  Yes.

9  Q.  Where was it you were to meet?

10 A.  At the Swiss Valley Apartments.

11 Q.  Did a specific apartment come into play?

12 A.  Yeah.  There was a number.  I can't remember offhand.

13 Q.  All right.  D1 sound --

14 A.  Yes.  Yes.

15 Q.  Did you -- approximately 6:15 on November 14 --

16 A.  Yes.

17 Q.  -- did you go to the Swiss Valley Apartments?

18 A.  Yes.

19 Q.  Is that apartment complex located about the 2900 block of

20     Burlingame?

21 A.  Yes.

22 Q.  Is that in the City of Wyoming, County of Kent, State of

23     Michigan?

24 A.  Yes.

25 Q.  When you arrived at the apartment complex, what did you do?

---

**Page 7**

2  A.  I looked i       you know, went through my wallet and noticed

3      that my money was missing.

4  Q.  How much money was missing?

5  A.  $300.

6  Q.  I'm sorry?

7  A.  $300.

8  Q.  Do you remember what denominations that $300 was in?

9  A.  Not offhand, no.

10 Q.  The next morning, November 15 of 2011, did you receive a

11     phone call from the same number you responded to in the ad?

12 A.  Yes.  Yes.

13 Q.  And what did this person say?

14 A.  I -- I did not answer it at this time.  The night before I

15     did receive a call as -- as well.  Well, I received a voice

16     -- I'm trying to think exactly -- I believe it was a

17     voicemail stating that, you know, I needed to go to the

18     police office; that my, like, you know, license plate number

19     -- they had my license plate number and that I needed to go

20     down to the police office -- police station.  And this was

21     after eleven o'clock at night.

22 Q.  Was it a male caller?  Male voice or female voice?

23 A.  Yes, it was a male voice.

24 Q.  Now, did you contact the police?

25 A.  Yes.

---

**Page 6**

1  A.  I walked to see where Apartment D1 was.  And, yeah, as I

2      walked into that part of the building, a man came the other

3      direction and stated that there was a sting operation; that

4      there was a rapist in the area; and he asked for my wallet.

5          So, you know, I thought it was a cop.  He said he

6      was a police officer.  And then he patted me down, and in

7      the end said that I did not fit the description and I was

8      free to go.

9  Q.  Had you given him your wallet?

10 A.  Yes.

11 Q.  Did the defendant, was he facing you when he patted you

12     around, or did he turn you around?

13 A.  He turned me around.

14 Q.  How did your wallet come out of your pocket?

15 A.  He asked for ID, and I just, you know, took my wallet, you

16     know, since he asked for the ID.

17 Q.  So, you give him your wallet; you're told then by this

18     person that you don't match the suspect's description.  What

19     does this person do?  Does he tell you you're free to go

20     then?

21 A.  Yeah.  He says I'm free to go.

22 Q.  What did you -- who left the building first?

23 A.  I believe I did.

24 Q.  And where did you go?

25 A.  Back to my car.

---

**Page 8**

1  Q.  When did you contact the police?

2  A.  At, you know, shortly after it happened.  I would say within

3      15 -- yeah, 10, 15 minutes.

4  Q.  All right.  Did you tell the police why -- initially why you

5      were showing up there?

6  A.  Not initially.

7  Q.  All right.  And can you explain to this jury why you didn't

8      tell the police?

9  A.  Embarrassed.

10 Q.  Did you eventually tell the police the truthful reason as to

11     why you were present at that apartment complex?

12 A.  Yes.

13 Q.  Did the police ask you to do a sketch of the suspect?

14 A.  Yes.

15 Q.  Did you do that?

16 A.  Yes.

17 Q.  Approximately a couple weeks later, were you also asked to

18     go to the -- to go and observe a physical lineup?

19 A.  Yes.

20 Q.  Did you do so?

21 A.  Yes.

22 Q.  Were you able to pick someone out of the lineup as being the

23     person who was posing as a police officer?

24 A.  Yes.

25 Q.  I'm going to show you what's been marked as People's

---

**Page 9**

1    MR. BRAMBLE: May I app___ ___e witness, your

2    Honor?

3    THE COURT: Yes.

4    BY MR. BRAMBLE:

5  Q.  Is this picture with six people in it the picture they

6    showed you -- or the lineup you observed?

7  A.  Yes.

8  Q.  Did you pick someone out of that lineup as being the person

9    who --

10  A.  Yes.

11  Q.  What number?

12  A.  Five.

13    MS. FOSTER: I've seen it.

14  BY MR. BRAMBLE:

15  Q.  Did they make you fill out a card indicating what number you

16    chose?

17  A.  Yes.

18  Q.  I'll show you what's marked proposed Exhibit 5 and ask if

19    you recognize this card?

20  A.  Yes.

21  Q.  You put down number -- picked number five?

22  A.  Yes.

23  Q.  Your name on there, as well?

24  A.  Yes.

(Numbering continues; page label: 9)

**Page 10**

1  Q.  Also, going to show you what's marked as proposed Exhibit 3,

2    and ask if you can recognize specifically the phone number

3    on there?

4  A.  Yeah. I believe that is -- is the phone number.

5  Q.  All right. Is that phone number area code 601.831.0149?

6  A.  Yes.

7  Q.  Is this comparable to the type of ad that you responded to

8    on backpage?

9  A.  Yes. Yes.

10    MS. FOSTER: I've seen it.

11    MR. BRAMBLE: Your Honor, at this time I would

12    move for the admission of proposed Exhibits 3, 4, and 5.

13    MS. FOSTER: May I voir dire on the two proposed

14    -- the proposed Exhibits 4 and 5?

15    THE COURT: Yes.

16    MS. FOSTER: Exhibit 3 is the backpage ad; right?

17    MR. BRAMBLE: Right.

18    MS. FOSTER: Okay. Exhibit 4 and 5, your Honor.

19    I don't have any objection to the admission of Exhibit 3.

20    VOIR DIRE

21  BY MS. FOSTER:

22  Q.  This will just take a couple minutes with regard to -- this

23    is involving the lineup.

24  A.  Okay.

25  Q.  Can you kind of walk us through how you participated in this

(page label: 10)

**Page 11**

1    somebody ___ g you to come down?

2  A.  Yes.

3  Q.  Where was this lineup taken? Where did this lineup take

4    place?

5  A.  It was at the jail, the Kent County jail.

6  Q.  Do you remember who you met there?

7  A.  Detective Swiercz, who I met there. And then I'm not --

8  Q.  That's fine about names. Do you remember how many people

9    were there?

10  A.  There was two.

11  Q.  Two. One was a detective. Do you remember who the other

12    individual was?

13  A.  No.

14  Q.  What happened once you got there? Were you led to an area,

15    a room? What happened?

16  A.  Yeah. We were led to the area and then after that to the

17    room.

18  Q.  Okay. Can you describe the room?

19  A.  It's a -- was a small room with benches, a few like benches

20    going up.

21  Q.  Okay. And did you observe the six gentlemen in jail greens

22    come into another room?

23  A.  They -- they came from another room into this room, into

24    behind the glass.

(page label: 11)

**Page 12**

1  Q.  Okay. They couldn't see you; correct?

2  A.  Correct.

3  Q.  Was it like you see on television, they can't see you, but

4    you can see them kind of a thing?

5  A.  Correct. Yes.

6  Q.  Approximately how far were they from you?

7  A.  I would say ten feet maybe.

8  Q.  Okay. I see you're wearing glasses. Were you wearing

9    glasses that day?

10  A.  Yes, I was.

11  Q.  Okay. And your vision is correct at the 20/20 with the

12    glasses on?

13  A.  Correct.

14  Q.  And do you remember how many people were in the room with

15    you when you were asked to look at these gentlemen?

16  A.  I'm -- I don't remember.

17  Q.  Was there more than two at this point?

18  A.  I think there might have been a third. I'm not positive.

19  Q.  Were there any women in the room?

20  A.  It's a little ways back. I --

21  Q.  You don't remember?

22  A.  I'm not positive.

23  Q.  Okay. How long were you allowed to observe the men in the

24    lineup?

25  A.  Very short time. You know, they were front and then each

(page label: 12)

1     Q. Okay. And when did you fill out a c    at Mr. Bramble

2     mentioned?

3     A. Right after I was -- after they left the room.

4     Q. During the time that you were in the room observing, did any

5     police officer, anybody make any statements to you about any

6     of the six gentlemen?

7     A. No.

8     Q. Did you make any statements to the police officers about any

9     of the six gentlemen?

10    A. No.

11    Q. Did you point and say, "It's him, number such and such," or

12    anything like that?

13    A. No.

14    Q. Were you instructed not to do that?

15    A. Correct. Yes.

16    Q. And this card that you filled out was after you left the

17    room?

18    A. Correct.

19         MS. FOSTER: With that, I have nothing further,

20    your Honor.

21         THE COURT: Mr. Bramble.

22         MR. BRAMBLE: I would move for admission of 4 and

23    5 at this point.

24         MS. FOSTER: At this point, I have no objection.

13

1         THE COURT: Exhibits 3, 4 and 5 are admitted.

2         (People's Exhibits 3-5 admitted)

3    BY MR. BRAMBLE:

4     Q. At this lineup did anyone tell you whether or not the person

5    was going to be in there, or tell you which one to pick, or

6    anything like that?

7     A. No, no.

8     Q. That person that you picked out of that lineup, was this the

9    person that approached you and said they were a police

10    officer on November 14, 2011?

11    A. Yes.

12    Q. Is that person present here in the courtroom?

13    A. Yes.

14    Q. Can you point out where he's seated right now and what he's

15    wearing right now?

16    A. He's sitting right over there with the white shirt. Yes.

17         MR. BRAMBLE: Your Honor, may the record reflect

18    the identification of the defendant?

19         THE COURT: Yes.

20    BY MR. BRAMBLE:

21    Q. Prior to this date, November 14, 2011, had you ever met the

22    defendant?

23    A. No.

24    Q. And prior to the preliminary exam, had you ever met a person

25    named Barry Isaacson?

14

2     Q. Do you ki    mo that is?

3     A. No. It does not register, no.

4     Q. Okay.

5         MR. BRAMBLE: Thank you. I have nothing further.

6         THE COURT: Ms. Foster.

7         MS. FOSTER: Thank you, your Honor.

8              CROSS-EXAMINATION

9    BY MS. FOSTER:

10    Q. Good afternoon, Mr. Gray. You indicated that you work at

11    Hope Network?

12    A. Correct.

13    Q. And are you married?

14    A. No.

15    Q. Is Hope Network, is that a faith-based organization?

16    A. Loosely faith-based.

17    Q. Loosely faith-based. Okay. How old are you, sir?

18    A. I'm 36.

19    Q. Thirty-six. And you indicated that you were responding to

20    an ad in backpage.com? That's correct; right?

21    A. Correct.

22    Q. And asked what backpage is about, you indicated it's like

23    craigslist. Is that your definition of backpage?

24    A. Yes. It's the same type of format. They don't -- it's not

25    just massages. They do -- they have job placements, you

15

1     know.

2     Q. But you weren't going to backpage looking for a job

3    placement; were you?

4     A. No.

5     Q. You indicated -- and you've said it again today -- that you

6    were looking for a massage.

7     A. Correct.

8         MS. FOSTER: Exhibit Number 3 please.

9         MR. BRAMBLE: Let me make sure that's it.

10    BY MS. FOSTER:

11    Q. Can you take a look at this that's already been admitted

12    into evidence and tell me what part of that ad convinced you

13    that this person would give you a good massage?

14    A. I -- I can't answer.

15    Q. So, you weren't really looking for a massage with this

16    particular individual; were you? Remember you're under

17    oath.

18    A. No, not necessarily.

19    Q. You were relieved of $300; is that your testimony?

20    A. Correct.

21    Q. What money was agreed upon when you had these series of

22    texts or telephone messages with whom you believed to be the

23    person in this ad?

24    A. $100.

25    Q. $100. Had you ever been to a massage therapist, a

16

1   ...legitimate one or find one somewhere?
2   A.   Yes, I've had them.
3   Q.   How much do they generally charge?
4   A.   65.
5   Q.   Okay.  So my question to you, sir, is why would you pay more
6        to go to a massage therapist from backpage.com when you can
7        go to a legitimate massage therapist in a legitimate office
8        for less money?
9             So, you weren't looking for a massage with this
10       woman; were you?  You were hoping to score; weren't you?
11       Just be honest.  You're under oath.
12  A.   Yes, yes.
13  Q.   You were hoping to score.
14  A.   Yes.
15  Q.   You're single.  You said you're not married, so there's no
16       shame in that.
17            You said that you were accosted by an individual
18       saying that he said that you were a suspect in some type of
19       assault that was happening in the area; correct?
20  A.   Correct.
21  Q.   Exactly how long were you able to look at this individual
22       who accosted you, this individual posing as a police
23       officer?
24  A.   I would say two different times for a total of a minute.
25  Q.   A total of a minute.  Okay.  When the person -- did the

17

1        person approach you from in front or from behind?
2   A.   He came from in front, but, you know --
3   Q.   He swung you around?
4   A.   Swung me.  Yeah.
5   Q.   And did he force you up against a wall?  Did he make you put
6        your hands up?
7   A.   Yes.
8   Q.   And you didn't resist; did you?
9   A.   No.
10  Q.   And you -- did you question whether or not he was a police
11       officer?
12  A.   No, not at the time.
13  Q.   You only questioned after you found out your money was gone;
14       is that a fair statement?
15  A.   (Nods head affirmatively).
16  Q.   Is that a "yes"?
17  A.   There was a little bit of a question at the end when it was
18       just, you know, so abrupt, "You don't fit the description;
19       you can go to your -- you can go back to your car."  That
20       seemed a little bit --
21  Q.   Okay.
22  A.   -- strange.
23  Q.   So, he turns you around, he got you up against a wall, and
24       he patted you down and he took a wallet -- took your wallet.
25       Did you have your keys on you too?

18

**Page 19 (top-right)**

2   Q.   Did he take those as well?
3   A.   No.
4   Q.   Just the wallet?
5   A.   Yes.
6   Q.   What kind of wallet?  Was it leather?
7   A.   It's a leather wallet.
8   Q.   Okay.  And you said you didn't notice until after he was
9        gone that the money was gone; is that a fair statement?
10  A.   Correct.
11  Q.   And while after this individual took your wallet, did you --
12       did you turn around and get a good look at him, or did you
13       remain faced in front of the wall that you were up against?
14  A.   Umm, before I left?
15  Q.   When the person took the wallet from your pocket, I'm
16       assuming that you were --
17  A.   He didn't take it from my pocket.  He asked for ID, and I
18       gave him -- and I gave him my own -- whole -- he basically,
19       when I showed the ID, he took the wallet.  And I didn't
20       question it basically.
21  Q.   Okay.  So, if you can tell -- and tell me if I'm wrong -- he
22       comes up to you, he turns you around, and you put your arms
23       or your hands up, up against a wall like you're being patted
24       down like you see on television?
25  A.   Correct.

19

**Page 20 (bottom-right)**

1   Q.   So, your hands were on a wall.  Are you indoors or outdoors?
2   A.   In -- well, it's -- you know how apartment complexes --
3   Q.   Have kind of that out --
4   A.   -- it's kind of an outdoor.  Yeah, it's not --
5   Q.   I got ya.  So, you weren't quite indoors, but you weren't on
6        a brick wall either?
7   A.   Correct.
8   Q.   So, you got your arms up and he tells you to reach in and
9        grab your wallet.  And I'm assuming you're right-handed.  I
10       shouldn't assume.
11  A.   I'm left-handed.
12  Q.   You're left-handed.  See, I shouldn't assume.
13            So, you grab your wallet out of your pocket and
14       you just give it to him; correct?
15  A.   Correct.  I believe that he asked for it before I -- he
16       frisked me.  But I'm not completely positive on that.
17  Q.   Well, did he -- was there any like forcible movements on
18       this person's part?  In other words, did he shove you up
19       against a wall?  Did he -- you know what you see on
20       television -- did he cut your legs apart?
21  A.   He didn't cut my legs.  No.
22  Q.   He shove you?
23  A.   You know, pretty forcefully.  I wouldn't call it a full-
24       forced shove, but a -- you know, a --
25  Q.   Did he say, "Get up against the wall.  You're under arrest,"

20

**Page 21**

1  A. He didn't say, "You're under arre— e said, "You're a

2      suspect," and then he acted like he was on the phone with --

3      on his cell phone or on, you know, on a police -- I don't

4      know what they -- walkie-talkie that he was with -- you

5      know, that he was talking with someone else.

6  Q. Okay. So, my question to you again is, when all this was

7      going on, were you looking at him or were you facing

8      forward? Were you looking -- were you -- where were you

9      looking at when all this was going on?

10  A. I was against the wall.

11  Q. Okay. So, you weren't looking at him very much, were you?

12  A. Not at this point.

13  Q. When he gives the wallet back to you, does he just walk

14      away?

15  A. I walk, and then he -- yeah, he walks away.

16  Q. Do you walk away together like you're two guys walking

17      beside each other?

18  A. No, no.

19  Q. Does he run?

20  A. He did not run.

21  Q. Did you see him get into a vehicle?

22  A. No.

23  Q. Okay. At what point did you actually have a chance to look

24      at him? I'm assuming when he first approached you; correct?

**Page 22**

1  A. When he first approached me, yes, and then when I left.

2  Q. And when you left. Okay. But you didn't see where he went

3      and what vehicle he got into?

4  A. No.

5  Q. Okay.

6          MS. FOSTER: You can have that back.

7  BY MS. FOSTER:

8  Q. Do you recall at some point giving -- talking to a sketch

9      artist?

10  A. Yes.

11          MS. FOSTER: Do you have that?

12          MR. BRAMBLE: I can get it for you.

13          MS. FOSTER: (Reviewing).

14  BY MS. FOSTER:

15  Q. When did you talk to the sketch artist?

16  A. It was that same evening.

17  Q. So, it was like less than 24 hours away?

18  A. Yes.

19  Q. Less than 12 hours?

20  A. Yes.

21  Q. Okay. How much time did you spend with the sketch artist?

22  A. Fifteen minutes maybe.

23  Q. Okay. And obviously it was, it was -- the memory of this

24      guy's face was pretty fresh in your head; is that a fair

25      statement?

**Page 23**

2  Q. Okay. Fr— han when you were in a lineup two or three

3      weeks later; is that a fair statement?

4  A. Yes.

5          MS. FOSTER: I'd like to mark this, your Honor,

6      as --

7          (Defense Exhibit A marked)

8          MS. FOSTER: I'd like to mark this as proposed

9      Defense Exhibit A, your Honor.

10          And may I approach the witness with this?

11          THE COURT: You may.

12          MS. FOSTER: Thank you.

13  BY MS. FOSTER:

14  Q. Did you ever see this photograph -- or this photograph or

15      whatever you want to call it -- composite, I guess?

16  A. Yes.

17  Q. And was this a composite that was done after you gave the

18      sketch artist, or whoever it was, your description of this

19      individual?

20  A. Yes.

21  Q. And was this the -- this face, was this the face you agreed

22      upon was the likeness of the person who had assaulted you or

23      who had robbed you, in your mind?

24  A. Yeah. It was as close as the computer could, you know,

25      generate that I saw.

**Page 24**

1  Q. Okay.

2          MS. FOSTER: At this time we would ask for this

3      exhibit to be admitted as Defense --

4          MR. BRAMBLE: (Reviewing).

5          MS. FOSTER: I would ask that this exhibit be

6      admitted as Defense -- proposed Defense Exhibit A.

7          MR. BRAMBLE: No objection, your Honor.

8          THE COURT: Admitted.

9          (Defense Exhibit A admitted)

10          MS. FOSTER: Thank you.

11  BY MS. FOSTER:

12  Q. You said it took you about 15 or so minutes to provide a

13      physical facial description of the person who had accosted

14      you?

15  A. Yes.

16  Q. Okay. And again, that was done within a few hours of this

17      incident; correct? That same day?

18  A. Yes.

19  Q. What time of day did you go to this apartment complex?

20  A. It was in the evening.

21  Q. Okay. Was it still light out? No. It would have been

22      November. It probably was dark.

23  A. Was dark.

24  Q. Okay. Was the apartment complex well lighted?

25  A. It was. That area, yes, it was well lighted.

**Page 25**

1  Q.  So, it was dark out, but it was pretty w--

2  A.  (Nods head affirmatively).

3  Q.  You indicated you did the sketch thing that same evening?

4  A.  **Yes.**

5  Q.  Can you give us an approximate time?

6  A.  **Nineish, I believe, but I can't -- you know I'm --**

7  Q.  Can you tell us how you characterized this individual?  What

8      he looked like, his age?  Tell us what you thought he looked

9      like to you.  When the police asked you -- when they asked

10     you a description, what description did you give?

11  A.  **I said, you know, in his thirties.**

12  Q.  Okay.

13  A.  **Yeah.  He -- short of stature, but still, you know, quite**

14     **built.**

15  Q.  Um-hmm (affirmatively) yes.

16  A.  **And yeah, I wasn't positive on the --**

17  Q.  So, you said thirties?

18  A.  **I could remember -- but I wasn't positive on the hair and**

19     **whether he had -- I knew it was either short or shaved, but**

20     **I could not --**

21  Q.  Did he have a shirt that said "police" on it?

22  A.  **It was similar to a shirt -- it didn't say -- whether it**

23     **said "police" or not, I don't believe it did.  But it was**

24     **similar to kind of a shirt you would see on cops when they**

25     **do undercover stuff, like a black with some lettering on it.**

**Page 26**

1  Q.  Okay.

2         MS. FOSTER:  Excuse me (confers with client).

3  BY MS. FOSTER:

4  Q.  Do you remember what -- do you remember describing the

5      person's build?

6  A.  **Yes.**

7  Q.  How would you describe his build?

8  A.  **He was shorter and quite, you know, strong, you know.**

9  Q.  Strong and short?

10  A.  **Short.  And he was strong.**

11  Q.  You never said he was thin?

12  A.  **No.**

13  Q.  You never described him as thin?

14  A.  **No.  I might have said, you know, that he wasn't, you**

15     **know --**

16  Q.  Girth.

17  A.  **You know, girth, yeah.  But I don't believe I ever used the**

18     **word "thin" either.**

19         MS. FOSTER:  Just a moment, your Honor (confers

20     with client).

21  BY MS. FOSTER:

22  Q.  Okay.  Turning to this Exhibit Number [sic] A or Letter A, I

23     want to have you --

24         MS. FOSTER:  If you don't mind, if I can approach

25     the witness again, your Honor?

**Page 27**

1     body or so; and, or may.

2  BY MS. FOSTER:

3  Q.  If you look in that first line, just read it to yourself.

4      Does that accurately reflect how you described the

5      individual that assaulted you or approached you and posed as

6      a police officer?

7  A.  **Yes.  That looks correct.**

8  Q.  You agreed to that picture, that face, and you agreed to the

9      description.  Is that a fair statement?

10  A.  **Yes.**

11  Q.  Okay.

12         MS. FOSTER:  I'll have that back, please.

13  BY MS. FOSTER:

14  Q.  So, if the description indicates "black male approximately

15     30 years of age, slender build, approximately 150 pounds,"

16     that -- you would agree with that?

17  A.  **Yes.**

18  Q.  Okay.  And this composite, this computer-generated image

19     actually shows a man that looks approximately 30, correct,

20     with a little hair on his head; correct?

21  A.  **Correct.**

22         MS. FOSTER:  Okay.  I don't think I have anything

23     further, your Honor.  Thank you.

24         THE COURT:  Mr. Bramble?

25

**Page 28**

1             REDIRECT EXAMINATION

2  BY MR. BRAMBLE:

3  Q.  That composite, I thought I heard you say that this was the

4      best that the computer could generate?

5  A.  **Yeah.  I don't think it was -- you know, we went through a**

6     **lot of stuff, and that was the most similar that I saw with**

7     **the -- with it.**

8  Q.  With the computer?

9  A.  **Yes.**

10  Q.  But you did indicate it was a black male?

11  A.  **Yes.**

12  Q.  Approximately 5'7 to 5'8?

13  A.  **Correct.**

14  Q.  Slender -- or you indicated strong build.

15  A.  **Yeah.  I -- I definitely mentioned to them that, you know, a**

16     **stronger build.**

17  Q.  Do you remember telling the police that possibly with yellow

18     lettering on the -- black, long-sleeved t-shirt possibly

19     with yellow lettering on the front?

20  A.  **Yes.**

21  Q.  Person was in there thirties or 30?

22  A.  **In thirties, I thought.**

23  Q.  How did you describe the hair?

24  A.  **I -- I wasn't sure if there was a little bit of hair or if**

25     **it was completely shaved.  I wasn't positive on -- on that.**

1   Q.  When you were doing this composite, did anyone suggest to

2   you what you should do or what you should use as your

3   identifier? Did anyone try to put words in your mouth?

4   A.  No, no.

5   Q.  You were -- said you were embarrassed by the police -- by

6   going to the police and telling them initially why you did

7   this.

8   A.  Yeah.

9   Q.  I mean, are you still embarrassed about that?

10   A.  Yes.

11      MR. BRAMBLE: I don't think I have anything

12   further, your Honor.

13      THE COURT: Ms. Foster.

14      MS. FOSTER: Just one question.

15         **RECROSS-EXAMINATION**

16   BY MS. FOSTER:

17   Q.  Based on your own description, you said you're 36; correct?

18   A.  Correct.

19   Q.  So, based on your own description of this individual, you

20   believe him to be approximately your age if not younger?

21   A.  Yes. I believed approximately my age, yeah.

22      MS. FOSTER: Okay. Nothing further, your Honor.

23   Thank you.

24      THE COURT: Mr. Bramble?

25      MR. BRAMBLE: Nothing further.

29

---

1         OFFICIAL REPORTER'S CERTIFICATE

2

3   STATE OF MICHIGAN     )

4                 ) SS

    COUNTY OF KENT      )

5

6         I, Leslie Rydahl, Court Reporter in and

7   for the Circuit Court for the County of Kent, State of Michigan,

8   do hereby certify that I reported stenographically the

9   proceedings held in the above-entitled cause before the Honorable

10   GEORGE S. BUTH on March 27, 2012; and do further certify that the

11   foregoing EXCERPT of a transcript is a true and correct

12   transcript of my stenographic notes of said proceedings so

13   reported and transcribed by me.

14

15

16

17         Leslie L. Rydahl CSR 4078

           Official Court Reporter

18

19   Dated: _____

         Grand Rapids, Michigan

20

21

22

23

24

25

31

---

1      THE COURT: Thank you very much. You are excused.

2      (At 12:22 p.m., witness stepped down)

3      E N D  O F  E X C E R P T

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

30

1  OFFICIAL REPORTER'S CERTIFICATE

2

3

STATE OF MICHIGAN        )
4                        )    SS
COUNTY OF KENT           )

5

6           I, Leslie Rydahl, Court Reporter in and

7  for the Circuit Court for the County of Kent, State of Michigan,

8  do hereby certify that I reported stenographically the

9  proceedings held in the above-entitled cause before the Honorable

10  GEORGE S. BUTH on March 27, 2012; and do further certify that the

11  foregoing EXCERPT of a transcript is a true and correct

12  transcript of my stenographic notes of said proceedings so

13  reported and transcribed by me.

14

15

16           _____

           Leslie L. Rydahl CSR 4078
17             Official Court Reporter

18  Dated: ___3-28-12___

19          Grand Rapids, Michigan

20

21

22

23

24

25