STATE OF MICHIGAN

SEVENTEENTH JUDICIAL CIRCUIT COURT (KENT COUNTY)

- - -

THE PEOPLE OF THE
STATE OF MICHIGAN

-v-

Case No. 11-11910-FH
11-11911-FH

KELVIN WAYNE HEATH,

        Defendant.
_____/

RCV'D & FILED

MAR 2 8 2012

JUDGE BUTH
17TH CIRCUIT COURT

JURY TRIAL

(Excerpt of Proceedings - Witness Kelvin Wayne Heath)

BEFORE THE HONORABLE GEORGE S. BUTH - CIRCUIT JUDGE
Grand Rapids, Michigan - Tuesday, March 27, 2012

- - -

APPEARANCES

For the People:        MR. KEVIN M. BRAMBLE P38380
                              ASSISTANT PROSECUTING ATTORNEY
                              82 Ionia, N.W.
                              Suite 450
                              Grand Rapids, Michigan 49503
                              616.632.6710

For the Defendant:     MS. VALERIE A. FOSTER P44459
                              KENT COUNTY DEFENDER OFFICE
                              146 Monroe Center Street, N.W.
                              Suite 920
                              Grand Rapids, Michigan 49503
                              616.632.5021

- - -

Reported by:           Leslie L. Rydahl, CSR-4078
                              Official Court Reporter
                              616.632.5021

TABLE OF CONTENTS

WITNESSES - DEFENSE:

KELVIN WAYNE HEATH
    Direct Examination by Ms. Foster              3
    Cross-Examination by Mr. Bramble             14

EXHIBITS:                    MARKED          ADMITTED

## Page 1

STATE OF MICHIGAN

SEVENTEENTH JUDICIAL CIRCUIT COURT (KENT COUNTY)

THE PEOPLE OF THE
STATE OF MICHIGAN

-v-                              Case No. 11-11910-FH
                                         11-11911-FH

KELVIN WAYNE HEATH,

    Defendant.
_____/

JURY TRIAL

(Excerpt of Proceedings - Witness Kelvin Wayne Heath)

BEFORE THE HONORABLE GEORGE S. BUTH - CIRCUIT JUDGE
Grand Rapids, Michigan - Tuesday, March 27, 2012

APPEARANCES

For the People:    MR. KEVIN M. BRAMBLE P38380
                   ASSISTANT PROSECUTING ATTORNEY
                   82 Ionia, N.W.
                   Suite 450
                   Grand Rapids, Michigan 49503
                   616.632.6710

For the Defendant: MS. VALERIE A. FOSTER P44459
                   KENT COUNTY DEFENDER OFFICE
                   146 Monroe Center Street, N.W.
                   Suite 920
                   Grand Rapids, Michigan 49503
                   616.632.5021

Reported by:       Leslie L. Rydahl, CSR-4078
                   Official Court Reporter
                   616.632.5021

## Page 2

**TABLE OF CONTENTS**

**WITNESSES - DEFENSE:**

KELVIN WAYNE HEATH
   Direct Examination by Ms. Foster    3
   Cross-Examination by Mr. Bramble    14

**EXHIBITS:**    MARKED    ADMITTED

## Page 3

Grand Rapids, Michigan
Tuesday, March 27, 2012
(Court in session)

- - -

BEGINNING OF EXCERPT

    MS. FOSTER: The defense calls Kelvin Heath.

    THE COURT: Stand up please and state your full name.

    MR. HEATH: Kelvin Heath.

    THE COURT: Raise your right hand.

    Do you solemnly swear or affirm that the testimony you're about to give in this matter will be the truth, the whole truth, and nothing but the truth, so help you God?

    MR. HEATH: I do.

    THE COURT: Please be seated.

KELVIN WAYNE HEATH,
called by the People at 3:27 p.m., sworn by the Court, testified:

DIRECT EXAMINATION

BY MS. FOSTER:
Q. Once again, can you state your full, true name?
A. Kelvin Heath. Kelvin Wayne Heath.
Q. And your date of birth?
A. 3-28-61.

## Page 4

Q. Where do you reside?
A. 1833 Prairie Parkway.
Q. How long have you lived there?
A. Well, comin' out of a divorce situation, I go there periodically.
Q. Who lives at that address besides you?
A. My sister; her son.
Q. There was some --
A. My mother was visiting then. She's sick.
Q. She doesn't live there?
A. No.
Q. Okay. You were here throughout the entire trial. I want to direct your attention to the two cell phones that are in question here.
    One of the cell phones, does it belong to you, the grey one, the grey and white one or the --
A. Yeah, it belongs to me.
Q. What about the black one?
A. The black one belongs to Sheila.
Q. Tell us who Sheila is.
A. Sheila is Kelly Carpenter.
Q. And who is she to you?
A. A friend.
Q. Okay. Why would you be in possession of her cell phone?
A. Well, I was with her previously, and her phone went dead,

**Page 5**

1    and she used my phone.
2 Q. Okay. The phone that the police found ... too?
3 A. The grey phone they're speaking about.
4 Q. Okay. When were you with her previously? I'm directing
5    your attention to November 29th of 2011. Were you with her
6    that day?
7 A. Earlier that day, yeah.
8 Q. And what were you doing with her that day?
9 A. I gave her a ride.
10 Q. From where to where?
11 A. Well, first we went to -- we went a couple places.
12 Q. Okay.
13 A. I dropped her off. She left in her car.
14 Q. What does she drive?
15 A. She drive a black Honda.
16 Q. Okay. And?
17 A. Later, later she contacted me.
18 Q. Later, what time?
19 A. I'm gonna say about 2:00 or so.
20 Q. P.m.?
21 A. P.m., yeah.
22 Q. She contacted you and did what?
23 A. Asked me to come and get her. She was havin' a problem with
24    somebody. She told me -- asked me to come and get her.
25 Q. Who was she having a problem with?

**Page 6**

1 A. One of her clients.
2 Q. Who would that client be?
3 A. That client would be Mr. Isaacson.
4 Q. What kind of client is he to her?
5 A. He's considered a john.
6 Q. Okay. What does that -- are you trying to tell me that she
7    is a lady of the evening?
8 A. She's a call girl.
9 Q. Okay. Why would she contact you to help her with this
10    particular john?
11 A. Because -- you want me to be frank?
12 Q. Yeah. Be frank if that's what --
13 A. Okay. The guy ejaculated before his hours. She charged
14    $200 an hour. He ejaculated before his hour. He was
15    dissatisfied. She told me that he was acting belligerent,
16    can I come give her a ride.
17 Q. Slow down.
18 A. Huh?
19        THE REPORTER: You have to slow down.
20 A. Excuse me.
21        MR. BRAMBLE: I'm going object to anything this
22    other supposed woman named "Sheila" said.
23        THE COURT: Sustained.
24        MR. BRAMBLE: Thank you.
25 BY MS. FOSTER:

**Page 7**

1 Q. Okay. You res...nded because she had you -- the information
2    had been ... to you that this particular john wasn't
3    living up to his end of the bargain; is that a fair
4    statement?
5 A. Correct.
6 Q. And what was your purpose of confronting him? What were you
7    planning on doing with that information?
8 A. I was just givin' her a ride. She asked me to pick her up,
9    and she told me where to pick her up at.
10        I was proceeding through the parking lot, and I
11    see this guy. I'm thinking he asking me for direction. I
12    roll down the window, and all I heard him say was "MF"
13    something. You know, he say "You guys" something. That's
14    all I remember. And I told them that as well.
15        And when Wyoming Police Department first
16    confronted me. I also told this gentleman here (indicates)
17    that "What are they on, some racist stuff?" I say this
18    because at the time I didn't notice this was a guy that
19    Sheila had dated, because I hadn't seen her yet.
20 Q. Okay.
21 A. So, that's where that came in at.
22 Q. Okay. What happened after this incident with the name --
23    the man calling you a name?
24 A. Whatever after that, I --
25 Q. Yeah.

**Page 8**

1 A. -- I proceeded out. I didn't see her.
2 Q. You didn't see her?
3 A. I didn't see Sheila. Swiss Valley is across the street from
4    1833 Prairie Parkway. So, I went back over there to wait on
5    her; she supposed to meet me back there.
6 Q. So, Swiss Valley and where you were staying with your
7    mother, or your brother or sister, whoever, is right across
8    the street from where these incidences occurred; correct?
9 A. Correct.
10 Q. Okay. And you never saw her after that day?
11 A. I didn't see after that. I didn't see her. I got arrested
12    before I seen her again.
13 Q. Okay. So, let's back up to November 14 of 2011. Do you
14    remember anything about that date whatsoever?
15 A. The 14th? I can't -- I can't really remember what I was
16    doing the 14th.
17 Q. Did you ever have a -- do you ever have a reason to be in or
18    around the Swiss Valley Apartments?
19 A. No.
20 Q. Had you ever met the gentleman who testified here this
21    morning, Mr. Gray?
22 A. No. I never met him.
23 Q. Never saw him before?
24 A. No.
25 Q. Did you know him to be one of this Sheila's johns?

**Page 9**

1  A.  Nope, not that I know of.
2  Q.  Okay.
3  A.  I never seen him.
4  Q.  And your only involvement -- let me ask you this: There was
5      testimony that your cell phone was found -- your cell phone
6      number was found on Mr. Isaacson's phone. Why would that be
7      if you didn't know this gentleman?
8  A.  That's because Sheila contacted him before the date. This
9      is not the first time Sheila did this. I mean, if your
10     phone go dead, you use somebody else phone.
11 Q.  Can you be a little slower? I don't know if everybody got
12     that.
13 A.  I said Sheila contacted him. Her phone was dead. I
14     explained that to the officers, as well, that was my phone.
15     Officer -- the second officer that testified, I explained
16     that to him. That's not in the police report, nor is me
17     calling racist in the police report. They never said that.
18 Q.  So, they -- the comment about you calling them racist didn't
19     make it into the police report?
20 A.  I'm saying none -- yeah.
21 Q.  But did you answer the question as to why his number would
22     be in a phone that was in your possession?
23 A.  Sheila used my phone earlier that day before this incident,
24     approximately 10:30, eleven o'clock, before I got with my
25     daughter and her cousin.

**Page 10**

1  Q.  Let's talk a little bit about that. There was testimony
2      that you had told the officers that you had taken your
3      daughter to Mel Trotter or something to get a car?
4  A.  She had bought a car and she was having trouble. She called
5      me to meet her down there to elaborate with them the problem
6      -- explain the problem she was havin' with the car. That
7      happened.
8  Q.  Was that that day?
9  A.  That happened that day.
10 Q.  Where did that happen in relationship to your driving this
11     Sheila around?
12 A.  Okay. I was with Sheila previously, before that. Then I
13     got with my daughter.
14 Q.  What time were you with --
15 A.  I came back -- I came back after being with my daughter, and
16     me and Sheila was together again. I dropped her off.
17 Q.  Where did you drop her off?
18 A.  I dropped her off at Swiss Valley.
19 Q.  Okay. Where did you pick her up from?
20 A.  I didn't pick her back up. I was detained before I got with
21     her.
22 Q.  I'm backing up. Where did you pick her up originally before
23     you dropped her off at Swiss Valley?
24 A.  I met her in the parking lot across the street from Swiss
25     Valley.

**Page 11**

1  Q.  Is that where *** were staying?
2  A.  No. I go ***periodically because my clothes is over
3      there.
4  Q.  Did you meet her at the location where they eventually
5      arrested you?
6  A.  Yes, I did.
7  Q.  How did she get there?
8  A.  She got there by her car.
9  Q.  Why did she need you to drive her across the street if it's
10     across the street?
11 A.  I was with her. I didn't say I drove her across the street.
12 Q.  You walked with her across the street?
13 A.  That's where I -- that's where she was. That's where Sheila
14     was.
15 Q.  I just want to make sure we're clear about the -- I don't
16     want the jury to be confused. I want the jury to understand
17     your side of these events; okay?
18 A.  Okay. Ask me again.
19 Q.  I'm confused, and I'm sure they're confused. So, let's
20     backtrack and maybe we'll do it one more time.
21       Starting off with your day, where -- who did you
22     meet up with first, your daughter or Sheila?
23       THE COURT: Excuse me. Excuse me. What time
24     period are we talking about here?
25       MS. FOSTER: We're talking about the November 29,

**Page 12**

1  2011.
2  BY MS. FOSTER:
3  Q.  What time -- who did you meet up with first, the daughter or
4      Sheila?
5  A.  Sheila.
6  Q.  Where did you meet her?
7  A.  I met her in the parking lot.
8  Q.  Parking lot where?
9  A.  Across the street from Swiss Valley --
10       THE COURT: Excuse me. Can we have a time?
11 BY MS. FOSTER:
12 Q.  What time?
13 A.  -- 1833. Possibly 9:30 or so.
14 Q.  In the morning?
15 A.  In the morning.
16 Q.  You say, "Across the street from Swiss Valley." Would that
17     be the parking lot where you were hanging your hat?
18 A.  Where I was arrested at, yes.
19 Q.  1833?
20 A.  1833 Prairie Parkway.
21 Q.  Did she come to that location or did you bring her to that
22     location?
23 A.  She came in her own car, a black Honda.
24 Q.  She came in to that location for what purpose?
25 A.  She came there for the purpose to work that day.

**Page 13**

1 Q. To work doing what?
2 A. Prostitution.
3 Q. Okay. Why did she need to come to your location to do her
4   call girl thing?
5 A. Because she's married and she has nowhere else to do it at.
6 Q. So, was she going to do -- meet the john at your apartment
7   or somewhere else?
8 A. No. She -- she comes there to meet me because it's a setup
9   through her backpage. It's set up through the backpage
10   through someone else.
11 Q. Who's the someone else?
12 A. Brittany Heywood.
13 Q. Who is she?
14 A. She's the one that set up the backpage. She, she's the one
15   that put it together.
16 Q. Okay. Both these backpages or just one?
17 A. Both of 'em.
18 Q. Okay. So, Sheila meets with you at 9:30 in the morning, and
19   what happens then?
20 A. She went on a couple dates then.
21 Q. I'm sorry?
22 A. She went on a couple dates then, earlier that morning. She
23   went again with Isaacson later that afternoon. But I was
24   with her, and I went with my daughter after that, if that's
25   was you're tryin' to ask me.

**Page 14**

1 Q. I just want to know -- we want to understand a timeline.
2   So, she meets you in the morning; she goes on a couple of
3   dates with a couple of johns. Do you know where she does
4   these dates?
5 A. No. Sometime they go to a hotel.
6 Q. Okay. Did she leave her car parked?
7 A. Most the time she leaves her car up there -- she, meets --
8   sometimes she have a hotel. Sometimes the john, and she
9   meets 'em at the designated spot.
10 Q. Okay. So, a john will meet her, say, at the Prarie Parkway
11   area, and then they will go somewhere else; is that a fair
12   statement?
13 A. Yeah, that's a fair statement, because she got to be sure
14   that they aren't the police.
15 Q. So, then she goes; she comes back. Does she go again and
16   come back?
17 A. Yeah.
18 Q. And then in that period of time, at some point you have an
19   issue with your daughter's car. You and your daughter go
20   and see about a problem with her car?
21 A. Right.
22 Q. How old is your daughter?
23 A. My daughter is 21.
24 Q. So, she's young. And then when are you done with your
25   daughter? What time?

**Page 15**

1 A. I went there about maybe 40 minutes or so.
2 Q. Yeah, but ...me? Do you remember what time it was that
3   you were, "Bye, daughter. I'm home now" or whatever?
4 A. I'm about 12:45, one o'clock, I imagine.
5 Q. And then when did Sheila return?
6 A. Sheila returned maybe 20 minutes, 25 minutes after that.
7   Ten after 1:00 or so. I explained that to the officers as
8   well. That's not in the police report.
9 Q. Okay. Well, let's not worry about what's in and what's not
10   in the police report. That's why we have people here to
11   testify.
12   So, she then goes to do this thing with
13   Mr. Isaacson and then contacts you because Isaacson is
14   shortchanging her for some reason. Does that sum up
15   everything as I understand it?
16 A. He's not shortchanging her, but he be question his money
17   back because he said he didn't get a full hour. That was
18   his argument.
19 Q. He didn't get a full hour. Okay. You went to assist?
20 A. I went to give her a ride, yeah, assist her in giving her a
21   ride, yeah.
22 Q. From --
23 A. Swiss Valley.
24 Q. -- Swiss Valley to 1833 Prarie Parkway?
25 A. I went there, yeah, to get her from there.

**Page 16**

1   MS. FOSTER: I have nothing further. Thank you.
2   THE COURT: Mr. Bramble?
3   MR. BRAMBLE: Thank you.
4   **CROSS-EXAMINATION**
5 BY MR. BRAMBLE:
6 Q. So, you want this jury to believe that these two men -- let
7   me start with this -- these two men, who don't even know
8   each other, have the same identical thing happen to them,
9   and identify you, and you're saying that's not accurate?
10 A. I want this jury to believe that I think the police is
11   tryin' to tie me in with someone that's been posing as a
12   police officer. That's what I think. Because since I've
13   been incarcerated, somebody else has been posin' as a police
14   officer, and stoppin' people and robbin' people.
15 Q. You know this how?
16 A. Pardon me?
17 Q. How?
18 A. Well, one incident concern a woman being pulled over.
19 Q. This is my job, and you're tellin' me things that I've never
20   heard.
21 A. Repeat that.
22 Q. Sure. How do you know this information?
23 A. It was on the news, number one.
24 Q. Really?
25 A. Yeah.

**Page 17**

1  Q. Really?
2  A. Yeah.
3  Q. What newscast?
4  A. I'm not sure of what newscast, but it was on the news.
5  Q. Can you tell me the --
6  A. He's a detective. He knew about it, I'm sure. He admitted
7     it hisself [sic] that there was ongoing investigation.
8  Q. Well, admitted there was an investigation, an investigation
9     involving you.
10 A. Okay.
11 Q. Well, you indicated you called the police racist?
12 A. I called who?
13 Q. Did you call the police racist, or how did the term "racist"
14    come up?
15 A. I'm not hearing you. I can't hear that good because you
16    ain't by the microphone.
17 Q. How did the term "racist" come up?
18 A. The term "racist" came because me and the gentleman is in
19    cars, and we have words. When they come and -- when they
20    come and detain me, I say, "What you guys all some racist
21    stuff?" Because me and the gentleman traded words. I'm
22    thinking he -- I don't know what he told 'em. I'm thinkin'
23    he just had a problem with me of some kind, and they
24    arrested me to that.
25         At the time, I didn't know Sheila was involved.

**Page 18**

1     This was -- Isaacson was involved with Sheila.
2  Q. Well, if you told the police all this stuff, why don't you
3     think it's not in the police report?
4  A. What was the second officer's name? I want to call his name
5     correctly.
6  Q. Officer Ferguson.
7  A. Well, he could have testified that I said that. Did I say
8     that or not?
9  Q. You can't ask questions here. You just answer them.
10    Understood? Do you understand?
11 A. Yeah, I understand.
12 Q. All right. You seem to have a lot of familiarity with how
13    Sheila -- this Sheila person -- how her business operates.
14 A. Okay.
15 Q. Is that true?
16 A. Yeah.
17 Q. And do you help her in this business?
18 A. Kind of, sort of.
19 Q. You're her business manager, shall we say?
20 A. You could say that.
21 Q. All right. Another way to describe that would be that
22    you're her pimp?
23 A. No. We not gonna say that.
24 Q. But you're just her business manager?
25 A. I'm gonna say we're associates.

**Page 19**

1  Q. A moment ago, you said you were her business manager.
2  A. You puttin' the sense that we was associating, and we was
3     in a business venture. You was puttin' it in that manner,
4     so I --
5  Q. You're in a business venture with her.
6  A. We are -- we are associates.
7  Q. Well, I'll ask you the question again. You already said
8     you're her business manager. What does that entail?
9  A. That we are associates.
10 Q. What does it mean by "associates"?
11 A. That we have an agenda that we both tryin' to meet.
12 Q. You have an agenda you're both tryin' to meet?
13 A. Yeah.
14 Q. What is the agenda?
15 A. To make some money.
16 Q. And you get some of her money that she makes?
17 A. Me and a couple more people, yeah.
18 Q. Okay. So, the proceeds this Sheila -- that supposedly
19    exists -- the proceeds from her being a call girl, you take
20    a cut of?
21 A. I don't take a cut. I get paid a portion for being
22    associate of, let's say, an organization of some kind.
23 Q. Before I go through the exhibits, I'm going to ask you, do
24    you recall being questioned by Officer Ferguson?
25 A. Do you recall being questioned by him? Which one is

**Page 20**

1     Officer Ferguson?
2  Q. The second one who testified. Do you recall being
3     questioned by him?
4  A. Yes, I do.
5  Q. Do you remember telling him that -- when he asked you if you
6     were in the Swiss Valley parking lot, you said you were
7     there briefly, but just passed through.
8  A. Right. Yes, I did.
9  Q. That you had -- when you returned from Mel Trotter, you
10    turned around and then went back out. Do you remember
11    tellin' him that?
12 A. I told him that my daughter and her cousin and I went to
13    Mel Trotter to discuss her car problems with Mel Trotter's
14    car lot.
15 Q. All right. But I'm asking you specifically about being in
16    the Swiss Valley parking lot.
17 A. Okay.
18 Q. And you told the officer that you just turned around briefly
19    in that parking lot; correct?
20 A. I told him that initially, yes.
21 Q. And you denied ever encountering anyone there; didn't you?
22 A. No. I told him that I had some words with a guy. At the
23    time I didn't know this Isaacson was affiliated with Sheila.
24    I didn't find that out till --
25 Q. Let me ask you this: Before you told him that you'd met

**Page 21**

1        someone, you initially said you'd never encountered anyone
2        there.
3   A.   No. I told him that I -- that I encountered a guy. That's
4        where the racism came in, my statement about the racism.
5        That's where that came in, that concerning that guy.
6   Q.   So, if the officer testified under oath here that your first
7        statement to him, you told him you never encountered
8        anybody.
9   A.   Okay. I did say that initially. I said that. I admitted
10       that.
11   Q.   So, you lied?
12   A.   I lied.
13   Q.   You lied and said you never encountered anyone.
14   A.   Initially, yes.
15   Q.   Who went with you to Goodwill?
16   A.   My daughter and her cousin, Booter.
17   Q.   After you told the officer that you never encountered
18       anyone, you later then told them that you encountered some
19       white guy or Hispanic guy who yelled mother-fucker or
20       something at you.
21   A.   Right.
22   Q.   And that you denied ever getting out of your car?
23   A.   That's correct.
24   Q.   Then you said the guy was asking directions or something
25       like that.

**Page 22**

1   A.   No. I said I thought that's what he was asking me, because
2       the window was up. I let the window down, and that's when
3       he was making accusations about you mother-fuckers.
4   Q.   When the officer said, "Why do you ask directions from
5       someone calling you a mother-fucker" --
6   A.   Well, initially my line to him was because I figured it had
7       something to do with Sheila. That was initially why I told
8       him that. I wanted to find out what happened first.
9   Q.   Talked to you about the cell phones; correct?
10   A.   Right.
11   Q.   And Exhibit 7, that's your cell phone?
12   A.   Yes, it is.
13   Q.   Whose is Exhibit 8?
14   A.   That's Sheila's cell phone.
15   Q.   You don't contest that your number was corresponding with
16       Mr. Isaacson.
17   A.   Okay.
18   Q.   Your phone was being used to correspond with --
19   A.   I told you that Sheila used my phone. Her phone went dead.
20       When they got the phone, it was dead. He attested that as
21       well, the officer did.
22   Q.   You're saying Sheila used the phone, but you're not denying
23       that Mr. Isaacson was on your phone.
24   A.   I'm not denying that, no.
25   Q.   Why did you lie to the officer initially?

**Page 23**

1   A.   I lied to the officer initially because I didn't know if it
2       had something to do with Sheila or not.
3   Q.   Why would that matter? Why do you have to lie?
4   A.   Because I don't know what -- what's went down. I don't know
5       what's goin' on.
6   Q.   So, you automatically lie?
7   A.   We gonna say a "fib." We ain't gonna say a "lie," we're
8       gonna say a "fib."
9   Q.   Well, we said a lie a moment ago, and you agreed to that.
10   A.   Well --
11   Q.   Fib or lie, it --
12   A.   You was happier with a lie than a fib.
13   Q.   Fib, lie, it wasn't the truth.
14   A.   So did Isaacson. He lied.
15   Q.   Who lied?
16   A.   Isaacson and Mr. Gray, both of them lied.
17   Q.   You're saying both of them --
18   A.   So, whatever you hold against me, hold against them as well.
19   Q.   You're saying both Mr. Gray and Mr. Isaacson, who don't know
20       each other, came in here and by chance told the same story
21       that you -- hold on -- that you robbed them.
22   A.   Okay. Mr. Isaacson's not here. Why he's not here?
23       Mr. Gray said somebody was slender, now he says something
24       different.
25   Q.   Mr. Isaacson testified already, and we've got that testimony

**Page 24**

1        on the record.
2   A.   Okay, well, why he's not here?
3   Q.   Do you understand, you don't ask the questions? You can ask
4       your attorney that.
5   A.   You want me to answer it properly; right? You're looking
6       for the honesty and truth; right?
7   Q.   Yeah.
8   A.   Okay. Well, that's what I'm tryin' to bring to you.
9   Q.   From someone who's already admitted he lied.
10   A.   Okay. Yes, I did. I lied.
11   Q.   So, Mr. Isaacson, his number is on Exhibit 7, your phone;
12       correct?
13   A.   Sir, I can hear you when you're by there or by that
14       microphone there (indicating).
15   Q.   Your number was on Mr. Isaacson's phone.
16   A.   Okay.
17   Q.   Correct?
18   A.   Mr. Isaacson's phone what?
19   Q.   Your number is on Mr. Isaacson's phone.
20   A.   Right. You asked me that three times. I said, "yes."
21   Q.   I want to make sure. Well, you have to just answer the
22       question.
23        So, you don't deny that --
24   A.   No, sir.
25   Q.   -- that your phone was used to correspond with

**Page 25**

1  Mr. Isaacson's?
2  A. Yes.
3  Q. I'll show you what's marked Exhibit 9, $497 that was seized
4  from you.
5  A. Okay.
6  Q. Do you agree that that was seized from you?
7  A. Yes, I am. I won it at the casino the night before. The
8  records reflect that at the casino.
9  Q. So, this $500, did you tell the officers that?
10 A. I believe I did.
11 Q. So, if they don't have that --
12 A. At one point I shut down on 'em because they start actin'
13 very racist with me, as I said. So, I shut down on 'em.
14 Q. What did they do that was racist?
15 A. He was tellin' me to "shut up," you know. He askin' me
16 questions. He tellin' me to "shut up." You know, the got
17 -- they got everybody there on the ground.
18 Q. Who told you to shut up?
19 A. The second officer sitting to the right there (indicating).
20 Q. Officer Ferguson.
21 A. Pardon me?
22 Q. Officer Ferguson.
23 A. Ferguson. I ask you the name so I can say they names.
24 Q. He told you to "shut up," is your testimony?
25 A. Yeah. He's tellin' me -- he's askin' me questions -- this

**Page 26**

1  detective here -- he's tellin' me to "shut up." You know,
2  then you got nine cars there. You got nine police officers
3  there.
4  Q. All right. What else did they do that was racist besides
5  tell you to shut up?
6  A. I thought they was being racist because me and the white guy
7  had some words, and they was on me like that. They was
8  already deeming me guilty of something that they hadn't even
9  investigated yet. That's why.
10 Q. Well, do you think you helped yourself by lying?
11 A. I don't know. I probably did. It depends. Did
12 Mr. Isaacson and Gray help theyself [sic] by lyin'?
13 Q. Your testimony -- you keep saying they're lying. They made
14 this up?
15 A. I can't say what they made up.
16 Q. But you're saying they're lying.
17 A. They're lying if they said I robbed them; correct. They're
18 lying if they said that I robbed them. Yes.
19 Q. Exhibit 6, do you recognize that?
20 A. Yeah.
21 Q. And --
22 A. He also said it was long-sleeved too.
23 Q. Is this your shirt?
24 A. That's a short-sleeved shirt.
25 Q. Is this your shirt?

**Page 27**

1  A. Yes, that's my shirt.
2  Q. It's the shirt you're wearing in the picture, correct?
3  A. Pardon me?
4  Q. It's the shirt you're wearing in the picture?
5  A. Correct.
6  Q. So again, I want to ask you this question. Listen, okay,
7  before you answer.
8  A. Okay.
9  Q. So, it's your testimony that two men who don't know each
10 other, identify you as doing basically the identical thing,
11 and you're saying they're lying?
12 A. I never met or never seen Mr. Gray until today. So, what
13 you got goin' on, I don't know. Mr. Isaacson, I think he's
14 a dissatisfied customer and he cried robbery because of
15 those reasons. That's all I can tell you about that.
16 Q. Okay. Wow, isn't it amazing how similar it is between
17 Mr. Isaacson's case and Mr. Gray's case?
18 A. Why Mr. Gray wait until the 29th to come forward about
19 somethin' he was robbed about? Why he wait?
20 Q. He was present at the preliminary exam on December 14. He
21 was there. He just -- you just waived the hearing, so you
22 didn't hear his testimony. He didn't just come forward on
23 the 29.
24 A. You lookin' for the truth. Why you didn't ask him about the
25 robberies that's goin' on --

**Page 28**

1  Q. Because there aren't any.
2  A. -- and about somebody else impersonating a police officer?
3  Why didn't you ask him that and see what he had to say?
4  Q. We can call him back.
5  A. You sure can.
6  Q. Okay. Listen to my question here, because you get off track
7  here. You said a moment ago that Mr. Gray was lying.
8  A. I don't think I said he was lying. I said I can't attest to
9  what Mr. Gray problem was, basically. I don't know. I
10 never seen Mr. Gray, so I can't attest to anything about
11 him.
12 Q. And you don't know why they would -- why would Mr. Gray make
13 up a story about --
14 A. I think Mr. Gray made a mistake, that's what I think -- when
15 they showed him my photo before he came in here. That's the
16 only thing I can deduce from that.
17 Q. Okay. So, you think that someone showed him the photograph
18 to pick you out of the lineup?
19 A. Pardon me?
20 Q. You were picked out of the lineup.
21 A. Okay.
22 Q. He identified you as being the one who accosted him and
23 robbed him. Do you understand that?
24 A. Yeah, I understand that.
25 Q. Tell me, do you think someone showed him your picture

**Page 29**

1  beforehand? Is that what you said a moment ago?
2  A. If he said that I did it, they did something. I know I
3    haven't seen Mr. Gray. I never met Mr. Gray till today.
4  Q. What are you saying they did?
5  A. Who was what?
6  Q. What are you saying they did with Mr. Gray?
7  A. I don't know what they did, sir.
8  Q. Are you saying they showed him a picture?
9  A. They did something.
10 Q. Well, what?
11 A. How do I know? Ask him.
12 Q. You're thinking they put him up to this?
13 A. Listen. You askin' me about Mr. Gray, man. All I'm tellin'
14   you is I don't know what they -- what Mr. Gray. I never
15   seen him before today.
16 Q. What are you saying -- who are you saying -- who are the
17   people that are putting Mr. Gray up to this?
18 A. I'm saying this detective here (indicating); the prosecutor
19   that was present. That's what I'm saying.
20 Q. You're saying they did what?
21 A. I'm saying that they showed 'em my photo before he picked me
22   out, if he picked me out. Or, he made a mistake, one of the
23   two.
24 Q. But you're saying -- your first thought was that the --
25 A. I didn't say my first thought. I gave you two synopsis of

**Page 30**

1  what I think. You're asking me to speculate, so I did.
2  Q. One of your speculations here is that this is part of some
3    conspiracy?
4  A. I don't -- I don't know what it is, sir. I know I don't
5    know Mr. Gray. I never seen him before today.
6  Q. So, but you're saying one of the scenarios here is that the
7    detective showed your photograph to Mr. Gray before you went
8    in and identified you in that lineup.
9  A. Or Mr. Gray made a mistake, sir. That's what I'm sayin',
10   those two things. Yes, that's what I'm saying.
11 Q. Why didn't you tell the police right upfront what had
12   happened here?
13 A. Well, already, law is being broken by both sides. That's
14   why. I'm breakin' the law, they breakin' the law, she
15   breakin' the law. That's why.
16 Q. But you later told -- you didn't tell them anything about
17   your elaborate business relationship with Sheila; did you?
18 A. They never asked. They never did put what I said in the
19   report anyway, other than being with my daughter. That's
20   all they put there.
21 Q. So, you're saying they left out a bunch of stuff out of the
22   report?
23 A. Yeah, that's what I'm saying.
24 Q. Intentionally?
25 A. Yeah.

**Page 31**

1  Q. So, these police officers who have, I don't know how many
2    years of experience, risked their entire career and left --
3    intentionally left things out of their report just to get
4    you?
5  A. Repeat that.
6  Q. Sure.
7  A. I can hear you when you're closer to the table or by the
8    microphone.
9  Q. You're saying that these officers risked their entire career
10   by intentionally omitting things from the report to get you?
11 A. I guess I am saying that.
12 Q. Well, let's not guess. You are saying that; aren't you?
13 A. Yeah.
14 Q. So, we have Mr. Gray, who's either mistaken or lying;
15   correct?
16 A. Right.
17 Q. Mr. Isaacson, who is either mistaken or lying?
18 A. You got Mr. Isaacson as being dissatisfied.
19 Q. So, when he says that you robbed him, that's a lie?
20 A. I can't rob him if I never got out the car.
21 Q. You're saying that's a lie?
22 A. Yeah. I'm saying that's a lie.
23 Q. So, we have Mr. Gray either mistaken or lying, Mr. Isaacson
24   lying, the police officer's intentionally omitting things
25   from their report.

**Page 32**

1  A. Yeah.
2  Q. All those things happened?
3  A. They sure did.
4     MR. BRAMBLE: I have nothing further.
5     THE COURT: Ms. Foster?
6     MS. FOSTER: Nothing, your Honor.
7     THE COURT: All right. You may step down. Thank
8  you.
9     (At 3:59 p.m., witness stepped down)
10    END OF EXCERPT

```
 1                OFFICIAL REPORTER'S CERTIFICATE
 2
 3
     STATE OF MICHIGAN    )
 4                        )  SS
     COUNTY OF KENT       )
 5
 6                     I, Leslie Rydahl, Court Reporter in and
 7   for the Circuit Court for the County of Kent, State of Michigan,
 8   do hereby certify that I reported stenographically the
 9   proceedings held in the above-entitled cause before the Honorable
10   GEORGE S. BUTH on March 27, 2012; and do further certify that the
11   foregoing EXCERPT of a transcript is a true and correct
12   transcript of my stenographic notes of said proceedings so
13   reported and transcribed by me.
14
15
16              _____
                Leslie L. Rydahl CSR 4078
17              Official Court Reporter
18   Dated: _____
19          Grand Rapids, Michigan
20
21
22
23
24
25

                                 33
```

OFFICIAL REPORTER'S CERTIFICATE

STATE OF MICHIGAN  )
                   )  SS
COUNTY OF KENT     )

            I, Leslie Rydahl, Court Reporter in and for the Circuit Court for the County of Kent, State of Michigan, do hereby certify that I reported stenographically the proceedings held in the above-entitled cause before the Honorable GEORGE S. BUTH on March 27, 2012; and do further certify that the foregoing EXCERPT of a transcript is a true and correct transcript of my stenographic notes of said proceedings so reported and transcribed by me.

_____
Leslie L. Rydahl CSR 4078
Official Court Reporter

Dated: _3-28-12_
Grand Rapids, Michigan