STATE OF MICHIGAN

SEVENTEENTH JUDICIAL CIRCUIT COURT (KENT COUNTY)

THE PEOPLE OF THE
STATE OF MICHIGAN

ORIGINAL

-v-

Case No. 11-11910-FH
11-11911-FH

RCV'D & FILED

KELVIN WAYNE HEATH,

Defendant.

SEP 11 2012

JUDGE BUTH
17ᵀᴴ CIRCUIT COURT

/

JURY TRIAL -- VOLUME 1 OF 2

BEFORE THE HONORABLE GEORGE S. BUTH, CIRCUIT JUDGE

Grand Rapids, Michigan - Tuesday, March 27, 2012

APPEARANCES:

For the People:        MR. KEVIN M. BRAMBLE (P38380)
                       Assistant Prosecuting Attorney
                       82 Ionia Avenue, NW, Suite 450
                       Grand Rapids, MI  49503
                       616.632.6710

For the Defendant:     MS. VALERIE A. FOSTER (P44459)
                       Kent County Defender Office
                       146 Monroe Center Street, N.W.
                       Suite 920
                       Grand Rapids, MI  49503
                       616.774.8181

REC'D & FILED

SEP 11 2012

CIRCUIT COURT ADMINISTRATION

Reported by:           Leslie Rydahl, CSR-4078
                       Official Court Reporter
                       Kent County Courthouse
                       180 Ottawa Avenue, NW, Suite 12200
                       616.632.5021

1                          TABLE OF CONTENTS

2    OPENING REMARKS                                         7
     PANEL SWORN                                            12
3    VOIR DIRE                                              13
     JURORS SWORN                                           79
4    INSTRUCTIONS BY THE COURT                              79
     OPENING STATEMENT BY MR. BRAMBLE                       91
5    OPENING STATEMENT BY MS. FOSTER                        98
     WITNESSES - PEOPLE:
6    BRIAN JAMES GRAY

7    DIRECT EXAMINATION BY MR. BRAMBLE                      102
     VOIR DIRE                                             110
8    CROSS-EXAMINATION BY MS. FOSTER                        114
     REDIRECT EXAMINATION BY MR. BRAMBLE                    127
9    RECROSS EXAMINATION BY MS. FOSTER                      128

10   TESTIMONY OF BARRY ISAACSON READ                       131

11   DONALD VERHAGE

12   DIRECT EXAMINATION BY MR. BRAMBLE                      133
     NO CROSS-EXAMINATION
13
     PHILIP SWIERCZ
14
     DIRECT EXAMINATION BY MR. BRAMBLE                      140
15   CROSS-EXAMINATION BY MS. FOSTER                        148
     REDIRECT EXAMINATION BY MR. BRAMBLE                    154
16   RECROSS-EXAMINATION BY MS. FOSTER                      156

17   DENNIS FERGUSON

18   DIRECT EXAMINATION BY MR. BRAMBLE                      157
     CROSS-EXAMINATION BY MS. FOSTER                        166
19
     DEFENSE MOTION FOR MISTRIAL                            170
20   DEFENSE MOTION FOR DIRECTED VERDICT                    173
     WITNESSES - DEFENSE:
21
     KELVIN WAYNE HEATH
22   DIRECT EXAMINATION BY MS. FOSTER                       177
     CROSS-EXAMINATION BY MR. BRAMBLE                       189

23   EXHIBITS: _____     MARKED          ADMITTED
     PX 3-5                       Prior to trial      113
24   PX 1 & 2 from prior hearing        --           131
     DX A                            122             123
25   PX 6                         Prior to trial      145
     PX 6-9                       Prior to trial      169

STATE OF MICHIGAN

SEVENTEENTH JUDICIAL CIRCUIT COURT (KENT COUNTY)

THE PEOPLE OF THE
STATE OF MICHIGAN

-v-                                   Case No. 11-11910-FH
                                              11-11911-FH

KELVIN WAYNE HEATH,

                    Defendant.
_____/

JURY TRIAL -- VOLUME 1 OF 2

BEFORE THE HONORABLE GEORGE S. BUTH, CIRCUIT JUDGE

Grand Rapids, Michigan - Tuesday, March 27, 2012

APPEARANCES:

For the People:        MR. KEVIN M. BRAMBLE (P38380)
                       Assistant Prosecuting Attorney
                       82 Ionia Avenue, NW, Suite 450
                       Grand Rapids, MI  49503
                       616.632.6710

For the Defendant:     MS. VALERIE A. FOSTER (P44459)
                       Kent County Defender Office
                       146 Monroe Center Street, N.W.
                       Suite 920
                       Grand Rapids, MI  49503
                       616.774.8181

Reported by:           Leslie Rydahl, CSR-4078
                       Official Court Reporter
                       Kent County Courthouse
                       180 Ottawa Avenue, NW, Suite 12200
                       616.632.5021

1

---

**TABLE OF CONTENTS**

OPENING REMARKS                                          7
PANEL SWORN                          12
VOIR DIRE                            13
JURORS SWORN                                            79
INSTRUCTIONS BY THE COURT            79
OPENING STATEMENT BY MR. BRAMBLE                        91
OPENING STATEMENT BY MS. FOSTER                         98
WITNESSES - PEOPLE:
BRIAN JAMES GRAY

DIRECT EXAMINATION BY MR. BRAMBLE                      102
VOIR DIRE                                              110
CROSS-EXAMINATION BY MS. FOSTER                        114
REDIRECT EXAMINATION BY MR. BRAMBLE                    127
RECROSS EXAMINATION BY MS. FOSTER                      128

TESTIMONY OF BARRY ISAACSON READ                       131

DONALD VERHAGE

DIRECT EXAMINATION BY MR. BRAMBLE                      133
NO CROSS-EXAMINATION

PHILIP SWIERCZ

DIRECT EXAMINATION BY MR. BRAMBLE                      140
CROSS-EXAMINATION BY MS. FOSTER                        148
REDIRECT EXAMINATION BY MR. BRAMBLE                    154
RECROSS-EXAMINATION BY MS. FOSTER                      156

DENNIS FERGUSON

DIRECT EXAMINATION BY MR. BRAMBLE                      157
CROSS-EXAMINATION BY MS. FOSTER                        166

DEFENSE MOTION FOR MISTRIAL                            170
DEFENSE MOTION FOR DIRECTED VERDICT                    173
WITNESSES - DEFENSE:

KELVIN WAYNE HEATH
DIRECT EXAMINATION BY MS. FOSTER                       177
CROSS-EXAMINATION BY MR. BRAMBLE                       189
EXHIBITS:              MARKED         ADMITTED
PX 3-5            Prior to trial    113
PX 1 & 2 from prior hearing    --                131
DX A                   122         123
PX 6             Prior to trial    145
PX 6-9           Prior to trial    169

2

---

Grand Rapids - Michigan
Tuesday, March 27, 2012

(At about 8:58 a.m. - Court in session)

                    - - -

THE COURT: We're on the record here waiting for jurors to come up in two cases, People versus Kelvin Wayne Heath. Each one contains an unarmed robbery count and unlawful imprisonment count, each one of which carries a maximum period of imprisonment of 15 years. And then each case has an impersonating a public officer count that carries a maximum of one year.

Mr. Bramble, you're set to pick a jury on both cases and try the matter?

MR. BRAMBLE: Yes, your Honor.

THE COURT: All right. Ms. Foster, you're all set?

MS. FOSTER: Yes, your Honor.

THE COURT: Just so we're clear here, is there any plea offer? And I would just address the defendant right now.

If you lose in front of the jury, you'll have two convictions -- well, two cases where your convictions will carry anywhere up to a maximum of life in prison.

3

---

Do you understand that, Mr. Heath?

THE DEFENDANT: (No verbal response)

THE COURT: Mr. Heath, do you understand that?

THE DEFENDANT: Yeah, I understand.

THE COURT: Okay. And is there any offer at this point, Mr. Bramble?

MR. BRAMBLE: There is, your Honor. One count of larceny from a person in each file, and we would dismiss the remainder of the charges, including the Supplemental Information.

THE COURT: The maximum on larceny person is ten years; correct?

MR. BRAMBLE: Correct, your Honor.

THE COURT: Ms. Foster?

MS. FOSTER: Yes. That's the understanding; larceny from a person, two counts; dismiss the balance.

THE COURT: And your client is going to reject that and proceed with a jury pick?

MS. FOSTER: Yes. But can we just at least for clarification let my client know fully the guideline ranges on -- what would be the guideline range -- if he were to take the plea bargain, what the guideline were if he's convicted of all of the charges --

THE COURT: Sure.

MS. FOSTER: -- with the supplemental.

4

---

**Page 5**

1      Now I had originally indicate-- -- let's talk about

2  the actual guidelines. The actual guide -- is for the

3  unarmed robbery plus with the other added counts, the

4  unarmed robbery being the most serious, but with the added

5  counts, in my estimation, puts him at F5 range, which would

6  be 58 to 114 months without the supps, which would be 58 to

7  228 on the minimum with the supps.

8      Is that what you have, Mr. Bramble?

9      MR. BRAMBLE: That's what I have.

10     MS. FOSTER: If he were to take advantage of the

11  plea bargain -- I originally said that they probably would

12  be F5, but since you are eliminating the impersonating a

13  police officer -- two counts of impersonating a police

14  officer and two counts of unlawful imprisonment, I think

15  that throws him down quite a bit. I'm thinking he's

16  probably, at the worst, F3 range, which is 29 to 57 months

17  on the minimum with a cap of 57 months because there will be

18  no supps involved.

19     THE COURT: All right. Do you want to talk with

20  your client anymore, Ms. Foster?

21     MS. FOSTER: I think he's ready to go. I just

22  wanted him to understand, if he were to take the deal right

23  now, he's looking at 29 to the 57 months. If he goes to

24  trial and loses, he's looking at 58 to 228 months on the

25  minimum and up to life imprisonment on the max.

**Page 6**

1      But I believe he wants to go forward. Is that

2  correct, Mr. Heath?

3      THE DEFENDANT: What, 29 months to something, two

4  years, whatever it is? I'm not takin' no two years.

5      MS. FOSTER: So your answer is you want to go

6  forward with a trial?

7      THE DEFENDANT: Yeah, I want to go to trial.

8      MS. FOSTER: Okay. He's indicated -- he's

9  rejected the offer and wants to go forward with a trial.

10     THE COURT: Anything else we need to cover,

11  Mr. Bramble, before selecting the jury?

12     MR. BRAMBLE: I don't believe so, your Honor.

13     THE COURT: Ms. Foster, anything else?

14     MS. FOSTER: Only thing is I believe all these

15  other issues have been already discussed in previous motions

16  and whatnot. The Court had decided to combine these cases.

17  I argued against that. The Court rejected my argument, and

18  we are going forward with these consolidated cases. I just

19  want the record to reflect that I did oppose -- I do

20  continue to oppose the consolidation of these two cases.

21  There was a period of time in between the first and the

22  second alleged incident and there are some differences --

23  nuance differences between the two, and I would just stand

24  by my opposition to the Court's ruling on this matter, your

25  Honor.

**Page 7**

1      Other than that, I don't have anything further.

2      THE COURT: I say the operative word there is

3  "nuance." I'll leave it at that.

4      MS. FOSTER: Okay.

5      THE COURT: All right. We will -- Ms. Foster, off

6  the record.

7      (Discussion off the record)

8      (At 8:58 a.m., break had)

9      (At 9:19 a.m., panel seated)

10     THE COURT: Good morning.

11     I'm Judge George Buth. I'll be presiding over

12  this matter. We're actually trying two cases together

13  today, each one entitled People of the State of Michigan

14  versus Kelvin Wayne Heath.

15     Seated on my right is my clerk, Marlene Gould; on

16  my left is my court reporter, Leslie Rydahl. On your right

17  at counsel table is Assistant Kent County Prosecutor Kevin

18  Bramble. Seated next to him is Wyoming Officer Philip

19  Swiercz. Seated on your left at counsel table is Defense

20  Attorney Valerie Foster.

21     MS. FOSTER: Good morning.

22     THE COURT: Seated next to her is her client, the

23  defendant, Mr. Heath.

24     Then she also has three externs seated with her.

25     MS. FOSTER: Their names, this is Mr. Simpson,

**Page 8**

1  Alton Simpson; and this is Mr. Brad Seigman. And this is

2  Laura Joyce, and they're all law students shadowing me and

3  learning the ropes.

4      THE COURT: Any of the potential witnesses in this

5  case will be mentioned to you during voir dire.

6      We will be going all day today and all day

7  Thursday. We'll complete the case sometime on Thursday. If

8  any of you have a conflict with that schedule, if any of you

9  have any health issues such at seeing, hearing, sitting for

10  long periods of time, call that to our attention.

11     As I said, this is a criminal case. The paper

12  used to charge the defendant with a crime or crimes is

13  called an Information. The Information in the first case

14  charges the defendant -- actually in each one of these cases

15  there are identical charges, Counts One, Two and Three.

16  Count One, unarmed robbery; Count Two, unlawful

17  imprisonment; Count Three, impersonating a public officer.

18     The first Information reads as follows:

19     That on or about November 14 of the year 2011, at

20  2983 Burlingame Avenue, City of Wyoming, Kent County, that

21  in Count One the defendant did, in the course of committing

22  a larceny of money, assault or put in fear a person present,

23  Brian Gray; contrary to Michigan law.

24     Count Two, defendant did knowingly restrain Brian

25  Gray to facilitate the commission of larceny of money,

1  again, contrary to Michigan law.

2  In Count Three, defendant of an unlawful

3  purpose represent to Brian Gray that he was a peace officer

4  when he was not a peace officer, again, contrary to Michigan

5  law.

6  The second case, on or about November 29 of the

7  year 2011 at 3001 Burlingame Avenue, City of Wyoming, Kent

8  County, in Count One, that defendant did in the course of

9  committing a larceny of money, assault or put in fear a

10  person present, Barry Isaacson; contrary to Michigan law.

11  In Count Two, defendant did knowingly restrain

12  Barry Isaacson to facilitate the commission of larceny of

13  money from his person, again; contrary to Michigan law.

14  Finally, in Count Three, defendant did for an

15  unlawful purpose represent to Barry Isaacson that he was a

16  peace officer when he was not a peace officer, again;

17  contrary to Michigan law.

18  The defendant has pled not guilty to each one of

19  these charges. You should clearly understand that the

20  Informations I have just read are not evidence. An

21  Information is read in every criminal trial so that the

22  defendant and jury can hear the charges. You must not think

23  it is evidence of his guilt or that he must be guilty

24  because he has been charged.

25  A person accused of a crime is presumed to be

9

1  innocent. This means that you must start with the

2  presumption that the defendant is innocent. This

3  presumption continues throughout the trial and entitles the

4  defendant to a verdict of not guilty unless you are

5  satisfied beyond a reasonable doubt that he is guilty.

6  Every crime is made up of parts called elements.

7  The prosecutor must prove each element of the crime beyond a

8  reasonable doubt. The defendant is not required to prove

9  his innocence or to do anything. If you find that the

10  prosecutor's not proven every element beyond a reasonable

11  doubt, then you must find the defendant not guilty.

12  A reasonable doubt is a fair, honest doubt growing

13  out of the evidence or lack of evidence. It is not merely

14  an imaginary or possible doubt, but a doubt based on reason

15  and common sense. A reasonable doubt is just that -- a

16  doubt that is reasonable, after a careful and considered

17  examination of the facts and circumstances of this case.

18  I know that jury duty may be a new experience for

19  some of you. Jury duty is one of the most serious duties

20  that members of a free society are asked to perform. Our

21  system of self-government do not exist without it.

22  The jury is an important part of this court. The

23  right to a jury trial is an ancient tradition and part of

24  our heritage. The law says that both a person who is

25  accused of a crime and the prosecution have the right to a

10

1  trial, not by one person but by a jury of twelve impartial

2  persons.

3  Jurors must be as free as humanly possible from

4  bias, prejudice, or sympathy for either side. Each side in

5  a trial is entitled to jurors who keep open minds until the

6  time comes to decide the case.

7  A trial begins with jury selection. The purpose

8  of this process is to obtain information about you that will

9  help us choose a fair and impartial jury to hear this case.

10  During jury selection the lawyers will ask you

11  questions. This is called the voir dire. The questions are

12  meant to find out if you know anything about the case.

13  Also, we need to find out if you have any opinions or

14  personal experiences that might influence you for or against

15  the prosecution, the defendant, or any witnesses. One or

16  more of these things could cause you to be excused in this

17  particular case, even though you may otherwise be qualified

18  to be a juror.

19  The questions may probe deeply into your

20  attitudes, beliefs, and experiences. They are not meant to

21  be an unreasonable prying into your private life. The law

22  requires that we obtain this information so that an

23  impartial jury can be chosen.

24  If you do not hear or understand a question, you

25  should say so. If you do understand it, you should answer

11

1  it truthfully and completely. Please do not hesitate to

2  speak freely about anything you believe we should know.

3  During jury selection you may be excused from

4  serving on the jury in one of two ways. First, I may excuse

5  you for cause; that is, I may decide that there's a valid

6  reason why you cannot or should not serve in this case. Or,

7  a lawyer from one side or the other may excuse you without

8  giving any reason for doing so. This is called a peremptory

9  challenge. The law gives each side the right to excuse a

10  certain number of jurors in this way. If you are excused,

11  you should not feel bad or take it personally. As I

12  explained before, there simply may be something that causes

13  you to be excused from this particular case.

14  If you'd all please stand, my clerk will swear you

15  in.

16  THE CLERK: Would you raise your right hands,

17  please?

18  Will you solemnly swear or affirm that you will

19  truthfully and completely answer all questions about your

20  qualifications to serve as jurors in this cause, so help you

21  God?

22  THE JURY: (Responds affirmatively)

23  (At 9:27 a.m., panel sworn)

24  THE COURT: We will be seating fourteen jurors up

25  here. The first juror selected should sit in the back row.

12

**13**

1  Mr. Bramble, a question or --
2  MR. BRAMBLE:  I never got -- yet.
3  THE COURT:  Oh.
4  THE CLERK:  (Distributing jury seating chart)
5  THE COURT:  First juror selected should sit in the
6  back row in the chair closest to you, one through seven,
7  working across the back, away from you.  Juror Number Eight
8  will sit in the front row, the juror closest to you, eight
9  through fourteen across the front.
10  Please listen carefully for your name.  The
11  numbers that we are using internally here are most likely
12  different than the number you were assigned downstairs.
13  Go ahead, please.
14  THE CLERK:  Number 31, Nicholas Bogert.
15  Number 40, Laura Stahle.
16  Number 27, Alison Hodgson.
17  Number 4, Craig Miller.
18  Number 16, Hadiya Muhammad.
19  Number 12, James VanEssen.
20  Number 30, Sharon Ingersoll.
21  Number 28, Leslie Daniels.
22  Number 7, Ashlee Roberts.
23  Number 18, Seneca Wilcox.
24  Number 23, Daniel Siegel.
25  Number 21, Michelle Rowland.

**14**

1  Number 2, Ruth Slagle.
2  Number 34, Alessandro Libriani.
3  THE COURT:  Mr. Bramble.
4  MR. BRAMBLE:  Thank you, your Honor.
5  Ladies and gentlemen of the jury, as Judge Buth
6  indicated, this is my opportunity to question you in voir
7  dire.  I'm going to ask you some questions and defense
8  counsel is going to ask you some questions.  Those questions
9  aren't meant to embarrass or to pry into your personal life;
10  they're simply meant to gain a little bit more information
11  about you, because all the information we have is just that
12  limited information that was on that jury questionnaire form
13  that you filled out some time ago.
14  I caution people who are sitting in the back here
15  that haven't been chosen yet.  If you'll make sure you can
16  listen and make sure you could hear me and defense counsel,
17  because inevitably people get removed from here, and one of
18  you have to replace them.  And so, if you can kind of make a
19  mental note, if you would respond if you were up here, it
20  will help move things along a little more quickly.
21  As the Judge indicated, I'm going to give you a
22  list of witnesses here and see if any of you recognize the
23  names.
24  Robert Augnst.  He is a police officer with the
25  City of Wyoming; Officer Jonathan Durell; Officer Swiercz;

**15**

1  Officer Anthony Jacob; Officer D.J. VerHage; Officer Dennis
2  Ferguson; Officer Ada  Vitone; Officer Christopher DeBoer;
3  Officer Matthew Rooks; Officer Ryan Silvis; Officer Jesse
4  Lopez; Barry Gordon Isaacson; Eleanor Griffin; Jerrell
5  Heath; Anthony Johnson; Deon Moody; Terry Demontae Houston.
6  Those are just a list of potential witnesses I might call.
7  Does anyone recognize any of those names?
8  Ma'am, is it Stahle?
9  JUROR SEAT #2:  Stahle, yep.
10  MR. BRAMBLE:  Stahle.  All right.  What name can
11  you recognize there?
12  JUROR SEAT #2:  Eleanor Griffin.  I think she used
13  to work for a company I worked for.
14  MR. BRAMBLE:  Okay.  How long ago?
15  JUROR SEAT #2:  Ten years ago maybe.
16  MR. BRAMBLE:  All right.  Did you work with her
17  directly?
18  JUROR SEAT #2:  No.  I worked in the front office
19  and she worked -- if she's the same person, she worked as a
20  teacher at one of the Head Start programs.
21  MR. BRAMBLE:  Okay.  Anything about that that
22  would prevent you from sitting as a fair and impartial
23  juror?
24  JUROR SEAT #2:  No.
25  MR. BRAMBLE:  Okay.  And Mr. Miller, you recognize

**16**

1  some of the police officers' names?
2  JUROR SEAT #4:  Correct.
3  MR. BRAMBLE:  That's because you worked as a
4  probation officer; correct?
5  JUROR SEAT #4:  Correct.
6  MR. BRAMBLE:  Anything about the work you do or
7  that -- your knowledge or familiarity with any of these
8  police officers that would prevent you from sitting and
9  following the Judge's instructions?
10  JUROR SEAT #4:  No.
11  MR. BRAMBLE:  Okay.  Anyone else think they may
12  have recognized any of those names that I read off?
13  THE JURY:  (Responds negatively)
14  MR. BRAMBLE:  How many of you have served as
15  jurors before?
16  JUROR SEAT #2:  (Raising hand)
17  MR. BRAMBLE:  Ms. Stahle, you have?
18  JUROR SEAT #2:  Yes.
19  MR. BRAMBLE:  Was that here in Kent County?
20  JUROR SEAT #2:  Yes.
21  MR. BRAMBLE:  And was it here in this building?
22  JUROR SEAT #2:  No.  It was in the old building.
23  It was back about 20 years ago.
24  MR. BRAMBLE:  Do you know, was it a civil case or
25  a criminal case?

1     JUROR SEAT #2: Criminal.

2     MR. BRAMBLE: And what, if case was it, if you

3 remember?

4     JUROR SEAT #2: It was a theft from a car.

5     MR. BRAMBLE: All right. Did you actually go to

6 deliberation on it?

7     JUROR SEAT #2: Yes.

8     MR. BRAMBLE: Anything about that that would

9 prevent you from sitting here as a fair and impartial juror?

10     JUROR SEAT #2: No.

11     MR. BRAMBLE: Okay.

12     Anyone on the panel besides Mr. Miller that knows

13 some police officers?

14     I'll start in the back row with you, Mr. VanEssen.

15 How do you know some police officers?

16     JUROR SEAT #6: I am retired from the City of

17 Wyoming. So, I have been around a few officers,

18 acquaintances. This gentleman here looks familiar,

19 Mr. Swiercz.

20     MR. BRAMBLE: Do you know him well, though?

21     JUROR SEAT #6: No, no.

22     MR. BRAMBLE: Do you know any of these officers

23 real well?

24     JUROR SEAT #6: No.

25     MR. BRAMBLE: Do you think your contact with them,

**17**

1 which you might have had, would prevent you from sitting as

2 a fair and impartial juror?

3     JUROR SEAT #6: No.

4     MR. BRAMBLE: Ms. Roberts, what police officers do

5 you know?

6     JUROR SEAT #9: My father and uncle are police

7 officers.

8     MR. BRAMBLE: What department was your father --

9     JUROR SEAT #9: Kent County.

10     MR. BRAMBLE: All right. Is he still with the

11 department?

12     JUROR SEAT #9: No. He retired like 12 years ago.

13     MR. BRAMBLE: Anything about that that would

14 prevent you from sitting as a fair and impartial juror?

15     JUROR SEAT #9: No.

16     MR. BRAMBLE: All right. And you said your uncle

17 was also?

18     JUROR SEAT #9: (Nods head affirmatively)

19     MR. BRAMBLE: What department did he work for?

20     JUROR SEAT #9: I believe the Grand Rapids Police

21 Department.

22     MR. BRAMBLE: And was this a while ago, as well?

23     JUROR SEAT #9: Yeah.

24     MR. BRAMBLE: Did you discuss his work with him

25 very much?

**18**

1     JUROR SEAT #9: No.

2     MR. BRAMBLE: Anything about that that would

3 prevent you from sitting as a fair and impartial juror?

4     JUROR SEAT #9: No.

5     MS. FOSTER: Excuse me. My client is deaf in one

6 ear and he's having a hard time hearing.

7     THE REPORTER: (Distributing headset)

8     MR. BRAMBLE: Anyone else in the front row?

9     Okay, Ms. Rowland?

10     JUROR SEAT #12: I know a Traci Ludwig and Randy

11 Haverkamp.

12     MR. BRAMBLE: What department do they work for?

13     JUROR SEAT #12: They are Kent County Sheriff

14 Department.

15     MR. BRAMBLE: How well do you know them?

16     JUROR SEAT #12: I see them maybe a couple times a

17 year.

18     MR. BRAMBLE: Anything about that that would

19 prevent you from sitting as a fair and impartial juror?

20     JUROR SEAT #12: No, sir.

21     MR. BRAMBLE: Okay. Regarding police officers,

22 has anyone on the panel had a bad experience with a police

23 officer? I don't care if it's something as minor as a

24 traffic ticket. Anyone had a bad experience with a police

25 officer? Okay.

**19**

1     Anyone on the panel that has had an experience

2 with a police officer that would prevent them from sitting

3 and listening to their testimony just as you would any other

4 persons? Okay.

5     Anyone on the panel know anyone who's been either

6 accused, charged or convicted of a crime? Know anyone who's

7 been accused, charged or convicted of a crime? Okay.

8     I'll start with you, Mr. Bogert.

9     JUROR SEAT #1: My brother.

10     MR. BRAMBLE: What type of offense was it?

11     JUROR SEAT #1: Theft.

12     MR. BRAMBLE: And anything -- was it here in Kent

13 County?

14     JUROR SEAT #1: Yes.

15     MR. BRAMBLE: Did you know that much about the

16 case?

17     JUROR SEAT #1: Some, yes.

18     MR. BRAMBLE: Okay. Did you feel he was treated

19 fairly by the police, the prosecution or the judge?

20     JUROR SEAT #1: Yes.

21     MR. BRAMBLE: Okay. And my reason for asking you

22 that is I don't want someone who's got an axe to grind

23 against the system here or against the police officers. You

24 understand that?

25     JUROR SEAT #1: Okay.

**20**

**Page 21**

1    MR. BRAMBLE: Ms. Stahle, did you raise your hand?

2    JUROR SEAT #2: Yes.

3    MR. BRAMBLE: Who do you know?

4    JUROR SEAT #2: My nephew.

5    MR. BRAMBLE: All right. What type of offense?

6    JUROR SEAT #2: Murder.

7    MR. BRAMBLE: All right. Here in Kent County?

8    JUROR SEAT #2: No.

9    MR. BRAMBLE: Where, please?

10   JUROR SEAT #2: Lake County.

11   MR. BRAMBLE: Did you feel he was treated fairly?

12   JUROR SEAT #2: The case is just going on. It

13   hasn't gone to court yet.

14   MR. BRAMBLE: Okay. Ms. Hodgson, did you raise

15   your hand?

16   JUROR SEAT #3: Yes.

17   MR. BRAMBLE: Who do know who's either been

18   accused, charged or convicted of a crime?

19   JUROR SEAT #3: A cousin of mine is involved in a

20   robbery. He was down in Florida years and years ago.

21   MR. BRAMBLE: Did you know that much about it?

22   JUROR SEAT #3: I was young. His mythology was he

23   hadn't been in Florida and worked it out later since.

24   MR. BRAMBLE: Do you have an axe to grind against

25   the police or anything about that?

**Page 22**

1    JUROR SEAT #3: No.

2    MR. BRAMBLE: No. Mr. Miller, because of your

3    work, you do?

4    JUROR SEAT #4: Correct.

5    MR. BRAMBLE: All right. Again, you feel you can

6    follow the Judge's instructions?

7    JUROR SEAT #4: Yes, sir.

8    MR. BRAMBLE: Okay. And who else in the back row

9    raised -- anyone else in the back row?

10   Okay, Ms. Ingersoll?

11   JUROR SEAT #7: Um-hmm (affirmatively)

12   MR. BRAMBLE: Who do you know who's been either

13   accused, charged or convicted of a crime?

14   JUROR SEAT #7: My son.

15   MR. BRAMBLE: And here in Kent County?

16   JUROR SEAT #7: Um-hmm (affirmatively).

17   MR. BRAMBLE: And what type of offense was it?

18   JUROR SEAT #7: Fleeing and eluding.

19   MR. BRAMBLE: Oh, all right. Do you know what

20   department it was?

21   JUROR SEAT #7: As far as the --

22   MR. BRAMBLE: What police agency.

23   JUROR SEAT #7: Kent County.

24   MR. BRAMBLE: Sheriff's Department.

25   JUROR SEAT #7: Um-hmm (affirmatively). I think

**Page 23**

1    State police, too.

2    MR. BRAMBLE: Okay. Did it -- did you feel he was

3    treated appropriately?

4    JUROR SEAT #7: Yes.

5    MR. BRAMBLE: All right. By the police?

6    JUROR SEAT #7: Um-hmm (affirmatively).

7    MR. BRAMBLE: Okay. And again, for the same

8    reason, I don't want you saying, "Geez, they didn't treat my

9    son fairly, so I'm going to take it out on this case."

10   That's doesn't sound like it's the situation with you.

11   JUROR SEAT #7: No.

12   MR. BRAMBLE: Okay. How about in front row?

13   Anyone know anyone who's been accused, charged or convicted

14   of a crime? All right.

15   Ms. Roberts.

16   JUROR SEAT #9: Um-hmm (affirmatively).

17   MR. BRAMBLE: Who do you know that's been accused,

18   charged or convicted of a crime?

19   JUROR SEAT #9: My brother.

20   MR. BRAMBLE: All right. What did he get

21   convicted of?

22   JUROR SEAT #9: I -- I honestly don't know the

23   formal conviction, but it was convicted of masturbation in

24   public.

25   MR. BRAMBLE: So, like an indecent exposure type

**Page 24**

1    of thing?

2    JUROR SEAT #9: Yes.

3    MR. BRAMBLE: How long ago?

4    JUROR SEAT #9: Six months ago.

5    MR. BRAMBLE: Here in Kent County?

6    JUROR SEAT #9: Yep.

7    MR. BRAMBLE: Do you feel he was treated fairly by

8    the police, the prosecution?

9    JUROR SEAT #9: (Nods head affirmatively)

10   MR. BRAMBLE: Again, you don't have an axe to

11   grind against this case, or the system or anything of that

12   nature?

13   JUROR SEAT #9: No. It was his own fault.

14   MR. BRAMBLE: Ms. Wilcox, you know someone?

15   JUROR SEAT #10: Multiple people.

16   MR. BRAMBLE: Any of them that are close to you?

17   JUROR SEAT #10: My brother was convicted of

18   accessory to B&E about twelve years ago.

19   MR. BRAMBLE: The people that you know, have they

20   been treated fairly as far as you know?

21   JUROR SEAT #10: Yes.

22   MR. BRAMBLE: Anything about that that would

23   prevent you from sitting as a fair and impartial juror?

24   JUROR SEAT #10: No.

25   MR. BRAMBLE: All right. Mr. Siegel, you raised

**Page 25**

1  your hand, as well?

2  JUROR SEAT #12: Uh-huh.

3  MR. BRAMBLE: You did not. All right.

4  Ms. Rowland?

5  JUROR SEAT #12: Umm, my husband for assault.

6  MR. BRAMBLE: All right. And how long ago,

7  please?

8  JUROR SEAT #12: Approximately a year-and-a-half

9  ago.

10  MR. BRAMBLE: Here in Kent County?

11  JUROR SEAT #12: Yes, sir.

12  MR. BRAMBLE: And again, I'm not trying to harass

13  you or embarrass you, but did you feel he was treated fairly

14  by the system?

15  JUROR SEAT #12: Yes, sir.

16  MR. BRAMBLE: Were you present when the assault

17  took place?

18  JUROR SEAT #12: Yes.

19  MR. BRAMBLE: Ms. Slagle, did you raise your hand?

20  JUROR SEAT #13: Yes.

21  MR. BRAMBLE: Who do you know that's been --

22  JUROR SEAT #13: My son.

23  MR. BRAMBLE: Here in Kent County?

24  JUROR SEAT #13: Yeah.

25  MR. BRAMBLE: What type of offense, please?

**Page 27**

1  JUROR SEAT #13: Well it was just really a -- it

2  was just a messed up -- I mean, it was like he wasn't --

3  my son wasn't totally innocent, but it was just -- it was

4  just, you know, it went on like when he was in his later

5  teen-age years. So, it's been a while but...

6  MR. BRAMBLE: Okay. Mr. Libriani, did you raise

7  your hand?

8  JUROR SEAT #14: Yep.

9  MR. BRAMBLE: Who do you know, please?

10  JUROR SEAT #14: My good friend got a DUI.

11  MR. BRAMBLE: Here in Kent County?

12  JUROR SEAT #14: No. I don't know what county it

13  was, but it was up in Mt. Pleasant.

14  MR. BRAMBLE: Isabella County maybe?

15  JUROR SEAT #14: Sure, yeah.

16  MR. BRAMBLE: Anything about that that would

17  prevent you from sitting as a fair and impartial juror?

18  JUROR SEAT #14: No.

19  MR. BRAMBLE: Do you feel from what you knew that

20  he was treated fairly?

21  JUROR SEAT #14: Yeah.

22  MR. BRAMBLE: Okay.

23  MS. FOSTER: Somebody just raised their hand.

24  MR. BRAMBLE: Yes, Ms. Muhammad.

25  JUROR SEAT #5: I have a son that was convicted of

**Page 26**

1  JUROR SEAT #13: Under the influence and fleeing

2  and eluding an officer.

3  MR. BRAMBLE: Did you feel he was treated fairly

4  by the police?

5  JUROR SEAT #13: Kind of, yeah.

6  MR. BRAMBLE: And kind of not?

7  JUROR SEAT #13: I don't -- just -- yes, but I

8  don't -- I don't know.

9  MR. BRAMBLE: All right. Did it actually go

10  through the system?

11  JUROR SEAT #13: Yeah.

12  MR. BRAMBLE: Did he plead guilty to it?

13  JUROR SEAT #13: I -- I don't remember because I

14  wasn't in the -- I wasn't in the courtroom.

15  MR. BRAMBLE: Okay. But you thought maybe he

16  wasn't treated fairly in some respects, I take it?

17  JUROR SEAT #13: Yeah. There were some things I

18  wasn't, you know, really happy about. But I don't know.

19  MR. BRAMBLE: My reason for questioning you a

20  little bit on this is do you feel you could sit and listen

21  to a police officer's testimony just like you would anyone

22  else's?

23  JUROR SEAT #13: I could try.

24  MR. BRAMBLE: Okay. I take it your problem was

25  with the police officers that --

**Page 28**

1  possession of marijuana.

2  MR. BRAMBLE: Okay. Here in Kent County?

3  JUROR SEAT #5: Yes.

4  MR. BRAMBLE: Did you feel he was treated fairly?

5  JUROR SEAT #5: By the police?

6  MR. BRAMBLE: By the police.

7  JUROR SEAT #5: No.

8  MR. BRAMBLE: No? Okay.

9  Again, I'm not meaning to embarrass or pry, but

10  has anyone on the panel themselves been either accused,

11  charged or convicted of a crime?

12  JUROR SEAT #13: (Raising hand)

13  MR. BRAMBLE: You have?

14  JUROR SEAT #13: I don't know if it was a crime.

15  It was a DUI.

16  MR. BRAMBLE: Did you feel you were treated

17  fairly?

18  JUROR SEAT #13: No.

19  MR. BRAMBLE: Okay. Anyone on the panel been the

20  victim of a crime?

21  Ms. Hodgson, what type of offense.

22  JUROR SEAT #3: Arson. My house was burned down.

23  MR. BRAMBLE: How long ago?

24  JUROR SEAT #3: It's -- in June it will be two

25  years.

**29**

1 MR. BRAMBLE: All right. Here in Kent County?

2 JUROR SEAT #3: Um-hmm (affirmatively).

3 MR. BRAMBLE: Did they ever catch who did it?

4 JUROR SEAT #3: Well, ours was the first. There

5 was a string of arsons. Ours was the first. I'm sorry

6 (crying).

7 It wasn't officially linked in the investigation,

8 and so at the time I didn't think anything of it.

9 MS. FOSTER: Excuse me. Do you need a tissue?

10 JUROR SEAT #3: I'm sorry.

11 MS. FOSTER: That's okay.

12 MR. BRAMBLE: That's all right.

13 JUROR SEAT #3: I didn't think that bothered me,

14 but it's -- so they caught an arsonist, but it wasn't

15 officially linked to our fire. Ours was the first, and then

16 the string started less than a month after that.

17 MR. BRAMBLE: Wasn't the gentleman tried -- I

18 can't remember his name.

19 JUROR SEAT #3: Joseph McIntyre.

20 MR. BRAMBLE: He was eventually caught.

21 JUROR SEAT #3: (Nods head affirmatively). But

22 ours was very -- ours was first. He was in a different

23 location.

24 MR. BRAMBLE: Okay.

25 JUROR SEAT #3: And because of a sense of fear, I

**30**

1 found that it is hard because I can't say, "Yes, they did

2 catch him."

3 MR. BRAMBLE: I see what you're saying.

4 Are you upset with the police because they

5 couldn't link it to your --

6 JUROR SEAT #3: Umm, no. I don't have an axe to

7 grind, but I was frustrated. I mean, when someone burns

8 your house down, you're busy, and I think we saw him as we

9 left -- as we fled the home. I sent in a description and we

10 didn't hear back. And then when he was caught, I mean, it's

11 vague, it was a wide, you know, tens of thousands of young

12 men could have fit my description of the guy I saw and trace

13 it back to the address it happened to. We never heard back.

14 You know what I'm saying? It was a frustration thing.

15 MR. BRAMBLE: Did your entire house burn down?

16 JUROR SEAT #3: Well, I mean, we lost everything.

17 MR. BRAMBLE: You lost everything.

18 JUROR SEAT #3: I have an axe to grind with the

19 township, but not the police.

20 MR. BRAMBLE: Okay. Again, I just don't want you

21 taking it out on me or my police officers. It doesn't sound

22 like that's the case with you.

23 JUROR SEAT #3: No, no. It was just -- yeah.

24 MR. BRAMBLE: Mr. Miller, you indicated you'd been

25 the victim of a crime.

**31**

1 JUROR SEAT #4: When I was 16-years-old my car was

2 broken into.

3 MR. BRAMBLE: It shouldn't affect your ability to

4 sit here?

5 JUROR SEAT #4: No.

6 MR. BRAMBLE: All right. Anyone else in the back

7 row been the victim of a crime?

8 In the front row, Ms. Rowland.

9 JUROR SEAT #12: Assault.

10 MR. BRAMBLE: Was this involved in the same

11 incident your husband was?

12 JUROR SEAT #12: Correct.

13 MR. BRAMBLE: Did you feel the police handled it

14 okay?

15 JUROR SEAT #12: Yes.

16 MR. BRAMBLE: Okay. You don't have any concerns

17 about that?

18 JUROR SEAT #12: No, sir.

19 MR. BRAMBLE: The Judge is going to instruct you

20 that there are two types of evidence, direct evidence and

21 circumstantial evidence.

22 Now, direct evidence is if you're outside and you

23 watch the thunder and the lightning, you see rain coming

24 down, you're getting wet, you're outside, and you can see.

25 But I'll start with Mr. Bogert.

**32**

1 If you can look through those windows, and let's

2 say they're thin windows, and you see what looks like

3 lightning and you hear what sounds like thunder. People

4 come in carrying umbrellas, and they look like they have

5 raindrops on them. What would the -- inference would you

6 draw from that information?

7 JUROR SEAT #1: It's raining.

8 MR. BRAMBLE: It's raining. Do you understand

9 that circumstantial evidence is just as -- it can be just as

10 powerful, sometimes even more powerful, than direct

11 evidence.

12 JUROR SEAT #1: Um-hmm (affirmatively).

13 MR. BRAMBLE: The Judge will instruct you that you

14 can use circumstantial evidence. Will you just follow the

15 Judge's instruction?

16 JUROR SEAT #1: Yes.

17 MR. BRAMBLE: Ms. Stahle, would you agree with

18 that, as well?

19 JUROR SEAT #2: Yes.

20 MR. BRAMBLE: Ms. Hodgson?

21 JUROR SEAT #3: Yes.

22 MR. BRAMBLE: Mr. Miller?

23 JUROR SEAT #4: Yes.

24 MR. BRAMBLE: Ms. Muhammad?

25 JUROR SEAT #5: Yes.

1    MR. BRAMBLE: Mr. VanEss---?

2    JUROR SEAT #7: Yes.

3    MR. BRAMBLE: Ms. Ingersoll?

4    JUROR SEAT #7: Yes.

5    MR. BRAMBLE: Would everyone in the front row

6 agree with that, as well.

7    THE JURY: (Responds affirmatively)

8    MR. BRAMBLE: The Judge is going to instruct you

9 that you, if you remain seated on this panel, will be the

10 judge or determine the credibility of witnesses. You -- let

11 me start with you, Ms. Daniels. Do you work? Do you have a

12 job.

13    JUROR SEAT #8: Yes.

14    MR. BRAMBLE: Where do you work.

15    JUROR SEAT #8: Goodwill.

16    MR. BRAMBLE: And could I ask you either, whether

17 it be in your work or your just your day-to-day life, do you

18 think you determine and judge whether or not people are

19 being straight with you; honest with you?

20    JUROR SEAT #8: Yes.

21    MR. BRAMBLE: Okay. And do you understand that

22 may be part of the process here?

23    JUROR SEAT #8: Yes.

24    MR. BRAMBLE: Okay. And you feel you can do that

25 in this setting?

33

1    JUROR SEAT #8: Yes.

2    MR. BRAMBLE: Ms. Roberts, would you agree with

3 that?

4    JUROR SEAT #9: Yes.

5    MR. BRAMBLE: All right.

6 How about you, Ms. Wilcox?

7    JUROR SEAT #10: Yes.

8    MR. BRAMBLE: Mr. Siegel?

9    JUROR SEAT #11: Yep.

10    MR. BRAMBLE: Ms. Rowland?

11    JUROR SEAT #12: Yes, sir.

12    MR. BRAMBLE: Ms. Slagle, would you agree with

13 that?

14    JUROR SEAT #13: Yeah, I think so.

15    MR. BRAMBLE: Okay. How about you, Mr. Libriani?

16    JUROR SEAT #14: Yes.

17    MR. BRAMBLE: Everyone in the back row agree with

18 that, as well?

19    THE JURY: (Responds affirmatively)

20    MR. BRAMBLE: With this -- I'll start with you,

21 Ms. Ingersoll -- with this idea of judging or determining

22 the credibility of witnesses, do you understand there may

23 come a point in the trial where one -- when there's evidence

24 of people saying one thing happened and another person

25 saying it didn't happen, and, you know, the easy thing to do

34

1 would be to throw up your hands and say you can't -- you

2 get beside. You need to dig a little deeper

3 than that and determine who's being straight with you and

4 who's being honest with you. Would you agree with that?

5    JUROR SEAT #7: Yes.

6    MR. BRAMBLE: Do you feel you can do that in this

7 setting?

8    JUROR SEAT #7: Yes.

9    MR. BRAMBLE: Does everyone feel they could do

10 that?

11    THE JURY: Yes, sir (collectively).

12    MR. BRAMBLE: Okay. I won't get into a whole

13 bunch -- you know the charges, and they're unarmed robbery,

14 false impersonation of a police officer, false imprisonment

15 or unlawful imprisonment.

16    The allegations are that the defendant did this.

17 But I'd like to tell you a little bit about what you're

18 going to hear. There was the two gentlemen that are

19 involved, Mr. Isaacson and Mr. Gray, were driving after

20 responding to an ad -- I think it's a bogus ad that the

21 defendant put up, but an ad -- for a massage for adult

22 services. I think they're both going to be candid with you

23 and tell you that's why they were going there when the

24 defendant met up with them.

25    Anyone say, "Geez, just because they were going to

35

1 this massage or adult services, that they deserve to be

2 robbed or deserved to have their money stolen"? Anyone feel

3 that way?

4    THE JURY: (Responds negatively)

5    MR. BRAMBLE: Okay. The Judge will instruct you

6 that sympathy or prejudice shouldn't enter into your

7 deliberation process. I'll ask you this as a group. Does

8 everyone agree to follow that instruction?

9    THE JURY: (Responds affirmatively)

10    MR. BRAMBLE: Okay. The Judge will also instruct

11 you that penalty -- if the defendant is convicted -- is left

12 up to the Judge and not anyone else. You don't let that

13 enter into your deliberation process, the thought of a

14 penalty or repercussions from this. Does everyone

15 understand that?

16    THE JURY: (Responds affirmatively)

17    MR. BRAMBLE: Everyone agree to follow that

18 instruction?

19    THE JURY: (Responds affirmatively)

20    MR. BRAMBLE: Okay. The Judge will also instruct

21 you that I have the burden of proof here. That burden of

22 proof is beyond a reasonable doubt.

23    Mr. Bogert, do you understand that that is not --

24 it's beyond a reasonable doubt and it's the instruction

25 that's been used in every criminal case in this country.

36

1       Do you understand that?

2       MR. BRAMBLE:  Do you understand, as well, that

3       MR. BRAMBLE:  Do you understand, as well, that

4       it's not beyond a shadow of a doubt or beyond all doubt or

5       to a mathematical certainty, or anything of that nature;

6       it's simply beyond a reasonable doubt?

7       JUROR SEAT #1:  Yep.

8       MR. BRAMBLE:  You agree to follow that

9       instruction?

10      JUROR SEAT #1:  Yes, sir.

11      MR. BRAMBLE:  Ms. Stahle, would you agree with

12      that?

13      JUROR SEAT #2:  Yes.  Yes.

14      MR. BRAMBLE:  Ms. Hodgson, would you agree to

15      follow that?

16      JUROR SEAT #3:  Yes.

17      MR. BRAMBLE:  Mr. Miller?

18      JUROR SEAT #4:  Yes.

19      MR. BRAMBLE:  Ms. Muhammad?

20      JUROR SEAT #5:  Yes.

21      MR. BRAMBLE:  Mr. VanEssen?

22      JUROR SEAT #6:  Yes, sir.

23      MR. BRAMBLE:  Ms. Ingersoll?

24      JUROR SEAT #7:  Yes.

25      MR. BRAMBLE:  Ms. Daniels, would you agree to

                                37

1       follow that instruction?

2       JUROR SEAT #8:  Yes, sir.

3       MR. BRAMBLE:  All right.

4       I'm going to put you on the spot here.  I don't

5       know how else to do this.

6       Ms. Daniels, do you understand that you're an

7       African-American woman?

8       JUROR SEAT #8:  Yes.

9       MR. BRAMBLE:  And race, prejudice, things of that

10      nature shouldn't enter into this.  Would you agree with

11      that?

12      JUROR SEAT #8:  Yes, sir.

13      MR. BRAMBLE:  And whether he's guilty or not is

14      whether or not the facts show he's guilty.  You would agree

15      with that?

16      JUROR SEAT #8:  I agree.

17      MR. BRAMBLE:  If I prove beyond a reasonable doubt

18      that the defendant is guilty, what would your verdict be?

19      JUROR SEAT #8:  Same as yours.

20      MR. BRAMBLE:  Would you have a problem making that

21      finding?

22      JUROR SEAT #8:  If he's proven to be guilty, he's

23      guilty.

24      MR. BRAMBLE:  Okay.  My point is you wouldn't hold

25      me to a higher standard of proof here than beyond a

                                38

1       reasonable doubt?

2       MR. BRAMBLE:  Okay.  Knowing a little bit more

3       about the case, can anyone think of any reason they couldn't

4       sit as a fair and impartial juror?  Okay.

5       Mr. Libriani, am I pronouncing your name right?

6       JUROR SEAT #14:  Libriani.

7       MR. BRAMBLE:  Libriani.  Sorry if I'm

8       mispronouncing that.

9       JUROR SEAT #14:  No problem.

10      MR. BRAMBLE:  Would you agree you were either born

11      with some common sense or we develop it along the way?

12      JUROR SEAT #14:  Yeah.

13      MR. BRAMBLE:  Hopefully, you develop it as you

14      grow older.

15      JUROR SEAT #14:  Right.  Yes.

16      MR. BRAMBLE:  And some people develop more common

17      sense than others?

18      JUROR SEAT #14:  Yeah.

19      MR. BRAMBLE:  Do you understand that, even though

20      this is kind of a sterile process, that you don't set your

21      common sense outside the door when you go back inside to

22      deliberate.  Do you understand that?

23      JUROR SEAT #14:  Yes.

24      MR. BRAMBLE:  Okay.  And will you agree to use

25      your common sense in looking at all the facts?

                                39

1       your common sense in looking at all the facts?

2       JUROR SEAT #14:  Yes.

3       MR. BRAMBLE:  Ms. Rowland, would you agree with

4       that?

5       JUROR SEAT #12:  Yes, sir.

6       MR. BRAMBLE:  Does everyone agree with that; that

7       you're going to use your common sense in looking at the

8       facts here?

9       THE JURY:  (Responds affirmatively)

10      MR. BRAMBLE:  Thank you.  Your Honor, I don't

11      think I have anything further here.

12      THE COURT:  Ms. Foster.

13      MS. FOSTER:  Thank you, Judge.

14      Good morning, ladies and gentlemen.

15      THE JURY:  Good morning (collectively).

16      MS. FOSTER:  Now, I usually don't start off by

17      discussing bias.  But since Mr. Bramble opened the door to

18      one juror, I guess I feel I need to question any of the

19      other jurors about this.  It's something I usually ask in a

20      trial anyway, but not usually something I ask coming out of

21      the gate.

22      As you can see, I'm African-American and my client

23      is African-American.  Both the alleged victims are

24      Caucasian.  I was in the Marine Corp. for eight years.  I

25      have a very thick skin.  My client is entitled to a fair

                                40

**41**

1   trial. That's just what he's entitled -- Is there anybody
2   who
3   about offending me because I would be more offended if you
4   kept your mouth shut and went back there and during
5   deliberations say "he's black, he had to do it, he has to be
6   guilty." Does anybody feel that, based on race or anything
7   else, any other type of bias, you don't like guys who wear
8   whatever color tie that happens to be, whatever, that's
9   going to cause you not to be a fair and impartial juror,
10   based on a bias, does anybody feel like they cannot do this
11   job, take on this role as a juror? Anyone?
12   THE JURY: (Responds negatively)
13   MS. FOSTER: Thank you. Now you're going to hear
14   testimony from some police officers. I know some of you, a
15   number of you, have indicated you know police officers or
16   have family members who are police officers. Maybe some of
17   you know them pretty intimately.
18   Does anybody feel that police officers are --
19   their testimony is, say, more sacred than a lumberjack? In
20   other words, when a police officer takes the stand and
21   testifies, are you going to consider everything he says as
22   truth without any fallacies or any flaws? Anybody believe
23   police officers are just -- rank up there -- in terms of
24   their credibility -- with priests, ministers, whatever? In
25   other words, you're all comfortable that a police officer is

**42**

1   capable of being incorrect or even lying like anybody else?
2   Is everybody comfortable with that?
3   JUROR SEAT #6: Well, I can't agree with that.
4   MS. FOSTER: Why can't you agree with that, sir?
5   JUROR SEAT #6: I can't say a police officer would
6   necessarily stand up there and lie.
7   MS. FOSTER: Okay. So -- so let's probe into
8   that. Mr. VanEssen -- is that how you pronounce your name,
9   sir?
10   JUROR SEAT #6: Right.
11   MS. FOSTER: You indicated you know a few police
12   officers. You're not a retired police officer yourself, are
13   you?
14   JUROR SEAT #6: No.
15   MS. FOSTER: In your opinion, a police officer who
16   takes the stand, you feel that anything that come out of his
17   mouth is going to be the truth? Is that your -- basically
18   your feeling?
19   JUROR SEAT #6: Yes.
20   MS. FOSTER: So, if a police officer gets on the
21   stand and points to an individual and says, "He did it
22   because I believe so," that's good enough for you, even
23   though he wasn't there; he didn't witness anything?
24   JUROR SEAT #6: Well, no. I wouldn't agree with
25   that.

**43**

1   MS. FOSTER: Okay. But you will agree that a
2   police officer -- you cannot come to the
3   conclusion that a police officer is capable of lying on the
4   stand; is that right?
5   JUROR SEAT #6: I don't think so, no.
6   MS. FOSTER: Okay. Do you think a police officer
7   is capable of being legitimately mistaken about something?
8   JUROR SEAT #6: Possible.
9   MS. FOSTER: Possible. Do you believe a police
10   officer is less likely to be mistaken than a lay person like
11   you or any of these other individuals on the panel who are
12   not police officers?
13   JUROR SEAT #6: No.
14   MS. FOSTER: I'm sorry, so that you believe that
15   they are just as likely to be mistaken as anybody as?
16   JUROR SEAT #6: They could.
17   MS. FOSTER: But you do believe that, unlike a lay
18   person, if they take the stand and raise their hand to take
19   an oath, under no circumstances will they lie?
20   JUROR SEAT #6: I hope not.
21   MS. FOSTER: You hope not. But you had
22   indicated that you don't believe police officers are capable
23   of lying under oath; is that a fair statement?
24   JUROR SEAT #6: True.
25   MS. FOSTER: Okay. Ms. Stahle?

**44**

1   JUROR SEAT #2: Stahle.
2   MS. FOSTER: Stahle.
3   JUROR SEAT #2: Stahle.
4   MS. FOSTER: Stahle. Sorry about that.
5   Ms. Stahle, if I were to ask you -- my client's
6   name is Mr. Heath here -- if I were to ask you, "Is
7   Mr. Heath guilty or innocent right now," what would your
8   answer be?
9   JUROR SEAT #2: You can't tell right now. We
10   haven't heard the case.
11   MS. FOSTER: Okay. What about you, Ms. Slagle,
12   what would your answer be?
13   JUROR SEAT #13: We didn't hear anything.
14   MS. FOSTER: So if I were to say, "Is he guilty or
15   innocent," what would your answer be?
16   JUROR SEAT #13: I'd have to hear it first.
17   MS. FOSTER: You haven't heard anything, so what
18   would your answer be?
19   JUROR SEAT #13: Well, he's not guilty yet.
20   MS. FOSTER: That's right. In our system, we have
21   something called the presumption of innocence. So, if I ask
22   each and every one of you if my client is guilty of
23   anything, you can't say, could you, because you haven't
24   heard anything?
25   Does anybody have a problem on the notion that, if

1  I were to ask each and every one of you right now, "Is my
2  client guilty or not guilty?" What would you answer have to
3  be? Or at least not guilty. What would your answer have to
4  be, Ms. Slagle?

5       JUROR SEAT #13: Not guilty.

6       MS. FOSTER: How about you, Mr. Siegel?

7       JUROR SEAT #11: Not guilty.

8       MS. FOSTER: Ms. Stahle?

9       JUROR SEAT #2: Not guilty.

10      MS. FOSTER: Ms. Daniels?

11      JUROR SEAT #8: Not guilty.

12      MS. FOSTER: Ms. Muhammad?

13      JUROR SEAT #5: Not guilty.

14      MS. FOSTER: How about you, Mr. VanEssen?

15      JUROR SEAT #4: Not guilty.

16      MS. FOSTER: Is everybody comfortable with that
17  notion? Are you -- are you all comfortable with the notion
18  that the burden is not on me to prove that he's innocent?
19  That's not my burden. In our system, the burden is on the
20  prosecutor to prove that he is guilty. I can sit over there
21  with my feet up on the chair -- I won't -- but, you know,
22  technically I could sit over there with my legs propped up
23  playing Angry Birds throughout this entire trial, and you
24  still have to be convinced beyond a reasonable doubt that he
25  did it, based on his burden, not on my burden. Is everybody

45

1  comfortable with that?

2       THE JURY: (Responds affirmatively)

3       MS. FOSTER: Don't worry, I won't play Angry
4  Birds. I don't even play it. My kid does, but I don't.
5  Okay. Moving along.

6       You're going to get an instruction ad nauseam
7  about reasonable doubt. I believe Mr. Bramble kind of
8  touched upon it. And he wanted to give you the
9  prosecution's version, basically, that it's not absolute
10  doubt. But you have to understand it's more than -- if you
11  want to put a number equation on it, if this were a civil
12  case you would only have to be convinced 51 to 49 percent,
13  very kind of close there. I can't put a number on it, but
14  it's much lighter than 51 because we're not talking about
15  awarding monetary damages at the end of the day, we're
16  talking about a person's liberty. So, the burden is much
17  higher.

18      Is everybody comfortable with you have to be
19  convinced beyond a reasonable doubt, putting together your
20  world -- your life experiences, common sense, the evidence
21  that you're going to be presented, and weigh all of these
22  things to come to a conclusion that you are convinced beyond
23  a reasonable doubt? Does anybody have a problem with that?
24  You'll get an instruction on exactly -- or at least
25  technically -- what reasonable doubt is. Does anybody have

46

1  a real problem with that?

2       MS. FOSTER: Okay. Does anybody have any
3  religious convictions that make it impossible for you to put
4  somebody else in judgment? Anyone? Okay.

5       Now, you know it's coming, Craig. I'm going to
6  have to pick on you, bro. We know each because I deal with
7  him; we do pv's together. How many years have you been
8  doing this now?

9       JUROR SEAT #4: August will be 14.

10      MS. FOSTER: Okay. Yeah. We've both been around
11  a pretty long time. So you've seen a lot of probationers;
12  right?

13      JUROR SEAT #4: Right.

14      MS. FOSTER: You've seen -- you've run the gamut
15  on the kind of people that have come to you on probation.

16      JUROR SEAT #4: Right.

17      MS. FOSTER: You honestly think -- I'm not saying
18  this to be facetious, because we know each other -- but do
19  you think you could put aside all the characters that you've
20  dealt with the last 14 years and sit -- do you actually know
21  this gentleman?

22      JUROR SEAT #4: No, ma'am.

23      MS. FOSTER: We'll make sure we get that clear.
24  Actually sit and listen to this case from a perspective of

47

1  somebody who doesn't deal with convicted felons every day?

2      JUROR SEAT #4: Yes. I have no problem with that.

3      MS. FOSTER: Okay. Because you're not a district
4  court probation officer, you're a circuit court probation
5  officer. You deal with convicted felons?

6      JUROR SEAT #4: Correct.

7      MS. FOSTER: Okay. And I'm sure you visit houses,
8  you -- you have to get into their personal lives. Because
9  we know each other, you've dealt with people who have
10  violated probation. You've been in front of this judge,
11  every judge in this building, every circuit court judge in
12  this building with people who have done everything from
13  re-offending to not reporting, to not paying fines, to
14  slapping their wives around, everything?

15      JUROR SEAT #4: Yes.

16      MS. FOSTER: And you're able to put all that aside
17  and judge this case fairly and impartially?

18      JUROR SEAT #4: Yes.

19      MS. FOSTER: Excuse me. Just to interject here,
20  Mr. Miller it says you live in the City of
21  Wyoming, but you have no connection with the City of
22  Wyoming; is that correct?

23      JUROR SEAT #4: As far as?

24      THE COURT: Well, I'm just reading here.
25  Security, law enforcement -- Wyoming. I assume that Wyoming

48

1     is in there as your city of residence, not connected with
2     your car. Okay.
3         JUROR SEAT #4:  Correct.
4         MS. FOSTER:  You work with the state?
5         JUROR SEAT #4:  I work for the State of Michigan.
6         THE COURT:  Very good.
7         JUROR SEAT #4:  I live in Wyoming, 62A District.
8         MS. FOSTER:  Thanks for bring that up, Judge.
9     You will hear that -- and I think you probably already
10    figured out that these two allegations arise out of Wyoming.
11        JUROR SEAT #4:  Correct.
12        MS. FOSTER:  I'm sorry. Yeah, Wyoming, yeah.  I
13    remember because we -- yep.  Is that going to be a problem
14    for you?
15        JUROR SEAT #4:  No, ma'am.
16        MS. FOSTER:  Okay. Anybody else live in Wyoming?
17        JUROR SEAT #6:  Yes.
18        MS. FOSTER:  You live in Wyoming, as well?  Did
19    you indicate you knew some of the gentlemen whose names were
20    called?
21        JUROR SEAT #6:  Well, police officers.
22        MS. FOSTER:  That's what I meant, some of the
23    police officers.  Okay.  Is the fact that you live in
24    Wyoming going to be a problem for you and -- because now
25    you'd already indicated you tend to put a police officer on

**49**

1     a higher plain.  Now we're talking about the city in which
2     you reside, okay?
3        JUROR SEAT #6:  (Nods head affirmatively)
4        MS. FOSTER:  Is that going to be a problem for
5     you?
6        JUROR SEAT #6:  No.
7        MS. FOSTER:  No. What about you, Ms. Daniels?
8        JUROR SEAT #8:  No, ma'am.
9        MS. FOSTER:  Okay.  This is your last out, folks.
10    Anybody feel like there's any -- any reason that you can
11    come up with that you cannot do this?
12        JUROR SEAT #3:  (Raising hand)
13        MS. FOSTER:  Yes?
14        JUROR SEAT #3:  I'm sorry.  I didn't know the
15    appropriate time.  I have a scheduling conflict.
16        MS. FOSTER:  Okay.  What's your scheduling
17    conflict, ma'am?
18        JUROR SEAT #3:  Well, I home school my youngest
19    and something changed.  Today she has this big presentation.
20    I was able to get my husband to get her there.  It would be
21    really great if I could -- if I would be -- I really would
22    like to not miss it.
23        MS. FOSTER:  Okay.  That's today?
24        JUROR SEAT #3:  That's today.
25        MS. FOSTER:  This afternoon?

**50**

1        JUROR SEAT #3:  It's right now.
2        MS. FOSTER:  It's right now.
3        JUROR SEAT #3:  That's my -- I know, I'm sorry I
4    didn't bring that up.
5        THE COURT:  Well, is it too late?
6        JUROR SEAT #3:  It's not too late.
7        MS. FOSTER:  I don't have any objection, your
8    Honor.  I mean I understand that.
9        THE COURT:  I'll excuse you right now.
10        JUROR SEAT #3:  Okay.  Thank you very much.
11        (At 10:13 a.m., juror excused)
12        THE COURT:  Thank you.
13        MS. FOSTER:  Mr. Bogert, in your questionnaire it
14    says you're self employed.  Is this going to be a financial
15    detriment to you?
16        JUROR SEAT #1:  It kind of is, yes.
17        MS. FOSTER:  What do you do, sir?
18        JUROR SEAT #1:  Flooring.  I subcontract.  I've
19    had jobs scheduled this whole week that I've had to cancel.
20    Today I missed a huge day at work.
21        MS. FOSTER:  This is going to go all day today and
22    potentially all day Thursday.  Do you think that's going to
23    be a major financial hardship for you?
24        JUROR SEAT #1:  It definitely is.
25        MS. FOSTER:  Judge.

**51**

1        THE COURT:  Do I have a motion?
2        MS. FOSTER:  I was going to ask for -- I know it
3    doesn't really fall under the parameters of cause, but I
4    hate to see a man lose his livelihood.  And I wouldn't have
5    any objection if the Court would be willing to excuse him.
6        THE COURT:  Mr. Bramble, any position?
7        MR. BRAMBLE:  I'll leave it up to the Court.
8        THE COURT:  I'm going to deny a challenge for
9    cause on that.  It's not uncommon for jurors to have
10    employment obligations and suffer some financial hardship.
11    So, I'll deny a challenge for cause.
12        MS. FOSTER:  Okay.  With that, your Honor, I have
13    nothing further.
14        THE COURT:  All right.  We need to seat a juror in
15    Seat Number 3.
16        THE CLERK:  Number 24, Jeffrey Pitchure.
17        THE COURT:  I'll go with you, Mr. Bramble.
18        MR. BRAMBLE:  All right.
19        THE COURT:  You're questioning first.
20        MR. BRAMBLE:  Is it Pitchure?
21        JUROR SEAT #3:  Yes, Pitchure.
22        MR. BRAMBLE:  Mr. Pitchure, were you able to hear
23    all the questions I asked?
24        JUROR SEAT #3:  Yeah.
25        MR. BRAMBLE:  Any of them that would have caused

**52**

**Page 53**

1  you to respond now that you're sitting -- here?

2  JUROR SEAT #3: They're the police

3  officers.

4  MR. BRAMBLE: What departments do they work for?

5  JUROR SEAT #3: City of Walker.

6  MR. BRAMBLE: How well do you know them?

7  JUROR SEAT #3: Went to high school with them.

8  MR. BRAMBLE: Do you see them very often?

9  JUROR SEAT #3: On occasion in passing.

10  MR. BRAMBLE: Do you discuss their work with them

11  that much?

12  JUROR SEAT #3: No.

13  MR. BRAMBLE: Anything about that that would

14  prevent you from sitting as a fair and impartial juror?

15  JUROR SEAT #3: No.

16  MR. BRAMBLE: You heard me discuss with the fellow

17  -- your fellow jurors that the two victims in this case were

18  going to solicit massage or adult services, or things of

19  this nature. I think they were set up, basically, because I

20  don't think that even existed. But do you understand that

21  -- would that cause you to say, "Geez, they got what they

22  deserved"?

23  JUROR SEAT #3: No.

24  MR. BRAMBLE: Okay. Can you simply follow the

25  Judge's instructions, regardless of why they may have been

**Page 54**

1  going to the area of Burlingame?

2  JUROR SEAT #3: Sure.

3  MR. BRAMBLE: Okay. By now you kind of know what

4  we're looking for. Is there any reason you couldn't sit as

5  a fair and impartial juror?

6  JUROR SEAT #3: That I couldn't?

7  MR. BRAMBLE: Yeah, that you cannot.

8  JUROR SEAT #3: No.

9  MR. BRAMBLE: Nothing further at this time, your

10  Honor.

11  THE COURT: Ms. Foster?

12  MS. FOSTER: Good morning, sir.

13  JUROR SEAT #3: Good morning.

14  MS. FOSTER: Any of the questions that I asked

15  that you would have responded affirmatively regarding -- I

16  think you had already answered a question about police

17  officers, so we won't go there. But any religious

18  convictions, any biases that might come into play here?

19  JUROR SEAT #3: No.

20  MS. FOSTER: Do you understand the burden of proof

21  is on the prosecution, and you're okay with that?

22  JUROR SEAT #3: Yep.

23  MS. FOSTER: Have you ever served on a jury

24  before.

25  JUROR SEAT #3: Yes.

**Page 55**

1  MS. FOSTER: When.

2  JUROR SEAT #3: I would say a little over

3  two years ago.

4  MS. FOSTER: Was it in this Court or a different

5  court?

6  JUROR SEAT #3: This Court.

7  MS. FOSTER: District court or circuit court?

8  JUROR SEAT #3: District.

9  MS. FOSTER: District. Was it a criminal matter

10  or civil matter?

11  JUROR SEAT #3: Criminal.

12  MS. FOSTER: Do you remember what the charge was?

13  JUROR SEAT #3: Sexual contact with a minor.

14  MS. FOSTER: Okay. This obviously has nothing to

15  do with that.

16  Was your overall experience in that process --

17  were you okay with it, did you have a good take away from

18  it?

19  JUROR SEAT #3: Yeah. Yeah.

20  MS. FOSTER: Did you actually deliberate?

21  JUROR SEAT #3: Yes.

22  MS. FOSTER: Okay. Were you -- are you able to

23  separate that experience from this one?

24  JUROR SEAT #3: Sure.

25  MS. FOSTER: Okay. I don't think I have anything

**Page 56**

1  further. Thank you, sir.

2  THE COURT: Mr. Bramble, any challenges for cause?

3  MR. BRAMBLE: No, your Honor.

4  THE COURT: Ms. Foster, any challenges for cause?

5  MS. FOSTER: No, your Honor.

6  THE COURT: All right. Back to you, Mr. Bramble.

7  And each one of you can exercise peremptories one at a time

8  or more than one. First, Mr. Bramble.

9  MR. BRAMBLE: I would thank and excuse Juror

10  Number 2, in Seat 13, Ms. Slagle, and Juror Number 28, Seat

11  8, Ms. Daniels.

12  THE COURT: All right. Ms. Slagle, Ms. Daniels,

13  you two are excused. Thank you.

14  (At 10:19 a.m., jurors excused)

15  MS. FOSTER: You have to get your capsules into --

16  you have to get your capsules.

17  THE CLERK: Number 37, Loretta Durkin.

18  THE COURT: Take the seat furthest in, Seat

19  Number 8.

20  THE CLERK: Number 38, Dana Young.

21  THE COURT: Mr. Bramble?

22  MR. BRAMBLE: Thank you.

23  Miss Durkin, I'm going to direct my questions to

24  you and Mr. Young. Were you able to hear all the questions

25  I asked?

**57**

1    JUROR SEAT #8:  Yes.
2    MR. BRAMBLE:  Any of them cause you to respond now
3 that you're seated here in the jury box?
4    JUROR SEAT #8:  My sister is a deputy in
5 San Diego and my brother-in-law is a deputy in San Diego.
6    MR. BRAMBLE:  Do you discuss work with them that
7 much?
8    JUROR SEAT #8:  With my sister, some.  But she
9 does a lot of undercover casino and FBI things.
10    MR. BRAMBLE:  Anything about that that would
11 prevent you from sitting here as a fair and impartial juror?
12    JUROR SEAT #8:  No.
13    MR. BRAMBLE:  You heard me talk about judging and
14 determining the credibility of witnesses.  Do you feel you
15 can do that in this setting?
16    JUROR SEAT #8:  Yes.
17    MR. BRAMBLE:  Do you think you do that in your
18 day-to-day life?
19    JUROR SEAT #8:  Yes.
20    MR. BRAMBLE:  Okay.  Do you feel you could do that
21 here?
22    JUROR SEAT #8:  Yes.
23    MR. BRAMBLE:  You agree to use your common sense,
24 too, in looking at the facts?
25

**58**

1    JUROR SEAT #8:  Yes.
2    MR. BRAMBLE:  All right.  Mr. Young, were you able
3 to hear all the questions I asked?
4    JUROR SEAT #13:  Yes.
5    MR. BRAMBLE:  Any of them that would have caused
6 you to respond now that you're seated here in the jury box?
7    JUROR SEAT #13:  No.
8    MR. BRAMBLE:  Do you know any police officers?
9    JUROR SEAT #13:  Officer Tom Bush, City of Grand
10 Rapids.
11    MR. BRAMBLE:  Grand Rapids.  Do you discuss his
12 work with him very much?
13    JUROR SEAT #13:  About ten years ago.  Not since.
14    MR. BRAMBLE:  When was the last time you saw him?
15    JUROR SEAT #13:  About a year-and-a-half ago.
16    MR. BRAMBLE:  Anything about that that would
17 prevent you from sitting here as a fair and impartial juror?
18    JUROR SEAT #13:  No.
19    MR. BRAMBLE:  I discussed with the fellow jurors,
20 the two victims here were going to -- I believe they were
21 going to respond to an ad for a massage or adult services,
22 things of that nature.  Does it cause you to say, "Well,
23 geez, if they were going to do that, they deserve to get
24 robbed, they deserved to get set up"?
25    JUROR SEAT #13:  No.

**59**

1    MR. BRAMBLE:  I don't think I have anything
2 further than this.
3    THE COURT:  Ms. Foster?
4    MS. FOSTER:  Thank you, sir.
5    Good morning Ms. Durkin and Mr. Young.
6    Ms. Durkin, you indicated in your questionnaire
7 you testified before a grand jury?
8    JUROR SEAT #8:  Yes.
9    MS. FOSTER:  Was it -- where was that?
10    JUROR SEAT #8:  At the federal building.
11    MS. FOSTER:  Okay.  I don't want to get too much
12 into it, but I will ask you this.  Did that experience --
13 would that experience, would it have any bearing on your
14 ability to be a fair and impartial juror in this?
15    JUROR SEAT #8:  I don't think so.  I have been
16 contacted again.  So I don't know if that is still -- they
17 said they'd contact me if I had to testify in front of --
18 for a trial, and I haven't been contacted.
19    MS. FOSTER:  Are you a witness or --
20    JUROR SEAT #8:  I would be a victim.
21    MS. FOSTER:  You would be a victim, okay, in a
22 federal case?
23    JUROR SEAT #8:  Yes.
24    MS. FOSTER:  If you don't mind my asking, what
25 does it involve?

**60**

1    JUROR SEAT #8:  I don't know the official charges
2 were; fraud.  I had quite a bit of money that I lost.
3    MS. FOSTER:  Okay.  Do you feel that that -- this
4 is still ongoing?
5    JUROR SEAT #8:  As far as I know.  I haven't heard
6 if they settled anything.
7    MS. FOSTER:  Okay.  How long ago was this that
8 this happened?
9    JUROR SEAT #8:  It happened in '08, and I believe
10 the charges -- they were doing a lot of investigation before
11 they --
12    MS. FOSTER:  It's the feds, and they are a little
13 slow.
14    JUROR SEAT #8:  Yeah.  So I testified last year.
15 I think it was August.
16    MS. FOSTER:  Well, so this is something we --
17 you're a victim or alleged victim of this ongoing matter.
18 And this is a matter that involves fraud, which is a --
19 basically a theft of money.  You said a substantial amount
20 of money?
21    JUROR SEAT #8:  (Nods head affirmatively)
22    MS. FOSTER:  Do you feel that because the
23 allegation in this case involves, obviously, not substantial
24 amount, but it does involve the allegation of a theft of
25 money, do you think that that may prevent you from being a

**Page 61**

```
1    fair and impartial juror in a case like this?
2         JUROR SEAT #8: (Continued.)
3         MS. FOSTER: All right. If you don't mind, can
4    you tell us why?
5         JUROR SEAT #8: I think I'm a pretty fair person
6    in general.
7         MS. FOSTER: Okay.
8         JUROR SEAT #8: Which is why I probably lost a lot
9    of money, because I believe people until they do something
10   that makes me not believe them.
11        MS. FOSTER: Okay. Do you have any other biases
12   or any concerns or anything that I should be concerned about
13   in your ability to be a fair and impartial juror? In other
14   words, you'd indicated you have siblings who are police
15   officers?
16        JUROR SEAT #8: Um-hmm (affirmatively).
17        MS. FOSTER: Would that come into play in your
18   ability to be a fair and impartial juror?
19        JUROR SEAT #8: No, I don't think so. I have --
20   there's ten kids in our family. Several work for the
21   county. I've had a couple brothers that have served time.
22   So, we have a lot of color in our --
23        MS. FOSTER: An eclectic bunch.
24        JUROR SEAT #8: Yes.
25        MS. FOSTER: You understand that the whole notion
```

**Page 62**

```
1    of the presumption of innocence?
2         JUROR SEAT #8: Yes.
3         MS. FOSTER: You don't have any problem with that?
4         JUROR SEAT #8: No.
5         MS. FOSTER: You don't have any problem with the
6    burden being on the prosecution, not on me?
7         JUROR SEAT #8: No.
8         MS. FOSTER: How about you, Mr. Young? Is there
9    anything -- any of the questions that I asked, would you
10   have raised your hand? Are there any red flags I should
11   know about with regards to you?
12        JUROR SEAT #13: No.
13        MS. FOSTER: No axes to grind or anything like
14   that?
15        JUROR SEAT #13: No.
16        MS. FOSTER: Okay. What do you do, sir?
17        JUROR SEAT #13: I'm an insurance adjuster.
18        MS. FOSTER: All right. Have you been the victim
19   of a crime yourself or know somebody?
20        JUROR SEAT #13: No.
21        MS. FOSTER: I'm sure everybody knows somebody who
22   has been a victim of a crime.
23        JUROR SEAT #13: I know people, but I couldn't
24   tell you their name right now because it's been such a long
25   time.
```

**Page 63**

```
1         MS. FOSTER: Okay. Thank you.
2         THE COURT: Right. From here on out, if there
3    are any challenges for cause, I'll rely on respective
4    counsel to call that to my attention. I'll assume
5    everything from here on out are peremptory.
6         I'll go to you, Ms. Foster.
7         MS. FOSTER: Your Honor, I'm going to exercise
8    three peremptory challenges at this time.
9         THE COURT: Very good.
10        MS. FOSTER: I want to thank and excuse the juror
11   in Seat Number 2.
12        THE COURT: Okay.
13        MS. FOSTER: That would be Ms. Stahle.
14        THE COURT: All right.
15        MS. FOSTER: No offense, but I have to thank and
16   excuse the juror in Seat Number 4.
17        THE COURT: Mr. Miller, you are excused, also.
18        MS. FOSTER: And I have to thank and excuse the
19   juror in Seat Number 6.
20        THE COURT: Mr. VanEssen, you are excused, also.
21        (At 10:28 a.m. jurors excused)
22        THE CLERK: Number 32, John Piela.
23        THE COURT: Sit in Seat Number 2, please.
24        THE CLERK: Number 3, James Bolden.
25        THE COURT: Seat 4.
```

**Page 64**

```
1         THE CLERK: Number 19, Jason Fuller.
2         THE COURT: Ms. Foster, go ahead, please.
3         MS. FOSTER: Thank you, Judge. We're still in
4    morning, folks. Okay, good morning.
5         Is it Piela?
6         JUROR SEAT #2: Piela.
7         MS. FOSTER: That's what I thought. Good morning,
8    Mr. Piela. You heard the questions asked by myself and
9    Mr. Bramble this morning. Is there anything that we should
10   know about you that may cause you to either cause
11   Mr. Bramble some concern or me some concern with regards to
12   your ability to be a fair and impartial juror?
13        JUROR SEAT #2: No, ma'am.
14        MS. FOSTER: What do you do for a living, sir?
15        JUROR SEAT #2: Construction.
16        MS. FOSTER: Construction. Are you self-employed,
17   as well?
18        JUROR SEAT #2: No.
19        MS. FOSTER: You work with a company?
20        JUROR SEAT #2: Yes.
21        MS. FOSTER: All right. HVAC. Okay, is that
22   where you work?
23        JUROR SEAT #2: Yes.
24        MS. FOSTER: Do you know any police officers?
25        JUROR SEAT #2: An acquaintance with one, Kent
```

**Page 65**

1    County.

2    acquaintanceship, is that going to come into play?

3    JUROR SEAT #2: Our kids go to the same school.

4    Socially, not professionally.

5    MS. FOSTER: You don't drink with these guys,

6    shoot pool with these guys, anything like that?

7    JUROR SEAT #2: No.

8    MS. FOSTER: Anything else? What about your

9    understanding of the presumption of innocence? You're okay

10   with that?

11   JUROR SEAT #2: (Nods head affirmatively)

12   MS. FOSTER: The burden is on the prosecution.

13   JUROR SEAT #2: (Nods head affirmatively)

14   MS. FOSTER: That you'll hold him to his standard

15   of beyond a reasonable doubt, not just, "Well, he probably

16   did it, so he did it" kind of a thing?

17   JUROR SEAT #2: Yes.

18   MS. FOSTER: Okay. Mr. Fuller, what are you

19   reading there? I saw you come up with a book.

20   JUROR SEAT #6: Catching Fire.

21   MS. FOSTER: Catching -- can I see it?

22   JUROR SEAT #6: Yeah.

23   MS. FOSTER: Catching Fire. Is that part of the

24   Hunger Game series?

**Page 66**

1    JUROR SEAT #6: Yes.

2    MS. FOSTER: I heard it's really good. I would

3    like to read the books before I see the movie.

4    JUROR SEAT #6: Yes.

5    MS. FOSTER: I hear it's really good.

6    JUROR SEAT #6: It is very good.

7    MS. FOSTER: What about the questions that

8    Mr. Bramble and I asked the other jurors? Is there anything

9    about you we should know?

10   JUROR SEAT #6: No.

11   MS. FOSTER: How about, do you know any police

12   officers?

13   JUROR SEAT #6: No.

14   MS. FOSTER: You look pretty young. You've

15   probably never served on a jury before?

16   JUROR SEAT #6: No.

17   MS. FOSTER: Okay. Oh, you're not that young; you

18   just have a baby face. Well, you are young, but you're not

19   18. I thought maybe you were 18-years-old.

20   So, but it does indicate that -- do you live in

21   Wyoming?

22   JUROR SEAT #6: I do.

23   MS. FOSTER: Is the fact that these allegations

24   take place in Wyoming, is that going to be any cause of

25   concern for you?

**Page 67**

1    JUROR SEAT #6: No.

2    MS. FOSTER: -- is there any reason why you

3    feel you cannot be a fair and impartial juror in this case?

4    JUROR SEAT #6: No.

5    MS. FOSTER: Okay. Thank you very much.

6    MR. BRAMBLE: (Conferring with defense counsel)

7    MS. FOSTER: I'm sorry. Mr. Bolden, I missed you,

8    bro. What's up?

9    JUROR SEAT #4: Yes.

10   MS. FOSTER: Mr. Bramble had to just quietly --

11   how are you, Mr. Bolden. You heard the questions I asked

12   the other individuals. Is there anything about you we

13   should know?

14   JUROR SEAT #4: No.

15   MS. FOSTER: Do you think you could be a fair and

16   impartial juror?

17   JUROR SEAT #4: Yes. I had a stroke so...

18   MS. FOSTER: Okay. That's the -- do you have any

19   hearing problems, any other deficits that may --

20   JUROR SEAT #4: No, nope.

21   MS. FOSTER: Okay. Do you know any people in law

22   enforcement?

23   JUROR SEAT #4: Used to.

24   MS. FOSTER: Okay.

25   JUROR SEAT #4: Hudsonville.

**Page 68**

1    MS. FOSTER: Okay.

2    JUROR SEAT #4: I -- all of them were Hudsonville

3    police officers.

4    MS. FOSTER: You know a lot of Hudsonville police

5    officers?

6    JUROR SEAT #4: There's five or six Hudsonville

7    police officers.

8    MS. FOSTER: You know them all?

9    JUROR SEAT #4: This was 20 years ago.

10   MS. FOSTER: Okay. So that's not going to come

11   into play now?

12   JUROR SEAT #4: No.

13   MS. FOSTER: Okay. Any biases? Will any biases

14   come into play?

15   JUROR SEAT #4: No.

16   MS. FOSTER: You're not going to be friendlier

17   because everybody at this table is African-American?

18   JUROR SEAT #4: No.

19   MS. FOSTER: I would hope not, anymore than I hope

20   any of the Caucasians wouldn't be any friendlier with any of

21   the people over there.

22   I have nothing further. Thank you.

23   THE COURT: Mr. Bramble?

24   MR. BRAMBLE: Mr. Piela were you able to --

25   that's the pronunciation?

**Page 69**

```
 1        JUROR SEAT #2:  Yes.
 2        MR. BRAMBLE:  Did you hear all the
 3   questions I asked?
 4        JUROR SEAT #2:  Yes.
 5        MR. BRAMBLE:  Any of them that would have caused
 6   you to respond besides I think you indicated you knew a
 7   police officer?
 8        JUROR SEAT #2:  No.
 9        MR. BRAMBLE:  Anything else that you can think of?
10        JUROR SEAT #2:  Just a little bit of a higher
11   standard for a police officer maybe.  It's not -- it is just
12   the years of experience.  They see stuff we don't because
13   they've done it.  It's not a whole set of higher standards,
14   but it's just their career.  I'd hope they wouldn't
15   jeopardize it by --
16        MR. BRAMBLE:  They might have special training
17   that you and I don't have that causes them to be -- observe
18   things differently.  Would you agree with that?
19        JUROR SEAT #2:  Absolutely.
20        MR. BRAMBLE:  Okay.  Mr. Bolden, were you able to
21   hear all the questions I asked?
22        JUROR SEAT #4:  Yes.
23        MR. BRAMBLE:  Any of them cause you to respond?
24        JUROR SEAT #4:  No.
25        MR. BRAMBLE:  Okay.  It indicates on your
```

**Page 70**

```
 1   questionnaire form that you are retired.
 2        JUROR SEAT #4:  Yes.
 3        MR. BRAMBLE:  What did you retire from, if I could
 4   ask?
 5        JUROR SEAT #4:  Friendly Food Shops, a little --
 6   right by Burger King and everything in Hudsonville.  I was
 7   employed in Hudsonville.
 8        MR. BRAMBLE:  Okay.  Who else do we have?
 9        MS. FOSTER:  Mr. Fuller.
10        MR. BRAMBLE:  Mr. Fuller.  I put you in the wrong
11   box there.  That's why I was having trouble finding you.
12   I'm going to cross you out there.
13        Mr. Fuller, were you able to hear all the
14   questions I asked?
15        JUROR SEAT #6:  Yes.
16        MR. BRAMBLE:  Any of them cause you to respond?
17        JUROR SEAT #6:  No.
18        MR. BRAMBLE:  Know anyone who's been accused,
19   charged or convicted of a crime?
20        JUROR SEAT #6:  No.
21        MR. BRAMBLE:  Okay.  By now you have to kind of
22   know what we're looking for here.  Anything you think you
23   should tell myself or the defense counsel or the Judge?
24        JUROR SEAT #6:  No.
25        MR. BRAMBLE:  Okay.  Thank you.  Nothing further.
```

**Page 71**

```
 1        THE COURT:  Back to you, Mr. Bramble.
 2        MR. BRAMBLE:  I hear all the -- thank you, Juror
 3   Number 16 in Seat 5, Ms. Muhammad.
 4        THE COURT:  Thank you very much.  You are excused.
 5        (At 10:36 a.m., juror excused)
 6        THE CLERK:  Number 14, Benjamin Masterson.
 7        THE COURT:  Mr. Bramble.
 8        MR. BRAMBLE:  Thank you.  Mr. Masterson, were you
 9   able to hear all the questions I asked?
10        JUROR SEAT #5:  Yes, sir.
11        MR. BRAMBLE:  Any of them cause you to respond?
12        JUROR SEAT #5:  Briefly just known some police
13   officers, but nothing formal.  Someone to say "Hi" to in the
14   grocery store.
15        MR. BRAMBLE:  Shouldn't affect your ability to sit
16   here as a fair and impartial juror?
17        JUROR SEAT #5:  No, sir.
18        MR. BRAMBLE:  I lost my train of thought here.  I
19   discussed with your fellow jurors this idea of determining
20   or judging the credibility of witnesses.  Let me ask you
21   this.  What do you do for a living?
22        JUROR SEAT #5:  Administrator at a hospital,
23   Spectrum.
24        MR. BRAMBLE:  Would it be in your work or in your
25   day-to-day personal life?  Do you agree that you determine
```

**Page 72**

```
 1   and judge whether or not people are being candid, straight
 2   with you?
 3        JUROR SEAT #5:  Absolutely.
 4        MR. BRAMBLE:  Do you understand that may be part
 5   of the process here?
 6        JUROR SEAT #5:  Um-hmm (affirmatively).
 7        MR. BRAMBLE:  I discussed with a couple jurors
 8   this idea of one person says something happened and the
 9   other didn't.  They are diametrically opposed.  The easy
10   thing would be to throw up your hands and say you can't
11   decide.  But your job is to dig a little deeper and
12   determine what the facts are and apply those facts to the
13   law.
14        JUROR SEAT #5:  Um-hmm (affirmatively).
15        MR. BRAMBLE:  Do you understand that?
16        JUROR SEAT #5:  Absolutely.
17        MR. BRAMBLE:  Again, just as I asked Mr. Fuller,
18   by now you have to know what we're looking for here.  Can
19   you think of any reason you couldn't sit as a fair and
20   impartial juror?
21        JUROR SEAT #5:  No.
22        MR. BRAMBLE:  Thank you.
23        THE COURT:  Ms. Foster?
24        MS. FOSTER:  Good morning, Mr. Masterson.
25        JUROR SEAT #5:  Good morning.
```

**Page 73**

MS. FOSTER: You heard the questions I asked.

MS. FOSTER: I will think we pretty much covered our bases. We're becoming repetitive at this point. Is there anything that I asked that would have caused you to raise your hand initially?

JUROR SEAT #5: No, ma'am.

MS. FOSTER: You indicated you could be a fair and impartial juror?

JUROR SEAT #5: Yes, ma'am.

MS. FOSTER: No biases, no prejudices?

JUROR SEAT #5: No, ma'am.

MS. FOSTER: No religious convictions?

JUROR SEAT #5: No.

MS. FOSTER: Police officers aren't above and beyond reproach?

JUROR SEAT #5: No.

MS. FOSTER: And no axes to grind, I'd imagine --

JUROR SEAT #5: No, ma'am.

MS. FOSTER: -- not working at Spectrum. Maybe not in this realm, maybe. Who knows.

Thank you, sir.

THE COURT: Back to you, Ms. Foster. Any further challenges?

MS. FOSTER: Not for cause, your Honor. Oh,

**Page 74**

that's right. You indicated we don't have any -- give me a second, your Honor.

THE COURT: Sure.

MS. FOSTER: (Confers with client and externs) Your Honor, we'd like to thank and excuse the juror in Seat Number 1.

THE COURT: All right. Mr. Bogert, you are excused. Thank you very much.

(At 10:41 a.m., juror excused)

THE CLERK: Number 6, Mark MacFarlane.

THE COURT: Ms. Foster.

MS. FOSTER: Is it me, your Honor?

THE COURT: Yes.

MS. FOSTER: Sorry about that. Still in morning, aren't we? Yes, we are. MacFarlane?

JUROR SEAT #1: Yes, ma'am.

MS. FOSTER: I heard MacFerrell for some reason, and I'm not seeing it on this list.

Good morning, sir.

JUROR SEAT #1: Good morning.

MS. FOSTER: MacFarlane; correct, sir?

JUROR SEAT #1: Yes, it is.

MS. FOSTER: You heard my questions. You heard Mr. Bramble's questions. Is there anything we should know about you that -- is there anything about you that we should

**Page 75**

know that may be of either concern to myself or Mr. Bramble in regards to you being a fair and impartial juror?

JUROR SEAT #1: No.

MS. FOSTER: Okay. Have you ever served on a jury before?

JUROR SEAT #1: No.

MS. FOSTER: Okay. You know anybody in law enforcement?

JUROR SEAT #1: Just one from high school. I don't see him at all.

MS. FOSTER: Okay. So they don't -- he doesn't swap war stories -- he or she doesn't swap war stories with you or not?

JUROR SEAT #1: No, no.

MS. FOSTER: Okay. Any particular bias or prejudice that may prevent you from being a fair and impartial juror?

JUROR SEAT #1: No.

MS. FOSTER: Know anybody who's been the victim of any kind of theft crime?

JUROR SEAT #1: No. Nobody that I really know.

MS. FOSTER: Do you -- you understand the whole presumption of innocence; reasonable doubt; burden of proof; any issue with any of those legal concepts?

**Page 76**

JUROR SEAT #1: No.

MS. FOSTER: Okay. All right.

Anything else that you want to share with us that may be of either concern to myself or Mr. Bramble?

JUROR SEAT #1: Nothing I know of.

MS. FOSTER: Nothing that you can think of? Okay. Thank you.

THE COURT: Mr. Bramble?

MR. BRAMBLE: Mr. MacFarlane, this is where I feel like I'm beating a dead horse. Can you think of anything that would prevent you from sitting here as a fair and impartial juror?

JUROR SEAT #1: No. I could be fair.

MR. BRAMBLE: I have nothing further, your Honor.

THE COURT: Mr. Bramble, any further challenges?

MR. BRAMBLE: Your Honor, the State is satisfied.

THE COURT: Ms. Foster?

MS. FOSTER: (Confers with client and extern) Defense is satisfied, your Honor.

THE COURT: Very good. Those of you remaining out there are excused. You can check out downstairs. Thank you.

(At 10:44 a.m., remainder of jury panel excused)

THE COURT: All right, ladies and gentlemen. I think you've already seen we have excellent attorneys here.

**77**

1    They are very straightforward and to the point; very
2    experienced attorneys on both sides of this
3    trial.

4            We hope to move this along efficiently and
5    certainly finish on Thursday at the latest.

6            For now we're going to take a 15-minute recess.
7    After that recess, you'll be sworn in. I'll give you
8    preliminary instructions. You will be handed copies of
9    those preliminary instructions and then we'll proceed with
10   opening statements and the evidence in the case.

11           I'll just caution you now, as I will repeatedly
12   through this case, the only evidence, the only facts you may
13   consider in this case will come to you while I, the
14   attorneys, the defendant are all here. That will come to
15   you through sworn testimony, exhibits, and anything else I
16   tell you to consider as evidence. It's very important to
17   consider only those things as evidence.

18           Don't discuss the case in any way with anybody,
19   including yourselves, until the end of the trial when you
20   can deliberate. Don't have any contact with the attorneys,
21   the defendant, or any witnesses, even if it has nothing to
22   do with this case. Don't do any investigation or any
23   experiments on your own.

24           We'll take a 15-minute recess, and my clerk will
25   take you back to the jury room back here.

**78**

1            (At 10:47 a.m., break had)
2            THE COURT: Anything further at this time,
3    Mr. Bramble?
4            MR. BRAMBLE: Nothing from the People.
5            THE COURT: Ms. Foster?
6            MS. FOSTER: Not from the defense, your Honor.
7            THE COURT: All right. We're in recess.
8            (At 10:48 a.m., break had)
9            (At 11:15 a.m., jury resumes seats)
10           THE COURT: Jurors remain standing, please. My
11   clerk will swear you in. Others, you may be seated.
12           MS. FOSTER: Thank you, sir.
13           THE COURT: One little detail to cover with
14   counsel here. You've received green sheets here that the
15   jury has received. Any objection to the content of those
16   instructions? I am assuming that each one of you has read
17   through them thoroughly.
18           Go ahead and swear in the jury.
19           THE CLERK: Would you raise your right hand,
20   please.
21           Do you solemnly swear that in this action now
22   before the court you will justly decide the questions
23   submitted to you, and unless you are discharged by the Court
24   from further deliberation, you will render a true verdict
25   and that you will render your verdict only on the evidence

**79**

1    introduced and in accordance with the instructions of the
2    Court and the laws of this state, so help you God?
3            (At 11:16 a.m., jurors administered oath)
4            THE JURY: (Responds affirmatively)
5            THE COURT: Be seated.
6            MS. FOSTER: The answer to that question is "Yes,"
7    your Honor, we're satisfied with the preliminary jury
8    instructions.
9            MR. BRAMBLE: Likewise, your Honor.
10           THE COURT: Ladies and gentlemen of the jury, you
11   will be hearing the charges -- you can follow along on the
12   green sheets as I read them, or you can listen to me, or
13   both. That's your choice. I always reserve the right to
14   edit what we have in here. I might change something, but it
15   will be as to style and not content.
16           You will be hearing charges filed in two separate
17   cases. Because the alleged conduct of the defendant was
18   very similar, you will decide both cases. The offenses
19   alleged in Case No. 11-11910-FH involved the alleged victim,
20   Barry Gordon Isaacson. The offenses alleged in Case
21   No. 11-11911-FH involved the alleged victim, Brian James
22   Gray.
23           I'll now explain some of the legal principles you
24   will need to know and procedure we will follow in this
25   trial.

**80**

1            First, the prosecutor makes an opening statement,
2    where he gives his theories about the cases. The defense
3    lawyer does not have to make an opening statement, but she
4    may make an opening statement after the prosecutor makes
5    his, or she may wait until later. These statements are not
6    evidence. They are only meant to help you understand how
7    each side views the cases.
8            Next, the prosecutor presents his evidence. The
9    prosecutor may call witnesses to testify and may show you
10   exhibits like documents or objects. The defense lawyer has
11   the right to cross-examine the prosecutor's witnesses.
12           After the prosecutor has presented all his
13   evidence, the defense attorney may also offer evidence, but
14   does not have to. By law, the defendant does not have to
15   prove his innocence or produce any evidence. If the defense
16   does call any witnesses, the prosecutor has the right to
17   cross-examine them. The prosecutor may also call witnesses
18   to contradict the testimony of the defense witnesses.
19           After all the evidence has been presented, the
20   prosecutor and the defense lawyer will make their closing
21   arguments. Like the opening statements, these are not
22   evidence. They are only meant to help you understand the
23   evidence and the way each side sees the cases. You must
24   base your verdicts only on the evidence.
25           You have been given a written copy of the

**Page 81**

1  instructions I'm reading to you. You may refer to them
2  during the trial. However, because this is a complicated
3  trial, these instructions may change at the end of the
4  trial. At the close of the trial, I will provide you with a
5  copy of my final instructions for your use during
6  deliberations.
7      My responsibilities as the judge in this trial are
8  to make sure that the trial is run fairly and efficiently,
9  to make decisions about evidence, and to instruct you about
10  the law that applies to these cases. You must take the law
11  as I give it to you. Nothing I say is meant to reflect my
12  own opinions about the facts of the cases. As jurors, you
13  are the ones who will decide these cases.
14      Your responsibility as jurors is to decide what
15  the facts of the cases are. This is your job, and no one
16  else's. You must think about all the evidence and all the
17  testimony, and then decide what each piece of evidence means
18  and how important you think it is. This includes how much
19  you believe what each of the witnesses said.
20      What you decide about any fact in these cases is
21  final.
22      When it is time for you to decide cases, you are
23  only allowed to consider the evidence that was admitted in
24  the cases. Evidence includes only the sworn testimony of
25  witnesses, the exhibits admitted into evidence, and anything

**Page 82**

1  else I tell you to consider as evidence.
2      It is your job to decide what the facts of these
3  cases are. You must decide which witnesses you believe and
4  how important you think their testimony is. You do not have
5  to accept or reject everything a witness says. You are free
6  to believe all, none, or part of any person's testimony.
7      In deciding which testimony you believe, you
8  should rely on your own common sense and everyday
9  experience. However, in deciding whether you believe a
10  witness's testimony, you must set aside any bias or
11  prejudice you have based on the race, gender, or national
12  origin of the witness.
13      There is no fixed set of rules for judging whether
14  you believe a witness, but it may help you to think about
15  these questions:
16      Was the witness able to see or hear clearly? How
17  long was the witness watching or listening? Was anything
18  else going on that might have distracted the witness?
19      Does the witness seem to have a good memory?
20      How does the witness look and act while
21  testifying? Does the witness seem to be making an honest
22  effort to tell the truth, or does the witness seem to evade
23  the questions or argue with the lawyers?
24      Does the witness's age or maturity affect how you
25  judge his or her testimony?

**Page 83**

1      Does the witness have any bias or prejudice or any
2  personal interest in how the cases are decided?
3      Have there been any promises, threats,
4  suggestions, or other influences that affect how the witness
5  testifies?
6      In general, does the witness have any special
7  reason to tell the truth, or any special reason to lie?
8      All in all, how reasonable does the witness's
9  testimony seem when you think about all the other evidence
10  in the cases?
11      The questions the lawyers ask the witnesses are
12  not evidence. Only the answers are evidence. You should
13  not think that something is true just because one of the
14  lawyers asks questions that assume or suggest that it is.
15      I may ask some of the witnesses questions myself.
16  These questions are not meant to reflect my opinion about
17  the evidence. If I ask questions, my only reason would be
18  to ask about things that may not have been fully explored.
19      During the trial, the lawyers may object to
20  certain questions or statements made by the other lawyers or
21  witnesses. I will rule on these objections according to the
22  law. My rulings for or against one side or the other are
23  not meant to reflect my opinions about the facts in these
24  cases.
25      Sometimes the lawyers and I will have discussions

**Page 84**

1  out of your hearing. Also, while you are in the jury room,
2  I may have to take care of other matters that have nothing
3  to do with these cases. Pay no attention to these
4  interruptions.
5      You must not discuss these cases with anyone,
6  including your family or friends. You must not even discuss
7  them with the other jurors until the time comes for you to
8  decide the cases. When it is time for you to decide the
9  cases, I will send you to the jury room for that purpose.
10  Then you should discuss the cases among yourselves, but only
11  in the jury room and only when all the jurors are there.
12  When the trial is over, you may, if you wish, discuss the
13  cases with anyone.
14      If I call for a recess during the trial, I will
15  either send you back to the jury room or allow you to leave
16  the courtroom on your own and go about your business. But
17  you must not discuss the cases with anyone or let anyone
18  discuss them with you or in your presence. If someone tries
19  to do that, tell him or her to stop, and explain that as a
20  juror you are not allowed to discuss the cases. If he or
21  she continues, leave and report the incident to me as soon
22  as you return to court.
23      You must not talk to the defendant, the lawyers,
24  or the witnesses about anything at all, even if it has
25  nothing to do with the cases.

1    It is very important that you only receive
2  information about the cases when you are getting it from
3  the jury and when the defendant, the lawyers, and I are all
4  here.
5         During the trial, do not read, listen to, or watch
6  any news reports about the cases. Under the law, the
7  evidence you consider to decide cases must meet certain
8  standards. For example, witnesses must swear to tell the
9  truth, and the lawyers must be able to cross-examine them.
10 Because news reports do not have to meet these standards,
11 they could give you incorrect or misleading information that
12 might unfairly favor one side. So, to be fair to both
13 sides, you must follow this instruction.
14        Before recesses I may or may not instruct you.
15 Remember, for the reasons I explained to you earlier, you
16 must not read, listen to, or watch any news reports about
17 these cases while you are serving on this jury.
18        I don't expect any media coverage on this trial.
19 But I don't know, so... Again, if you get wind of anything,
20 just ignore it and you can read up on it after the trial.
21        The only information that you will receive about
22 these cases will come to you in this courtroom. You must
23 not consider any information that comes from anywhere else.
24 You must not read newspaper headlines or articles relating
25 to the trial. Also, you must not watch or listen to

85

1  television and radio comments or accounts of the trial while
2  it is in progress.
3         Until your jury service is concluded, you are not
4  to discuss the cases with others, including other jurors,
5  except as otherwise authorized by the court. You are not to
6  read or listen to any news reports about the cases. You may
7  also not use a computer, cellular phone, or other electronic
8  device with communication capabilities while in attendance
9  at trial or during deliberation. These devices may be used
10 during breaks or recesses, but may not be used at any time
11 to obtain or disclose information about a party, witness,
12 attorney, or court officer; news accounts of the cases; or
13 information collected through juror research on any topics
14 raised or testimony offered by any witness or by any
15 exhibit.
16        You must not visit the scenes of the occurrences
17 that are the subjects of this trial. If it should become
18 necessary that you view or visit the scenes, you will be
19 taken as a group under court supervision. You must not
20 consider as evidence any personal knowledge you have of the
21 scenes.
22        You must not do any investigations on your own or
23 conduct any experiments of any kind. This includes using
24 the Internet for any purpose regarding these cases.
25        If you discover a juror has violated my

86

1  instructions, you should report it to me.
2         If more than one person wishes to speak with,
3  but of course you don't have to. If you do take notes, you
4  should be careful that it does not distract you from paying
5  attention to all the evidence. When you go to the jury room
6  to decide your verdicts, you may use your notes to help you
7  remember what happened in the courtroom. If you take notes,
8  do not let anyone except the other jurors see them.
9         Your notes will not be examined by anyone, and
10 when your jury service concludes, your notes will be
11 collected and destroyed.
12        You can see that we have chosen a jury of
13 fourteen. After you've heard all the evidence and my
14 instructions, we will draw lots to decide which two of you
15 will be dismissed in order to form a jury of twelve.
16        Possible penalty should not influence your
17 decision. It is the duty of the judge to fix the penalties
18 within the limits provided by law.
19        I may give you more instructions during the trial,
20 and at the end of the trial I will give you detailed
21 instructions about the law in these cases. You should
22 consider all of my instructions as a connected series.
23 Taken all together, they are the law you must follow.
24        After all of the evidence has been presented and
25 the lawyers have given their arguments, I will give you

87

1  detailed instructions about the rules of law that apply to
2  these cases. Then you will go to the jury room to decide on
3  your verdicts. The verdicts must be unanimous. That means
4  that every juror must agree on them, and they must reflect
5  the individual decisions of each juror.
6         It is important for you to keep an open mind and
7  not make decisions about anything in these cases until you
8  go to the jury room to decide the cases.
9         I'll now go through the elements of the charged
10 offenses. You will have them in writing. I'm going read
11 through the elements in the first case. I'm not going to
12 repeat them in the second case. The only thing that changes
13 in the second case, primarily a different alleged victim. I
14 believe the locations here, Mr. Bramble, are near each
15 other, in the same apartment complex; correct?
16        MR. BRAMBLE: Yes, your Honor.
17        THE COURT: All right. They occurred on different
18 dates. Obviously some of the witnesses may be different.
19 But as to the elements, really the only thing that changes
20 from one case to the other is the alleged victim.
21        So, I'll read through the first one. In Count
22 One, the defendant is charged with the crime of unarmed
23 robbery. To prove this charge, the prosecutor must prove
24 each of the following elements beyond a reasonable doubt:
25        First, the defendant assaulted or put in fear

88

**89**

1     Barry Gordon Isaacson.

2 of committing a larceny. A "larceny" is the taking and

3 movement of someone else's property or money with the intent

4 to take it away from that person permanently. "In the

5 course of a larceny," includes acts that occur in an attempt

6 to commit the larceny, or during the commission of the

7 larceny, or in flight after the commission of the larceny,

8 or in an attempt to retain possession of the property or

9 money.

10     Third, Barry Gordon Isaacson was present while the

11 defendant was in the course of committing the larceny.

12     What I'm going to read here is a less serious

13 crime. I'll make the final decision before you deliberate,

14 but very possibly you will have an alternative within

15 Count One, either guilty of unarmed robbery or guilty of

16 larceny from a person or, of course, not guilty.

17     So the lesser offense. To prove that -- to prove

18 whether the defendant is guilty of a less serious crime

19 known as larceny from a person, the prosecutor must prove

20 each of the following elements beyond a reasonable doubt:

21     First, that the defendant took someone else's

22 property.

23     Second, that the property was taken without

24 consent.

25

**90**

1     Third, that there was some movement of the

2 property. It does not matter whether the defendant actually

3 kept the property.

4     Fourth, that the property was taken from Barry

5 Gordon Isaacson's person or from Barry Gordon Isaacson's

6 immediate area of control or immediate presence.

7     Fifth, at the time it was taken, the defendant

8 intended to permanently deprive the owner of the property.

9     In Count Two, the defendant is charged with the

10 crime of unlawful imprisonment. To prove this charge, the

11 prosecutor must prove each of the following elements beyond

12 a reasonable doubt:

13     First, that the defendant knowingly restrained

14 Barry Gordon Isaacson. "Restrain" means to forcibly

15 restrict a person's movements or to forcibly confine the

16 person so as to interfere with that person's liberty without

17 that person's consent or without lawful authority. The

18 restraint does not have to exist for any particular length

19 of time and may be related or incidental to the commission

20 of other criminal acts.

21     Second, the defendant restrained Barry Gordon

22 Isaacson to facilitate the commission of another felony,

23 larceny of money from his person.

24     In Count Three, the defendant is charged with the

25 crime of false personation. To prove this charge, the

**91**

1 prosecutor must prove each of the following elements beyond

2 a reasonable doubt:

3     First, that the defendant is not a peace officer.

4 A peace officer means an officer of the police department of

5 a city, village or township of this state.

6     Second, that the defendant knowingly represented

7 to Barry Gordon Isaacson that he was a police officer for an

8 unlawful purpose or with the intent to compel Barry Gordon

9 Isaacson to do or refrain from doing any act against his

10 will.

11     Again, the second case, the elements are

12 identical; the alleged victim is different.

13     Mr. Bramble, your opening statement.

14     MR. BRAMBLE: Thank you, your Honor.

15     Ladies and gentlemen of the jury, as Judge Buth

16 indicated, this is my opportunity to provide you with an

17 opening statement. What it is is my opportunity to tell you

18 what witnesses are going come forward and what information

19 they're going to provide you as it relates to the elements

20 of the offenses that the Judge just read to you.

21     I won't actually argue at this time. That's left

22 for closing argument. But I'll just tell you, kind of give

23 you a roadmap as to where we're going and how we're going to

24 get there.

25     I'm going to tell you a couple of things here.

**92**

1     One is, I'm going to do something I haven't had to do in my

2 20-some years of doing this. One of my victims isn't going

3 to appear here. But he did testify once before, and so

4 we're going to read that transcript into the record here.

5 And I'd ask you to listen to that closely because, again,

6 that's one of the victims: Mr. Isaacson. I want to tell you

7 how this all came about, how this all materialized.

8     You're going to hear from a couple different

9 witnesses, one being a Brian Gray. Brian Gray will testify

10 that on or about November 14 of 2011, he responded to an ad

11 on backpage.com. It was for a massage service. He called

12 the number -- he didn't get an answer -- that was listed on

13 this ad. He didn't get an answer. But at some point the

14 person at that number began to text him back, and they begin

15 to text back and forth on their phones. He will testify

16 that he thought he was talking to the woman in the ad. I

17 submit to you he wasn't, he was actually talking to the

18 defendant or texting back and forth to the defendant.

19     But he receives an area where he should go to,

20 what apartment complex, Apartment Number D1. This was

21 located at the 3000 block of Burlingame in the City of

22 Wyoming, County of Kent, State of Michigan.

23     So Brian Gray went to this address. As he walked

24 up to this address and up to this door, he was confronted by

25 the defendant. The defendant identified himself as a police

**Page 93**

1 officer and told Brian Gray that he matched the description
2 of a suspect that they were looking for. He tells him
3 to turn around and he begins to like pat him down and
4 removes Brian Gray's wallet. And then he later says, "Well,
5 you really don't match the suspect description." He gives
6 him back his wallet and sends him on his way.
7 　　　　What Brian Gray realizes is that the defendant has
8 taken $300 out of his wallet. Brian Gray reports it to the
9 police. I'll be candid and upfront with you here.
10 Initially, he doesn't tell the police why he's so
11 embarrassed about why he's going there. He doesn't tell the
12 police upfront why he was going there. Basically, he said
13 he was in the area to see a friend or something.
14 　　　　When the police -- and they suspect there's
15 something else going on here -- question him a little
16 further, he eventually acknowledges that "Yes, I was here
17 answering this backpage.com ad. It was for a massage
18 service, and this is when the individual approached me."
19 　　　　This incident involving Mr. Gray occurred on
20 November 14. The police don't have any suspects at this
21 time up until November 29th of 2011.
22 　　　　At that point, a gentleman by the name of Barry
23 Isaacson came up from Illinois, indicated he was on
24 business. He comes off as really answering this massage
25 service, same ad in this backpage.com. He was going there

**Page 94**

1 for adult services, whether it be for a massage or
2 otherwise. He again calls the same number, gets information
3 back from -- whether it be by text or phone number -- from a
4 person on the other end, telling him to report to Apartment
5 D1.
6 　　　　He gets there, basically the same thing happens.
7 The defendant grabs him, turns him around, says, "You're a
8 suspect, I'm investigating some assaults in the area. This
9 is a sting operation." He begins asking if he has any sharp
10 weapons on him. And at this time he's got a shirt on that
11 says "police," the defendant does. He pats him down,
12 removes his wallet; takes approximately $500 out of the
13 wallet; gives him back the wallet. Barry Isaacson is
14 suspicious because he realizes this person is really not
15 acting the way a police officer would. So he demands at
16 that time, "Let me see some I.D. Let me see your badge."
17 And the defendant keeps saying, "Well, we'll get someone
18 else here. We're going to call in other units here" and
19 basically puts him off, puts him off. Isaacson then says,
20 "Well, give me my money back." The defendant refuses to do
21 so, gets in his car and drives away.
22 　　　　Barry Isaacson follows him; gets part of his
23 license plate number; follows him and calls the number
24 again. At some point, the defendant calls him back and
25 tells him again "There will be other units on their way."

**Page 95**

1 　　　　Again, Mr. Isaacson realizes this isn't the way a police
2 officer would act, so takes a -- follows him again and
3 actually takes a photograph of him on his phone that
4 you'll see; the defendant in a car on his phone.
5 　　　　He tells him over and over again, "Either give me
6 my money back, or I'm going to call the police." The
7 defendant refuses to give his money back to him, so he does
8 call the police. The police arrive and Detective Swiercz,
9 who is also identified -- also advised of this second
10 incident realizes, "Geez, this sounds remarkably similar to
11 the November 14 incident.
12 　　　　They call and are able to get -- I'll let him
13 explain. But since they have the number on the phone,
14 they're able to track the defendant's movements. They track
15 it to a certain area. They know the type of make of car it
16 is, what color it is, and there's a little bit of damage to
17 the car as described by Mr. Isaacson.
18 　　　　They go to an address where this is, and they look
19 around and they find the car that's used. I believe it's
20 the defendant's mother's car. They bring in other units.
21 They kind of surround this apartment and the defendant is
22 observed near the back sliding glass door. He is arrested
23 at this time. Again, this is shortly after his
24 confrontation with Mr. Isaacson. The defendant has two
25 phones on him. He has $497 in cash, which fits

**Page 96**

1 approximately what Mr. Isaacson said was taken from him.
2 　　　　The officer, when he arrested the defendant
3 realizes, "Geez, these two phones could be of value, could
4 be evidence in the case." He takes the phones and one of
5 the phones -- one of them is off and one of them is still
6 on; opens it up, and Mr. Isaacson's phone number is on the
7 defendant's phone. So there's no doubt that the defendant
8 and Mr. Isaacson were the ones corresponding or the ones
9 talking or texting at this point.
10 　　　　The defendant later acknowledges that he has some
11 contact with somebody in the apartment complex. Ladies and
12 gentlemen of the jury, I'd submit to you that this massage
13 service, this adult service, was nothing more than a ruse to
14 get people show up to Apartment D1 in this complex so that
15 the defendant, posing as a police officer, could lead them
16 here and take their money from them. This happened, not on one
17 occasion, but two occasions; once November 14 and once again
18 November 29th.
19 　　　　Regarding that identification, while Mr. Isaacson
20 takes a picture of the defendant, once they realize who is
21 involved in this; that the defendant is involved in this,
22 they bring Mr. Gray in to a lineup. And the defendant
23 stands in a physical lineup. And you'll hear Mr. Gray
24 indicate that he picked the defendant out of that lineup.
25 There were five or six people in that lineup, and he picks

**Page 97**

1    him out. There's no doubt that this defendant has been
2    identified both by Mr. Gray and Mr. Isaacson as the person
3    impersonating a police officer.
4           The facts here, ladies and gentlemen, when you
5    begin to pull them all together, begin to apply them to the
6    law, they are going to indicate that the defendant is guilty
7    of both unarmed robbery or with a lesser included offense of
8    larceny from a person, but also guilty in that he restrained
9    these individuals.
10           You're going to hear Mr. Isaacson say he actually
11   grabs ahold of Mr. Isaacson and pushes him up against a
12   wall. So he does, in fact, restrain both of these
13   individuals, again, under the ruse that he's a police
14   officer and that he has the ability to do this.
15           You're also going to hear that he took this money;
16   that they never consented to it. So, when you begin to
17   apply all this evidence, you're going to find that, not only
18   did he commit this unarmed robbery or larceny from a person,
19   but that he also restrained these individuals and is guilty
20   of unlawful restraint. Finally, that he's also guilty of
21   posing as a police officer. Again, the facts are going to
22   show this.
23           On behalf of Mr. Isaacson and Mr. Gray, at the
24   conclusion of the proofs, I'm going to ask that your verdict
25   reflect that.

**Page 98**

1           THE COURT: Ms. Foster.
2           MS. FOSTER: Thank you, Judge. Good morning
3    ladies and gentlemen.
4           Ladies and gentlemen, this case is very simple.
5    The prosecutor has to prove beyond a reasonable doubt that
6    my client, Kelvin Heath, put a fake ad for a massage on
7    backpage.com with real pictures, threw on a t-shirt that
8    says "police"; convinced two unsuspecting men that he was
9    the police and stole money from each of them.
10           At the end of the evidence, ladies and gentlemen,
11   we are certain that this is something the prosecution will
12   not be able to do.
13           I'm going to ask you to consider two questions
14   that I'll present at the end of my opening. But, first, I
15   want to discuss reasonable doubt. As I indicated during
16   voir dire, you will and have been and you will in the future
17   be given various opportunities to hear and read the
18   instruction for reasonable doubt. It's almost -- it's a
19   legal instruction and maybe a little confusing to some of
20   you. Just in case that is the case, let me kind of give you
21   more of a laymen's definition of reasonable doubt.
22           First you need to know, ladies and gentlemen, that
23   this is a standard required by the prosecution in all
24   criminal cases. This means that the prosecution must prove
25   his case to the extent that there is no reasonable doubt in

**Page 99**

1    the minds of a reasonable person. Who is a reasonable
2    person. That would be you. That's the purpose of
3    voir dire; to make sure that we have individuals who are
4    going to listen to this case, reflect on this case, listen
5    to all the evidence and testimony and make a fair and
6    impartial decision based on the evidence and testimony in
7    the case. Nothing more, nothing less.
8           If there is a doubt, ladies and gentlemen, and if
9    that doubt that is raised does reflect -- or does affect a
10   reasonable person -- you being the reasonable person --
11   believe that the defendant -- my client -- is guilty, then
12   you, ladies and gentlemen, are not satisfied beyond a
13   reasonable doubt.
14           Think of reasonable doubt this way: it's a doubt
15   that would make a reasonable person -- again you being that
16   reasonable person -- hesitate in the most important of your
17   affairs. The facts of this case, as you've already heard
18   the prosecution's summations of the case, is real strange.
19   In my almost 20 -- in my over 20 years of practice, I've
20   never come across a case like this.
21           It kind of boils down to this. On November 14, a
22   guy by the name of Brian Gray was relieved of $300 from a
23   guy he says was a police officer. Brian claimed that he was
24   at the Swiss Valley Apartments in Wyoming visiting a friend
25   name Josh. But he didn't know the guy's last name or in

**Page 100**

1    which apartment this fellow lived. Interestingly, this $300
2    was all in $20 denominations.
3           Now the police officers who interviewed him, they
4    believed that something happened to him, but they didn't
5    believe his story about being at this location and why he
6    was actually there. It was later determined that he was
7    responding to an ad from backpage.com. Mr. Bramble, in his
8    opening, indicated that Mr. Gray was looking for a massage.
9    Well, you're going to see a printout of that backpage.com
10   ad. I guarantee you that the word "massage" is going to be
11   the farthest thing from your mind.
12           Two weeks later, November 29, this other
13   gentleman, Barry Isaacson, was relieved of $470 from a guy
14   saying he was a police officer. Mr. Isaacson was up from
15   Illinois, claiming that he was on business here in Grand
16   Rapids. He went to the same apartment complex. As it turns
17   out -- and as he reluctantly later confessed to the police
18   officers when they interviewed him -- he was up here for the
19   same exact reason; looking for a massage from an ad in
20   backpage.com. He didn't want to admit that was the reason
21   he was up here.
22           And as there was an alluding to by Mr. Bramble,
23   you're going to hear earlier testimony where he was
24   cross-examined by me and asked specifically of his purpose
25   for being here in Michigan. Even under oath he wasn't

## 101

```
 1   truthful.  In any proceeding where you have to testify in a
 2   court in this state you have to swear to tell the truth.
 3   So you're going to have to -- I'm asking you right here and
 4   right now to consider that dishonesty on his level.  I also
 5   want you to consider the fact that he's not even here to
 6   testify.  We're going to have to use other means for you to
 7   hear his testimony.
 8           The reason why he is not here is because he
 9   refuses to answer to a subpoena by the prosecution to be
10   here.  Consider that, too, folks.  You have every right to
11   do so.  In this case there will be no physical evidence that
12   my client was in this apartment complex; that he had
13   anything to do with this backpage ad.  I believe there's --
14   there may be a piece of physical evidence that there's a
15   shirt that belonged to my client.
16           My client will not deny that that is his shirt.
17   But I don't believe you will see any other -- it's not a
18   police shirt -- it's not the so-called shirt with the name
19   "police" on it either.  There is no other physical evidence
20   that you will hear of.  There is no other eyewitness
21   testimony that you'll hear.  The only eyewitnesses to these
22   alleged crimes are the two guys looking for the massages.
23   There will be no corroborating testimony.  Basically this
24   case boils down to whether or not you're willing to believe
25   two philanderers.
```

## 102

```
 1           So here are the two questions: Is that proof
 2   beyond a reasonable doubt, ladies and gentlemen?  Are you
 3   convinced beyond a reasonable doubt that my client committed
 4   the alleged offenses?  Consider those questions, and at the
 5   end of the testimony it is our contention that your verdict
 6   has to be not guilty.
 7           Thank you.
 8           THE COURT:  Mr. Bramble, your first witness.
 9           MR. BRAMBLE:  Brian Gray.
10           THE COURT:  State your full name, please.
11           MR. GRAY:  Brian James Gray.
12           Do you solemnly swear or affirm that the testimony
13   you're about to give in this matter will be the truth, the
14   whole truth, and nothing but the truth, so help you God?
15           MR. GRAY:  Yes.
16           THE COURT:  Please be seated.
17               BRIAN JAMES GRAY,
18   called by the People at 11:50 a.m., sworn by the Court,
19   testified:
20               DIRECT EXAMINATION
21   BY MR. BRAMBLE:
22   Q.   How do you spell your last name, Mr. Gray?
23   A.   Gray.  It's G-R-A-Y.
24   Q.   Are you employed, sir?
25   A.   Yes.
```

## 103

```
 1   Q.   Where are you employed?
 2   A.   Hope Network.
 3   Q.   What do you do there?
 4   A.   I work at a group home with developmentally disabled
 5        individuals.
 6   Q.   How long have you done that?
 7   A.   Eight years.
 8   Q.   All right.  I want to draw your attention back to
 9        November 14 of 2011.  Did you respond to an ad on that day?
10   A.   Yes.
11   Q.   And where did you see this ad?
12   A.   On backpage.
13   Q.   What is backpage?
14   A.   It's similar to like a Craigslist type of site that has lots
15        of different advertisements and stuff.
16   Q.   What type of advertisement did you respond to?
17   A.   It was for a massage.
18   Q.   And did you -- were you given a phone number to call?
19   A.   Yes.
20   Q.   Did you call that number?
21   A.   I called it, yes.
22   Q.   Did you get ahold of someone right away when you called it?
23   A.   I got a text message back.
24   Q.   You get a text message back?
25   A.   (Nods head affirmatively)
```

## 104

```
 1   Q.   Did you begin to text back and forth with this person who
 2        had texted you back?
 3   A.   Yes.
 4   Q.   Did this text come from the number you had called?
 5   A.   Yes.
 6   Q.   Who did you think you were communicating with when you were
 7        texting back and forth?
 8   A.   It was supposed to be a female that was supposedly from
 9        Northern Michigan, it said.
10   Q.   Through this texting were you -- did you come to an
11        agreement or understanding as to where you would meet?
12   A.   Yes.
13   Q.   Where was it you were to meet?
14   A.   At the Swiss Valley Apartments.
15   Q.   Did a specific apartment come into play?
16   A.   Yeah.  There was a number.  I can't remember offhand.
17   Q.   All right.  D1 sound --
18   A.   Yes.  Yes.
19   Q.   Did you -- approximately 6:15 on November 14 --
20   A.   Yes.
21   Q.   -- did you go to the Swiss Valley Apartments?
22   A.   Yes.
23   Q.   Is that apartment complex located about the 2900 block of
24        Burlingame?
25   A.   Yes.
```

**Page 105**

| | | |
|---|---|---|
| 1 | Q. | Is that in the City of Wyoming, County — Kent, State of |
| 2 | | Michigan? |
| 3 | A. | Yes. |
| 4 | Q. | When you arrived at the apartment complex, what did you do? |
| 5 | A. | I walked to see where Apartment D1 was. And, yeah, as I |
| 6 | | walked into that part of the building, a man came the other |
| 7 | | direction and stated that there was a sting operation; that |
| 8 | | there was a rapist in the area; and he asked for my wallet. |
| 9 | | So, you know, I thought it was a cop. He said he |
| 10 | | was a police officer. And then he patted me down, and in |
| 11 | | the end said that I did not fit the description and I was |
| 12 | | free to go. |
| 13 | Q. | Had you given him your wallet? |
| 14 | A. | Yes. |
| 15 | Q. | Did the defendant, was he facing you when he patted you |
| 16 | | around, or did he turn you around? |
| 17 | A. | He turned me around. |
| 18 | Q. | How did your wallet come out of your pocket? |
| 19 | A. | He asked for ID, and I just, you know, took my wallet, you |
| 20 | | know, since he asked for the ID. |
| 21 | Q. | So, you give him your wallet; you're told then by this |
| 22 | | person that you don't match the suspect's description. What |
| 23 | | does this person do? Does he tell you you're free to go |
| 24 | | then? |
| 25 | A. | Yeah. He says I'm free to go. |

**Page 106**

| | | |
|---|---|---|
| 1 | Q. | What did you — who left the building first? |
| 2 | A. | I believe I did. |
| 3 | Q. | And where did you go? |
| 4 | A. | Back to my car. |
| 5 | Q. | What did you do once you got there? |
| 6 | A. | I looked in my, you know, went through my wallet and noticed |
| 7 | | that my money was missing. |
| 8 | Q. | How much money was missing? |
| 9 | A. | $300. |
| 10 | Q. | I'm sorry? |
| 11 | A. | $300. |
| 12 | Q. | Do you remember what denominations that $300 was in? |
| 13 | A. | Not offhand, no. |
| 14 | Q. | The next morning, November 15 of 2011, did you receive a |
| 15 | | phone call from the same number you responded to in the ad? |
| 16 | A. | Yes. Yes. |
| 17 | Q. | And what did this person say? |
| 18 | A. | I — I did not answer it at this time. The night before I |
| 19 | | did receive a call as — as well. Well, I received a voice |
| 20 | | — I'm trying to think exactly — I believe it was a |
| 21 | | voicemail stating that, you know, I needed to go to the |
| 22 | | police office; that my, like, you know, license plate number |
| 23 | | — they had my license plate number and that I needed to go |
| 24 | | down to the police office — police station. And this was |
| 25 | | after eleven o'clock at night. |

**Page 107**

| | | |
|---|---|---|
| 1 | Q. | Was it a male caller? Male voice or female voice? |
| 2 | A. | Yes, it was a man. |
| 3 | Q. | Now, did you contact the police? |
| 4 | A. | Yes. |
| 5 | Q. | When did you contact the police? |
| 6 | A. | At, you know, shortly after it happened. I would say within |
| 7 | | 15 — yeah, 10, 15 minutes. |
| 8 | Q. | All right. Did you tell the police why — initially why you |
| 9 | | were showing up there? |
| 10 | A. | Not initially. |
| 11 | Q. | All right. And can you explain to this jury why you didn't |
| 12 | | tell the police? |
| 13 | A. | Embarrassed. |
| 14 | Q. | Did you eventually tell the police the truthful reason as to |
| 15 | | why you were present at that apartment complex? |
| 16 | A. | Yes. |
| 17 | Q. | Did the police ask you to do a sketch of the suspect? |
| 18 | A. | Yes. |
| 19 | Q. | Did you do that? |
| 20 | A. | Yes. |
| 21 | Q. | Approximately a couple weeks later, were you also asked to |
| 22 | | go to the — to go and observe a physical lineup? |
| 23 | A. | Yes. |
| 24 | Q. | Did you do so? |
| 25 | A. | Yes. |

**Page 108**

| | | |
|---|---|---|
| 1 | Q. | Were you able to pick someone out of the lineup as being the |
| 2 | | person who was posing as a police officer? |
| 3 | A. | Yes. |
| 4 | Q. | I'm going to show you what's been marked as People's |
| 5 | | Proposed Exhibit 4. |
| 6 | | MR. BRAMBLE: May I approach the witness, your |
| 7 | | Honor? |
| 8 | | THE COURT: Yes. |
| 9 | | BY MR. BRAMBLE: |
| 10 | Q. | Is this picture with six people in it the picture they |
| 11 | | showed you — or the lineup you observed? |
| 12 | A. | Yes. |
| 13 | Q. | Did you pick someone out of that lineup as being the person |
| 14 | | who — |
| 15 | A. | Yes. |
| 16 | Q. | What number? |
| 17 | A. | Five. |
| 18 | | MS. FOSTER: I've seen it. |
| 19 | | BY MR. BRAMBLE: |
| 20 | Q. | Did they make you fill out a card indicating what number you |
| 21 | | chose? |
| 22 | A. | Yes. |
| 23 | Q. | I'll show you what's marked proposed Exhibit 5 and ask if |
| 24 | | you recognize this card? |
| 25 | A. | Yes. |

**109**

1    Q.   You put down number -- picked number five?

2    A.   Yes.

3    Q.   Your name on there, as well?

4    A.   Yes.

5    Q.   Also, I'm going to show you what's marked as proposed

6         Exhibit 3, and ask if you can recognize specifically the

7         phone number on there?

8    A.   Yeah. I believe that is -- is the phone number.

9    Q.   All right. Is that phone number area code 601.831.0149?

10   A.   Yes.

11   Q.   Is this comparable to the type of ad that you responded to

12        on backpage?

13   A.   Yes. Yes.

14            MS. FOSTER: I've seen it.

15            MR. BRAMBLE: Your Honor, at this time I would

16        move for the admission of proposed Exhibits 3, 4, and 5.

17            MS. FOSTER: May I voir dire on the two proposed

18        -- the proposed Exhibits 4 and 5?

19            THE COURT: Yes.

20            MS. FOSTER: Exhibit 3 is the backpage ad; right?

21            MR. BRAMBLE: Right.

22            MS. FOSTER: Okay. Exhibit 4 and 5, your Honor.

23        I don't have any objection to the admission of Exhibit 3.

24

25

**110**

1                        VOIR DIRE

2    BY MS. FOSTER:

3    Q.   This will just take a couple minutes with regard to -- this

4         is involving the lineup.

5    A.   Okay.

6    Q.   Can you kind of walk us through how you participated in this

7         lineup? In other words, did you get a phone call from

8         somebody telling you to come down?

9    A.   Yes.

10   Q.   Where was this lineup taken? Where did this lineup take

11        place?

12   A.   It was at the jail, the Kent County jail.

13   Q.   Do you remember who you met there?

14   A.   Detective Swiercz, who I met there. And then I'm not --

15   Q.   That's fine about names. Do you remember how many people

16        were there?

17   A.   There was two.

18   Q.   Two. One was a detective. Do you remember who the other

19        individual was?

20   A.   No.

21   Q.   What happened once you got there? Were you led to an area,

22        a room? What happened?

23   A.   Yeah. We were led to the area, and then after that to the

24        room.

25   Q.   Okay. Can you describe the room?

**111**

1    A.   It's a -- was a small room with benches, a few like benches

2         going up.

3    Q.   Okay. And did you observe the six gentlemen in jail greens

4         come into another room?

5    A.   They -- they came from another room into this room, into

6         behind the glass.

7    Q.   Okay. They couldn't see you; correct?

8    A.   Correct.

9    Q.   Was it like you see on television, they can't see you, but

10        you can see them kind of a thing?

11   A.   Correct. Yes.

12   Q.   Approximately how far were they from you?

13   A.   I would say ten feet maybe.

14   Q.   Okay. I see you're wearing glasses. Were you wearing

15        glasses that day?

16   A.   Yes, I was.

17   Q.   Okay. And your vision is correct at the 20/20 with the

18        glasses on?

19   A.   Correct.

20   Q.   And do you remember how many people were in the room with

21        you when you were asked to look at these gentlemen?

22   A.   I'm -- I don't remember.

23   Q.   Was there more than two at this point?

24   A.   I think there might have been a third. I'm not positive.

25   Q.   Were there any women in the room?

**112**

1    A.   It's a little ways back. I --

2    Q.   You don't remember?

3    A.   I'm not positive.

4    Q.   Okay. How long were you allowed to observe the men in the

5         lineup?

6    A.   Very short time. You know, they were front and then each

7         asked to go to the side view.

8    Q.   Okay. And when did you fill out a card that Mr. Bramble

9         mentioned?

10   A.   Right after I was -- after they left the room.

11   Q.   During the time that you were in the room observing, did any

12        police officer, anybody make any statements to you about any

13        of the six gentlemen?

14   A.   No.

15   Q.   Did you make any statements to the police officers about any

16        of the six gentlemen?

17   A.   No.

18   Q.   Did you point and say, "It's him, number such and such," or

19        anything like that?

20   A.   No.

21   Q.   Were you instructed not to do that?

22   A.   Correct. Yes.

23   Q.   And this card that you filled out was after you left the

24        room?

25   A.   Correct.

**113**

```
 1          MS. FOSTER:  With that, I have nothing further,
 2   your Honor.
 3          THE COURT:  Mr. Bramble.
 4          MR. BRAMBLE:  I would move for admission of 4 and
 5   5 at this point.
 6          MS. FOSTER:  At this point, I have no objection.
 7          THE COURT:  Exhibits 3, 4 and 5 are admitted.
 8          (People's Exhibits 3-5 admitted)
 9   BY MR. BRAMBLE:
10   Q.   At this lineup, did anyone tell you whether or not the
11        person was going to be in there, or tell you which one to
12        pick, or anything like that?
13   A.   No, no.
14   Q.   That person that you picked out of that lineup, was this the
15        person that approached you and said they were a police
16        officer on November 14, 2011?
17   A.   Yes.
18   Q.   Is that person present here in the courtroom?
19   A.   Yes.
20   Q.   Can you point out where he's seated right now and what he's
21        wearing right now?
22   A.   He's sitting right over there with the white shirt.  Yes.
23          MR. BRAMBLE:  Your Honor, may the record reflect
24   the identification of the defendant?
25          THE COURT:  Yes.
```

**114**

```
 1   BY MR. BRAMBLE:
 2   Q.   Prior to this date, November 14, 2011, had you ever met the
 3        defendant?
 4   A.   No.
 5   Q.   And prior to the preliminary exam, had you ever met a person
 6        named Barry Isaacson?
 7   A.   No.
 8   Q.   Do you know who that is?
 9   A.   No.  It does not register, no.
10   Q.   Okay.
11          MR. BRAMBLE:  Thank you.  I have nothing further.
12          THE COURT:  Ms. Foster.
13          MS. FOSTER:  Thank you, your Honor.
14                 CROSS-EXAMINATION
15   BY MS. FOSTER:
16   Q.   Good afternoon, Mr. Gray.  You indicated that you work at
17        Hope Network?
18   A.   Correct.
19   Q.   And are you married?
20   A.   No.
21   Q.   Is Hope Network, is that a faith-based organization?
22   A.   Loosely faith-based.
23   Q.   Loosely faith-based.  Okay.  How old are you, sir?
24   A.   I'm 36.
25   Q.   Thirty-six.  And you indicated that you were responding to
```

**115**

```
 1        an ad in backpage.com?  That's correct; right?
 2   Q.   And asked what backpage is about, you indicated it's like
 3        Craigslist.  Is that your definition of backpage?
 4   A.   Yes.  It's the same type of format.  They don't -- it's not
 5        just massages.  They do -- they have job placements, you
 6        know.
 7   Q.   But you weren't going to backpage looking for a job
 8        placement; were you?
 9   A.   No.
10   Q.   You indicated -- and you've said it again today -- that you
11        were looking for a massage?
12   A.   Correct.
13          MS. FOSTER:  Exhibit Number 3, please.
14          MR. BRAMBLE:  Let me make sure that's it.
15   BY MS. FOSTER:
16   Q.   Can you take a look at this that's already been admitted
17        into evidence and tell me what part of that ad convinced you
18        that this person would give you a good massage?
19   A.   I -- I can't answer.
20   Q.   So, you weren't really looking for a massage with this
21        particular individual; were you?  Remember you're under
22        oath.
23   A.   No, not necessarily.
24   Q.   You were relieved of $300; is that your testimony?
```

**116**

```
 1   A.   Correct.
 2   Q.   What money was agreed upon when you had these series of
 3        texts or telephone messages with whom you believed to be the
 4        person in this ad?
 5   A.   $100.
 6   Q.   $100.  Had you ever been to a massage therapist, a
 7        legitimate one in an office somewhere?
 8   A.   Yes, I've had them.
 9   Q.   How much do they generally charge?
10   A.   Sixty-five.
11   Q.   Okay.  So my question to you, sir, is why would you pay more
12        to go to a massage therapist from backpage.com when you can
13        go to a legitimate massage therapist in a legitimate office
14        for less money?
15          So, you weren't looking for a massage with this
16        woman; were you?  You were hoping to score; weren't you?
17        Just be honest.  You're under oath.
18   A.   Yes, yes.
19   Q.   You were hoping to score?
20   A.   Yes.
21   Q.   You're single.  You said you're not married, so there's no
22        shame in that.
23          You said that you were accosted by an individual
24        saying that he said that you were a suspect in some type of
25        assault that was happening in the area; correct?
```

1 A. Correct.
2 Q. Exactly how long were you able to -- is this individual
3 who accosted you, this individual posing as a police
4 officer?
5 A. I would say two different times for a total of a minute.
6 Q. A total of a minute. Okay. When the person -- did the
7 person approach you from in front or from behind?
8 A. He came from in front, but, you know --
9 Q. He swung you around?
10 A. Swung me. Yeah.
11 Q. And did he force you up against a wall? Did he make you put
12 your hands up?
13 A. Yes.
14 Q. And you didn't resist; did you?
15 A. No.
16 Q. And you -- did you question whether or not he was a police
17 officer?
18 A. No, not at the time.
19 Q. You only questioned after you found out your money was gone;
20 is that a fair statement?
21 A. (Nods head affirmatively)
22 Q. Is that a "yes"?
23 A. There was a little bit of a question at the end when it was
24 just, you know, so abrupt, "You don't fit the description;
25 you can go to your -- you can go back to your car." That

117

1 seemed a little bit --
2 Q. Okay.
3 A. -- strange.
4 Q. So, he turns you around, he got you up against a wall, and
5 he patted you down and he took a wallet -- took your wallet.
6 Did you have your keys on you, too?
7 A. I did have my keys on me.
8 Q. Did he take those as well?
9 A. No.
10 Q. Just the wallet?
11 A. Yes.
12 Q. What kind of wallet? Was it leather?
13 A. It's a leather wallet.
14 Q. Okay. And you said you didn't notice until after he was
15 gone that the money was gone; is that a fair statement?
16 A. Correct.
17 Q. And while after this individual took your wallet, did you --
18 did you turn around and get a good look at him, or did you
19 remain faced in front of the wall that you were up against?
20 A. Umm, before I left?
21 Q. When the person took the wallet from your pocket, I'm
22 assuming that you were --
23 A. He didn't take it from my pocket. He asked for ID, and I
24 gave him -- and I gave him my own -- whole -- he basically,
25 when I showed the ID, he took the wallet. And I didn't

118

1 question it basically --
2 Q. ... okay. So, if this -- I caught me in[?]... wrong if he
3 comes up to you, he turns you around, and you put your arms
4 or your hands up, up against a wall like you're being patted
5 down like you see on television?
6 A. Correct.
7 Q. So, your hands were on a wall. Are you indoors or outdoors?
8 A. In -- well, it's -- you know how apartment complexes --
9 Q. Have kind of that out --
10 A. -- it's kind of an outdoor. Yeah, it's not --
11 Q. I got ya. So, you weren't quite indoors, but you weren't on
12 a brick wall either?
13 A. Correct.
14 Q. So, you got your arms up and he tells you to reach in and
15 grab your wallet. And I'm assuming you're right-handed. I
16 shouldn't assume.
17 A. I'm left-handed.
18 Q. You're left-handed. See, I shouldn't assume.
19 So, you grab your wallet out of your pocket and
20 you just give it to him; correct?
21 A. Correct. I believe that he asked for it before I -- he
22 frisked me. But I'm not completely positive on that.
23 Q. Well, did he -- was there any like forcible movements on
24 this person's part? In other words, did he shove you up
25 against a wall? Did he -- you know what you see on

119

1 television -- did he cut your legs apart?
2 A. He didn't cut my legs. No.
3 Q. He shove you?
4 A. You know, pretty forcefully. I wouldn't call it a full-
5 forced shove, but a -- you know, a --
6 Q. Did he say, "Get up against the wall. You're under arrest,"
7 or anything like that?
8 A. He didn't say, "You're under arrest." He said, "You're a
9 suspect," and then he acted like he was on the phone with --
10 on his cell phone or on, you know, on a police -- I don't
11 know what they -- walkie-talkie that he was with -- you
12 know, that he was talking with someone else.
13 Q. Okay. So, my question to you again is, when all this was
14 going on, were you looking at him or were you facing
15 forward? Were you looking -- were you -- where were you
16 looking at when all this was going?
17 A. I was against the wall.
18 Q. Okay. So, you weren't looking at him very much, were you?
19 A. Not at this point.
20 Q. When he gives the wallet back to you, does he just walk
21 away?
22 A. I walk, and then he -- yeah, he walks away.
23 Q. Do you walk away together like you're two guys walking
24 beside each other?
25 A. No, no.

120

**Page 121**

| | |
|---|---|
| 1 | Q. Does he run? |
| 2 | A. He did not. I am -- |
| 3 | Q. Did you see him get into a vehicle? |
| 4 | A. No. |
| 5 | Q. Okay. At what point did you actually have a chance to look |
| 6 | at him? I'm assuming when he first approached you; correct? |
| 7 | A. When he first approached me, yes, and then when I left. |
| 8 | Q. And when you left. Okay. But you didn't see where he went |
| 9 | and what vehicle he got into? |
| 10 | A. No. |
| 11 | Q. Okay. |
| 12 | MS. FOSTER: You can have that back. |
| 13 | BY MS. FOSTER: |
| 14 | Q. Do you recall at some point giving -- talking to a sketch |
| 15 | artist? |
| 16 | A. Yes. |
| 17 | MS. FOSTER: Do you have that? |
| 18 | MR. BRAMBLE: I can get it for you. |
| 19 | MS. FOSTER: (Reviewing) |
| 20 | BY MS. FOSTER: |
| 21 | Q. When did you talk to the sketch artist? |
| 22 | A. It was that same evening. |
| 23 | Q. So, it was like less than 24 hours away? |
| 24 | A. Yes. |
| 25 | Q. Less than 12 hours? |

**Page 122**

| | |
|---|---|
| 1 | A. Yes. |
| 2 | Q. Okay. How much time did you spend with the sketch artist? |
| 3 | A. Fifteen minutes maybe. |
| 4 | Q. Okay. And obviously it was, it was -- the memory of this |
| 5 | guy's face was pretty fresh in your head; is that a fair |
| 6 | statement? |
| 7 | A. I would say so, yeah. |
| 8 | Q. Okay. Fresher than when you were in a lineup two or three |
| 9 | weeks later; is that a fair statement? |
| 10 | A. Yes. |
| 11 | MS. FOSTER: I'd like to mark this, your Honor, |
| 12 | as -- |
| 13 | (Defense Exhibit A marked) |
| 14 | MS. FOSTER: I'd like to mark this as proposed |
| 15 | Defense Exhibit A, your Honor. |
| 16 | And may I approach the witness with this? |
| 17 | THE COURT: You may. |
| 18 | MS. FOSTER: Thank you. |
| 19 | BY MS. FOSTER: |
| 20 | Q. Did you ever see this photograph -- or this photograph or |
| 21 | whatever you want to call it -- composite, I guess? |
| 22 | A. Yes. |
| 23 | Q. And was this a composite that was done after you gave the |
| 24 | sketch artist, or whoever it was, your description of this |
| 25 | individual? |

**Page 123**

| | |
|---|---|
| 1 | A. Yes. |
| 2 | Q. And was this filed -- because you said you agreed |
| 3 | upon was the likeness of the person who had assaulted you or |
| 4 | who had robbed you, in your mind? |
| 5 | A. Yeah. It was as close as the computer could, you know, |
| 6 | generate that I saw. |
| 7 | Q. Okay. |
| 8 | MS. FOSTER: At this time we would ask for this |
| 9 | exhibit to be admitted as Defense -- |
| 10 | MR. BRAMBLE: (Reviewing) |
| 11 | MS. FOSTER: I would ask that this exhibit be |
| 12 | admitted as Defense -- proposed Defense Exhibit A. |
| 13 | MR. BRAMBLE: No objection, your Honor. |
| 14 | THE COURT: Admitted. |
| 15 | (Defense Exhibit A admitted) |
| 16 | MS. FOSTER: Thank you. |
| 17 | BY MS. FOSTER: |
| 18 | Q. You said it took you about 15 or so minutes to provide a |
| 19 | physical facial description of the person who had accosted |
| 20 | you? |
| 21 | A. Yes. |
| 22 | Q. Okay. And again, that was done within a few hours of this |
| 23 | incident; correct? That same day? |
| 24 | A. Yes. |
| 25 | Q. What time of day did you go to this apartment complex? |

**Page 124**

| | |
|---|---|
| 1 | A. It was in the evening. |
| 2 | Q. Okay. Was it still light out? No. It would have been |
| 3 | November. It probably was dark. |
| 4 | A. Was dark. |
| 5 | Q. Okay. Was the apartment complex well lighted? |
| 6 | A. It was. That area, yes, it was well lighted. |
| 7 | Q. So, it was dark out, but it was pretty well-lit? |
| 8 | A. (Nods head affirmatively) |
| 9 | Q. You indicated you did the sketch thing that same evening? |
| 10 | A. Yes. |
| 11 | Q. Can you give us an approximate time? |
| 12 | A. Nineish, I believe, but I can't -- you know I'm -- |
| 13 | Q. Can you tell us how you characterized this individual? What |
| 14 | he looked like, his age? Tell us what you thought he looked |
| 15 | like to you. When the police asked you -- when they asked |
| 16 | you a description, what description did you give? |
| 17 | A. I said, you know, in his thirties. |
| 18 | Q. Okay. |
| 19 | A. Yeah. He -- short of stature, but still, you know, quite |
| 20 | built. |
| 21 | Q. Um-hmm (affirmatively), yes. |
| 22 | A. And yeah, I wasn't positive on the -- |
| 23 | Q. So, you said thirties? |
| 24 | A. I could remember -- but I wasn't positive on the hair and |
| 25 | whether he had -- I knew it was either short or shaved, but |

**Page 125**

1    I could not --
2    Q.   Did he have a shirt that said police --
3    A.   It was similar to a shirt -- it didn't say -- whether it
4         said "police" or not, I don't believe it did.  But it was
5         similar to kind of a shirt you would see on cops when they
6         do undercover stuff, like a black with some lettering on it.
7    Q.   Okay.
8              MS. FOSTER:  Excuse me (confers with client).
9    BY MS. FOSTER:
10   Q.   Do you remember what -- do you remember describing the
11        person's build?
12   A.   Yes.
13   Q.   How would you describe his build?
14   A.   He was shorter and quite, you know, strong, you know.
15   Q.   Strong and short?
16   A.   Short.  And he was strong.
17   Q.   You never said he was thin?
18   A.   No.
19   Q.   You never described him as thin?
20   A.   No.  I might have said, you know, that he wasn't, you
21        know --
22   Q.   Girth.
23   A.   You know, girth, yeah.  But I don't believe I ever used the
24        word "thin" either.
25             MS. FOSTER:  Just a moment, your Honor (confers

**Page 126**

1    with client).
2    BY MS. FOSTER:
3    Q.   Okay.  Turning to this Exhibit Number [sic] A or Letter A, I
4         want to have you --
5              MS. FOSTER:  If you don't mind, if I can approach
6         the witness again, your Honor?
7              THE COURT:  You may.
8    BY MS. FOSTER:
9    Q.   If you look in that first line, just read it to yourself.
10        Does that accurately reflect how you described the
11        individual that assaulted you or approached you and posed as
12        a police officer?
13   A.   Yes.  That looks correct.
14   Q.   You agreed to that picture, that face, and you agreed to the
15        description.  Is that a fair statement?
16   A.   Yes.
17   Q.   Okay.
18             MS. FOSTER:  I'll have that back, please.
19   BY MS. FOSTER:
20   Q.   So, if the description indicates "black male approximately
21        30 years of age, slender build, approximately 150 pounds,"
22        that -- you would agree with that?
23   A.   Yes.
24   Q.   Okay.  And this composite, this computer-generated image
25        actually shows a man that looks approximately 30; correct,

**Page 127**

1    with a little hair on his head; correct?
2    Q.   Correct.
3              MS. FOSTER:  Okay.  I don't think I have anything
4         further, your Honor.  Thank you.
5              THE COURT:  Mr. Bramble?
6                    REDIRECT EXAMINATION
7    BY MR. BRAMBLE:
8    Q.   That composite, I thought I heard you say that this was the
9         best that the computer could generate?
10   A.   Yeah.  I don't think it was -- you know, we went through a
11        lot of stuff, and that was the most similar that I saw with
12        the -- with it.
13   Q.   With the computer?
14   A.   Yes.
15   Q.   But you did indicate it was a black male?
16   A.   Yes.
17   Q.   Approximately 5'7 to 5'8?
18   A.   Correct.
19   Q.   Slender -- or you indicated strong build?
20   A.   Yeah.  I -- I definitely mentioned to them that, you know, a
21        stronger build.
22   Q.   Do you remember telling the police that possibly with yellow
23        lettering on the -- black, long-sleeved t-shirt possibly
24        with yellow lettering on the front?
25   A.   Yes.

**Page 128**

1    Q.   Person was in their thirties or 30?
2    A.   In thirties, I thought.
3    Q.   How did you describe the hair?
4    A.   I -- I wasn't sure if there was a little bit of hair or if
5         it was completely shaved.  I wasn't positive on -- on that.
6    Q.   When you were doing this composite, did anyone suggest to
7         you what you should do or what you should use as your
8         identifier?  Did anyone try to put words in your mouth?
9    A.   No, no.
10   Q.   You were -- said you were embarrassed by the police -- by
11        going to the police and telling them initially why you did
12        this?
13   A.   Yeah.
14   Q.   I mean, are you still embarrassed about that?
15   A.   Yes.
16             MR. BRAMBLE:  I don't think I have anything
17        further, your Honor.
18             THE COURT:  Ms. Foster.
19             MS. FOSTER:  Just one question.
20                   RECROSS-EXAMINATION
21   BY MS. FOSTER:
22   Q.   Based on your own description, you said you're 36; correct?
23   A.   Correct.
24   Q.   So, based on your own description of this individual, you
25        believe him to be approximately your age if not younger?

**Page 129**

1    A.   Yes.  I believed approximately my age, yeah.

2    MS. FOSTER:  Okay.  Nothing further, your Honor.

3    Thank you.

4    THE COURT:  Mr. Bramble?

5    MR. BRAMBLE:  Nothing further.

6    THE COURT:  Thank you very much.  You are excused.

7    (At 12:22 p.m., witness stepped down)

8    MR. BRAMBLE:  Your Honor, at this time I would

9    like to read in the testimony of Barry Isaacson.

10   THE COURT:  Come on up, please.

11   Ladies and gentlemen of the jury -- Ms. Foster?

12   (Confers with the Court)

13   (At 12:23 p.m., sidebar had outside of reporter's

14   hearing)

15   THE COURT:  You can be seated.  Ladies and

16   gentlemen of the jury, correct me if I'm wrong, but

17   Mr. Bramble, but you propose to read in the sworn testimony

18   taken at a previous proceeding of the alleged victim in the

19   other case, Mr. Isaacson?

20   MR. BRAMBLE:  Yes, your Honor.

21   THE COURT:  It's my understanding he's a resident

22   of the State of Illinois and he's just simply not here

23   today.

24   MR. BRAMBLE:  Correct, your Honor.

25   THE COURT:  All right.  I'm going to allow, ladies

**Page 130**

1    and gentlemen of the jury, his sworn testimony to be read

2    in.

3    Obviously, this is Officer Swiercz; this is not

4    Mr. Isaacson.  I believe, Mr. Bramble and Ms. Foster, you

5    were present at the prior proceeding; correct?

6    MR. BRAMBLE:  I was not.

7    THE COURT:  Another representative of the

8    prosecutor's office?

9    MR. BRAMBLE:  Yes, your Honor.

10   THE COURT:  And Ms. Foster, you were there?

11   MS. FOSTER:  I was there, your Honor.

12   THE COURT:  You're to consider this as sworn

13   testimony, ladies and gentlemen of the jury, in this case.

14   Officer Swiercz is role playing the role of

15   Mr. Isaacson; another individual is representing the

16   prosecutor's office, but Mr. Bramble will ask the questions

17   and do the examination and Ms. Foster will play her part.

18   Again, obviously this is not Mr. Isaacson, but you

19   are to consider this as sworn testimony as evidence in the

20   case.

21   MR. BRAMBLE:  Thank you, your Honor.

22   Can we either have judicial notice or will the

23   defense agree that this prior hearing was conducted before

24   the Honorable Steven M. Timmers in Wyoming District Court on

25   Wednesday, December 14th of 2011?

**Page 131**

1    MS. FOSTER:  Take judicial notice, your Honor.

2    THE COURT:  All right.  Go ahead, please.

3    MR. BRAMBLE:  Thank you.

4    (At 12:25 p.m., testimony of Barry Isaacson read,

5    not reported)

6    THE COURT:  You have an objection, then?

7    MS. FOSTER:  No.

8    THE COURT:  Or just the record will reflect --

9    MS. FOSTER:  I want the record to accurately

10   reflect that we are obviously reading a transcript from an

11   earlier proceeding.  At the time when the prosecutor asked

12   if these two exhibits could be admitted, I did not object to

13   them because the actual witness was on the stand and could

14   testify to their veracity.  Since we don't have that actual

15   witness today, but it's an exact rendition of what was said

16   on that -- during that earlier proceeding under oath, I will

17   not object to the admission of these two documents.

18   THE COURT:  I will admit them.

19   (People's Exhibits 1 & 2 admitted from a prior

20   proceeding)

21   (Reading continues at Page 17, Line 18)

22   MS. FOSTER:  Yes.

23   THE COURT:  That completes the reading; is that

24   correct?

25   MS. FOSTER:  I think that completes it.

**Page 132**

1    THE COURT:  Mr. Bramble, do you have a short

2    witness?

3    MR. BRAMBLE:  I don't.

4    THE COURT:  Good time to break?

5    MR. BRAMBLE:  Probably would be a good time to

6    break.

7    THE COURT:  Ladies and gentlemen of the jury, we

8    will recess now and resume promptly at two o'clock.  You are

9    excused until two o'clock for lunch.

10   Again, I'll caution you not to have any contact

11   with anybody involved in the case; not to discuss the case

12   in any way.  You may go.

13   (At 12:52 p.m., jury exits courtroom)

14   THE COURT:  We're in recess.

15   MS. FOSTER:  What time do you want us back, sir?

16   THE COURT:  Two.

17   MS. FOSTER:  Two.  Okay.

18   (At 12:52 p.m., recess had)

19   (At 2:06 P.M., jury resumes seats)

20   THE COURT:  Be seated.  Mr. Bramble, your next

21   witness.

22   MR. BRAMBLE:  Thank you, your Honor.

23   Donald VerHage.

24   THE COURT:  State your full name, please.

25   MR. VERHAGE:  First name is Donald; last name is

1    VerHage.

2    the testimony you're about to give in this matter will be

3    the truth, the whole truth, and nothing but the truth, so

4    help you God?

5        MR. VERHAGE: I do.

6        THE COURT: Please be seated.

7          DONALD VERHAGE,

8    called by the People at 2:07 p.m., sworn by the Court,

9    testified:

10        DIRECT EXAMINATION

11    BY MR. BRAMBLE:

12    Q.   Mr. VerHage, do you spell VerHage with a capital H?

13       V-E-R-H-A-G-E?

14    A.   Yes, sir.

15    Q.   You are employed?

16    A.   I am. City of Wyoming.

17    Q.   In what capacity are you employed there with the City of

18       Wyoming?

19    A.   As a police officer, road patrol.

20    Q.   How long have you been employed as a police officer?

21    A.   Approximately 18 years.

22    Q.   What are your -- where is your current assignment within

23       that department?

24    A.   My current assignment is on road patrol on the day shift,

133

1       6:00 a.m. to 4:00 p.m.

2    Q.   How long have you worked the road shift -- road patrol?

3    A.   About 16 out of the 18 years.

4    Q.   Okay. I want to draw your attention back to November 29 of

5       2011. Were you called to the Swiss Valley Apartments?

6    A.   I was.

7    Q.   And why were you called there? Why were you dispatched

8       there?

9    A.   Reference original report of a possible robbery in the lot.

10    Q.   Did you go to that apartment complex?

11    A.   I did.

12    Q.   Is that located on Burlingame Street?

13    A.   It is. It's the southwest corner of Burlingame and Prairie

14       Parkway.

15    Q.   That's here in the County of Kent, State of Michigan?

16    A.   Yes, it is.

17    Q.   Who did you meet there?

18    A.   I pulled in and I met with the caller: Mr. Barry Isaacson.

19    Q.   Did you interview Mr. Isaacson?

20    A.   I did.

21    Q.   Take down information from him?

22    A.   Yes, I did.

23    Q.   And that included the specifics about the robbery?

24    A.   Yes, sir.

25    Q.   All right. At some point in time were you provided a name

134

2       of Kelvin Heath?

3    Q.   Who provided you with that name?

4    A.   I believe I received it two ways but, first, from Detective

5       Swiercz.

6    Q.   You indicated a second way?

7    A.   Yes.

8    Q.   How so?

9    A.   Dispatch. There's multiple things going on, but I was also

10      in contact with dispatch via phone; radio, as well as phone

11      with Detective Swiercz. I was getting it from both sources.

12    Q.   And Detective Swiercz can explain how he got that particular

13      name?

14    A.   Yes.

15    Q.   All right. But you were given the name of Kelvin Heath.

16      Did Mr. Isaacson give you a description of the car?

17    A.   He did.

18    Q.   And do you remember that description?

19    A.   Mr. Isaacson told me that --

20        MS. FOSTER: Your Honor, hearsay objection.

21        THE COURT: Sustained.

22        MR. BRAMBLE: I'll rephrase the question.

23    BY MR. BRAMBLE:

24    Q.   Did you go to 1833 Prairie Parkway?

25    A.   I did.

135

1    Q.   Why did you go there?

2    A.   I was directed there by Detective Swiercz.

3    Q.   And did you go to Apartment G?

4    A.   I eventually did, yes.

5    Q.   All right. Prior to that, did you observe a vehicle out in

6       front of that apartment?

7    A.   Yes, I did.

8    Q.   What type of vehicle?

9    A.   Black-colored Mercury four-door.

10    Q.   What was the significance of that; that it was a black

11      Mercury four-door?

12    A.   The significance of that to me was a couple things. It was

13      a black four-door which was described by Mr. Isaacson. He

14      was not aware of a make or model, but stated that he thought

15      the subject arrived in a black car. And he was positive

16      that the first three letters on the license plate were

17      BDR -- Boy, David, Robert. And he also told me he thought

18      there were a couple --

19        MS. FOSTER: Again, your Honor, I'd object.

20        MR. BRAMBLE: Hold on. I --

21        THE WITNESS: -- zeros on the --

22        THE COURT: Hold on, hold on.

23        MR. BRAMBLE: I'm asking him why he focused in on

24    this particular vehicle. Not for the truth of the matter

25    asserted, but just why he focused.

136

Case 2:14-cv-00123-PLM-TPG   ECF No. 13-5, 2   PageID.200   Filed 03/23/15   Page 37 of 55

**Page 137**

```
 1        THE COURT:  I'll allow it for that reason.
 2   BY MR. [...]
 3   Q.  And you said BDR?
 4   A.  Correct.  Was first three letters I observed on the plate
 5        that was in this parking lot at that time.  That was
 6        significant to me because I was told that was the first
 7        three letters of the plate believed to be the suspect's
 8        vehicle.
 9   Q.  Again, what were the first three letters?
10   A.  BDR, as in B, Boy; D, David; R, Robert.
11   Q.  You indicated Mr. Isaacson told you there were a couple
12        zeros in the license plate?
13   A.  Mr. Isaacson stated he also thought there was a couple
14        zeros.
15   Q.  Were there a couple zeros in this license plate?
16   A.  There were.
17   Q.  Once you get this information, do you approach 1833 Prairie
18        Parkway?
19   A.  Yes.  We --
20   Q.  Apartment G?
21   A.  Apartment G; correct.
22   Q.  And did you get to the front door?
23   A.  I never made it to the front door.  I was headed towards the
24        front door; Officer Ferguson was headed around the back
25        door.  And we also called for additional units to assist.
```

**Page 138**

```
 1        Prior to even making it to the front door, other officers
 2        were arriving.  You could hear there was commotion at the
 3        back door where Officer Ferguson was.  So, I immediately
 4        responded around to the back door.
 5   Q.  When you got there, did you see what Officer Ferguson was --
 6        what he was doing?
 7   A.  Officer Ferguson was detaining a subject at the back door
 8        and attempting to secure him in handcuffs.  That's what I
 9        saw.  Then I did speak to Officer Ferguson to understand why
10        he was doing such.
11   Q.  The person he's detaining, is he present here in the
12        courtroom?
13   A.  Yes.
14   Q.  And when he detained him, did you talk to the suspect then?
15   A.  Not right then.  We were dealing with probably four or
16        five -- if not more -- subjects that were in and out of the
17        doorway of that back -- that back door.  I say the "back
18        door" the north door of the residence.  There were multiple
19        subjects there, so we were securing other people besides the
20        subject that Officer Ferguson was detaining.
21   Q.  I'm going to show you what's been admitted as Exhibit 2.
22        Can you identify that picture and, if so, what significance
23        does it have to you?
24   A.  This is a printout of a picture that I saw in Mr. Isaacson's
25        phone at the time of his report.  He showed me this picture
```

**Page 139**

```
 1        on his phone and stated that was his picture he took on his
 2        own phone of the suspect who had just robbed him in the
 3        parking lot at Swiss Valley.
 4   Q.  What did you tell him to do with that picture?
 5   A.  After obtaining that information from Mr. Isaacson, I
 6        contacted Detective Swiercz, who was at the office.  I said,
 7        "Hey, I think we've got a picture of the suspect here.  Can
 8        we get it to you?"  We then sent it from Mr. Isaacson's
 9        phone to Detective Swiercz's email, his city email at the
10        office.  And then I watched Mr. Isaacson do that on his
11        phone.  And within minutes Detective Swiercz called me on my
12        work cell phone, saying he had received the photo.
13        MR. BRAMBLE:  (Confers with detective).  Nothing
14   further at this time, your Honor.
15        THE COURT:  Ms. Foster.
16        MS. FOSTER:  (Confers with client).  I have
17   nothing to ask of this witness, your Honor.  Thank you.
18        THE COURT:  Thank you very much.  You are excused.
19        (At 2:16 p.m., witness stepped down)
20        MR. BRAMBLE:  Your Honor, I'm waiting, I'll put
21   Officer Swiercz on.
22        THE COURT:  Sure.  State your full name, please.
23        MR. SWIERCZ:  Philip Swiercz.
24        THE COURT:  Do you solemnly swear or affirm that
25   the testimony you're about to give in this matter will be
```

**Page 140**

```
 1        the truth, the whole truth, and nothing but the truth, so
 2        help you God?
 3        MR. SWIERCZ:  Yes.
 4        THE COURT:  Please be seated.
 5              PHILIP SWIERCZ,
 6   called by the People at 2:17 p.m., sworn by the Court,
 7   testified:
 8              DIRECT EXAMINATION
 9   BY MR. BRAMBLE:
10   Q.  Sir, you are employed?
11   A.  Correct.
12   Q.  Where are you employed?
13   A.  City of Wyoming.
14   Q.  What capacity are you employed there?
15   A.  Detective.
16   Q.  How long have you been in the Detective Bureau?
17   A.  April will be one year.  So...
18   Q.  Prior to that were you working with the Wyoming Police
19        Department?
20   A.  Yes.
21   Q.  How long have you worked with the Wyoming Police Department
22        as a police officer in total?
23   A.  Eleven years.
24   Q.  Prior to joining the Wyoming Police Department, did you --
25        were you employed by any other law enforcement agency?
```

| | |
|---|---|
| 1 | A. No. |
| 2 | Q. Can you describe for the jury how you happened to get |
| 3 | assigned cases when you're in the Detective Bureau? |
| 4 | A. Well, road parole will initially take the original |
| 5 | complaints. They are all sent up to the supervisors. They |
| 6 | review the reports and they decide if the report is worthy |
| 7 | of further investigation. Then they -- you know, we all |
| 8 | kind of have our own niche. If cases are related, like if |
| 9 | there's seven B & Es in one area, you'll work, usually, all |
| 10 | seven of those. It just depends on what the sergeants want |
| 11 | to do. |
| 12 | Q. Were you assigned the robbery that was involved with |
| 13 | Mr. Gray on November 14 of 2011? |
| 14 | A. I was. |
| 15 | Q. You get all the reports that were generated as a result of |
| 16 | that investigation? |
| 17 | A. I do. |
| 18 | Q. You talk to witnesses, as well? |
| 19 | A. I only talk to the victim. I believe he was the only other |
| 20 | party involved. |
| 21 | Q. That would have been Mr. Gray? |
| 22 | A. Correct. |
| 23 | Q. Did you have any suspects then? |
| 24 | A. No. We just had the description that he provided us. |
| 25 | Q. Were you working on November 29 of -- excuse me, November 29 |

141

| | |
|---|---|
| 1 | officers. |
| 2 | Q. We just heard from -- Mr. VerHage that you provided him |
| 3 | with a name of Kelvin Heath. How did you happen to do that? |
| 4 | A. Well, all of our communication was on our work cell phones. |
| 5 | Once he arrived on-scene he was able to obtain suspect's |
| 6 | phone number, which I was able to relay to dispatch, saying, |
| 7 | "Hey we have this phone number. Can -- we call it -- can |
| 8 | you 'ping' it, enter it and see who the owner of that phone |
| 9 | is and like what cell towers it's hitting off of?" |
| 10 | So dispatch was able to help me with that. In |
| 11 | return, they provided me the general area and the owner of |
| 12 | that phone number, which came back to Kelvin Heath. |
| 13 | Q. Do you remember what that phone number was? |
| 14 | A. I believe it was 616.477 -- I mean, I don't recall the |
| 15 | number exactly. |
| 16 | MR. BRAMBLE: May I approach, your Honor? |
| 17 | THE COURT: Yes. |
| 18 | BY MR. BRAMBLE: |
| 19 | Q. Showing you what's been marked as Exhibit 1. You said |
| 20 | "616.477" -- |
| 21 | A. Yeah. This -- yep -- "1333." There's two numbers involved, |
| 22 | and I believe this was the one that we pinged. |
| 23 | Q. That's the same one that appears on Exhibit 1 with the ad at |
| 24 | backpage.com? |
| 25 | A. Yeah, yep. |

143

| | |
|---|---|
| 1 | of 2011? |
| 2 | A. I was. |
| 3 | Q. At some point in time do you -- are you made aware of the |
| 4 | fact that there's been another armed robbery in the Swiss |
| 5 | Valley Apartment -- or unarmed robbery? |
| 6 | A. I am. |
| 7 | Q. And tell the jury, did it click regarding this one on |
| 8 | November 14? |
| 9 | A. It did. I was just -- I remember the date. I was just |
| 10 | getting out of my detective car, and I heard the radio |
| 11 | traffic that Officer VerHage was sent to Swiss Valley |
| 12 | Apartments regarding a robbery. It clicked almost instantly |
| 13 | that, "Hey I got a case that's similar." That's when I made |
| 14 | the phone call to him just letting him know because |
| 15 | sometimes there's that communication breakdown where the |
| 16 | road guys may have not known that an incident like that |
| 17 | happened already. |
| 18 | Q. All right. Did you obtain information from, at least, what |
| 19 | Mr. Isaacson had conveyed to the police officers at that |
| 20 | time? |
| 21 | A. Yeah. Yep, I was -- yep. |
| 22 | Q. I mean, did you note the similarities between the two once |
| 23 | you gained the information? |
| 24 | A. Yeah. They were similar, just from hearing the dispatch -- |
| 25 | the information dispatch provided to the reporting road |

142

| | |
|---|---|
| 1 | Q. Do you get a photograph of -- that was texted over to you, |
| 2 | if that's the right way -- |
| 3 | A. I do. It's Mr. Isaacson has a smartphone. He was able to |
| 4 | email it to my work email. I was able to print it off on a |
| 5 | -- on a piece of paper -- 8 x 11 piece of paper. |
| 6 | Q. I show you what's marked as Exhibit 2. Is this the |
| 7 | photograph that Mr. Isaacson sent to you? |
| 8 | A. Yes. |
| 9 | Q. Did you obtain another photograph of Kelvin Heath? |
| 10 | A. I did. I -- after obtaining the name Kelvin Heath, I was |
| 11 | able to do a Secretary of State -- SOS -- check and a jail |
| 12 | mug. |
| 13 | Q. Did you get a photograph of him? |
| 14 | A. I did. |
| 15 | Q. Did you compare that to Exhibit 2? |
| 16 | A. I did. |
| 17 | Q. And did you believe them to be one in the same person? |
| 18 | A. I did. |
| 19 | Q. Did you go to the scene? |
| 20 | A. I did. |
| 21 | Q. And did you go to 1833 Prairie Parkway? |
| 22 | A. Yes. |
| 23 | Q. Did you go into the residence there? |
| 24 | A. I did. |
| 25 | Q. Who allowed you to go into the residence there? |

144

**Page 145**

1  A.  Eleanor -- Eleanor Griffin, I believe her name is.

2  Q.  Is she any relation to the defendant?

3  A.  She stated she was his mother.

4  Q.  Did you seize any items inside that apartment?

5  A.  Yes, I did.

6  Q.  What did you seize, please?

7  A.  One blue Polo shirt, light blue. I'd call it a baby blue.

8  Q.  I show you what's marked as proposed Exhibit 6 and ask if

9     you can identify that?

10  A.  Yes. This is the shirt I --

11  Q.  Can you tell me, Detective, why did you -- of what

12     significance was proposed Exhibit 6?

13  A.  That was -- that shirt is -- was very similar to the shirt

14     that was in the photograph that was emailed to me.

15         MR. BRAMBLE: Your Honor, I'm going to move for

16  admission of People's Proposed Exhibit 6 at this time.

17         MS. FOSTER: No objection.

18         THE COURT: Admitted.

19         (People's Exhibit 6 admitted)

20  BY MR. BRAMBLE:

21  Q.  Now, prior to this date, had you received any information

22     that there was a massage or adult services business being

23     run out of any of these apartments at Swiss Valley?

24  A.  No.

25  Q.  Did you take a statement from the defendant?

**Page 146**

1  A.  I did.

2  Q.  Where were you when you took the statement from him?

3  A.  We were in the parking lot of the Prairie Parkway address.

4  Q.  And were you aware whether or not the defendant had been

5     advised of his Miranda rights?

6  A.  Yes. I confirmed with Officer Denny Ferguson that he was

7     already advised of his Miranda rights.

8  Q.  Did you ask the defendant whether or not he wanted to speak

9     with you?

10  A.  I did.

11  Q.  Is that person, who I'm referring to as the "defendant" that

12     you spoke to on that day, present here in the courtroom?

13  A.  Yes, he is.

14  Q.  Can you point out where he's seated?

15  A.  Sitting at that table with the white button shirt

16     (indicating).

17         MR. BRAMBLE: Your Honor, may the record reflect

18  the identification of the defendant?

19         THE COURT: Yes.

20  BY MR. BRAMBLE:

21  Q.  Did you advise the defendant that he was in custody for

22     robbery and impersonation of a police officer?

23  A.  I did.

24  Q.  How did he react?

25  A.  He wasn't really surprised by this.

**Page 147**

1  Q.  Did you ask him why he was at the Swiss Valley Apartments?

2  A.  I did.

3  Q.  How did the defendant respond?

4  A.  He stated that he was just driving through, turning around.

5  Q.  Did he indicate whether or not he had an exchange with a

6     person in that parking lot?

7  A.  He did. He stated that there was an unknown male to him

8     that he believed was telling him to fuck off.

9  Q.  Did you ask him to explain further?

10  A.  I did, and he was unable to.

11  Q.  Did you ask him why would this person be telling him to fuck

12     off, to use his language?

13  A.  I did. I tried to get him to elaborate more on that, and he

14     really didn't have any explanation for that.

15  Q.  Did the defendant's demeanor change as you questioned him?

16  A.  Yeah. You could tell he was, you know -- he was not pleased

17     that he was under arrest and that I was asking questions

18     about it.

19  Q.  Did you ask the defendant whether he was driving the Mercury

20     Sable described by Officer VerHage?

21  A.  I did.

22  Q.  How did the defendant respond?

23  A.  He said he was. He said he did drive it.

24  Q.  Did you ask him about the blue Polo shirt the defendant was

25     wearing in Exhibit 2?

**Page 148**

1  A.  I did. He -- he stated he didn't know anything about it.

2  Q.  Did you ask him why someone took his picture at the Swiss

3     Valley apartments?

4  A.  I did.

5  Q.  What did he indicate?

6  A.  He didn't know anything about it.

7  Q.  Did you question the defendant why the victim, Mr. Isaacson,

8     had his cell phone number?

9  A.  I believe I did.

10  Q.  How did the defendant respond?

11  A.  He didn't know anything about it.

12  Q.  Did the interview end shortly after that?

13  A.  It did.

14         MR. BRAMBLE: I don't think I have anything

15  further at this time, your Honor.

16         THE COURT: Ms. Foster.

17         MS. FOSTER: Yes, your Honor.

18         **CROSS-EXAMINATION**

19  BY MS. FOSTER:

20  Q.  Good afternoon -- is it Detective Swiercz?

21  A.  Swiercz, yep.

22  Q.  I didn't want to mispronounce it. Now, you were obviously

23     made familiar -- you've sat through this entire time -- and

24     you were made familiar -- you became familiar with the case

25     during the course of the investigation; is that a fair

**Page 149**

```
1      statement?
2  A.  Yeah.
3  Q.  From the first allegation on the 14th of November, by
4      Mr. Gray.  Were you aware of it then, or no?  Did you come
5      up --
6  A.  I was aware of his incident, yeah.
7  Q.  Okay.  So you were aware of both incidences.  Do you have
8      any knowledge as to whether or not there were any similar
9      incidences either before the 14th or after the 29th of
10     November?
11 A.  I don't.  I looked into that, and we didn't
12     have any, you know, similar incidences at that location.
13 Q.  Okay.  Any others in the general vicinity of Prairie
14     Parkway, or Burlingame, or in Wyoming at all?
15 A.  None in Wyoming.
16 Q.  Did you look outside of the Wyoming city limits to see if
17     there were any similar incidences in say Kentwood or Grand
18     Rapids, Grandville, anywhere else?
19 A.  No.  I didn't make any phone calls.
20 Q.  Okay.  You were aware of -- from reading -- I'm assuming you
21     read the narrative from the officers who interviewed both
22     alleged victims; is that a fair statement?
23 A.  Yes.
24 Q.  And you were made aware of the fact that both alleged
25     victims gave bogus accounts as to why they were in the
```

**Page 150**

```
1      vicinity at first; is that a fair statement?
2  A.  Yes.
3  Q.  Okay.  And obviously after reviewing -- you had an
4      opportunity to review the backpage.com ads that both
5      individuals responded to; correct?
6  A.  I did.
7  Q.  You've been in law enforcement for you said 11 years?
8  A.  Correct.
9  Q.  How familiar are you with backpage.com?
10 A.  That's the first I've heard of it.
11 Q.  That was the first you've heard of it, in this case?
12 A.  Investigating these incidences.
13 Q.  Have you become more familiar with it since?
14 A.  No.  I just was able to make reference to those ads during
15     the investigation.
16 Q.  Okay.  Now, you indicated that you interviewed Mr. Heath and
17     he denied knowing -- having any connection with Mr. Isaacson
18     other than Mr. Isaacson yelled expletives at him from a
19     vehicle.  That pretty much sums it up?
20 A.  He described him as an unknown male to him.
21 Q.  Did he ever acknowledge having any particular contact
22     whatsoever or any contact whatsoever with Mr. Gray?
23 A.  No.
24 Q.  Did you ask him about Mr. Gray?
25 A.  I did.
```

**Page 151**

```
1  Q.  Okay.
2  A.  Excuse me (confers with client).
3  BY MS. FOSTER:
4  Q.  Other than Mr. Heath, was there anybody else in relation to
5      this investigation you spoke with outside of law
6      enforcement?
7  A.  Are you talking about --
8  Q.  Let's say outside of law enforcement and the two alleged
9      victims and my client, was there anybody else you
10     interviewed in relationship to this case, any other lay
11     witnesses?
12 A.  I talked to Eleanor.
13 Q.  The mom?
14 A.  Yeah.
15 Q.  Okay.  But I'm talking about anybody at the Swiss Valley
16     Apartments, anybody over there.  Were you able to interview
17     anybody over there, anybody come forward indicating they saw
18     anything?
19 A.  No, they did not.
20 Q.  Okay.
21         MS. FOSTER:  (Confers with client)
22 BY MS. FOSTER:
23 Q.  There was an -- I believe that the last individual who
24     testified, Officer VerHage, indicated there were other
25     individuals at the mom's apartment.
```

**Page 152**

```
1  A.  Correct.
2  Q.  Did you have any contact with those individuals?
3  A.  I did, but just passing.  I think one or two of them were
4      taken into custody for other related warrants.
5  Q.  Related to this or --
6  A.  Unrelated to this.
7  Q.  Unrelated.  Okay.
8  A.  Yeah.
9  Q.  But you did not actually have a conversation or interview
10     them in relation to this matter?
11 A.  Only Eleanor.
12 Q.  Eleanor.  Okay.
13         MS. FOSTER:  (Confers with client)
14 BY MS. FOSTER:
15 Q.  Okay.  Only a couple more questions, Detective Swiercz.
16         Were you the one who actually arrested Mr. Heath?
17 A.  I was not.
18 Q.  Okay.  When you interviewed him, were you -- was he already
19     in police custody?  Was it at the -- when you had this
20     interview you described in direct testimony, was he already
21     at the police department or was he still at the apartment
22     complex?
23 A.  We were still in the parking lot.
24 Q.  So, was he in custody?  Was he --
25 A.  Yeah, he was in custody; handcuffed.
```

1  Q.  Handcuffed.
2  A.  In the cruiser of Officer Ferguson?
3  Q.  He was in Officer Ferguson's cruiser?
4  A.  Yes.
5  Q.  Was Officer Ferguson in the cruiser with him?
6  A.  He was.  And I think when I was talking to him, maybe he
7     stepped outside his car.
8  Q.  Okay.  And I'm assuming you were sitting in the front, as
9     well?
10 A.  Nope.  I just opened the rear passenger door, just kind of
11    leaned in and talked to him.
12 Q.  Oh, okay.  So, you didn't get in the vehicle?  You weren't
13    talking to him from inside the vehicle?
14 A.  No.
15 Q.  Okay.  Are there incamera cameras; video cameras in these
16    cruisers?
17 A.  Not -- we're in transition at this time.  There's no audio
18    video.
19 Q.  Were there other individuals in the cruiser with Mr. Heath?
20    Was he alone or was there other individuals in the cruiser
21    with him?
22 A.  I believe he was alone.
23 Q.  Are you sure about that?
24 A.  I'm not sure but -- because there was, like I said, other
25    people in cars.

153

1  Q.  Right.
2  A.  I don't think he was with anyone else.
3        MS. FOSTER:  (Confers with client.)  I have
4     nothing further, your Honor.
5        THE COURT:  Mr. Bramble?
6        MR. BRAMBLE:  Follow up here.
7        REDIRECT EXAMINATION
8  BY MR. BRAMBLE:
9  Q.  Detective, were you present when Mr. Gray was present at the
10    lineup?
11 A.  I was.
12 Q.  And I'm going to show you what's marked as Exhibit 4.  Does
13    this picture, the bottom picture, indicate the physical
14    lineup that you guys view?
15 A.  Yes, it does.
16 Q.  All right.  And the defendant is in position five?
17 A.  Correct.
18 Q.  And Exhibit 5, Mr. Gray's name on it, showing he picked
19    number five.  Does your signature appear on there, as well?
20 A.  It does.
21 Q.  Did Mr. Gray hesitate at all when he picked number five?
22 A.  He did not.
23 Q.  Lastly, the phone records you obtained and the phone numbers
24    you obtained, what did you do with them, defendant's phone
25    numbers?

154

1  A.  I obtained a court order to get the phone records.
2  Q.  Did you get those records?
3  A.  I did.
4  Q.  And were these phones -- how many phones were listed to the
5     defendant or in the defendant's name?
6  A.  One phone was in his name and the other phone I believe had
7     -- I would have to look at the record.  But some phones,
8     like if they're a Metro or a Boost, they just have -- they
9     don't have an owner.  Some phones you don't even have to
10    register in your name.
11 Q.  Explain to the jury what a Boost phone is?
12 A.  I think you buy them at gas stations or other cell phone
13    providers.  You pay like a $30 phone card.  And when that
14    runs out, you just keep putting minutes on it.
15 Q.  So if -- you don't have to sign up like most of us do and
16    give your name?
17 A.  Yeah.  There's no contracts.  No.
18 Q.  What did your investigation of the phone that was listed as
19    the defendant's phone, what did that reveal?
20 A.  It just confirmed that the defendant's phone was
21    communicating with our victim phones.
22 Q.  That would be both victims?
23 A.  Yes.
24        MR. BRAMBLE:  I don't believe I have anything
25    further.

155

1        THE COURT:  Ms. Foster?
2        MS. FOSTER:  One of the -- thank you, your Honor.
3        RECROSS-EXAMINATION
4  BY MS. FOSTER:
5  Q.  One of the phones had an out-of-state area code.  Were you
6     able to ascertain who that phone was connected to?
7  A.  No.  That comes back to just an address, I think, in
8     Missouri.
9  Q.  Okay.
10 A.  Yep.
11        MS. FOSTER:  I don't have anything further, your
12    Honor.  Thank you.
13        THE COURT:  Mr. Bramble?
14        MR. BRAMBLE:  Nothing further at this time, your
15    Honor.
16        THE COURT:  You may step down.
17        (At 2:39 p.m., witness stepped down)
18        MR. BRAMBLE:  At this time the State would call
19    Officer Ferguson.
20        THE COURT:  State your full name, please.
21        MR. FERGUSON:  Dennis Ferguson.
22        THE COURT:  Do you solemnly swear or affirm that
23    the testimony you're about to give in this cause will be the
24    truth, the whole truth, and nothing but the truth, so help
25    you God?

156

```
 1          MR. FERGUSON: Yes, I do.
 2          THE COURT: Please be se
 3                    DENNIS FERGUSON,
 4     called by the People at 2:39 p.m., sworn by the Court,
 5     testified:
 6                    DIRECT EXAMINATION
 7  BY MR. BRAMBLE:
 8  Q.   Would you state your full name and spell your last name,
 9       please?
10  A.   Dennis Ferguson, F-E-R-G-U-S-O-N.
11  Q.   Are you employed, sir?
12  A.   Yes.
13  Q.   Where are you employed?
14  A.   City of Wyoming Police Department.
15  Q.   How long have you been employed there?
16  A.   Nearly 15 years.
17  Q.   Where are you currently assigned within that department?
18  A.   Patrol officer.
19  Q.   What shift do you work?
20  A.   Day shift; 6:00 a.m. to 4:00 p.m.
21  Q.   Were you working in that capacity on or about November 29 of
22       2011?
23  A.   Yes.
24  Q.   Did you get called to 1833 Prairie Parkway, Apartment G?
25  A.   Yes.
```

157

```
 1  Q.   Why were you dispatched or why did you go there?
 2  A.   Officer VerHage was taking a complaint from a victim and had
 3       information that the suspect may be at that address.
 4  Q.   Did you go there?
 5  A.   Yes.
 6  Q.   And did you get to the front door?
 7  A.   No.
 8  Q.   Where did you go?
 9  A.   I went to the back door.
10  Q.   All right.  And what did you observe eventually when you
11       were there at the back door?
12  A.   I was on northeast corner watching the east and the north
13       sides.  There was only two of us there at the time.
14       Officer VerHage was making contact with the front door, so I
15       covered the rear side.  And I saw an individual starting to
16       exit out the bottom-left apartment slider door.  So, I went
17       down there to make contact with that individual.
18            I visually ID him as a potential suspect in the
19       case because, prior to me going there, the suspect had taken
20       a picture -- I'm sorry -- the victim had taken a picture of
21       the suspect with his phone.  So, I knew what to look for as
22       in what the suspect looked like.
23  Q.   The picture you are referring to would be Exhibit 2?
24  A.   Yes.
25  Q.   You looked at the picture; looked at the person coming out
```

158

```
 1       of the back sliding glass door.  Did you detain this person?
 2  A.   He did.
 3  Q.   Is that person present here in the courtroom?
 4  A.   Yes, he is.
 5  Q.   Could you point out where he's seated and what he's wearing?
 6  A.   He's wearing a, I believe, cream-colored button-up shirt at
 7       the table to your left there.
 8          MR. BRAMBLE:  Your Honor, may the record reflect
 9       the identification of the defendant?
10          THE COURT:  Yes.
11  BY MR. BRAMBLE:
12  Q.   Did you place the defendant in handcuffs at the time?
13  A.   I did.
14  Q.   Was that as much for your safety as to kind of figure out
15       what was going on?
16  A.   Absolutely.
17  Q.   All right.  Prior to placing him in your cruiser, did you
18       empty out his pockets?
19  A.   Yes.
20  Q.   Can you tell this jury what you found?
21  A.   I'll refer to my notes here, if you will.
22  Q.   Will that refresh your recollection?
23  A.   Yep.  In his left front pocket I located a white and
24       silver -- a Boost Mobile Qualcomm cell phone identical to
25       the one in the picture that you just showed, as well as a
```

159

```
 1       black cell phone and a set of keys.
 2            In his right front pocket I located 12 Daily 4
 3       Lottery tickets -- Lotto tickets -- $497 in cash; a stack of
 4       miscellaneous cards, which included his Michigan ID card as
 5       well as a miscellaneous piece of paper.  I believe that was
 6       it.
 7  Q.   I'm going to show you two items here that are marked
 8       Proposed Exhibit 7 and 8.  I'll ask if you can identify
 9       these items.
10  A.   Okay.  This was the black cell phone in his pocket that he
11       turned off, and that was Exhibit 8.  Exhibit 7 is the silver
12       and white cell phone that was in his pocket.
13  Q.   Okay.  Let me get you then -- you indicated you found how
14       much money in his pocket?
15  A.   I found $497.
16  Q.   I show you what's marked as Exhibit 9.  If you need to open
17       it to -- what that item is?
18  A.   This is the cash that I found in his pocket that I turned in
19       to our technical support unit as evidence.  And I sealed it.
20  Q.   Did you check the defendant's cell phone?
21  A.   I did, yes.
22  Q.   And the one that was operating, not the one that was shut
23       off?
24  A.   The white and silver one I checked; it was on.
25  Q.   Why did you focus on the silver one?
```

160

| | | |
|---|---|---|
| 1 | A. | That was in the picture that the victim provided us. |
| 2 | Q. | All right. And what were you looking for? His silver |
| 3 | | phone? |
| 4 | A. | Specifically, some kind of evidence of correspondence |
| 5 | | between the suspect and victim to solidify the case. |
| 6 | Q. | Did you find a phone number on there that helped solidify |
| 7 | | the case? |
| 8 | A. | Yes. I conversed with Officer VerHage and was able to |
| 9 | | obtain the victim's cell phone number and I found that same |
| 10 | | number in the suspect's phone that he had called. |
| 11 | Q. | That number is -- is that the 847 number? |
| 12 | A. | Yes. |
| 13 | Q. | It's 847.370.4339? |
| 14 | A. | Yes. |
| 15 | Q. | Once you got this information, did you place the defendant |
| 16 | | under arrest? |
| 17 | A. | Yes. |
| 18 | Q. | Did you advise him of his Miranda rights? |
| 19 | A. | Yes. |
| 20 | Q. | Did he agree to talk to you? |
| 21 | A. | Yes. |
| 22 | Q. | Initially -- let me ask you this just as a broader question. |
| 23 | | Did his story or his version of what went on remain |
| 24 | | consistent or did it change? |
| 25 | A. | It -- it constantly changed. |

161

| | | |
|---|---|---|
| 1 | Q. | All right. What did he tell you at first; where he was that |
| 2 | | day? |
| 3 | A. | He said he was home all day, with the exception at 12:45 he |
| 4 | | drove his daughter to Mel Trotter because she had bought a |
| 5 | | car from them and was having troubles with the car and |
| 6 | | wanted her dad to go down there with him to help her |
| 7 | | straighten out the car problems. |
| 8 | | He said he dropped her off and returned home, |
| 9 | | arriving back home about 1:45. So, he was gone about an |
| 10 | | hour. |
| 11 | Q. | Did you ever ask him if he was at the Swiss Valley parking |
| 12 | | lot? |
| 13 | A. | Yes, he said he was. He said that when he returned home |
| 14 | | from Mel Trotter, he pulled into the lot to turn around and |
| 15 | | he said he went back out. |
| 16 | Q. | Did you ask him if he encountered anyone in that lot? |
| 17 | A. | The first time I asked him he said he didn't encounter |
| 18 | | anyone in there. He did not encounter anyone in there the |
| 19 | | first time I spoke with him or asked him. |
| 20 | Q. | So initially he denies encountering anyone in the Swiss |
| 21 | | Valley parking lot? |
| 22 | A. | Yes. |
| 23 | Q. | Did you ask him who the two cell phones belonged to that |
| 24 | | were in his pocket? |
| 25 | A. | Yes. |

162

| | | |
|---|---|---|
| 1 | Q. | How did he respond? |
| 2 | A. | He said they were his. |
| 3 | Q. | Did you ask him if anyone else had access to them? |
| 4 | A. | Yes. |
| 5 | Q. | How did he respond? |
| 6 | A. | He first said no one else had access to them but him. |
| 7 | Q. | Did he change that version? |
| 8 | A. | Yes. |
| 9 | Q. | What did he say? |
| 10 | A. | He said a friend of his named Sheila was with him around |
| 11 | | 1:30 and that she may have used one of his phones. |
| 12 | Q. | Did you ask him where she came from and where did she go? |
| 13 | A. | Yes. |
| 14 | Q. | How did the defendant respond, or did he respond? |
| 15 | A. | He did not respond. |
| 16 | Q. | Did the defendant change his story then, again, about where |
| 17 | | he was? |
| 18 | A. | Not so much about where he was, but the circumstances of |
| 19 | | where he went, with whom and stuff. |
| 20 | Q. | Can you outline this for us? |
| 21 | A. | When I asked him about this Sheila girl that used his phone |
| 22 | | and how she got involved in it -- because from 12:45 to 1:45 |
| 23 | | he said he was just with his daughter -- he said his |
| 24 | | daughter then drove him down to Mel Trotter with a cousin |
| 25 | | named Booter -- didn't have a name for her, he just said her |

163

| | | |
|---|---|---|
| 1 | | name was Booter -- to get her car looked at. And then the |
| 2 | | three of them returned home, but none of the officers that |
| 3 | | were on-scene ever located his daughter or a female by the |
| 4 | | name of Booter. |
| 5 | Q. | All right. Did the defendant eventually admit to you that |
| 6 | | he went through the Swiss Valley parking lot? |
| 7 | A. | Yes. |
| 8 | Q. | What did he say happened in that parking lot? |
| 9 | A. | He said he drove through the Swiss Valley parking lot and he |
| 10 | | said a white or Hispanic guy yelled mother-fucker something |
| 11 | | at him when he was driving through the lot. He said they |
| 12 | | were going in opposite directions. |
| 13 | Q. | Did he indicate whether or not he got out of his car? |
| 14 | A. | He said he never got -- he said he never got out of his car. |
| 15 | Q. | Did the defendant later talk about directions or someone -- |
| 16 | | this person asking for directions? |
| 17 | A. | He -- he made some kind of statement about maybe the guy was |
| 18 | | asking for directions. |
| 19 | Q. | Did you say something in response to that or question him? |
| 20 | A. | Well, I asked him why he would stop and -- or at least kind |
| 21 | | of entertained the idea of talking to the guy if he just |
| 22 | | called him a mother-fucker as he drove by each other and he |
| 23 | | didn't say anything; he just stayed silent. |
| 24 | Q. | Why would this person who called him a mother-fucker then |
| 25 | | ask him for directions? |

164

| | |
|---|---|
| 1 | A. That's what I asked him and he didn't have an answer. It |
| 2 | didn't make sense. |
| 3 | Q. Did you ask him why the victim, Mr. Isaacson's, cell phone |
| 4 | number was on his phone? |
| 5 | A. Yes. |
| 6 | Q. How did he respond? |
| 7 | A. Sheila must have called it. |
| 8 | Q. Did you point out an inconsistency with the story regarding |
| 9 | Sheila and -- |
| 10 | A. I -- yeah. I asked him how would Sheila have this victim's |
| 11 | phone number to call, and he didn't have an answer. |
| 12 | Q. The items that you identified, the money and the phones, |
| 13 | what did you do with them? |
| 14 | A. I turned them into our technical support unit or evidence |
| 15 | and secured them in a locker. |
| 16 | Q. Is that an area for safekeeping for articles of evidence? |
| 17 | A. Yeah. That's where we turn all of our evidence in. It's in |
| 18 | a locked locker with a lock. |
| 19 | Q. To your knowledge, has anyone tampered with any of those |
| 20 | things? |
| 21 | A. No. It's my signature over the seal. It's my -- this is |
| 22 | how I remember sealing them. |
| 23 | MR. BRAMBLE: I don't think I have anything |
| 24 | further at this time, your Honor. |
| 25 | THE COURT: Ms. Foster? |

165

| | |
|---|---|
| 1 | CROSS-EXAMINATION |
| 2 | BY MS. FOSTER: |
| 3 | Q. Did Mister -- good afternoon. I'm sorry, Officer Ferguson. |
| 4 | A. Good afternoon. |
| 5 | Q. Did Mr. Heath ever explain to him how he got this money? |
| 6 | Did you ask him about it? |
| 7 | A. I don't remember him telling me how he came about the money. |
| 8 | Q. You don't remember asking him about it? Would it be in your |
| 9 | notes if you had asked? |
| 10 | A. I don't have it in the report, so I don't remember how the |
| 11 | conversation about the money was. |
| 12 | Q. If you had asked him and he responded, would that have made |
| 13 | it into your report? |
| 14 | A. Yes. |
| 15 | Q. So, is it a fair statement that, since there's nothing in |
| 16 | your report reflecting that, you probably didn't ask him |
| 17 | about the money? |
| 18 | A. Correct. |
| 19 | Q. Excuse me, Officer. |
| 20 | MS. FOSTER: (Confers with client) |
| 21 | BY MS. FOSTER: |
| 22 | Q. There was an indication that there were other individuals at |
| 23 | this apartment complex. Is that -- |
| 24 | MS. FOSTER: Apparently you were apprehended that |
| 25 | same day? |

166

| | |
|---|---|
| 1 | BY MS. FOSTER: |
| 2 | Q. Do you recall that -- |
| 3 | A. Mr. Heath came out of the apartment. I took him into |
| 4 | protective custody for myself because there were multiple |
| 5 | people inside the apartment. I believe they were taken into |
| 6 | protective custody, as well, until we sorted everything out. |
| 7 | I was back there by myself and there was five people |
| 8 | approaching the door at the same time. So, we just kind of |
| 9 | secured the scene, as is common practice. |
| 10 | Q. Do you remember the gender of these individuals? Were they |
| 11 | both males and females? |
| 12 | A. I only saw males. |
| 13 | Q. You only saw males. Okay. And at some point is it true |
| 14 | that Mr. Heath was in your cruiser? |
| 15 | A. Yes. |
| 16 | Q. Were you the one that transported him to the county jail? |
| 17 | A. Yes. |
| 18 | Q. Was there anybody else in the cruiser with him? |
| 19 | A. No. |
| 20 | Q. At any point was there ever anybody else in the cruiser with |
| 21 | him besides you? |
| 22 | A. When you say "anyone else" -- |
| 23 | Q. Any other suspects, any other individuals taking a little |
| 24 | ride to the county jail with him? |
| 25 | A. No. A couple of officers spoke with him as I opened the |

167

| | |
|---|---|
| 1 | door. But no one else sat physically in the car besides him |
| 2 | and I, if that's what you're asking. |
| 3 | Q. Okay. Do you know if other individuals were arrested that |
| 4 | day? |
| 5 | A. It -- involved in this case? |
| 6 | Q. Not particularly involved in this incident, but were there |
| 7 | other individuals arrested that day on maybe warrants or |
| 8 | anything else? Were there other individuals that were taken |
| 9 | to the county jail or put in the cruiser from that day from |
| 10 | that apartment, if you know? |
| 11 | A. I don't know that. I don't know the answer. |
| 12 | Q. You don't know that. Okay. |
| 13 | MS. FOSTER: Excuse me (confers with client). I |
| 14 | have nothing further, your Honor. |
| 15 | THE COURT: All right. |
| 16 | MR. BRAMBLE: Nothing further. |
| 17 | THE COURT: You are excused. Thank you. |
| 18 | (At 2:55 p.m., witness stepped down) |
| 19 | MR. BRAMBLE: At this time I would move for |
| 20 | admission of 6, 7, 8 and 9. |
| 21 | MS. FOSTER: May I, your Honor? |
| 22 | THE COURT: Yes. |
| 23 | MR. BRAMBLE: I'll publish to defense counsel. |
| 24 | MS. FOSTER: (Reviewing) no objection. |
| 25 | THE COURT: Admitted. |

168

1     (People's Exhibits 6-9 admitted)

2     MR. BRAMBLE: Your Honor, this time the State

3 would rest.

4     THE COURT: Ms. Foster -- we'll take a 15-minute

5 recess at this point. You may go back.

6     (At 2:56 p.m., jury exits courtroom)

7     THE COURT: Everybody can be seated.

8     Ms. Foster, you wanted to put something on the

9 record regarding reading the transcript?

10     MS. FOSTER: Yes, your Honor. There were a couple

11 of matters I would like to place on the record before I do

12 my directed verdict motion.

13     The first thing I'd like to discuss is the issue

14 of the absence of the victim, Mr. Isaacson. I was told this

15 morning that Mr. Isaacson would not be here because he was

16 contacted -- apparently the information that was provided to

17 me was that there were several messages left at his last

18 known cell phone and that he had not returned any phone

19 calls. But apparently there was some phone contact made

20 with him, and he indicated he just wasn't going to come.

21 Your Honor, my client is entitled to a confrontation of

22 witnesses against him and the prosecution has a due

23 diligence responsibility to try to procure witnesses and

24 especially victims. Mr. Isaacson doesn't live in Guatemala;

25 he doesn't live in Australia; he lives in Illinois, which is

1 not far from here.

2     I do believe that, given the length of time from

3 the time that we had the preliminary examination -- which

4 was back in December of last year -- and now, a good-faith

5 effort could have been made on the part of the prosecution

6 to ensure that this gentleman was present, instead of having

7 us read his testimony into the record today in this trial.

8     I say that because, although I do believe I did a

9 fair amount of cross-examination, some additional

10 information has come to light since then that I would have

11 loved to have been able to cross-examine Mr. Isaacson on and

12 cannot now because he's not here. So, based on that, my

13 client has not been afforded his due process right to

14 confront witnesses against him.

15     Based on that, your Honor, we would ask that this

16 Court grant our request for a mistrial based on that

17 argument, your Honor. Thank you.

18     THE COURT: Mr. Bramble?

19     MR. BRAMBLE: Your Honor, as this Court has

20 already noted, the December 14, 2011 preliminary examination

21 that we used in lieu of live testimony, at that preliminary

22 exam it was noted on the record that this preliminary exam

23 was being taken or being run and testimony taken because we

24 wanted to preserve Mr. Isaacson's testimony. The reason we

25 did that is because Mr. Isaacson was less than cooperative

1 then, and we wanted to make sure we had him on the record.

2 The defense had a d--- to cross-examine Mr. Isaacson. So, they've had that

3 cross-examine Mr. Isaacson. So, they've had that

4 face-to-face confrontation.

5     Regarding our efforts to procure his presence here

6 today, we did send out a subpoena to him. He did receive

7 it. We made numerous calls to him and didn't get any

8 response until today. Today he told Rita Caruth -- our

9 victim advocate -- that he was not going to appear today; he

10 would not appear at all. And so we -- you know, we've

11 subpoenaed him; he's received his subpoena. He simply isn't

12 honoring that subpoena. So, I think he was made unavailable

13 and using the testimony from the preliminary exam was

14 appropriate.

15     THE COURT: Ms. Foster, I note as part of that

16 preliminary examination transcript you stated, I think, the

17 main reason for taking this other gentleman's testimony was

18 to preserve it because he doesn't live in state. So

19 certainly it was contemplated that there may be a problem,

20 and that was perceptive; correct?

21     MS. FOSTER: I don't disagree with that, your

22 Honor, but that's -- that matter -- that manner and

23 testimony is often done. We -- it happens a lot in domestic

24 violence cases. They're afraid a victim may recant down the

25 road, so they take her testimony -- and I say "her" because

1 it's usually a her -- at the preliminary examination to

2 preserve it.

3     But I still argue, your Honor, that the

4 prosecution shouldn't just throw his hands up and say, "Oh,

5 well, he's decided he's not going to show, so we'll just

6 proceed without him." There should at least be a due

7 diligent effort to procure that individual here for

8 testimony. I could understand it if we were talking about

9 somebody who was an illegal and had went back to Mexico or

10 was from out of the country. We're talking about a guy

11 that's less than two hours away.

12     If he'd have been in the state, I imagine the

13 prosecution would have gotten a material witness warrant and

14 gotten him here. If he's that valuable of a witness -- and

15 this is the most valuable of a witness because this is an

16 actual alleged victim -- there is nothing that's prevents

17 the prosecution from being duty-bound in an effort to get

18 that individual here to testify live.

19     If there was an issue of distance, I don't think

20 that the State of Illinois -- we're not talking about

21 extradition here -- I don't think the State of Illinois

22 would have told the prosecutor's office, "No. He lives in

23 our state; you can't have him." That's -- I don't believe

24 that would have been an issue. I think that it was a last-

25 minute effort to get him here. He said he wasn't going to

**173**

1    be here and now, you know, he -- we -- the prosecution
2    gets the advantage of his earlier testimony and we're at a
3    disadvantage because I'm left only with my earlier
4    cross-examination, nothing fresh to ask him because he's not
5    here. And he's not here because of me or because of
6    anything I've done. He's not here because he just doesn't
7    think he needs to be here. I just don't think that's reason
8    enough for him not to be here. Thank you.
9          THE COURT: Anything further on that, Mr. Bramble?
10   MR. BRAMBLE: Just real briefly. He is a
11   traveling salesman, and he did not advise Ms. Caruth of
12   where he was located. So, to assume he was in the State of
13   Illinois is just that; an assumption.
14         THE COURT: All right. Well, he is unavailable in
15   this Court's opinion. It was proper to allow the reading of
16   the preliminary examination transcript to be read in lieu of
17   his life live testimony.
18         Anything else, Ms. Foster?
19         MS. FOSTER: Your Honor, at this time I would ask
20   the Court to consider our motion for directed verdict. I
21   know that the Court has now heard all of the prosecution's
22   case-in-chief and I know that the Court has to decide in a
23   light most favorable to the prosecution. But we would
24   submit, your Honor, that there is credibility issues as to
25   the one witness who did testify. That one witness indicated

**174**

1    that he was accosted by somebody; that he only got a short
2    look at him. He provided a computer-generated image. This
3    computer-generated image was based on his verbalizing to the
4    imaging individual -- whoever does these computer-generated
5    images -- that this was the gentleman that robbed him. I'm
6    looking at this photograph this computer-generated image.
7    It looks absolutely nothing like my client. In fact, this
8    individual in this picture looks like a 25-year-old. My
9    client is 50.
10         In light of that, your Honor, and to kind of
11   expand upon that, the first -- the victim who -- alleged
12   victim -- who actually did appear said under oath that he
13   believed his assailant was his age. My client is at least
14   15 years older than that gentleman and doesn't really fit
15   the description other than height. I wouldn't call him
16   slender. I wouldn't call him 150 pounds. And he indicated
17   he was -- very short hair and no facial hair, which doesn't
18   pertain to my client. If you look at the photograph from
19   the second case, he looks about the same there as he does
20   today.
21         Going on to the second case, I would argue, your
22   Honor, that without the actual victim being here and, again,
23   with us relying on the preliminary exam testimony, I do not
24   believe, without the ability to cross-examine -- direct
25   examine and/or cross-examine this second victim, that that

**175**

1    case should be thrown out in its entirety anyway.
2         Based on the factors outlined, we would ask the
3    Court to consider my motion for directed verdict and dismiss
4    this case. Thank you.
5         THE COURT: Mr. Bramble?
6         MR. BRAMBLE: Your Honor, the standard for review
7    on this motion is pursuant to *People v Hampton*. You have to
8    view the evidence in a light most favorable to the
9    non-moving party, in this case, the prosecution. I think
10   when the Court takes everything in its totality, we've met
11   our burden here, and I would ask the Court to deny the
12   motion.
13         THE COURT: Ms. Foster, any response?
14         MS. FOSTER: No, your Honor.
15         THE COURT: Well, the Court has heard the
16   testimony. Under the *Hampton* case, the evidence viewed in a
17   light most favorable to the non-moving party -- the
18   prosecution -- there's certainly ample evidence there, if
19   believed by the jury, and the jury will decide what it
20   believes and decide the credibility of the witnesses. So,
21   sufficient, if believed by the jury, to find beyond a
22   reasonable doubt that the defendant is, in fact, guilty in
23   these cases. So, motion is denied.
24         Anything further at this point, Ms. Foster?
25         MS. FOSTER: No, your Honor.

**176**

1         THE COURT: You're ready to proceed with your
2    case?
3         MS. FOSTER: Well, you know, is that young -- is
4    Mr. Lewis in the courtroom? Is there a Mr. Lewis in the
5    courtroom? Okay.
6         Can I have a few minutes, your Honor?
7         THE COURT: Sure.
8         MS. FOSTER: Okay. Thank you.
9         THE COURT: Mr. Bramble, anything further?
10         MR. BRAMBLE: No, your Honor.
11         THE COURT: We're in recess.
12         (At 3:07 p.m., break had)
13         (At 3:26 p.m., jury resumes seats)
14         THE COURT: Be seated.
15         Ms. Foster.
16         MS. FOSTER: The defense calls Kelvin Heath.
17         THE COURT: Stand up please and state your full
18   name.
19         MR. HEATH: Kelvin Heath.
20         THE COURT: Raise your right hand.
21         Do you solemnly swear or affirm that the testimony
22   you're about to give in this matter will be the truth, the
23   whole truth, and nothing but the truth, so help you God?
24         MR. HEATH: I do.
25         THE COURT: Please be seated.

KELVIN WAYNE HEATH,

testified:

DIRECT EXAMINATION

BY MS. FOSTER:

1  Q. Once again, can you state your full, true name?

2  A. Kelvin Heath. Kelvin Wayne Heath.

3  Q. And your date of birth?

4  A. 3-28-61.

5  Q. Where do you reside?

6  A. 1833 Prairie Parkway.

7  Q. How long have you lived there?

8  A. Well, comin' out of a divorce situation, I go there periodically.

9  Q. Who lives at that address besides you?

10  A. My sister; her son.

11  Q. There was some --

12  A. My mother was visiting then. She's sick.

13  Q. She doesn't live there?

14  A. No.

15  Q. Okay. You were here throughout the entire trial. I want to direct your attention to the two cell phones that are in question here.

One of the cell phones, does it belong to you, the grey one, the grey and white one or the --

177

1  A. Yeah, it belongs to me.

2  Q. What about the black one?

3  A. The black one belongs to Sheila.

4  Q. Tell us who Sheila is.

5  A. Sheila is Kelly Carpenter.

6  Q. And who is she to you?

7  A. A friend.

8  Q. Okay. Why would you be in possession of her cell phone?

9  A. Well, I was with her previously, and her phone went dead, and she used my phone.

10  Q. Okay. The phone that the police found you with, too?

11  A. The grey phone they're speaking about.

12  Q. Okay. When were you with her previously? I'm directing your attention to November 29th of 2011. Were you with her that day?

13  A. Earlier that day, yeah.

14  Q. And what were you doing with her that day?

15  A. I gave her a ride.

16  Q. From where to where?

17  A. Well, first we went to -- we went a couple places.

18  Q. Okay.

19  A. I dropped her off. She left in her car.

20  Q. What does she drive?

21  A. She drive a black Honda.

22  Q. Okay. And?

178

1  A. Later, later she contacted me.

2  Q. Okay. Later, what time?

3  A. I'm gonna say about 2:00 or so.

4  Q. P.m.?

5  A. P.m., yeah.

6  Q. She contacted you and did what?

7  A. Asked me to come and get her. She was havin' a problem with somebody. She told me -- asked me to come and get her.

8  Q. Who was she having a problem with?

9  A. One of her clients.

10  Q. Who would that client be?

11  A. That client would be Mr. Isaacson.

12  Q. What kind of client is he to her?

13  A. He's considered a john.

14  Q. Okay. What does that -- are you trying to tell me that she is a lady of the evening?

15  A. She's a call girl.

16  Q. Okay. Why would she contact you to help her with this particular john?

17  A. Because -- you want me to be frank?

18  Q. Yeah. Be frank if that's what --

19  A. Okay. The guy ejaculated before his hours. She charged $200 an hour. He ejaculated before his hour. He was dissatisfied. She told me that he was acting belligerent, can I come give her a ride.

179

1  Q. Slow down.

2  A. Huh?

3  THE REPORTER: You have to slow down.

4  A. Excuse me.

5  MR. BRAMBLE: I'm going object to anything this other supposed woman named "Sheila" said.

6  THE COURT: Sustained.

7  MR. BRAMBLE: Thank you.

8  BY MS. FOSTER:

9  Q. Okay. You responded because she had you -- the information had been relayed to you that this particular john wasn't living up to his end of the bargain; is that a fair statement?

10  A. Correct.

11  Q. And what was your purpose of confronting him? What were you planning on doing with that information?

12  A. I was just givin' her a ride. She asked me to pick her up, and she told me where to pick her up at.

I was proceeding through the parking lot, and I see this guy. I'm thinking he asking me for direction. I roll down the window, and all I heard him say was "MF" something. You know, he say "You guys" something. That's all I remember. And I told them that as well.

And when Wyoming Police Department first confronted me. I also told this gentleman here (indicates)

180

**Page 181**

1      that "What are they on, some racist stuff?" I say this
2      because at the time I didn't notice -- was a guy that
3      Sheila had dated, because I hadn't seen her yet.
4  Q.  Okay.
5  A.  So, that's where that came in at.
6  Q.  Okay. What happened after this incident with the name --
7      the man calling you a name?
8  A.  Whatever after that, I --
9  Q.  Yeah.
10  A.  -- I proceeded out. I didn't see her.
11  Q.  You didn't see her?
12  A.  I didn't see Sheila. Swiss Valley is across the street from
13      1833 Prairie Parkway. So, I went back over there to wait on
14      her; she supposed to meet me back there.
15  Q.  So, Swiss Valley and where you were staying with your
16      mother, or your brother or sister, whoever, is right across
17      the street from where these incidences occurred; correct?
18  A.  Correct.
19  Q.  Okay. And you never saw her after that day?
20  A.  I didn't see after that. I didn't see her. I got arrested
21      before I seen her again.
22  Q.  Okay. So, let's back up to November 14 of 2011. Do you
23      remember anything about that date whatsoever?
24  A.  The 14th? I can't -- I can't really remember what I was
25      doing the 14th.

**Page 183**

1      calling racist in the police report. They never said that.
2  Q.  So, they -- the cop asked about you calling them racist didn't
3      make it into the police report.
4  A.  I'm saying none -- yeah.
5  Q.  But did you answer the question as to why his number would
6      be in a phone that was in your possession?
7  A.  Sheila used my phone earlier that day before this incident,
8      approximately 10:30, eleven o'clock, before I got with my
9      daughter and her cousin.
10  Q.  Let's talk a little bit about that. There was testimony
11      that you had told the officers that you had taken your
12      daughter to Mel Trotter to get a car?
13  A.  She had bought a car and she was having trouble. She called
14      me to meet her down there to elaborate with them the problem
15      -- explain the problem she was havin' with the car. That
16      happened.
17      Was that that day?
18  A.  That happened that day.
19  Q.  Where did that happen in relationship to your driving this
20      Sheila around?
21  A.  Okay. I was with Sheila previously, before that. Then I
22      got with my daughter.
23  Q.  What time were you with --
24  A.  I came back -- I came back after being with my daughter, and
25      me and Sheila was together again. I dropped her off.

**Page 182**

1  Q.  Did you ever have a -- do you ever have a reason to be in or
2      around the Swiss Valley Apartments?
3  A.  No.
4  Q.  Had you ever met the gentleman who testified here this
5      morning, Mr. Gray?
6  A.  No. I never met him.
7  Q.  Never saw him before?
8  A.  No.
9  Q.  Did you know him to be one of this Sheila's johns?
10  A.  Nope, not that I know of.
11  Q.  Okay.
12  A.  I never seen him.
13  Q.  And your only involvement -- let me ask you this: There was
14      testimony that your cell phone was found -- your cell phone
15      number was found on Mr. Isaacson's phone. Why would that be
16      if you didn't know this gentleman?
17  A.  That's because Sheila contacted him before the date. This
18      is not the first time Sheila did this. I mean, if your
19      phone go dead, you use somebody else phone.
20  Q.  Can you be a little slower? I don't know if everybody got
21      that.
22  A.  I said Sheila contacted him. Her phone was dead. I
23      explained that to the officers, as well, that was my phone.
24      Officer -- the second officer that testified, I explained
25      that to him. That's not in the police report, nor is me

**Page 184**

1  Q.  Where did you drop her off?
2  A.  I dropped her off at Swiss Valley.
3  Q.  Okay. Where did you pick her up from?
4  A.  I didn't pick her back up. I was detained before I got with
5      her.
6      I'm backing up. Where did you pick her up originally before
7      you dropped her off at Swiss Valley?
8  A.  I met her in the parking lot across the street from Swiss
9      Valley.
10  Q.  Is that where you were staying?
11  A.  No. I go there periodically because my clothes is over
12      there.
13  Q.  Did you meet her at the location where they eventually
14      arrested you?
15  A.  Yes, I did.
16  Q.  How did she get there?
17  A.  She got there by her car.
18  Q.  Why did she need you to drive her across the street if it's
19      across the street?
20  A.  I was with her. I didn't say I drove her across the street.
21  Q.  You walked with her across the street?
22  A.  That's where I -- that's where she was. That's where Sheila
23      was.
24  Q.  I just want to make sure we're clear about the -- I don't
25      want the jury to be confused. I want the jury to understand

| | Page 185 | | Page 187 |
|---|---|---|---|
| | your side of these events; okay? | 1 | A. Both of 'em. |
| 2 | Q. I'm confused, and I'm sure they're confused. So, let's | 2 | Q. Okay. So, she meets you in the morning and |
| 3 | | 3 | what happens then? |

Column 1 (Page 185):

1     your side of these events; okay?
2  Q.  I'm confused, and I'm sure they're confused.  So, let's
3     backtrack and maybe we'll do it one more time.
4         Starting off with your day, where -- who did you
5     meet up with first, your daughter or Sheila?
6  Q.  (line blank / continues)
7         THE COURT:  Excuse me.  Excuse me.  What time
8     period are we talking about here?
9         MS. FOSTER:  We're talking about the November 29,
10    2011.
11 BY MS. FOSTER:
12 Q.  What time -- who did you meet up with first, the daughter or
13    Sheila?
14 A.  Sheila.
15 Q.  Where did you meet her?
16 A.  I met her in the parking lot.
17 Q.  Parking lot where?
18 A.  Across the street from Swiss Valley --
19        THE COURT:  Excuse me.  Can we have a time?
20 BY MS. FOSTER:
21 Q.  What time?
22 A.  -- 1833.  Possibly 9:30 or so.
23 Q.  In the morning?
24 A.  In the morning.
25 Q.  You say, "Across the street from Swiss Valley."  Would that

Column 2 (Page 187):

1  A.  Both of 'em.
2  Q.  Okay.  So, she meets you in the morning and
3     what happens then?
4  A.  She went on a couple dates then.
5  Q.  I'm sorry?
6  A.  She went on a couple dates then, earlier that morning.  She
7     went again with Isaacson later that afternoon.  But I was
8     with her, and I went with my daughter after that, if that's
9     what you're tryin' to ask me.
10 Q.  I just want to know -- we want to understand a timeline.
11    So, she meets you in the morning; she goes on a couple
12    of dates with a couple of johns.  Do you know where she does
13    these dates?
14 A.  No.  Sometime they go to a hotel.
15 Q.  Okay.  Did she leave her car parked?
16 A.  Most the time she leaves her car up there -- she meets --
17    sometimes she have a hotel.  Sometimes the john and she
18    meets 'em at the designated spot.
19 Q.  Okay.  So, a john will meet her, say, at the Prarie Parkway
20    area, and then they will go somewhere else; is that a fair
21    statement?
22 A.  Yeah, that's a fair statement, because she got to be sure
23    that they aren't the police.
24 Q.  So, then she goes; she comes back.  Does she go again and
25    come back?

                                   187

Column 3 (Page 186):

1     be the parking lot where you were hanging your hat?
2  A.  Where I was arrested at, yes.
3  Q.  1833?
4  A.  1833 Prairie Parkway.
5  Q.  Did she come to that location or did you bring her to that
6     location?
7  A.  She came in her own car, a black Honda.
8  Q.  She came in to that location for what purpose?
9  A.  She came there for the purpose to work that day.
10 Q.  To work doing what?
11 A.  Prostitution.
12 Q.  Okay.  Why did she need to come to your location to do her
13    call girl thing?
14 A.  Because she's married and she has nowhere else to do it at.
15 Q.  So, was she going to do -- meet the john at your apartment
16    or somewhere else?
17 A.  No.  She -- she comes there to meet me because it's a setup
18    through her backpage.  It's set up through the backpage
19    through someone else.
20 Q.  Who's the someone else?
21 A.  Brittany Heywood.
22 Q.  Who is she?
23 A.  She's the one that set up the backpage.  She, she's the one
24    that put it together.
25 Q.  Okay.  Both these backpages or just one?

                                   186

Column 4 (Page 188):

1  A.  Yeah.
2  Q.  And then in that period of time, at some point you have an
3     issue with your daughter's car.  You and your daughter go
4     and see about a problem with her car?
5  A.  Right.
6  Q.  How old is your daughter?
7  A.  My daughter is 21.
8  Q.  So, she's young.  And then when are you done with your
9     daughter?  What time?
10 A.  I went there about maybe 40 minutes or so.
11 Q.  Yeah, but what time?  Do you remember what time it was that
12    you were, "Bye, daughter.  I'm home now" or whatever?
13 A.  I'm about 12:45, one o'clock, I imagine.
14 Q.  And then when did Sheila return?
15 A.  Sheila returned maybe 20 minutes, 25 minutes after that.
16    Ten after 1:00 or so.  I explained that to the officers as
17    well.  That's not in the police report.
18 Q.  Okay.  Well, let's not worry about what's in and what's not
19    in the police report.  That's why we have people here to
20    testify.
21        So, she then goes to do this thing with
22    Mr. Isaacson and then contacts you because Isaacson is
23    shortchanging her for some reason.  Does that sum up
24    everything as I understand it?
25 A.  He's not shortchanging her, but he be question his money

                                   188

**Page 189**

1   back because he said he didn't get - full hour. That was
2   his argument.
3 Q. He didn't get a full hour. Okay. You went to assist?
4 A. I went to give her a ride, yeah, assist her in giving her a
5    ride, yeah.
6 Q. From --
7 A. Swiss Valley.
8 Q. -- Swiss Valley to 1833 Prarie Parkway?
9 A. I went there, yeah, to get her from there.
10    MS. FOSTER: I have nothing further. Thank you.
11    THE COURT: Mr. Bramble?
12    MR. BRAMBLE: Thank you.
13         CROSS-EXAMINATION
14 BY MR. BRAMBLE:
15 Q. So, you want this jury to believe that these two men -- let
16    me start with this -- these two men, who don't even know
17    each other, have the same identical thing happen to them,
18    and identify you, and you're saying that's not accurate?
19 A. I want this jury to believe that I think the police is
20    tryin' to tie me in with someone that's been posing as a
21    police officer. That's what I think. Because since I've
22    been incarcerated, somebody else has been posin' as a police
23    officer and stoppin' people and robbin' people.
24 Q. You know this how?
25 A. Pardon me?

189

**Page 190**

1 Q. How?
2 A. Well, one incident concern a woman being pulled over.
3 Q. This is my job, and you're tellin' me things that I've never
4    heard.
5 A. Repeat that.
6 Q. Sure. How do you know this information?
7 A. It was on the news, number one.
8 Q. Really?
9 A. Yeah.
10 Q. Really?
11 A. Yeah.
12 Q. What newscast?
13 A. I'm not sure of what newscast, but it was on the news.
14 Q. Can you tell me the --
15 A. He's a detective. He knew about it, I'm sure. He admitted
16    it hisself [sic] that there was ongoing investigation.
17 Q. Well, admitted there was an investigation, an investigation
18    involving you.
19 A. Okay.
20 Q. Well, you indicated you called the police racist?
21 A. I called who?
22 Q. Did you call the police racist, or how did the term "racist"
23    come up?
24 A. I'm not hearing you. I can't hear that good because you
25    ain't by the microphone.

190

**Page 191**

1 Q. How did the term "racist" come up?
2 A. The term "racist" is because me and the gentleman is in
3    cars, and we have words. When they come and -- when they
4    come and detain me, I say, "What you guys all some racist
5    stuff?" Because me and the gentleman traded words. I'm
6    thinking the -- I don't know what he told 'em. I'm thinkin'
7    he just had a problem with me of some kind, and they
8    arrested me to that.
9         At the time, I didn't know Sheila was involved.
10    This was -- Isaacson was involved with Sheila.
11 Q. Well, if you told the police all this stuff, why don't you
12    think it's not in the police report?
13 A. What was the second officer's name? I want to call his name
14    correctly.
15 Q. Officer Ferguson.
16 A. Well, he could have testified that I said that. Did I say
17    that or not?
18 Q. You can't ask questions here. You just answer them.
19    Understood? Do you understand?
20 A. Yeah, I understand.
21 Q. All right. You seem to have a lot of familiarity with how
22    Sheila -- this Sheila person -- how her business operates.
23 A. Okay.
24 Q. Is that true?
25 A. Yeah.

191

**Page 192**

1 Q. And do you help her in this business?
2 A. Kind of, sort of.
3 Q. You're her business manager, shall we say?
4 A. You could say that.
5 Q. All right. Another way to describe that would be that
6    you're her pimp?
7 A. No. We not gonna say that.
8 Q. But you're just her business manager?
9 A. I'm gonna say we're associates.
10 Q. A moment ago you said you were her business manager.
11 A. You puttin' in the sense that we was associating, and we was
12    in a business venture. You was puttin' it in that manner,
13    so I --
14 Q. You're in a business venture with her.
15 A. We are -- we are associates.
16 Q. Well, I'll ask you the question again. You already said
17    you're her business manager. What does that entail?
18 A. That we are associates.
19 Q. What does it mean by "associates"?
20 A. That we have an agenda that we both tryin' to meet.
21 Q. You have an agenda you're both tryin' to meet.
22 A. Yeah.
23 Q. What is the agenda?
24 A. To make some money.
25 Q. And you get some of her money that she makes?

192

| | | |
|---|---|---|
| 1 | A. | Me and a couple more people, yeah |
| 2 | Q. | So, in the proceeds that Sheila -- supposedly |
| 3 | | exists -- the proceeds from her being a call girl, you take |
| 4 | | a cut of? |
| 5 | A. | I don't take a cut. I get paid a portion for being |
| 6 | | associate of, let's say, an organization of some kind. |
| 7 | Q. | Before I go through the exhibits, I'm going to ask you, do |
| 8 | | you recall being questioned by Officer Ferguson? Do you |
| 9 | | recall being questioned by him? |
| 10 | A. | Which one is Officer Ferguson? |
| 11 | Q. | The second one who testified. Do you recall being |
| 12 | | questioned by him? |
| 13 | A. | Yes, I do. |
| 14 | Q. | Do you remember telling him that -- when he asked you if you |
| 15 | | were in the Swiss Valley parking lot, you said you were |
| 16 | | there briefly, but just passed through? |
| 17 | A. | Right. Yes, I did. |
| 18 | Q. | That you had -- when you returned from Mel Trotter, you |
| 19 | | turned around and then went back out. Do you remember |
| 20 | | tellin' him that? |
| 21 | A. | I told him that my daughter and her cousin and I went to |
| 22 | | Mel Trotter to discuss her car problems with Mel Trotter's |
| 23 | | car lot. |
| 24 | Q. | All right. But I'm asking you specifically about being in |
| 25 | | the Swiss Valley parking lot. |

193

| | | |
|---|---|---|
| 1 | Q. | After you told the officer that you never encountered |
| 2 | | anyone, you later said that you encountered some |
| 3 | | white guy or Hispanic guy who yelled mother-fucker or |
| 4 | | something at you? |
| 5 | A. | Right. |
| 6 | Q. | And that you denied ever getting out of your car? |
| 7 | A. | That's correct. |
| 8 | Q. | Then you said the guy was asking directions or something |
| 9 | | like that. |
| 10 | A. | No. I said I thought that's what he was asking me, because |
| 11 | | the window was up. I let the window down, and that's when |
| 12 | | he was making accusations about you mother-fuckers. |
| 13 | Q. | When the officer said, "Why do you ask directions from |
| 14 | | someone calling you a mother-fucker" -- |
| 15 | A. | Well, initially my line to him was because I figured it had |
| 16 | | something to do with Sheila. That was initially why I told |
| 17 | | him that. I wanted to find out what happened first. |
| 18 | Q. | Talked to you about the cell phones; correct? |
| 19 | A. | Right. |
| 20 | Q. | And Exhibit 7, that's your cell phone? |
| 21 | A. | Yes, it is. |
| 22 | Q. | Whose is Exhibit 8? |
| 23 | A. | That's Sheila's cell phone. |
| 24 | Q. | You don't contest that your number was corresponding with |
| 25 | | Mr. Isaacson? |

195

| | | |
|---|---|---|
| 1 | A. | Okay. |
| 2 | Q. | And you told the officer that you just turned around briefly |
| 3 | | in that parking lot; correct? |
| 4 | A. | I told him that initially, yes. |
| 5 | Q. | And you denied ever encountering anyone there; didn't you? |
| 6 | A. | No. I told him that I had some words with a guy. At the |
| 7 | | time I didn't know this Isaacson was affiliated with Sheila. |
| 8 | | I didn't find that out till -- |
| 9 | Q. | Let me ask you this: Before you told him that you'd met |
| 10 | | someone, you initially said you'd never encountered anyone |
| 11 | | there? |
| 12 | A. | No. I told him that I -- that I encountered a guy. That's |
| 13 | | where the racism came in, my statement about the racism. |
| 14 | | That's where that came in, that concerning that guy. |
| 15 | Q. | So, if the officer testified under oath here that your first |
| 16 | | statement to him, you told him you never encountered |
| 17 | | anybody? |
| 18 | A. | Okay. I did say that initially. I said that. I admitted |
| 19 | | that. |
| 20 | Q. | So, you lied? |
| 21 | A. | I lied. |
| 22 | Q. | You lied and said you never encountered anyone? |
| 23 | A. | Initially, yes. |
| 24 | Q. | Who went with you to Goodwill? |
| 25 | A. | My daughter and her cousin, Booter. |

194

| | | |
|---|---|---|
| 1 | A. | Okay. |
| 2 | Q. | Your phone was being used to correspond with -- |
| 3 | A. | I told you that Sheila used my phone. Her phone went dead. |
| 4 | | When they got the phone, it was dead. He attested that as |
| 5 | | well, the officer did. |
| 6 | Q. | You're saying Sheila used the phone, but you're not denying |
| 7 | | that Mr. Isaacson was on your phone? |
| 8 | A. | I'm not denying that, no. |
| 9 | Q. | Why did you lie to the officer initially? |
| 10 | A. | I lied to the officer initially because I didn't know if it |
| 11 | | had something to do with Sheila or not. |
| 12 | Q. | Why would that matter? Why do you have to lie? |
| 13 | A. | Because I don't know what -- what's went down. I don't know |
| 14 | | what's goin' on. |
| 15 | Q. | So, you automatically lie? |
| 16 | A. | We gonna say a "fib." We ain't gonna say a "lie," we're |
| 17 | | gonna say a "fib." |
| 18 | Q. | Well, we said a lie a moment ago, and you agreed to that. |
| 19 | A. | Well -- |
| 20 | Q. | Fib or lie, it -- |
| 21 | | You was happier with a lie than a fib. |
| 22 | Q. | Fib, lie, it wasn't the truth? |
| 23 | A. | So did Isaacson. He lied. |
| 24 | Q. | Who lied? |
| 25 | A. | Isaacson and Mr. Gray, both of them lied. |

196

**Page 197**

1 Q. You're saying both of them --

2 A. Is you saying you hold against me -- against them as well --

3 Q. You're saying both Mr. Gray and Mr. Isaacson, who don't know

4 each other, came in here and by chance told the same story

5 that you -- hold on -- that you robbed them?

6 A. Okay. Mr. Isaacson's not here. Why he's not here?

7 Mr. Gray said somebody was slender, now he says something

8 different.

9 Q. Mr. Isaacson testified already, and we've got that testimony

10 on the record.

11 A. Okay, well, why he's not here?

12 Q. Do you understand, you don't ask the questions? You can ask

13 your attorney that.

14 A. You want me to answer it properly; right? You're looking

15 for the honesty and truth; right?

16 Q. Yeah.

17 A. Okay. Well, that's what I'm tryin' to bring to you.

18 Q. From someone who's already admitted he lied?

19 A. Okay. Yes, I did. I lied.

20 Q. So, Mr. Isaacson, his number is on Exhibit 7, your phone;

21 correct?

22 A. Sir, I can hear you when you're by there or by that

23 microphone there (indicating).

24 Q. Your number was on Mr. Isaacson's phone?

25 A. Okay.

**Page 198**

1 Q. Correct?

2 A. Mr. Isaacson's phone what?

3 Q. Your number is on Mr. Isaacson's phone.

4 A. Right. You asked me that three times. I said, "yes."

5 Q. I want to make sure. Well, you have to just answer the

6 question.

7 So, you don't deny that --

8 A. No, sir.

9 Q. -- that your phone was used to correspond with

10 Mr. Isaacson's?

11 A. Yes.

12 Q. I'll show you what's marked Exhibit 9, $497 that was seized

13 from you.

14 A. Okay.

15 Q. Do you agree that that was seized from you?

16 A. Yes, I am. I won it at the casino the night before. The

17 records reflect that at the casino.

18 Q. So, this $500, did you tell the officers that?

19 A. I believe I did.

20 Q. So, if they don't have that --

21 A. At one point I shut down on 'em because they start actin'

22 very racist with me, as I said. So, I shut down on 'em.

23 Q. What did they do that was racist?

24 A. He was tellin' me to "shut up," you know. He askin' me

25 questions. He tellin' me to "shut up." You know, they got

**Page 199**

1 -- they got everybody there on the ground.

2 Q. Who told you to --

3 A. The second officer sitting to the right there (indicating).

4 Q. Officer Ferguson?

5 A. Pardon me?

6 Q. Officer Ferguson.

7 A. Ferguson. I ask you the name so I can say they names.

8 Q. He told you to "shut up," is your testimony?

9 A. Yeah. He's tellin' me -- he's askin' me questions -- this

10 detective here -- he's tellin' me to "shut up." You know,

11 then you got nine cars there. You got nine police officers

12 there.

13 Q. All right. What else did they do that was racist besides

14 tell you to shut up?

15 A. I thought they was being racist because me and the white guy

16 had some words, and they was on me like that. They was

17 already deeming me guilty of something that they hadn't even

18 investigated yet. That's why.

19 Q. Well, do you think you helped yourself by lying?

20 A. I don't know. I probably did. It depends. Did

21 Mr. Isaacson and Gray help theyself [sic] by lyin'?

22 Q. Your testimony -- you keep saying they're lying. They made

23 this up?

24 A. I can't say what they made up.

25 Q. But you're saying they're lying?

**Page 200**

1 A. They're lying if they said I robbed them; correct. They're

2 lying if they said that I robbed them. Yes.

3 Q. Exhibit 6, do you recognize that?

4 A. Yeah.

5 A. And --

6 A. He also said it was long-sleeved, too.

7 Q. Is this your shirt?

8 A. That's a short-sleeved shirt.

9 Q. Is this your shirt?

10 A. Yes, that's my shirt.

11 Q. It's the shirt you're wearing in the picture; correct?

12 A. Pardon me?

13 Q. It's the shirt you're wearing in the picture?

14 A. Correct.

15 Q. So again, I want to ask you this question. Listen, okay,

16 before you answer.

17 A. Okay.

18 Q. So, it's your testimony that two men who don't know each

19 other, identify you as doing basically the identical thing,

20 and you're saying they're lying?

21 A. I never met or never seen Mr. Gray until today. So, what

22 you got goin' on, I don't know. Mr. Isaacson, I think he's

23 a dissatisfied customer and he cried robbery because of

24 those reasons. That's all I can tell you about that.

25 Q. Okay. Wow, isn't it amazing how similar it is between

**Page 201**

```
 1        Mr. Isaacson's case and Mr. Gray's case?
 2   A.   Why Mr. Gray wait until the 29th to come forward about
 3        somethin' he was robbed about?  Why he wait?
 4   Q.   He was present at the preliminary exam on December 14.  He
 5        was there.  He just -- you just waived the hearing, so you
 6        didn't hear their testimony.  He didn't just come forward on
 7        the 29th.
 8   A.   You lookin' for the truth.  Why you didn't ask him about the
 9        robberies that's goin' on --
10   Q.   Because there aren't any.
11   A.   -- and about somebody else impersonating a police officer?
12        Why didn't you ask him that and see what he had to say?
13   Q.   We can call him back.
14   A.   You sure can.
15   Q.   Okay.  Listen to my question here, because you get off track
16        here.  You said a moment ago that Mr. Gray was lying?
17   A.   I don't think I said he was lying.  I said I can't attest to
18        what Mr. Gray problem was, basically.  I don't know.  I
19        never seen Mr. Gray, so I can't attest to anything about
20        him.
21   Q.   And you don't know why they would -- why would Mr. Gray make
22        up a story about --
23   A.   I think Mr. Gray made a mistake, that's what I think -- when
24        they showed him my photo before he came in here.  That's the
25        only thing I can deduce from that.
```

**Page 202**

```
 1   Q.   Okay.  So, you think that someone showed him the photograph
 2        to pick you out of the lineup?
 3   A.   Pardon me?
 4   Q.   You were picked out of the lineup.
 5   A.   Okay.
 6   Q.   He identified you as being the one who accosted him and
 7        robbed him.  Do you understand that?
 8   A.   Yeah, I understand that.
 9   Q.   Tell me, do you think someone showed him your picture
10        beforehand?  Is that what you said a moment ago?
11   A.   If he said that I did it, they did somethin'.  I know I
12        haven't seen Mr. Gray.  I never met Mr. Gray till today.
13   Q.   What are you saying they did?
14   A.   Who was what?
15   Q.   What are you saying they did with Mr. Gray?
16   A.   I don't know what they did, sir.
17   Q.   Are you saying they showed him a picture?
18   A.   They did something.
19   Q.   Well, what?
20   A.   How do I know?  Ask him.
21   Q.   You're thinking they put him up to this?
22   A.   Listen.  You askin' me about Mr. Gray, man.  All I'm tellin'
23        you is I don't know what they -- what Mr. Gray.  I never
24        seen him before today.
25   Q.   What are you saying -- who are you saying -- who are the
```

**Page 203**

```
 1        people that are puttin' Mr. Gray up to this?
 2   A.   I'm saying this to y'all here -- indicating -- the prosecutor
 3        that was present.  That's what I'm saying.
 4   Q.   You're saying they did what?
 5   A.   I'm saying that they showed 'em my photo before he picked me
 6        out, if he picked him out.  Or, he made a mistake, one of the
 7        two.
 8   Q.   But you're saying -- your first thought was that the --
 9   A.   I didn't say my first thought.  I gave you two synopsis of
10        what I think.  You're asking me to speculate, so I did.
11   Q.   One of your speculations here is that this is part of some
12        conspiracy?
13   A.   I don't -- I don't know what it is, sir.  I know I don't
14        know Mr. Gray.  I never seen him before today.
15   Q.   So, but you're saying one of the scenarios here is that the
16        detective showed your photograph to Mr. Gray before you went
17        in and identified you in that lineup?
18   A.   Or Mr. Gray made a mistake, sir.  That's what I'm sayin',
19        those two things.  Yes, that's what I'm saying.
20   Q.   Why didn't you tell the police right upfront what had
21        happened here?
22   A.   Well, already, law is being broken by both sides.  That's
23        why.  I'm breakin' the law, they breakin' the law, she
24        breakin' the law.  That's why.
25   Q.   But you later told -- you didn't tell them anything about
```

**Page 204**

```
 1        your elaborate business relationship with Sheila; did you?
 2   A.   They never asked.  They never did put what I said in the
 3        report anyway, other than being with my daughter.  That's
 4        all they put there.
 5   Q.   So, you're saying they left out a bunch of stuff out of the
 6        report?
 7   A.   Yeah, that's what I'm saying.
 8   Q.   Intentionally?
 9   A.   Yeah.
10   Q.   So, these police officers who have, I don't know how many
11        years of experience, risked their entire career and left --
12        intentionally left things out of their report just to get
13        you?
14   A.   Repeat that.
15   Q.   Sure.
16   A.   I can hear you when you're closer to the table or by the
17        microphone.
18   Q.   You're saying that these officers risked their entire career
19        by intentionally omitting things from the report to get you?
20   A.   I guess I am saying that.
21   Q.   Well, let's not guess.  You are saying that; aren't you?
22   A.   Yeah.
23   Q.   So, we have Mr. Gray, who's either mistaken or lying;
24        correct?
25   A.   Right.
```

**Page 205**

1  Q.  Mr. Isaacson, who is either mistaken or lying?

2  A.  Mr. got Mr. Isaacson as being mistaken.

3  Q.  So, when he says that you robbed him, that's a lie?

4  A.  **I can't rob him if I never got out the car.**

5  Q.  You're saying that's a lie?

6  A.  **Yeah. I'm saying that's a lie.**

7  Q.  So, we have Mr. Gray either mistaken or lying, Mr. Isaacson

8      lying, the police officer's intentionally omitting things

9      from their report?

10 A.  Yeah.

11 Q.  All those things happened?

12 A.  **They sure did.**

13         MR. BRAMBLE:  I have nothing further.

14         THE COURT:  Ms. Foster?

15         MS. FOSTER:  Nothing, your Honor.

16         THE COURT:  All right.  You may step down.  Thank

17 you.

18         (At 3:59 p.m., witness stepped down)

19         THE COURT:  Any further witnesses, Ms. Foster?

20         MS. FOSTER:  Your Honor, there may be one rebuttal

21 witness.  We are trying to get in contact with this

22 individual.  So we're going to ask the Court -- it's

23 four o'clock now -- if we can recess for the day.  And I

24 know we're supposed to start back up on Thursday morning.

25 That will give us enough time to try to track down this

**Page 206**

1  potential rebuttal witness; interview this individual and

2  see if this person could be called as a witness for the

3  defense.

4          THE COURT:  In your case-in-chief to counter what?

5          MS. FOSTER:  No, no.  This would only be a

6  rebuttal witness, your Honor.

7          THE COURT:  All right.  Well, Mr. Bramble, if they

8  don't call anymore witnesses, do you contemplate rebuttal?

9          MR. BRAMBLE:  I have some brief rebuttal already,

10 your Honor, if you want me to put that on.

11         MS. FOSTER:  I don't have time, your Honor.  I'm

12 asking the Court if we can adjourn and pick this up on

13 Thursday morning.

14         THE COURT:  All right.  Okay.  I understand.

15         Ladies and gentlemen of the jury, I'll excuse you

16 now until nine o'clock Thursday morning.  I'm confident that

17 we can finish the case on Thursday.  We may or may not have

18 brief testimony Thursday morning, and then we can go into

19 closing arguments and instructions, and you can commence

20 deliberations sometime Thursday morning.

21         Again, I'll caution you not to discuss the case in

22 any way with anybody; not to have any contact with anybody

23 involved in the case.  Don't visit the scene; don't conduct

24 any investigation or experiments on your own; ignore any

25 potential media coverage.  With that, you are excused till

**Page 207**

1  nine o'clock Thursday morning.

2          (At 4:00 p.m., jury exits courtroom)

3          THE COURT:  Ms. Foster, you have a commitment at

4  this time; correct?

5          MS. FOSTER:  Yes, your Honor.

6          THE COURT:  All right.  Well, we'll recess until

7  -- we'll be back in court at 9:00.  Please be here no later

8  than 8:30 and we can go over instructions.

9          MS. FOSTER:  Thank you, Judge.

10         THE COURT:  We're in recess.

11         (At 4:02 p.m., concluded)

12                  --oo0oo--

**Page 208**

1                OFFICIAL REPORTER'S CERTIFICATE

2

3  STATE OF MICHIGAN      )
                          )  ss
4  COUNTY OF KENT         )

5

6          I, Leslie Rydahl, Court Reporter in and

7  for the Circuit Court for the County of Kent, State of Michigan,

8  do hereby certify that I reported stenographically the

9  proceedings held in the above-entitled cause before the Honorable

10 GEORGE S. BUTH on March 27, 2012; and do further certify that the

11 foregoing transcript is a true and correct transcript of my

12 stenographic notes of said proceedings so reported and

13 transcribed by me.

14

15

16

17              Leslie L. Rydahl CSR 4078
                Official Court Reporter

18

19 Dated: _____
        Grand Rapids, Michigan

1               OFFICIAL REPORTER'S CERTIFICATE

2

3

STATE OF MICHIGAN        )
4                               )    SS
COUNTY OF KENT           )

5

6                      I, Leslie Rydahl, Court Reporter in and

7   for the Circuit Court for the County of Kent, State of Michigan,

8   do hereby certify that I reported stenographically the

9   proceedings held in the above-entitled cause before the Honorable

10  GEORGE S. BUTH on March 27, 2012; and do further certify that the

11  foregoing transcript is a true and correct transcript of my

12  stenographic notes of said proceedings so reported and

13  transcribed by me.

14

15

16                              _____
                                Leslie L. Rydahl  CSR 4078
17                              Official Court Reporter

18  Dated:    9-11-12
19            Grand Rapids, Michigan

20

21

22

23

24

25