STATE OF MICHIGAN

SEVENTEENTH JUDICIAL CIRCUIT COURT (KENT COUNTY)

THE PEOPLE OF THE
STATE OF MICHIGAN

**ORIGINAL**

-v-

Case No. 11-11910-FH
11-11911-FH

KELVIN WAYNE HEATH,

RCV'D & FILED

Defendant.
/

SEP 14 2012

JUDGE BUTH
17ᵀᴴ CIRCUIT COURT

JURY TRIAL -- VOLUME 2 OF 2

BEFORE THE HONORABLE GEORGE S. BUTH, CIRCUIT JUDGE

Grand Rapids, Michigan - Thursday, March 29, 2012

APPEARANCES:

For the People:            MR. KEVIN M. BRAMBLE (P38380)
                           Assistant Prosecuting Attorney
                           82 Ionia Avenue, NW, Suite 450
                           Grand Rapids, MI  49503
                           616.632.6710


For the Defendant:         MS. VALERIE A. FOSTER (P44459)
                           Kent County Defender Office
                           146 Monroe Center Street, N.W.
                           Suite 920
                           Grand Rapids, MI  49503
                           616.774.8181


Reported by:               Leslie Rydahl, CSR-4078
                           Official Court Reporter
                           Kent County Courthouse
                           180 Ottawa Avenue, NW, Suite 12200
                           616.632.5021

# TABLE OF CONTENTS

WITNESSES - DEFENSE:      PAGE

PHILIP SWIERCZ

DIRECT EXAMINATION BY MS. FOSTER      17
CROSS-EXAMINATION BY MR. BRAMBLE      22


WITNESSES - REBUTTAL:

DONALD VERHAGE

DIRECT EXAMINATION BY MR. BRAMBLE      25
CROSS-EXAMINATION BY MS. FOSTER      26

DENNIS FERGUSON

DIRECT EXAMINATION BY MR. BRAMBLE      27
CROSS-EXAMINATION BY MS. FOSTER      28

CLOSING ARGUMENT BY MR. BRAMBLE      32
CLOSING ARGUMENT BY MS. FOSTER      42
REBUTTAL ARGUMENT BY MR. BRAMBLE      51

INSTRUCTIONS BY THE COURT      56
CLERK SWORN TO KEEP JURY      72
VERDICT      73
JURY POLLED      75


EXHIBITS:

     None

STATE OF MICHIGAN

SEVENTEENTH JUDICIAL CIRCUIT COURT (KENT COUNTY)

THE PEOPLE OF THE
STATE OF MICHIGAN

-v-                                    Case No. 11-11910-FH
                                                11-11911-FH

KELVIN WAYNE HEATH,

                    Defendant.
_____/

JURY TRIAL -- VOLUME 2 OF 2

BEFORE THE HONORABLE GEORGE S. BUTH, CIRCUIT JUDGE

Grand Rapids, Michigan - Thursday, March 29, 2012

APPEARANCES:

For the People:        MR. KEVIN M. BRAMBLE (P38380)
                       Assistant Prosecuting Attorney
                       82 Ionia Avenue, NW, Suite 450
                       Grand Rapids, MI  49503
                       616.632.6710

For the Defendant:     MS. VALERIE A. FOSTER (P44459)
                       Kent County Defender Office
                       146 Monroe Center Street, N.W.
                       Suite 920
                       Grand Rapids, MI  49503
                       616.774.8181

Reported by:           Leslie Rydahl, CSR-4078
                       Official Court Reporter
                       Kent County Courthouse
                       180 Ottawa Avenue, NW, Suite 12200
                       616.632.5021

1

## TABLE OF CONTENTS

WITNESSES - DEFENSE:                          PAGE

PHILIP SWIERCZ

DIRECT EXAMINATION BY MS. FOSTER          17
CROSS-EXAMINATION BY MR. BRAMBLE          22

WITNESSES - REBUTTAL:

DONALD VERHAGE

DIRECT EXAMINATION BY MR. BRAMBLE         25
CROSS-EXAMINATION BY MS. FOSTER           26

DENNIS FERGUSON

DIRECT EXAMINATION BY MR. BRAMBLE         27
CROSS-EXAMINATION BY MS. FOSTER           28

CLOSING ARGUMENT BY MR. BRAMBLE           32
CLOSING ARGUMENT BY MS. FOSTER            42
REBUTTAL ARGUMENT BY MR. BRAMBLE          51

INSTRUCTIONS BY THE COURT                 56
CLERK SWORN TO KEEP JURY                  72
VERDICT                                   73
JURY POLLED                               75

EXHIBITS:

    None

2

3                       * * *

4

5           (At 9:16 a.m., convened outside the presence of

6       the jury)

7           THE COURT:  We're in on the record without the

8       jury.

9           First of all, Mr. Bramble, you've rested,

10      obviously.  And Ms. Foster, do you have further testimony?

11          MS. FOSTER:  I do, your Honor.  Before we get

12      started with -- I'm going to recall the detective in this

13      case, your Honor.  But there a couple things I think we need

14      to put on the record.

15          THE COURT:  All right.

16          MS. FOSTER:  Mr. Heath, throughout pendency of

17      these proceedings, has indicated to me a potential rebuttal

18      witness.  He didn't give me the contact --

19          THE COURT:  Rebuttal witness or in your

20      case-in-chief.

21          MS. FOSTER:  I believe it would have been either a

22      case-in-chief or potential rebuttal witness.  The impression

23      I got was it was going to be a potential rebuttal witness to

24      rebut some of the earlier testimony.

25          He never gave me the full name of this individual;

3

1       he mentioned her name in several communication to me.  And

2       I'd like the record to also reflect that this is the only

3       witness by name he ever represented to me as a potential

4       witness.

5           The name he always gave was Sheila or Sheilia.  He

6       had two different spellings for her.  Finally was able to

7       get a full name out of him about this woman on Tuesday.  We

8       contacted the number that he provided; we left a message.

9       She called back yesterday.  She talked to my extern, who has

10      been second chairing me throughout this trial.  This is what

11      he says he told her.  He said that she wouldn't give her

12      full name.  She said that Mr. Heath is a friend of a friend;

13      not even a real friend.  And she indicated the last time she

14      saw him was on the day after Thanksgiving.  Now, I'm not

15      quite sure when Thanksgiving fell last year, but I can pull

16      up my calendar on my phone to find out what day that was.

17          She says that Mr. Heath attempted to break up her

18      marriage by telling her husband that they had slept

19      together.  She said that on 11-29, 2011 she was at home with

20      her husband; had not been in contact with that entire day

21      and has nothing further to add.  And she's not willing to

22      testify.  This is from my extern, from the mouth of the

23      woman who was the one witness I was told about.

24          Now, I know the Court didn't want me to bring this

25      up, but I feel I need to.  I was told by the court staff

4

**Page 5**

1 this morning that my client's mother called and said that I
2 had not contacted any potential defense witnesses. I want
3 the record to reflect right now that the only defense
4 witness I was ever told about by this defendant was this
5 woman, and we contacted her and this was the response we
6 got. There are no other witnesses I'm aware of. There were
7 no other witnesses that were brought to my attention. So,
8 there are no other witnesses I'm going to call, other than
9 the detective, who I'm going to recall in a few minutes when
10 the Court obliges.
11     The only other thing I'd like to bring up, your
12 Honor -- I think we talked about this in chambers -- do you
13 want me to bring this up now or before we --
14         THE COURT: Sure. Go ahead.
15         MS. FOSTER: About the proposed jury instruction
16 5.12. This deals with Mr. Isaacson, who was not present
17 during this trial. I'm asking for the Court to consider
18 reading this proposed jury instruction to the jury:
19         Barry Isaacson is a missing witness whose
20         appearance was the responsibility of the
21         prosecution. You may infer that the witness's
22         testimony would have been unfavorable to the
23         prosecution's case.
24         The reason why we're asking for that is because it
25 is our contention, your Honor, that Mr. Isaacson was here

**Page 6**

1 for the preliminary examination; came here from Illinois;
2 has transportation; was subpoenaed to be here for trial.
3 He's not a witness, he's an actual named victim in this
4 case. There are three counts against my client involving
5 this victim. He basically -- my understanding is -- I don't
6 know, and I think we're going to find out from Detective
7 Swiercz -- but basically I believe the scenario is he just
8 decided he wasn't going to come up here.
9         I believe the jury should be allowed to infer from
10 his absence that he could have been provided testimony that
11 would have been detrimental to the prosecution. I don't
12 think about there's been any evidence of a good-faith effort
13 to get him here.
14         Based on those, we would ask the Court to consider
15 allowing the reading of this jury instruction. Thank you.
16         THE COURT: Ms. Foster, backing up a few minutes.
17 You stated the Court didn't want you to bring something up.
18         MS. FOSTER: No. I think the Court indicated that
19 -- I wanted to address this issue of the mother calling and,
20 you know, based -- I think this is all aftermath of
21 Mr. Heath's testimony; that all of a sudden now it's the old
22 fallback: if things start going south, it's the attorney
23 fault.
24         I was advised this morning by Ms. Petersen of your
25 office that she had gotten a phone call yesterday from my

**Page 7**

1 client's mother, who've never seen throughout this trial;
2 she's never appeared, indicating that I had not contacted
3 any potential witnesses. I wanted the record to reflect
4 that I did contact the one witness that I was familiar with
5 or had been advised of. And there were no other witnesses
6 that were brought to my attention that could have testified
7 in these proceedings.
8         THE COURT: Well, the Court certainly wasn't going
9 to prohibit you from bringing that up. I probably said
10 something like, I didn't see any need to bring it up unless
11 you wanted to bring it up.
12         MS. FOSTER: I wanted to bring it up, your Honor.
13         THE COURT: All right. And then a couple things
14 before I forget. Ms. Foster, any request from you for the
15 Court to summarize your evidence?
16         MS. FOSTER: No.
17         THE COURT: Or to give your theory of the case?
18         MS. FOSTER: We would prefer not to have that
19 happen, your Honor.
20         THE COURT: Or any defenses?
21         MS. FOSTER: No, no defenses. I'll raise that.
22         THE COURT: Okay. And then as to Mr. Isaacson --
23 we got into this Tuesday, I believe -- obviously he's an
24 alleged victim here. He was subpoenaed and chose not to
25 honor that subpoena. He's out of state. Certainly, it was

**Page 8**

1 contemplated that there could be a problem with him, and
2 that's why his testimony was preserved at the preliminary
3 examination under oath. Certainly, I don't think I could
4 legitimately tell the jury that you can infer that his
5 testimony would be unfavorable to the prosecution when we
6 already have him on record under oath giving testimony
7 implicating your client.
8         Mr. Bramble, any input you want to give at this
9 point?
10         MR. BRAMBLE: No, your Honor. You've touched upon
11 my arguments; that we did have sworn testimony under oath of
12 Mr. Isaacson; we did subpoena him; he received a subpoena;
13 we did have phone contact with him. We did about everything
14 we could to get him up here, short of arresting him, but we
15 didn't know where he was. Since we have his testimony under
16 oath, I don't know how we can give an instruction that
17 indicates that you can infer it would be a negative to the
18 prosecution.
19         THE COURT: All right. Mr. Bramble, any request
20 from you to -- or for the Court to give a summary of the
21 evidence or defenses and/or theories of the case?
22         MR. BRAMBLE: I would waive both, your Honor, the
23 Court giving both.
24         THE COURT: And you have requested and I intend to
25 give a lesser of larceny from a person on Count One, unarmed

**Page 9**

1  robbery; that's your understanding?

2  MR. BRAMBLE: Yes, your Honor.

3  THE COURT: And Ms. Foster, any position on that?

4  MS. FOSTER: No objection, your Honor.

5  THE COURT: All right. Anything further on the

6  witness issue or anything else, Ms. Foster?

7  MS. FOSTER: I think my client has something to

8  say. But I have nothing further, your Honor. I'm ready to

9  go.

10  THE COURT: Well, do you want him to say

11  something?

12  MS. FOSTER: Yes. Go ahead. Let him do what he

13  needs to do to get it off his chest.

14  THE DEFENDANT: I want it stated for the record.

15  THE COURT: Go ahead.

16  THE DEFENDANT: Well, I don't have access to law

17  books. Do I have an attorney? I wanted to have --

18  actually, the law library -- the reason the law book, I know

19  my attorney she discussed my case with me, you know, other

20  than appearing for court. Since I've been incarcerated four

21  months, I have not seen her at the jail. My only

22  communication with her is by mail or in the court, and

23  that's very brief.

24  Now I'm here in trial proceedings, and she has not

25  contacted or even asked what witness I have calling first.

**Page 10**

1  I have written approximately four letters to her concerning

2  the same witness with phone numbers, yet she has not

3  contacted them. On February 26th, I was supposed to come

4  and pick a jury. I asked her was she workin' for the

5  prosecutor because she has not done what a lawyer is

6  supposed to do. And she screamed at me saying, "I'm

7  tired of you people sayin' that."

8  I asked because my daughter been tryin' to make

9  contact with her, as well as her cousin, with -- you know,

10  any attorney should have went up on their own self and seen

11  from the police report and contacted the witness; see what

12  they had to say on their own without me having to say

13  anything.

14  My sister has called. I don't know who else has

15  called and left messages. I understand that they don't do

16  callbacks, or whatever, but, I mean, try to find somethin'.

17  I want this -- I want this to reflect on the court

18  records that I have -- am challenging the reasonableness of

19  my counselor's conduct, professional judgment due to her

20  acts and omissions being outside the range of professional,

21  competent assistance at being effective, effectiveness. I

22  seen from Ms. Foster -- the only effectiveness I've seen

23  from Ms. Foster is her asking you for a directed verdict.

24  That's the only thing I've seen positive from this case

25  concerning me.

**Page 11**

1  Are you  tin' all that? I'm not talkin' too

2  fast, am I?

3  I don't know what's going on, but it's clear to me

4  something's not right in this courtroom. You know, I gotta

5  speak my peace as a man. I want to know who -- who, other

6  than me, is required by law to make sure I have a fair

7  trial. That's the question. Then I got two more

8  paragraphs, and I'm done.

9  Other than me, who else is required by law to make

10  sure I have a fair trial?

11  THE COURT: Well, everybody; both attorneys and

12  the Court have that responsibility.

13  THE DEFENDANT: Court officers -- Court officers,

14  a prosecutor is a court officer, too. These officers here

15  are -- are they subject under the same restraints, I mean,

16  to have a fair trial? They wrote the police report and

17  everything.

18  THE COURT: They're required to testify

19  truthfully.

20  THE DEFENDANT: Okay. All right. I just got two

21  more paragraphs and I'm done.

22  I don't want to wait two years to have this goin'

23  before no Court of Appeals to remand or overturn my case

24  when it can be rightfully did at this level here. My due

25  process rights are being violated by this Court and opposing

**Page 12**

1  attorney. And with all due respect, your Honor, I must

2  express the same way with you because she filed for a

3  directed verdict, it should have been -- it should have been

4  -- it should have been granted. I mean, here you got a guy

5  that's gonna testify and he can't come and testify? How can

6  you call somebody? How can you bring that before the jury?

7  And you're goin' off his testimony, and that's it.

8  I told her way, way back at the beginning that

9  this guy wasn't gonna show up. He's datin' this woman that

10  we talkin' about. And I didn't bring her about because

11  she's married. And I knew she was going to be a rebuttal

12  witness. And I told her I wouldn't bring her unless I

13  really, really have to. But, see, I have to. I didn't want

14  to involve her. It wasn't necessary. This case should have

15  been threw out.

16  I further asked this Court to postpone my trial

17  for approximately three weeks so I get these monies together

18  and hire an attorney. I didn't want to spend the money cuz

19  it could have been threw out, as far as I was concerned. I

20  could have went with a state-appointed attorney.

21  I already discussed this matter with -- with my

22  family, and this is a done deal so...

23  THE COURT: All right. Thank you, Ms. Foster, any

24  comments?

25  MS. FOSTER: Your Honor, I've represented

**Page 13**

1  Mr. Heath since his aggravated stalking charge. I believe
2  it was last late summer. He was out on bond on that charge
3  when these two allegations arose. He's been in custody
4  since -- I believe it's been since the early part of --
5  late part of November of last year.
6      I have -- every motion he's asked me to bring,
7  I've brought to this Court; a motion to reduce bond; a
8  motion to -- against the Court to sever these cases.
9      I believe I've been an effective attorney. I
10 believe I've cross-examined every witness effectively. I
11 believe I cross-examined the missing witness effectively at
12 the preliminary examination.
13     I've been doing this, Judge, for 21 years. I've
14 been trying cases for 21 years. This is the first time I've
15 had a client who has an epiphany late in the trial and now
16 wants to blame the lawyer for what he perceives as
17 everything going wrong. I didn't tell Mr. Heath what to say
18 when he took the stand on Tuesday. I didn't coach him.
19 He's 51 years of age; he knows how to answer questions on
20 his own.
21     This case is what it is, your Honor. I've done
22 everything I was supposed to. I've done everything with
23 everything that I had with every resource I had available to
24 me to try this case. And Mr. Heath just indicated in his
25 little statement to you, other than this lady that he kept

**Page 14**

1  mentioning, there were no other witnesses. He wanted me to
2  contact a daughter, he wanted to con -- I never got that
3  from him about contacting his daughter, contacting his
4  cousin. I never got a name from him, except this Sheila
5  woman. And I never got a last name from him until two days
6  ago.
7      I have kept in really good contact with him. I've
8  written -- I've responded to practically every letter he's
9  ever written me. But the reality is, your Honor, this man's
10 mind was made up from the day he picked up the aggravated
11 stalking case. We ran that preliminary examination. That
12 case was bound over. He didn't do that either.
13     When this case came about, he wanted to run the
14 prelim. I had to convince him not to take testimony of the
15 second -- the first guy because I was confident that, once
16 all the evidence was brought to light, that Mr. Heath would
17 have his epiphany. He never did. That's not my problem.
18     We're here today because Mr. Heath indicated he
19 wished to have his constitutional right to a trial by a
20 jury. That's the reason why we're here, your Honor. I
21 believe -- question -- tell me if I'm wrong; that I've done
22 everything I'm duty bound to do as his counselor.
23 That's all I have to say.
24     THE COURT: All right.
25     MS. FOSTER: Oh, one other thing. I didn't yell

**Page 15**

1  at him. I did rais -- / voice because, frankly, I get a
2  little offended when people say to me that I'm working for
3  the prosecution. I do not work for the prosecution.
4      THE DEFENDANT: You said it's your first case;
5  that nobody ever did this before. So why would you say that
6  if nobody ever said this to you?
7      MS. FOSTER: Did what before?
8      THE DEFENDANT: Accuse you of working for the
9  prosecutor.
10     MS. FOSTER: No, no, no, no. I never said that.
11 I said I don't like it when clients say to me, "You're
12 workin' for the prosecution."
13     THE DEFENDANT: You said, "you people." We don't
14 need to --
15     MS. FOSTER: You know what, Mr. Heath? I'm not
16 going to argue with you.
17     THE COURT: Well -- well, enough said from both of
18 you. I'll just -- Mr. Heath, I'll just state for the
19 record --
20     MS. FOSTER: It's not my fault you're here, your
21 man, it's your own.
22     THE COURT: -- Ms. Foster has, I think, been
23 trying cases here in Kent County for close to 20 years.
24     MS. FOSTER: Yes, sir.
25     THE COURT: Very experienced, very effective, very

**Page 16**

1  confident. You're not going to get a better attorney than
2  Ms. Foster. You may be disappointed with how things have
3  gone. That's not unusual. You're on trial, you're facing
4  serious charges. So, defendants are sometimes or oftentimes
5  upset. You're in a tough position; you're facing serious
6  charges. But that's why we have jury trials.
7      You have a very effective attorney. I'm sure
8  she'll make a very effective closing argument. All of us,
9  the Court, the prosecution, your defense attorney, are doing
10 the best job possible to give you a fair trial. I'm
11 confident that the witnesses are taking their oath seriously
12 when they testify.
13     So, enough said on that. I'll bring the jury in.
14     (At 9:30 a.m., jury resumes seats)
15     THE COURT: Be seated. Good morning.
16 Ms. Foster, any further witnesses?
17     MS. FOSTER: Yes. The defense would like to
18 re-call Detective Swiercz, please.
19     THE COURT: All right. You may take the stand.
20 You're still under oath.
21         PHILIP SWIERCZ,
22 re-called by the Defense at 9:36 a.m., previously sworn by
23 the Court, testified:
24
25

**Page 17**

BY MS. FOSTER:

3  Q.  How are you?

4  A.  Good.

5  Q.  Obviously you were here throughout the entire proceedings,

6      entire trial proceedings; correct?

7  A.  Correct.

8  Q.  And I want to take you back to your -- were you the

9      individual who interviewed Mr. Isaacson and Mr. Gray about

10     these incidences, or were they done by the officers at the

11     scene?

12 A.  Well, an officer for -- initial officer, report officer

13     interviewed them both, the initial, and then I did a

14     secondary interview.

15 Q.  And I want to focus on Mr. Isaacson. You obviously

16     questioned him about or had an interview with him about what

17     transpired on the 29th of November; correct?

18 A.  I did. It was a phone, phone interview.

19 Q.  Because he's from out-of-state?

20 A.  Correct.

21 Q.  Did he tell you where he was from?

22 A.  Illinois.

23 Q.  Okay. And did he -- during your course of your phone

24     conversation, did you -- did he give you some information

25     that didn't quite jibe with what you believed happened to

**Page 18**

1      him?

2  A.  Well, I -- yeah, because I knew of the prior incident

3      already, too.

4  Q.  Okay. What information did he provide that didn't quite

5      jibe with what you believed happened?

6  A.  A, I already knew what happened on the 14th.

7  Q.  Okay.

8  A.  And then B, is it -- just, you know, you pull in there for

9      directions and -- you know, just my -- as an officer for 11

10     years, my gut instinct was telling me something wasn't right

11     here.

12 Q.  And after pressing him, he came clean and indicated he was

13     going for adult services; is that a fair statement?

14 A.  Fair statement.

15 Q.  Okay. Now, when we were here on Tuesday and when my client

16     was on the stand, during his testimony he made a reference

17     to the fact that Mr. Isaacson wasn't here for trial.

18 A.  He did.

19 Q.  Do you remember that?

20 A.  I do.

21 Q.  And I believe Mr. Bramble's response was, "Ask your lawyer."

22 A.  Is what?

23 Q.  "Ask your lawyer."

24 A.  Okay.

25 Q.  I don't know if you remember that.

**Page 19**

1  A.  Yep.

2  Q.  Why did Mr. Isaacson not appear in trial, as far as you

3      know?

4  A.  As far as I know, just from my past conversation with him,

5      he's a high-end businessman and he's busy. He says a busy

6      schedule. He had made the comment that, "I already gave you

7      my sworn testimony under oath, and if I can make it, I'll

8      make it."

9  Q.  Now, isn't it the prosecution's responsibility to subpoena

10     witnesses for trial?

11 A.  It is.

12 Q.  And obviously if it's their responsibility to subpoena

13     witnesses, it's their responsibility to subpoena victims; is

14     that correct? Because victims are witnesses, but they're

15     also the victims; right?

16 A.  Yep.

17 Q.  He's not just a witness, he's an actual victim; is that a

18     fair statement?

19 A.  Yes.

20 Q.  Was this gentleman subpoenaed?

21 A.  Yes.

22 Q.  By mail or in person?

23 A.  I believe it was mail. I did not hand deliver a subpoena to

24     him.

25 Q.  But, to your knowledge, he was subpoenaed?

**Page 20**

1  A.  Correct.

2  Q.  Did he answer that subpoena?

3  A.  To me directly? No.

4  Q.  Okay. What was, what -- how were you made aware of his

5      decision not to show? Was it communicated to you by

6      somebody else?

7  A.  The day -- the court personnel here in victim witness.

8  Q.  And you were told somehow that he was not going to -- he

9      just wasn't going to show?

10 A.  That he wasn't -- that he couldn't make it. Yeah.

11 Q.  Okay. Generally speaking, when a person don't show -- when

12     somebody doesn't honor a subpoena, what do you usually do to

13     get that person to come to court?

14 A.  I've never had it happen.

15 Q.  You've never had that happen?

16 A.  No.

17 Q.  You've never had to send out a -- pick up a person on a

18     material witness warrant?

19 A.  I have not personally.

20 Q.  Can you explain to this jury what a material witness warrant

21     is?

22 A.  My understanding is, if they fail to show, the judge will

23     authorize a warrant to have them come.

24 Q.  And does that also entail a deputy or a police officer or,

25     some law enforcement official going to the person's home and

**Page 21**

1     actually physically taking them into custody to have them

2     appear in court?

3 A.   Yes.

4 Q.   Was that done with Mr. Isaacson?

5 A.   To my knowledge, no.

6 Q.   Okay. I know you said Mr. Isaacson is an important

7     businessman and travels. Did you always have a contact

8     address and phone number for him?

9 A.   Yeah, yep.

10 Q.   Okay. And like you indicated he lives in the State of

11     Illinois, which isn't like the State of Texas. It's not

12     that, that far away; is that a fair statement?

13 A.   Yeah, fair. I mean, it could be four hours or two hours,

14     depending where he lives in the state.

15 Q.   Right. But it's not out of the realm of possibility that he

16     could have been retrieved from his location and brought here

17     to testify; isn't that a fair statement?

18 A.   I guess. I'm not sure of the procedure of retrieving

19     somebody from out of state; how they would go about that.

20 Q.   Okay. You've never had to deal with extraditing individuals

21     from other states?

22 A.   I have not.

23 Q.   Okay. But, in any event, his not being here has absolutely

24     nothing to do with the defense; is that a fair statement to

25     your knowledge?

**Page 22**

1 A.   Yes.

2     MS. FOSTER: I have nothing further. Thank you.

3     THE COURT: Mr. Bramble.

4     MR. BRAMBLE: Thank you.

5               **CROSS-EXAMINATION**

6 BY MR. BRAMBLE:

7 Q.   Briefly here. You're aware that Mr. Isaacson is a traveling

8     businessman?

9 A.   Correct.

10 Q.   Do you have any idea where he is right now; whether he's

11     even in the State of Illinois?

12 A.   I do not.

13 Q.   Or where he may be traveling?

14 A.   I do not.

15 Q.   And your understanding was the reason we preserved his

16     testimony at the preliminary examination on December 14 in

17     the City of Wyoming was in case he didn't show up for trial?

18 A.   Correct. Given his profession.

19 Q.   Now, I have a question. I want to ask you a couple things

20     here. Do you remember the defendant indicating during his

21     testimony that he felt the only reason he could have been

22     identified was because you showed him a photograph of the

23     defendant prior to him viewing that physical lineup?

24     MS. FOSTER: Your Honor, I would object. I

25     believe this goes outside of the scope of direct.

**Page 23**

1     MR. BRAMBLE: This is their case-in-chief and I

2     don't think it matters. I can ask him any question.

3     THE COURT: Overruled. Go ahead.

4     MR. BRAMBLE: Thank you.

5 BY MR. BRAMBLE:

6 Q.   Do you remember him saying that?

7 A.   I recall that.

8 Q.   I shouldn't have to ask you this, but I'm going to. Did you

9     show him a photograph of the defendant prior to him viewing

10     the physical lineup that's set forth in Exhibit 4?

11 A.   I did not.

12 Q.   And can you tell this jury, were you aware, as the defendant

13     indicated, that there were other people maybe out there

14     impersonating police officers?

15 A.   Yes.

16 Q.   All right. At this time -- during this time period?

17 A.   Yes.

18 Q.   Or around there?

19 A.   Around.

20 Q.   My understanding is that one of them was a female?

21 A.   Correct.

22 Q.   And that originated out of the Grandville Police Department?

23 A.   Correct.

24 Q.   So, we know one was a female. The other was a male?

25 A.   Correct.

**Page 24**

1 Q.   By my understanding is his -- the description of that

2     individual didn't come close to matching this defendant; is

3     that accurate?

4 A.   Yes.

5 Q.   The other person -- male person -- was 6'3" and over

6     200 pounds?

7 A.   Correct. Described as a large belly.

8 Q.   With a large belly and a white streak in his hair?

9 A.   Correct.

10 Q.   Remarkably different than the defendant?

11 A.   Yes.

12 Q.   Can you clarify for this jury how close the Swiss Valley

13     Apartments are to the apartment complex where the defendant

14     was apprehended?

15 A.   They're -- I would say they're kitty-corner across the

16     street from each other. If you're standing in the parking

17     lot of the Swiss Valley Apartments, you can see Prairie

18     Parkway from where the defendant lives.

19 Q.   Thank you.

20     MR. BRAMBLE: I have nothing further.

21     THE COURT: Ms. Foster, any further questions?

22     MS. FOSTER: No, your Honor.

23     THE COURT: You may step down. Thank you.

24     (At 9:45 a.m., witness stepped down)

25     MS. FOSTER: Defense rests, your Honor.

**Page 25**

```
1              (Defense rests)
2       THE COURT:  Mr. Bramble, any rebuttal?
3       MR. BRAMBLE:  Can I just have a moment, your
4  Honor?
5       THE COURT:  Sure.
6       MR. BRAMBLE:  I'll call Officer VerHage.
7       THE COURT:  You may be seated.  You're still under
8  oath.
9              DONALD VERHAGE,
10 re-called by the People at 9:45 a.m., previously sworn by
11 the Court, testified:
12             DIRECT EXAMINATION
13 BY MR. BRAMBLE:
14 Q.  Did you have discussions with Barry Isaacson after this
15     incident occurred?
16 A.  I did.
17 Q.  And you heard -- you were present when the defendant
18     testified?
19 A.  Yes, I was.
20 Q.  You heard him testify that he won some money in a casino;
21     correct?
22 A.  I did.
23 Q.  All right.  Did you speak to Mr. Isaacson about the
24     denominations that he had removed from him by the defendant?
25 A.  Yes.
```

**Page 26**

```
1  Q.  When the money was seized from the defendant, there were
2      three $100 bills as noted on Exhibit 9?
3  A.  Yes.
4  Q.  What significance is that, the three $100 bills to you in
5      this investigation?
6  A.  When I took the original report from Mr. Isaacson, he had
7      reported that he was missing approximately $470.  That was
8      his estimate.  He stated to me he knew he had more than
9      $450, but knew that he had less than $500.  The reason he
10     knew this is he was recently at the bank -- stating he was
11     at the bank because of the business trip he was on.  He also
12     indicated that he knew he specifically had three $100 bills,
13     just getting those from the bank before that business trip.
14          He was unaware of the exact denominations of the
15     remaining, whether it was, again, 470, somewhere between
16     that 450 and 500.  But he knew specifically three $100 bills
17     and estimated the rest to be twenties, tens and fives.
18     MR. BRAMBLE:  Nothing further, your Honor.
19     THE COURT:  Ms. Foster.
20             CROSS-EXAMINATION
21 BY MS. FOSTER:
22 Q.  Good morning, sir.
23 A.  Good morning.
24 Q.  Did you have any of the bills analyzed for fingerprints?
25 A.  I did not, no.
```

**Page 27**

```
1  Q.  Okay.  Did you have any evidence to present that
2      Mr. Heath did not go to the casino the night before this
3      alleged incident?
4  A.  I cannot prove or disprove that Mr. Heath was at the casino.
5      No.
6  Q.  And other than Mr. Isaacson's say so, you have no other
7      independent evidence tying this money to Mr. Isaacson that
8      was found on Mr. Heath; is that a fair statement?
9  A.  That is.
10     MS. FOSTER:  Nothing further, your Honor.
11     MR. BRAMBLE:  Nothing further, your Honor.
12     THE COURT:  You may step down.
13     (At 9:48 a.m., witness stepped down)
14     MR. BRAMBLE:  At this time I would recall Officer
15 Ferguson.
16     THE COURT:  You may be seated.  You're still under
17 oath.
18             DENNIS FERGUSON,
19 re-called by the People at 9:48 a.m., previously sworn by
20 the Court,
21             DIRECT EXAMINATION
22 BY MR. BRAMBLE:
23 Q.  Officer, you took a statement from the defendant?
24 A.  Yes.
25 Q.  Did he ever mention in that statement that he had been at
```

**Page 28**

```
1      the casino and that's why he had this $497?
2  A.  I don't recall him saying that at all.
3  Q.  I shouldn't have to ask you this, but you heard him testify
4      yesterday or Tuesday; correct?
5  A.  Yes.
6  Q.  Did you hear him state that you intentionally omitted things
7      from your report?
8  A.  I heard him say that.  Yes.
9  Q.  Okay.  Did you do so?
10 A.  No.
11 Q.  Anything that you thought was of merit or of substance, you
12     put in that report?
13 A.  Yes.
14 Q.  Thank you.
15     MR. BRAMBLE:  I have nothing further.
16     THE COURT:  Ms. Foster.
17             CROSS-EXAMINATION
18 BY MS. FOSTER:
19 Q.  Good morning, Officer.
20 A.  Good morning.
21 Q.  My client indicated that when you first approached him, he
22     said to you something along the lines of "is this some
23     racist something or other," making a reference to him being
24     arrested or being accosted because of his race.  Do you
25     remember that interaction with Mr. Heath?
```

**Page 29**

1  A.  I don't remember him or I saying any' 'ng like that. I
2     remember him exiting the apartment. _ visually looked at
3     him and said, "Wow, he looks like the person I'm looking
4     for" with different clothing on. I took him into custody.
5     I asked him his name. He said, "Kelvin Heath." We were
6     going to look for a Kelvin Heath. I said, "I'm going to put
7     you in cuffs for my safety until we get everything sorted
8     out."
9          He was near the wall. He was not happy about
10    things, but he was sort of compliant with putting his hand
11    behind his back. He was tense about it, though. And at
12    this point I saw handful of other individuals in the
13    apartment, kind of milling towards the door and wondering
14    what's going on because they had no idea the police were
15    there. Then that's when I had more officers come to the
16    back to see -- to help secure the scene, as we do.
17 Q.  Just out of curiosity, can you tell me how many other
18    individuals you saw, if you remember? Was it more than two?
19 A.  Yes.
20 Q.  Was it more than five?
21 A.  I don't remember. I'd say three, four, five.
22 Q.  So, between two and five -- between three and five?
23 A.  In the realm of things, yeah. But I was more focused on
24    Mr. Heath in securing him.
25 Q.  Understandable. These individuals, were they all male?

**Page 30**

1  A.  That I remember seeing, yes.
2  Q.  African-American?
3  A.  That I saw, yes.
4  Q.  Okay. You didn't see any women?
5  A.  I did not see any women.
6  Q.  You didn't speak to Mr. Heath's mother; correct?
7  A.  I did not.
8  Q.  And you didn't see any individuals of any other race; no
9     white guy, no Hispanic guy, no Asian guy, nothing?
10 A.  Not that I recall, no.
11 Q.  Do you remember the general age of these guys? Or -- did
12    any of them appear to be older or elderly?
13 A.  What's elderly? No. I don't --
14 Q.  Elderly is relative. Let's say over --
15 A.  They all appeared in their twenties, if I had to guess. But
16    Mr. Heath looks younger than 50, too. So, sometimes
17    appearance isn't always indicative.
18 Q.  I know they say "black don't crack." Anyway, they were
19    under 50, over 20 maybe; between 20 and 50?
20 A.  I didn't get a good enough look at them to give a definite
21    age. But they just --
22 Q.  Okay. Did any of them look similar to Mr. Heath? In other
23    words, could they have been a brother or a cousin?
24 A.  The closest I got to them was -- was five to ten feet. And
25    like I said, I was more focused on securing Mr. Heath. Once

**Page 31**

1     I had him sec_____' Officer DeBoer came around and some
2     others came around. I believe Officer VerHage came around.
3     I'm not sure. But then they were able to talk to them and
4     make sure the scene was secure.
5          But my main focus wasn't them, it was for my
6     safety in securing Mr. Heath.
7  Q.  Understandable. Is it true, though, some other individuals
8     from that residence were arrested on other various bench
9     warrants; is that a correct statement?
10 A.  I don't know that.
11 Q.  Okay.
12 A.  I dealt with Mr. Heath; put him in his cruiser; did what I
13    did, and I focused on him.
14 Q.  You were the one who transported him to the county jail;
15    correct?
16 A.  Yes.
17 Q.  And he was alone?
18 A.  Yes.
19 Q.  Okay. But you don't know whatever happened to these other
20    individuals?
21 A.  I don't know.
22 Q.  And you won't refute that some of the others may have been
23    arrested on other existing bench warrants or other issues?
24 A.  May have been. I don't know that.
25         MS. FOSTER: Nothing further. Thank you.

**Page 32**

1          MR. BRAMBLE: Nothing further, your Honor.
2          THE COURT: Thank you. You may step down.
3          (At 9:52 a.m., witness stepped down)
4          MR. BRAMBLE: At this time, the State would rest
5     again, your Honor.
6          (At 9:52 a.m., the State rests)
7          THE COURT: Ms. Foster, any sur-rebuttal?
8          MS. FOSTER: No.
9          THE COURT: Mr. Bramble, your closing argument.
10         MR. BRAMBLE: Ladies and gentlemen of the jury, as
11    Judge Buth indicated, this is my opportunity to provide you
12    with closing argument. It's different than the opening
13    statement in that here I'm going to actually argue how the
14    law -- how the facts that have come forward from the witness
15    stand, as well as the exhibits, apply to the elements of the
16    offenses that the Judge will instruct you on in a few
17    moments.
18         I'm not going to go through the elements of the
19    offenses like I normally do. I'm going to touch upon a
20    couple of them. The Judge is going to give you that in a
21    written form -- and you'll be able to see that in front of
22    you -- and also apply the facts to that law. But I want to
23    touch upon a couple things before I go into actually what
24    the facts are.
25         One is I had this happen last week when I was

1  trying a case. You heard reference to police reports.

2  Usually what jurors do is, when they get to deliberate,

3  they will say, "We want to see the police reports." Well,

4  they're not admissible and they can't come into evidence.

5  So, you can't have them and I want to clarify that right

6  now. Again, last week I had a jury request the police

7  reports, and we have to tell them they can't have them. The

8  transcripts are another issue, and the Judge will deal with

9  you on that.

10       I'd like to start off with a couple things here

11  and it's the question I posed to the defendant. How is it

12  that two men who don't know one another, who live in

13  different states, more than two weeks apart, November 14 to

14  November 29, come in and tell you really an identical story

15  of what -- an identical set of facts as to what occurred on

16  those respective days, November 14 and November 29? They

17  mirror one another entirely.

18       If you remember when I asked Mr. Gray, Brian Gray,

19  "Well, do you know this Barry Isaacson?" He looked at me

20  strange and he said, "I've never heard the name. I don't

21  know who he is." These two individuals don't know each

22  other, and yet we know they tell an identical -- almost to

23  the "T" -- statement of facts as to what occurred on the

24  respective dates of November 14 and November 29 and both of

25  them identify the defendant.

**33**

1  because he also got rid of the shirt he's wearing

2  underneath, the blue shirt.

3       I'd like to just cover a few sets of -- a little

4  bit of the facts here that came out here through Brian Gray.

5  Brian Gray indicated that he works for Hope Network. That

6  on November 14 of 2011, he responded to this ad on

7  backpage.com. This ad was for adult services. Let's not

8  mince any words here. That's what both he and Mr. Isaacson

9  were going there for. I'm not going to deny that for a

10  minute. That's why they were there. Mr. Isaacson admitted

11  that at the preliminary examination in the sworn statement

12  under oath that you heard. They're there for that. What a

13  perfect way to set somebody up. Lord knows how many times

14  the defendant was able to do this because most people aren't

15  going to come in. If they are that embarrassed, as Mr. Gray

16  was, as Mr. Isaacson was, so embarrassed they didn't want to

17  say why they were there, how many other people could this

18  have possibly happened to who didn't report it to the

19  police?

20       Brian Gray shows up, and he's there for adult

21  services. He has $300 in his pocket. He calls the number

22  and this person from that number texts back. And I submit

23  to you, ladies and gentlemen of the jury, there's a reason

24  why there was texting done back and forth. That's because

25  if the defendant calls back on the phone, then Brian Gray

**35**

1  We know Barry Isaacson actually follows him after

2  this occurs, follows in his car; takes a picture of him.

3  That's been admitted into evidence. We also know that Brian

4  Gray is brought down to the Kent County jail; views a

5  physical lineup that's set forth in Exhibit 4; has no

6  problems picking the defendant out as the individual who

7  assaulted him, turned him around and took his money.

8       We know that the defendant was followed at the

9  scene by Barry Isaacson. And he had no problem identifying

10  him as the one who assaulted him and took his money. More

11  importantly or just as importantly, where is the defendant

12  leaving or trying to leave that apartment where they

13  eventually arrive? It's really basically across the road

14  from where these incidences took place. He's trying to

15  leave out the back door, the back slider. The police have

16  started to surround the place, and they catch him.

17       I think it's also important to note, ladies and

18  gentlemen of the jury, that you have a picture in Exhibit 2

19  that shows the defendant wearing that blue Polo shirt.

20  During this short period of time that the defendant, between

21  this incident that occurred with Barry Isaacson and the time

22  that the police apprehend him -- and there isn't a great

23  deal of time -- the defendant has managed to get rid of the

24  shirt he was wearing, both shirts; the one that said police

25  on it. He knows that he's in a little bit of trouble here

**34**

1  would know he's dealing with a male and not the female, who

2  he thought he was dealing with, from the ad. But texting is

3  used here. And the defendant texts him back; they arrange

4  for a place to meet; it's there at the Swiss Valley

5  Apartments, and the apartment is D1. Brian Gray goes there,

6  gets to the apartment, and right when he gets to the

7  apartment, this black male -- the defendant -- shows up and

8  spins him around. I submit to you, ladies and gentlemen of

9  the jury, that when he grabs him and puts him up against the

10  wall, that is enough for the assault and the unarmed

11  robbery, and it's also the restraint that is required for

12  the unlawful imprisonment. That restraint alone is enough.

13  But you have him spinning him around, placing him around,

14  patting him down, telling him that, "Oh, you're a suspect in

15  a string of assaults in this area" telling him that "This is

16  a sting operation; give me some identification." Brian Gray

17  pulls out his identification. It happens to be in his

18  wallet. It happens to contain $300; that he's there to pay

19  for this adult service.

20       The defendant takes his wallet, removes the money,

21  gives him the wallet back and says something along the line

22  that "There will be other cars coming here for you" or "You

23  don't match the description" and immediately leaves.

24       Brian Gray immediately gets back in his car and

25  leaves or starts to leave. He tells you later he receives a

**36**

**37**

1  call from a male caller saying that a citat---n will be sent
2  to him, or something along the those linc.. I think, again,
3  this is all part of the ruse. What does Brian Gray tell
4  you? He tells you that when the police call him and ask him
5  to come out to the jail, he's certain he'll be able to
6  identify the defendant. And in this lineup that you can see
7  where there are six people. The defendant is number five,
8  and the defendant is picked out of that lineup and
9  positively identified by Brian Gray.
10       Barry Isaacson, through that sworn testimony under
11  oath, told you he was in town for business; that he called
12  this number for an adult service. We know that the
13  defendant's phone is being used here because the police
14  later match up -- which is, I believe, and I submit is good
15  police work here -- match up the phone numbers. And it
16  shows that the defendant and Barry Isaacson have been
17  corresponding.
18       Barry Isaacson goes there and after this texting
19  back and forth he is directed to an apartment, just as Brian
20  Gray was. He's directed there, and what happens when he
21  gets there? The defendant immediately confronts him, spins
22  him around and restrains him, and asks him for some
23  identification. When Barry Isaacson pulls out the -- his
24  money clip that contains his identification, the defendant
25  removes almost $500, he believes, from him.

**38**

1       Barry Isaacson at that point is then face-to-face
2  with the defendant. He's saying, "I want to see some
3  identification. I want you to show me that you're a police
4  officer." He is face-to-face with the defendant at this
5  point. The defendant responds with some language that, "Oh,
6  there will be other cars here. You don't match the
7  description" just as he did with Brian Gray. They're
8  face-to-face here.
9       The defendant then exits and Barry Isaacson
10  follows him. So they go out and they get into their
11  respective vehicles and Barry Isaacson follows him. You'll
12  see that, when the defendant spun around, Barry Isaacson was
13  smart enough to photograph him on that phone. We know it's
14  the phone that was corresponding between he and Barry
15  Isaacson, the defendant and Barry Isaacson. He snaps that
16  photograph of him in the car in this black vehicle.
17       Well, we know from the police that the police are
18  able to -- through that phone number that's obtained -- find
19  out where that phone is; where it's pinging off certain
20  towers as it's being used. They narrow it down to
21  833 Prairie View [sic]. They go there and they've received
22  information from Barry Isaacson that there are two zeros and
23  a BDR on this license plate. They find this car that has
24  those numbers and letters on the license plate. It is a
25  black four-door, just as described by Barry Isaacson.

**39**

1       They go---- to the apartment. As they begin to
2  surround the apartment, the defendant is exiting out the
3  back rear slider. He has removed the shirt he was wearing.
4  We then hear testimony from Officer Ferguson indicating the
5  defendant's ever evolving story.
6       First he says, by his own testimony under oath, he
7  lied. What is the first thing he says? "I was never in the
8  Swiss Valley Apartments. Never there. I don't know what
9  you're talking about." That statement later evolves to,
10  "Yes, I was there. Yes, I was -- I just pulled in and
11  turned out." The statement evolves further where he goes on
12  to state that, "Yes, I was there and I just had a
13  conversation with a man. He just told me -- called me a
14  mother-fucker, and then he decided to ask me for
15  directions." I ask you, ladies and gentlemen, just as
16  Officer Ferguson asked him, "Well, this doesn't make sense.
17  A person swears at you, then asks for directions" and the
18  defendant didn't have a response for that.
19       I submit to you, ladies and gentlemen, the
20  defendant's ever evolving story here is an attempt to cover
21  up his tracks and attempt to put a spin on this. I submit
22  to you, ladies and gentlemen of the jury, when he attempted
23  to put a spin on this when he testified here on Tuesday. By
24  that I mean he has been able to sit through all the
25  testimony; hear all the evidence; have access to the police

**40**

1  reports and come up with a story that kind of weaves through
2  and meshes with the evidence to explain away everything.
3       Well, what do we know? We know that Mr. Isaacson
4  said, "Look, I had close to $500 stolen from me and three of
5  them were $100 bills," or at least three denominations were
6  hundred dollars bills. What does the defendant have on him
7  when he's apprehended? Well, he has the two cell phones,
8  the one which was used to contact Mr. Isaacson, and he has
9  $497 in his pocket and $300 of that is in $100 bills. The
10  shirt that he was wearing when he assaults Mr. Isaacson is
11  found in that apartment.
12       So you have, not only direct evidence of people
13  identifying -- two people positively identifying the
14  defendant as the one who assaulted them and removed their
15  money from them, but you also have circumstantial evidence
16  in the phones and in the back and forth from the phones; the
17  dispatch -- the texting that went back and forth
18       You have the shirt, you have the phones, and you
19  have two people positively identifying him. I submit to
20  you, ladies and gentlemen of the jury, on some level this is
21  a creative scheme of the defendant's. You can set someone
22  up by putting an ad in, knowing they're going to come there,
23  knowing they're not going to want the police involved, and
24  boost or take their money from them without any problem.
25  That's what the defendant thought he could do here.

**41**

1 The defendant testified that, "C" there was this
2 other person, this woman -- and I don't want to -- I'll
3 make it real clear that I have the burden here -- but when
4 defendant tells you, "Geez, this is this other woman, this
5 Sheila, whose real name is such-and-such," we didn't hear
6 from her. I submit to you it's because either she doesn't
7 exist or, if she does exist, she had nothing to do with
8 this, this business associate the defendant claimed.
9 So, ladies and gentlemen of the jury, when you
10 begin to pull all this together and you look at the direct
11 evidence, two people positively identifying the defendant as
12 the individual who assaulted them and removed their money
13 from them under this guise that they were going there for
14 adult services; when you look at the circumstantial evidence
15 of the phones; the back and forth between -- on those phones
16 -- between Mr. Isaacson and the defendant, when you look at
17 the fact the defendant removed the shirt he was wearing when
18 he was photographed by Mr. Isaacson, it all begins to add up
19 here ladies and gentlemen of the jury.
20 The facts here indicate the defendant is guilty of
21 the charges set forth in the complaint and information; that
22 he did, in fact, rob these two individuals of their money by
23 assaulting them; that he did, in fact, restrain these
24 individuals; unlawfully restrained them because he had no
25 authority to do so; and, third, he was impersonating a

**42**

1 police officer when he did all these acts.
2 The facts indicate he's guilty. Again, on behalf
3 of the People of the State of Michigan, I ask that your
4 verdict reflect that.
5 THE COURT: Ms. Foster.
6 MS. FOSTER: Thank you, your Honor.
7 Good morning, ladies and gentlemen.
8 THE JURY: Good morning (collectively).
9 MS. FOSTER: Because the prosecution has the
10 burden, this is my only opportunity to talk to you. In
11 other words, the defense -- I don't know if -- I think most
12 of you indicated you don't watch *Law & Order* or watch *CSI*.
13 I don't know how many of you indicated or if you were even
14 asked if you watch *Law & Order*.
15 Let's assume, for the sake of assuming, that some
16 of you have watched *Law & Order*. You notice, if you ever
17 watch the original *Law & Order* -- which it has to be one of
18 my favorite -- the first half-hour is devoted to the police
19 investigation and second half-hour is the prosecution and
20 defense grilling individuals on the stand. Then toward the
21 end of the episode you have a defense attorney -- the
22 prosecution making a pitch and then you have a defense
23 attorney making a pitch, and then you have a jury standing
24 up and rendering a verdict. Well, it doesn't happen that
25 way in real life. In real life the prosecution, since he

**43**

1 has the burden, is going to have the last say. So, this
2 is my only opportunity, since the voir dire, for me to talk
3 to each and every one of you directly. The only thing I ask
4 of you folks is to please listen to what I have to say and
5 consider our version of events.
6 This case, ladies and gentlemen, is simple but
7 strange, if you think about it. I'm sure many of you have
8 never heard of a scenario that was quite like the one that
9 was described in this trial. I have to admit, in over 20
10 years of practice, I've never had to do what I characterize
11 as a dramatic reading of someone else' testimony -- I've
12 played myself -- a dramatic reading of an earlier court
13 proceeding. Again, about the laughing, I'm sorry. I didn't
14 expect that to happen. It wasn't done -- I don't want it to
15 be taken out of context. I consider this case very, very
16 serious, and I consider what I do very serious.
17 Seriously, folks, the prosecution, at the end of
18 the day, has to prove beyond a reasonable doubt that my
19 client, Kelvin Heath, concocted a rather clever scheme, in
20 fact, creative scheme -- Mr. Bramble characterized it as
21 creative -- a creative scheme in putting a fake ad for a
22 massage on backpage.com -- which I'm sure most of you hadn't
23 even heard of before this trial -- of real pictures of real
24 women. He had to be creative enough to do this. Again,
25 you'll see the physical evidence that's going to be

**44**

1 presented to you to take back in your deliberations. These
2 are real ads from a real website with real pictures of real
3 women. But he had the cleverness to throw on a t-shirt, a
4 blue t-shirt. We had conflicting testimony as to whether it
5 was blue or black and whether it was a long-sleeved t-shirt
6 or short-sleeved t-shirt. You can sort out these
7 conflicting testimonies. Whether it even had the word
8 police on it or a police logo, or something like that,
9 that's for you folks to sort out. I contend to you folks
10 that there are some -- there's significant discrepancies in
11 how this -- even the shirt -- was described.
12 But that aside, that he had the creativity to put
13 on this t-shirt or sweatshirt, or long-sleeved shirt, and
14 convince two -- and the prosecution suggested there may even
15 be more out there we don't know about, but we're here
16 because of two -- two unsuspecting, and I would say
17 educated, because one -- the guy who took the stand works at
18 Hope Network and he spoke to you quite articulating. He
19 struck me as somebody who has had some level of education.
20 The other individual who wasn't here, it's been provided to
21 you today through testimony through the detective, that he
22 is an important businessman who travels a lot. So these are
23 two educated, articulate gentlemen. These two guys, these
24 two unsuspecting yet educated gentlemen, were convinced by
25 this man that he was a police officer, convinced enough that

**Page 45**

1   he was able to dupe them into being patt   down; having
2   their money taken from them; having the ...allets or clips, or
3   whatever, retrieved from them; having their money taken from
4   them before they realized that this was all a ruse.
5          You've had the opportunity to hear from one of the
6   two victims. Brian Gray admittedly lied about why he was at
7   the Swiss Valley Apartments and admitted that he only had a
8   very short window of opportunity to observe the man who was
9   accosting him. The computer-generated image -- you'll
10   receive that as well as all the evidence from the
11   prosecution -- shows a picture of a man that looks
12   absolutely nothing like this guy. I submit to you the
13   picture you're going to see is of a man who looks like he's
14   in his early 20s; has a different shaped nose; has
15   different shaped eyes; has hair on his head. He doesn't
16   even look like he could be his son. But the picture -- the
17   generated -- the computer-generated composite is of a man
18   who is young enough to be his son. The other victim, Barry
19   Isaacson, had better things to do than honor a subpoena and
20   appear at this trial and testify about what happened to him.
21          Now, ladies and gentlemen, common sense -- and
22   that's all I'm asking of each and every one of you, and I
23   believe you all have that -- if you were a victim of an --
24   of what somebody is accusing to be an unarmed robbery, if
25   somebody threw you -- supposedly threw you up against a wall

**Page 46**

1   and took money from you, almost $400 from you of hard-earned
2   money -- because $400, I don't care who you are, doesn't
3   come easily, but -- and they supposedly caught the guy,
4   wouldn't you show up to testify at the trial? Consider
5   that, folks.
6          Remember, ladies and gentlemen, reasonable doubt
7   is defined as any doubt which would make a reasonable person
8   hesitate in the most important of his or her affairs. What
9   are some of the most important things of our affairs: buying
10   a house, buying a car, proposing to somebody, getting
11   married, the decision to have children. But I would throw
12   up there the decision to see justice be done. If you are a
13   victim of a crime, I believe that would be the top thing,
14   the top priority of yours to see justice be done. The fact
15   that one of the individuals who is the supposed victim of
16   this case, the reason why we're all here, couldn't take a
17   day out of his life to make sure that justice is done is
18   telling.
19          So let's talk about the elephant in the room. The
20   elephant in the room, ladies and gentlemen -- I will be the
21   first to admit -- is Mr. Heath's testimony. I'm not going
22   to insult your intelligence. There was a lot of back and
23   forth between Mr. Heath and Mr. Bramble. You were probably
24   -- were maybe a little shocked that I didn't cross-exam him.
25   Well, there is a reason for that: I wanted you to observe

**Page 47**

1   Mr. Heath's deme        . I wanted you to observe the things
2   that he said. I wanted you to observe his articulation. I
3   wanted you to observe what he had to say. I wanted you to
4   observe the fact that this is a gentleman who has been
5   accused of committing what we agree -- I agree with
6   Mr. Bramble -- is a clever, creative scheme.
7          So, I need you to ask yourselves, is this man
8   capable alone -- two pictures, a website, real women, real
9   adult services advertisement -- convincing enough to take
10   two educated, unsuspecting guys? One traveled from the
11   State of Illinois to come all the way up here for a piece of
12   tail. Is this the man who did this, based on what you saw
13   here Tuesday? Does he have the acumen, the cleverness to
14   pull off putting a fake ad for a massage on backpage.com
15   with real pictures, throwing on a t-shirt that says
16   "police," and convincing two educated men to travel to do --
17   to -- in order to be robbed supposedly -- and both of them
18   not even convinced that they were being robbed until after
19   their money was gone?
20          Reasonable doubt, ladies and gentlemen. Any doubt
21   which would make a reasonable person hesitate in the most
22   important of his or her affairs. Did Kelvin Heath, with his
23   bad hearing and his reckless ranting about racist cops and
24   pimping, commit this clever scheme?
25          Look, perhaps someone else associated with

**Page 48**

1   1833 Prairie Parkway had something to do with the robberies.
2   As we heard this morning; as we heard it on Tuesday; we heard
3   it again today, there were at least -- between two to five
4   -- maybe even more -- other guys at that apartment complex,
5   all of them doing a bat out of hell, trying to do a
6   disappearing act, as they were being bombarded by all these
7   Wyoming police officers. I wanted to see if any of them
8   could have fit the description of the gentleman who did
9   this. There were several males, and I do believe that there
10   was testimony and I believe that you probably -- I'm sure
11   many of you who took notes, wrote it in your notes that
12   there were other individuals arrested on different charges,
13   different warrants.
14          We never saw -- what we didn't see -- and it was
15   there, they could have done this -- we've got a shirt that
16   my client supposedly wore -- but we never saw this police
17   shirt, this blue or black long-sleeved or short-sleeved with
18   a police name or a logo on it. They were there. They could
19   have -- they had probable cause to search this apartment.
20   He had time to remove this shirt but he -- what happened to
21   the other shirt? That should have been found, too. If they
22   found this one, they should have found the other one.
23          Where is the computer that was used to put up
24   these ads? That should have been found there, too. Where
25   is the IP, whatever you call it? Anybody who has an email

**49**

1 address or who have a website know that they have an IP
2 address, or something like that. There should have been an
3 IP address linked to Mr. Heath connecting him, connecting
4 the dots that need to be connected.
5     There were two cell phones on him. They say one
6 is his; they say there's another one. Could that cell phone
7 have been used by somebody else? Absolutely. And there
8 were communications, ladies and gentlemen. Have no doubt
9 there were over-the- phone communications between these two
10 gentlemen and a female. You heard my client testify. I
11 don't know -- I don't think he could even pull off sounding
12 like a woman even if he tried. Certainly not sounding like
13 the two women that you're going to see in those pictures.
14 There's just no way. There were no prints lifted from the
15 money. There were no prints lifted from any other thing
16 that could have been used to further tie my client to this
17 -- to these events.
18     So I argue to you, ladies and gentlemen, any one
19 of those other gentlemen who were in that apartment, who
20 were also making a bat out of hell out of the back door,
21 could have been responsible.
22     You've heard all of the evidence, ladies and
23 gentlemen. You've heard all the evidence that's been
24 presented to you. If you feel that the prosecution has not
25 met its burden beyond a reasonable doubt with regards to

**50**

1 Brian Gray, your answer must be "no" to the accusation of
2 unarmed robbery and your verdict must be a "not guilty."
3     You will, however, be given an opportunity to
4 consider a lesser offense of something called larceny from a
5 person. I only say this to you, ladies and gentlemen,
6 because if when you go back to make your deliberation you
7 feel that Mr. Heath was responsible for something with
8 regards to Mr. Gray, you can consider that as a lesser
9 included offense. I don't need to -- I won't, and as
10 Mr. Bramble has already indicated because of the change in
11 the laws, you folks are being provided with all of these
12 instructions and all of these elements of these offenses.
13 You can take them with you, which is actually a benefit of
14 you because you don't have to hear us rehash them and
15 regurgitate them over and over. Retention is probably hard
16 with all the legal mumbo-jumbo. It's there for you to look
17 and there for you to review, and this is actually a good
18 thing. I welcome you to review all of the elements,
19 including the elements of this lesser offense of larceny
20 from a person.
21     Now, you heard all the evidence. If you feel,
22 ladies and gentlemen, that the prosecutor has not met his
23 burden with regards to Barry Isaacson -- who, I again,
24 submit to you didn't even feel he needed to come here and
25 testify and seek justice for himself -- your answer, again,

**51**

1 with regards to a  charges against him, must be "no" and
2 that your verdict with regards to my client must be a "not
3 guilty."
4     This is my only opportunity to talk to you. I
5 thank you for listening.
6     Thank you.
7     THE COURT: Mr. Bramble, rebuttal.
8     MR. BRAMBLE: Thank you.
9     Ladies and gentlemen of the jury, as I told you
10 during my opening statement, during my rebuttal here I'm not
11 going to rehash everything I told you a moment ago; I'm
12 simply going to comment on some of the things defense
13 counsel said during her closing argument, just as she
14 commented on some of the things I told you a moment ago.
15     I'd like to start with the phones. The defendant
16 in his opening statement -- in his testimony to you
17 indicated that Sheila must have called using his silver
18 phone. We know the black one was off. Sheila must have
19 called. She must have been the one setting this up because;
20 it wasn't him. Well, he's found with two phones on him. He
21 has the silver phone in his hand in Exhibit 2, when he's
22 photographed by Barry Isaacson. Sheila never had that
23 phone; the defendant did. If you look at that photograph,
24 there's no one else in the vehicle, as well. It is the
25 defendant alone in the vehicle with this silver phone.

**52**

1     Defense counsel indicates that you have to sort
2 things out here. Well, I submit to you, ladies and
3 gentlemen of the jury, we discussed this during voir dire
4 when I was commenting on the credibility of witnesses. At
5 this point I said to you there may come a point during this
6 trial where one person says something happened, or two
7 people said something happened and one person says it
8 doesn't. It's diametrically opposed. Now, the easy thing
9 to do would be for you to throw up your hands and say,
10 "Well, I can't figure this out." Well, I'd submit to you,
11 ladies and gentlemen, your job is a little bit more involved
12 than that. You have to dig through and look at the evidence
13 that supports things here in making your determination of
14 who's being straight with you; who's being candid with you;
15 who simply isn't telling you the truth. I submit to you,
16 ladies and gentlemen of the jury, when you look at that,
17 look at the defendant's testimony. Again, I submit to you
18 ladies and gentlemen of the jury, he had an opportunity to
19 sit and listen to all the evidence, all the witnesses
20 testify and try to weave a story that matches with the
21 evidence. But we know with the phone that simply doesn't
22 work. The defendant had the silver phone that was calling
23 Barry Isaacson. No one else had it. He got caught with it
24 in that picture.
25     When it comes to this idea about who's telling the

**Page 53**

1  truth, the defense would have you believe -- or the
2  defendant would have you believe -- what did he tell you
3  when he testified? Well, close to being this giant
4  conspiracy here; that Barry Isaacson is lying is; that Brian
5  Gray is lying; that Officer Ferguson was lying and
6  intentionally omitting things from his report; that
7  Detective Swiercz risked his reputation and his career by
8  showing a photograph of the defendant prior to Brian Gray
9  looking at the physical lineup at the jail.
10         What the defendant has done here, ladies and
11  gentlemen of the jury, is put himself in the position that,
12  "Everyone is lying, and I'm the only one telling you the
13  truth." Well, if you -- I'd submit to you, ladies and
14  gentlemen of the jury, if you look at the evidence, the
15  sworn testimony and the exhibits, it's pretty clear here who
16  isn't being candid or straight with you and who has the most
17  to gain by that.
18         Let's look at who had the most to gain here.
19  Brian Gray told you, frankly, he's still embarrassed and
20  embarrassed to come before you and tell you why he was
21  showing up at that Swiss Valley apartment. What has he
22  gained from this other than being embarrassed? What has he
23  gained? Nothing. What has Barry Isaacson gained other than
24  being embarrassed and having to come in and testify under
25  oath that he was there for adult service? What has he

**Page 54**

1  gained? Then look at what the defendant has to gain here.
2  He is the one with the motive to lie here, not these two
3  individuals. Both of those individuals positively identify
4  him.
5         Regarding the other people at the apartment, well,
6  no one else was identified, only the defendant, as being the
7  perpetrator here. Secondly, the defendant in his statement,
8  that ever evolving statement, eventually admitted to being
9  in the Swiss Valley parking lot and having that
10  confrontation with Barry Isaacson. I submit it was for
11  different reasons: Barry Isaacson confronted him to get his
12  money back. The defendant didn't plan on his picture being
13  taken and his picture being taken with that silver phone.
14         The defendant is the only one who's been
15  identified here and the defendant's picture was taken by
16  Barry Isaacson as being the perpetrator.
17         Defense counsel would tell you that, "Well,
18  there's a reasonable doubt here." I'd submit to you, ladies
19  and gentlemen of the jury, look at the instruction the Judge
20  gives you and not the one defense counsel provides you. She
21  talked to you about, "Well, buying a house." I'd submit to
22  you, ladies and gentlemen of the jury, if you've ever bought
23  a house, you always have doubts. But you sit down and you
24  take the facts and you match them up against the house and
25  what you want to do here, and you realize those doubts

**Page 55**

1  aren't reasonable ... id you go ahead and make your purchase.
2  Or, if they are big enough, you don't. But I submit to you,
3  all of us have purchased homes and we've all had doubts, but
4  -- but they haven't been reasonable doubts. You manage to
5  take the facts, apply them to our situation, and move ahead
6  with a purchase. Well, I submit to you, ladies and
7  gentlemen of the jury, there isn't reasonable doubt here.
8  We have two people who have positively identified the
9  defendant. We have him caught in a photograph with the
10  picture of a phone that was used corresponding with one of
11  the victims. You have the defendant with $497 on his
12  person, 300 of them in $100 denominations.
13         The facts, both direct and circumstantial, add up
14  to just one thing. I will conclude by this, ladies and
15  gentlemen of the jury, defense counsel said, "Well, 400 or
16  $500; money doesn't come easy." I'd submit to you that's
17  true, except when you're in the defendant's position and
18  you're trying to get money the easy way by setting people
19  up. Really, this is a clever ruse, but it's not that clever
20  because he got caught. The really smart ones get away; the
21  dumb ones get caught.
22         When you are allowing yourself to be photographed
23  after you boosted $500 from somebody, you're going to get
24  caught. The facts here, ladies and gentlemen of the jury,
25  indicate the defendant is guilty. Again, on behalf of the

**Page 56**

1  People of the State of Michigan, I ask that your verdict
2  reflect that.
3         THE COURT: My clerk will bring in the copies of
4  the final instructions and I'll get those in a moment.
5         Members of the jury, the evidence and arguments in
6  these cases are finished. You have heard the theories of
7  both sides in their closing arguments. These arguments
8  detailed the issues and theories of each party. It is your
9  job to evaluate all the evidence and apply the law to decide
10  if the prosecutor has met his burden of proof on each
11  element of the charged offenses or whether, as the defense
12  has argued, the prosecutor has failed to do so. I will now
13  instruct you on the law, that is, I will explain the law
14  that applies in these cases.
15         Remember that you've taken an oath to return true
16  and just verdicts based only on the evidence and my
17  instructions on the law. You must not let sympathy or
18  prejudice influence your decisions.
19         As jurors, you must decide what the facts of these
20  cases are. This is your job, and nobody else's. You must
21  think about all the evidence and then decide what each piece
22  of evidence means and how important you think it is. This
23  includes whether you believe what each of the witnesses
24  said. What you decide about any fact in this case is final.
25         It is my duty to instruct you on the law. You

**Page 57**

1  must take the law as I give it to you. If a lawyer says
2  something different about the law, follow what I say. At
3  various times I've already given you some instructions about
4  the law. You must take all of my instructions together as
5  the law you are to follow. You should not pay attention to
6  some instructions and ignore others.
7       To sum up, it is your job to decide what the facts
8  of these cases are, to apply the law as I give it to you,
9  and, in that way, to decide the cases.
10      A person accused of a crime is presumed to be
11 innocent. This means that you must start with the
12 presumption that the defendant is innocent. This
13 presumption continues throughout the trial and entitles the
14 defendant to a verdict of not guilty unless you are
15 satisfied beyond a reasonable doubt that he is guilty.
16      Every crime is made up of parts called elements.
17 The prosecutor must prove each element of the crime beyond a
18 reasonable doubt. The defendant is not required to prove
19 his innocence or to do anything. If you find that the
20 prosecutor has not proven every element beyond a reasonable
21 doubt, then you must find the defendant not guilty.
22      A reasonable doubt is a fair, honest doubt growing
23 out of the evidence or lack of evidence. It is not merely
24 an imaginary or possible doubt, but a doubt based on reason
25 and common sense. A reasonable doubt is just that -- a

**Page 58**

1  doubt that is reasonable after a careful and considered
2  examination of the facts and circumstances of these cases.
3       When you discuss the cases and decide on your
4  verdicts, you may only consider the evidence that has been
5  properly admitted in these cases. Therefore, it is
6  important for you to understand what is evidence and what is
7  not evidence.
8       Evidence includes only the sworn testimony of
9  witnesses, the exhibits admitted into evidence, and anything
10 else I told you to consider as evidence.
11      Many things are not evidence, and you must be
12 careful not to consider them as such. I will now describe
13 some of the things that are not evidence.
14      The fact that the defendant is charged with a
15 crime and is on trial is not evidence.
16      The lawyers' statements and arguments are not
17 evidence. They are only meant to help you understand the
18 evidence and each side's legal theories. The lawyers'
19 questions to witnesses are also not evidence. You should
20 consider these questions only as they give meaning to the
21 witnesses' answers. You should only accept things the
22 lawyers say that are supported by the evidence or by your
23 own common sense and general knowledge.
24      My comments, rulings, questions, and instructions
25 are also not evidence. It is my duty to see that the trial

**Page 59**

1  is conducted according to the law, and to tell you the law
2  that applies to these cases. However, when I make a comment
3  or give an instruction, I am not trying to influence your
4  vote or express a personal opinion about the case. If you
5  believe I have an opinion about how you should decide these
6  cases, you must pay no attention to that opinion. You are
7  the only judges of the facts, and you should decide these
8  cases from the evidence.
9       At times during the trial, I have excluded
10 evidence that was offered or stricken testimony that was
11 heard. Do not consider those things in deciding the case.
12 Make your decision only on the evidence that I let in, and
13 nothing else.
14      Your decisions should be based on all the
15 evidence, regardless of which party produced it.
16      You should use your own common sense and general
17 knowledge in weighing and judging the evidence, but you
18 should not use any personal knowledge you may have about a
19 place, person, or event. To repeat once more, you must
20 decide these cases based only on the evidence admitted
21 during this trial.
22      As I said before, it is your job to decide what
23 the facts of these cases are. You must decide which
24 witnesses you believe and how important you think their
25 testimony is. You do not have to accept or reject

**Page 60**

1  everything a witness said. You are free to believe all,
2  none, or part of any person's testimony.
3       In deciding which testimony you believe, you
4  should rely on your own common sense and everyday
5  experience. However, in deciding whether you believe a
6  witness's testimony, you must set aside any bias or
7  prejudice you may have based on the race, gender, or
8  national origin of the witness.
9       There is no fixed set of rules for judging whether
10 you believe a witness, but it may help you to think about
11 these questions:
12      Was the witness able to see or hear clearly? How
13 long was the witness watching or listening? Was anything
14 else going on that might have distracted the witness?
15      Did the witness seem to have a good memory? How
16 did the witness look and act while testifying? Did the
17 witness seem to be making an honest effort to tell the
18 truth, or did the witness seem to evade the questions or
19 argue with the lawyers?
20      Does the witness' age and maturity affect how you
21 judge his or her testimony?
22      Does the witness have any bias, prejudice, or
23 personal interest in how this case is decided?
24      Have there been any promises, threats,
25 suggestions, or other influences that affected how the

**Page 61**

1  witness testified?

2  In general, does the witness have any special

3  reason to tell the truth, or any special reason to lie?

4  All in all, how reasonable does the witness's

5  testimony seem when you think about all the other evidence

6  in the case?

7  Sometimes the testimony of different witnesses

8  will not agree, and you must decide which testimony you

9  accept. You should think about whether the disagreement

10  involves something important or not and whether you think

11  someone is lying or simply mistaken. People see and hear

12  things differently, and witnesses may testify honestly but

13  simply be wrong about what they thought they saw and

14  remembered. It is also a good idea to think about which

15  testimony agrees best with the other evidence in these

16  cases.

17  However, you may conclude that a witness

18  deliberately lied about something that is important to how

19  you decide the cases. If so, you may choose not to accept

20  anything that witness said. On the other hand, if you think

21  the witness lied about some things but told the truth about

22  others, you may simply accept the part you think is true and

23  ignore the rest.

24  The prosecution has introduced evidence of a

25  statement that it claims the defendant made.

**Page 63**

1  consider all the evidence that you believe.

2  The testimony of Barry Isaacson was read into this

3  trial because he was not available. This testimony was

4  taken under oath at an earlier hearing. You should consider

5  this testimony the same way you consider any other testimony

6  you have heard in court.

7  The defendant's intent may be proved by what he

8  said, what he did, how he did it, or by any other facts and

9  circumstances in evidence.

10  You should not decide these cases based on which

11  side presented more witnesses. Instead, you should think

12  about each witness and each piece of evidence and whether

13  you believe them. Then you must decide whether the

14  testimony and evidence you believe proves beyond a

15  reasonable doubt that the defendant is guilty.

16  You have heard that the lawyers talked to some of

17  the witnesses. There is nothing wrong with this. A lawyer

18  may talk to a witness to find out what the witness knows

19  about the case and what the witness's testimony will be.

20  You have heard testimony from witnesses who are

21  police officers. That testimony is to be judged by the same

22  standards you use to evaluate the testimony of any other

23  witness.

24  Now I'll go into the elements of the charged

25  offenses here.

**Page 62**

1  Before you may consider such an out-of-court

2  statement against the defendant, you must first find that

3  the defendant actually made the statement as given to you.

4  If you find that the defendant did make the

5  statement, you may give the statement whatever weight you

6  think it deserves. In deciding this, you should think about

7  how and when the statement was made, and about all the other

8  evidence in the case. You may consider the statement in

9  deciding the facts of the case and in deciding if you

10  believe the defendant's testimony in court.

11  Facts can be proved by direct evidence from a

12  witness or an exhibit. Direct evidence is evidence about

13  what we actually see or hear. For example, if you look

14  outside and see rain falling, that is direct evidence that

15  it is raining.

16  Facts can also be proved by indirect or

17  circumstantial evidence. Circumstantial evidence is

18  evidence that normally or reasonably leads to other facts.

19  So, for example, if you see a person come in from outside

20  wearing a raincoat covered with small drops of water, that

21  would be circumstantial evidence that it is raining.

22  You may consider circumstantial evidence.

23  Circumstantial evidence by itself, or a combination of

24  circumstantial evidence and direct evidence, can be used to

25  prove the elements of a crime. In other words, you should

**Page 64**

1  Again, we have two separate incidence,

2  occurrences; two separate cases, two separate alleged

3  victims.

4  First, in Case Number 11-11910-FH, the Barry

5  Gordon Isaacson case where he is the alleged victim,

6  Count I, the defendant is charged with the crime of unarmed

7  robbery. To prove this charge, the prosecutor must prove

8  each of the following elements beyond a reasonable doubt:

9  First, the defendant assaulted or put in fear

10  Barry Gordon Isaacson.

11  Second, the defendant did so while he was in the

12  course of committing a larceny. A "larceny" is the taking

13  and movement of someone else's property or money with the

14  intent to take it away from that person permanently.

15  "In the course of a larceny" includes acts that

16  occur in an attempt to commit the larceny, or during the

17  commission of the larceny, or in flight after the commission

18  the larceny, or in an attempt to retain possession of the

19  property or money.

20  Third, Barry Gordon Isaacson was present while the

21  defendant was in the course of committing the larceny.

22  Within Count I, you may also consider whether the

23  defendant is guilty of the less serious crime known as

24  larceny from a person. To prove this charge, the prosecutor

25  must prove each of the following elements beyond a

reasonable doubt:

First, that the defendant took someone else's property.

Second, that the property was taken without consent.

Third, that there was some movement of the property. It does not matter whether the defendant actually kept the property.

Fourth, that the property was taken from Barry Gordon Isaacson's person or from Barry Gordon Isaacson's immediate area of control or immediate presence.

Fifth, that at the time it was taken, the defendant intended to permanently deprive the owner of the property.

In Count II, the defendant is charged with the crime of unlawful imprisonment. To prove this charge, the prosecutor must prove each of the following elements beyond a reasonable doubt:

First, that the defendant knowingly restrained Barry Gordon Isaacson. "Restrain" means to forcibly restrict a person's movements or to forcibly confine the person so as to interfere with that person's liberty without that person's consent or without lawful authority. The restraint does not have to exist for any particular length of time and may be related or incidental to the commission

65

of other criminal acts.

Second, the defendant restrained Barry Gordon Isaacson to facilitate the commission of another felony, larceny of money from his person.

In Count III, the defendant is charged with the crime of false personation. To prove this charge, the prosecutor must prove each of the following elements beyond a reasonable doubt:

First, that the defendant is not a peace officer. A peace officer means an officer of the police department of a city, village or township of this state.

Second, that the defendant knowingly represented to Barry Gordon Isaacson that he was a police officer for an unlawful purpose or with the intent to compel Barry Gordon Isaacson to do or refrain from doing any act against his will.

In the second case, Case Number 11-11911-FH, the case involving Brian James Gray, I'm not going to read this. That would be redundant. The counts and the charges here are identical in each case. You have them written in front of you.

On the second case you merely substitute the name Brian James Gray as the alleged victim, just as you had Barry Gordon Isaacson as the alleged victim in the first case. Again, everything follows identically.

66

Further, you determine -- this applies to both cases -- if you determine that the defendant had possession of the money or property in question here and that this money or property was recently stolen, you may infer that the defendant committed the theft charged. However, you do not have to make this inference.

The term "recently stolen money or property" has no fixed meaning. You should think about what kind of property it was, how hard it was to transfer, and all of the other circumstances in deciding whether the time between the alleged theft and the defendant's alleged possession of the money or property was so short that no one else had time to possess it.

When you go to the jury room, you should first chose a foreperson. The foreperson should see to it that your discussions are carried on in a businesslike way and that everyone has a fair chance to be heard.

During your deliberations please turn off your cell phones or other communications equipment until we recess.

A verdict in a criminal case must be unanimous. In order to return a verdict, it is necessary that each of you agrees on that verdict. In the jury room you will discuss the cases among yourselves, but ultimately each of you will have to make up your own mind. The verdicts must

67

represent the individual, considered judgment of each juror.

It is your duty as jurors to talk to each other and make every reasonable effort to reach agreement. Express your opinions and the reasons for them, but keep an open mind as you listen to your fellow jurors. Rethink your opinions and do not hesitate to change your mind if you decide you were wrong. Try your best to work out your differences.

However, although you should try to reach agreement, none of you should give up your honest opinion about the cases just because other jurors disagree with you or just for the sake of reaching a verdict in each case. In the end, your vote must be your own, and you must vote honestly and in good conscience.

In Count I of each case, there are two different crimes you may consider. When you discuss the case and discuss the counts, you must consider the crime of unarmed robbery first. If you all agree that the defendant is guilty of that crime, you may stop your discussions on that count and return a verdict. If you believe that the defendant is not guilty of unarmed robbery or if you cannot agree about that crime, you should consider the less serious crime of larceny from a person. You decide how long to spend on unarmed robbery before discussing larceny from a person. You can go back to unarmed robbery after discussing

68

**69**

1 larceny from a person if you want to.
2 If you have any questions abou... the jury
3 instructions before you begin deliberations, or questions
4 about the instructions that arise during deliberations, you
5 may submit them in writing in a sealed envelope to my clerk.
6 Possible penalties should not influence your
7 decisions. It is the duty of the judge to fix the penalty
8 within the limits provided by law.
9 If you want to communicate with me while you are
10 in the jury room, please have your foreperson write a note
11 and give it to my clerk. It is not proper for you to talk
12 directly to the judge, lawyers, court officers, or other
13 people involved in these cases. If questions about the jury
14 instructions arise during deliberations, you may submit them
15 to me through my clerk in a sealed envelope.
16 As you discuss the cases, you must not let anyone,
17 even me, know how your voting stands. Therefore, until you
18 return with unanimous verdicts, do not reveal this to anyone
19 outside the jury room.
20 When you go to the jury room to deliberate, you
21 may take your notes and full instructions.
22 If you want to look at any or all of the exhibits
23 that have been admitted, just ask my clerk for them.
24 When you go to the jury room, you will have a
25 written copy of these instructions you have just heard. As

**70**

1 you discuss the case, you should think about all my
2 instructions together as the law you are to follow.
3 The defendant is charged with six counts, that is,
4 with three crimes in each of two different cases. These are
5 six separate crimes, and the prosecutor is charging that the
6 defendant committed all of them. You must consider each
7 crime separately in light of all the evidence in the cases.
8 You may find the defendant guilty of all counts,
9 or not guilty of all counts, or guilty of some and not
10 guilty of others.
11 I have prepared a verdict form listing the
12 possible verdicts. There will be two separate verdict
13 forms. Those will go with you to the jury room. They will
14 have the case caption. One is entitled the Barry Gordon
15 Isaacson case and the other is entitled the Brian James Gray
16 case. In each of the cases, the verdict forms are
17 identical.
18 Count I, you may return only one verdict on this
19 charge, either not guilty or guilty of unarmed robbery; or
20 guilty of the lesser offense of larceny from a person.
21 Count II, either not guilty or guilty of unlawful
22 imprisonment.
23 Count III, either not guilty or guilty of false
24 personation.
25 There's place a for the foreperson to sign and

**71**

1 date.
2 Again I'll remind you that your verdict on each
3 one of these counts must be unanimous. You may find only
4 one of the possible verdicts on each one of these six
5 counts. Just to remind you again, Count I in each case,
6 there are three possible verdicts. But, again, you may find
7 only one of the three possible verdicts.
8 Counsel, could you approach for a minute, please?
9 Just housekeeping here.
10 (At 10:51 a.m., sidebar had outside of reporter's
11 hearing)
12 THE COURT: Now my clerk, by lot, will select the
13 two alternates who will be excused at this point. But don't
14 jump out of your seats. I'll give you a few instructions
15 before you leave.
16 Go ahead, please.
17 THE CLERK: Number 3, James Bolden.
18 Number 37, Loretta Durkin.
19 THE COURT: All right. Ms. Durkin, Mr. Bolden,
20 I'll excuse you two in a few minutes. We should leave your
21 notebooks on your chairs. Those will be kept confidential,
22 absolutely, including your notes. Those will be destroyed
23 or shredded when there's a final verdict.
24 In a few minutes you two can leave; gather up any
25 personal belongings in the jury room and check out

**72**

1 downstairs.
2 A few important instructions. You should have no
3 contact with the remaining twelve until they shall have
4 rendered a final verdict in the case. This is my 26th year
5 doing this, and I've only had this happen once: in one
6 instance one of the twelve jurors was not able to complete
7 deliberations for whatever reason. If that should happen in
8 this case, we would contact one or both of you to come back
9 in, participate along with your notes and instructions, and
10 we would recommence deliberations. But, again, that's a
11 long shot. Chances are it won't happen.
12 So, after you leave, you don't need to stay around
13 the courthouse; you don't need to be at home; you don't need
14 to be listening to your phone or anything like that. If we
15 need you, we'll find you.
16 With that, again, leave your notebooks on your
17 seats, please. You two are excused. Thank you very much.
18 (At 10:54 a.m., alternates excused)
19 (At 10:54 a.m., the Court administered oath to
20 clerk to keep jurors)
21 THE CLERK: I will.
22 THE COURT: All right. Ladies and gentlemen, you
23 can go back to the jury room. Take your notebooks, your
24 notes. Share your notes with other jurors. My clerk will
25 give you a verdict form for each case. If you want any or

**Page 73**

1  all of the exhibits, please let her know.
2  Then as to, if you want to take a break at any
3  point, just coordinate that through my clerk and it will be
4  certainly permitted within reason.
5  So, you may go back and commence. Thank you.
6  (At 10:56 a.m., jury exits courtroom)
7  THE COURT: Mr. Bramble, any comments regarding
8  instructions or anything else?
9  MR. BRAMBLE: No, your Honor.
10  THE COURT: All right. Satisfied with the
11  instructions?
12  MR. BRAMBLE: Yes, your Honor.
13  THE COURT: All right. Ms. Foster, anything from
14  the defense?
15  MS. FOSTER: No, your Honor. Satisfied.
16  THE COURT: Very good. Thank you. We're in
17  recess. Let my clerk know where you'll be.
18  (At 10:56 a.m., court recessed)
19  (At 2:44 p.m., jury resumes seats)
20  THE COURT: Be seated.
21  THE CLERK: Ladies and gentlemen of the jury, have
22  you agreed upon a verdict? If so, please have your
23  foreperson rise.
24  What is your verdict in Case Number 11-11910-FH
25  Barry Gordon Isaacson as to Count I?

**Page 74**

1  THE FOREMAN: Guilty.
2  THE COURT: Well, there are two choices.
3  THE FOREMAN: Of unarmed robbery.
4  THE COURT: Thank you.
5  THE CLERK: What is your verdict as to Count II.
6  THE FOREMAN: Not guilty.
7  THE CLERK: What is your verdict as to Count III.
8  THE FOREMAN: Guilty of false personation
9  THE CLERK: What is your verdict in 1-11911-FH,
10  Brian James Gray, as to Count I?
11  THE FOREMAN: Guilty of unarmed robbery.
12  THE CLERK: What is your verdict as to Count II?
13  THE FOREMAN: Not guilty.
14  THE CLERK: What is your verdict as to Count III.
15  THE FOREMAN: Guilty of false personation.
16  THE CLERK: Thank you. Ladies and gentlemen of
17  the jury, listen to your verdict as recorded. You say upon
18  your oaths that you find the defendant, Kelvin Wayne Heath,
19  in Case Number 11-11910-FH, Barry Gordon Isaacson, as to
20  Count I, guilty of unarmed robbery; as to Count II, not
21  guilty; as to Count III, guilty of false personation. And
22  in Case Number 11-11911-FH, Brian James Gray, as to Count I,
23  guilty of unarmed robbery; as to Count II, not guilty; as to
24  Count III, guilty of false personation, in the manner and
25  form as the People have in their Information in this cause

**Page 75**

1  charged, so say Madam Foreperson?
2  THE FOREMAN: Yes.
3  THE CLERK: So say you all, members of the jury?
4  THE JURY: (Responds affirmatively).
5  THE CLERK: (Retrieves verdict form).
6  MR. BRAMBLE: (Reviewing verdict).
7  MS. FOSTER: (Reviewing verdict).
8  THE COURT: (Reviewing verdict).
9  Mr. Bramble, would you like to have the jury
10  polled?
11  MR. BRAMBLE: No, your Honor.
12  THE COURT: Ms. Foster, would you like the jury
13  polled?
14  MS. FOSTER: Yes, sir.
15  THE COURT: Go ahead, please.
16  THE CLERK: Juror Number 1, was this and is this
17  your verdict?
18  JUROR SEAT #1: Yes.
19  THE CLERK: Juror Number Two, was this and is this
20  your verdict?
21  JUROR SEAT #2: Yes.
22  THE CLERK: Juror Number 3, was this and is this
23  your verdict?
24  JUROR SEAT #3: Yes.
25  THE CLERK: Juror Number 5, was this and is this

**Page 76**

1  your verdict?
2  JUROR SEAT #5: Yes.
3  THE CLERK: Juror Number 6, was this and is this
4  your verdict?
5  JUROR SEAT #6: Yes.
6  THE CLERK: Juror Number 7, was this and is this
7  your verdict?
8  JUROR SEAT #7: Yes.
9  THE CLERK: Juror Number 9, was this and is this
10  your verdict?
11  JUROR SEAT #9: Yes.
12  THE CLERK: Juror Number 10, was this and is this
13  your verdict?
14  JUROR SEAT #10: Yes.
15  THE CLERK: Juror Number 11, was this and is this
16  your verdict?
17  JUROR SEAT #11: Yes.
18  THE CLERK: Juror Number 12, was this and is this
19  your verdict?
20  JUROR SEAT #12: Yes.
21  THE CLERK: Juror Number 13, was this and is this
22  your verdict?
23  JUROR SEAT #13: Yes.
24  THE CLERK: Juror Number 14, was this and is this
25  your verdict?

1         JUROR SEAT #14: Yes.

2         THE COURT: All right. Ladies and gentlemen of

3 the jury, we all thank you very much for spending pretty

4 much two full days with us. These cases are never easy.

5 The easy cases usually get resolved before this point. So,

6 we appreciate your time, attention and effort in fulfilling

7 your civic duty and helping us out.

8         With that, you are excused. You'll need to check

9 out downstairs. If any of you want to remain in the jury

10 room I'll come back and the attorneys will probably come

11 back; if you have any questions, comments, criticisms,

12 whatever. And, of course, you are free to leave immediately

13 if you want to. You're also free at this point to discuss

14 the case if you want to and free not to discuss it.

15         So, with that you are excused. You may go back.

16         (At 2:49 p.m., jury exits courtroom)

17         THE COURT: The jury is out. Mr. Heath, you have

18 been found guilty of four separate counts here. You are

19 remanded without bond to the Kent County jail to await

20 sentencing April 25.

21         I would just ask, for the record, Ms. Foster, if

22 there's any question as to the validity of the supplemental

23 charges here, please call that to my attention.

24         MS. FOSTER: There is no invalidity.

25         THE COURT: Also, we have the aggravated stalking

77

1 case.

2         MS. FOSTER: I'll have to talk to Mr. Bramble

3 about that. Is there any chance we can resolve that with a

4 dismissal since he's been found guilty of far more serious

5 charges?

6         MR. BRAMBLE: I think so. I will check with the

7 victim. My understanding is the victim does not want to go

8 forward. So, if that's the case, we'll resolve that.

9         THE COURT: Please get back to us in a couple days

10 on that. Thank you. We're in recess.

11         THE DEFENDANT: Can I get an appeal paper?

12         THE COURT: After sentencing.

13         (At 2:51 p.m., concluded)

14         --ooOOoo--

15

16

17

18

19

20

21

22

23

24

25

78

---

OFFICIAL REPORTER'S CERTIFICATE

STATE OF MICHIGAN     )
                )  SS
COUNTY OF KENT      )

        I, Leslie Rydahl, Court Reporter in and
for the Circuit Court for the County of Kent, State of Michigan,
do hereby certify that I reported stenographically the
proceedings held in the above-entitled cause before the Honorable
GEORGE S. BUTH on March 29, 2012; and do further certify that the
foregoing transcript is a true and correct transcript of my
stenographic notes of said proceedings so reported and
transcribed by me.

_____
Leslie L. Rydahl CSR 4078
Official Court Reporter

Dated: _____
      Grand Rapids, Michigan

79

1                       OFFICIAL REPORTER'S CERTIFICATE

2

3

4    STATE OF MICHIGAN        )
                            )    SS

COUNTY OF KENT          )

5

6                        I, Leslie Rydahl, Court Reporter in and

7    for the Circuit Court for the County of Kent, State of Michigan,

8    do hereby certify that I reported stenographically the

9    proceedings held in the above-entitled cause before the Honorable

10   GEORGE S. BUTH on March 29, 2012; and do further certify that the

11   foregoing transcript is a true and correct transcript of my

12   stenographic notes of said proceedings so reported and

13   transcribed by me.

14

15

16   _____

17            Leslie L. Rydahl CSR 4078
             Official Court Reporter

18   Dated:   ___9-14-12___

19            Grand Rapids, Michigan

20

21

22

23

24

25